# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CATHERINE C DE BACA,

       Plaintiff,

vs.                                     No. CIV 17-1161 JB\KK

UNITED STATES OF AMERICA,

       Defendants.

Consolidated with:

GARY CIANCHETTI,

       Plaintiff,

vs.                                       No. CIV 17-1186 JB\KK

UNITED STATES OF AMERICA,

       Defendant.

Consolidated with:

GERALD OHLSEN; JANET
YOUNGBERG; JAMES FARRINGTON;
TONY and CARYN DEROCHIE;
WILLIAM and DONNA MCCLELLAN;
NANCY HIGGINS; VERNON and
BINDA COBB; CHRISTINE WOOD;
MARK THOMPSON; DONALD GILES
and BONNIE LONG; THOMAS and
DIANE BRAGG; ERNEST and FRIEDA
VIGIL; BRAD WOSICK; JOHNNY and
DEANNE LUNA; MARLENE BARBER;
MICHAEL MCDANIEL and PAULA
WILTGEN, and MARTIN VALENCIA,

       Plaintiffs,

vs.                                     No. CIV 18-0096 JB\KK

UNITED STATES, and DOES 1-10,

        Defendants.

<u>Consolidated with:</u>

STATE FARM FIRE & CASUALTY
CO., and SAFECO INSURANCE
COMPANY OF AMERICA,

        Plaintiffs,

vs.                                      No. CIV 18-0367 JB\KHR

UNITED STATES, and DOES 1-10,

        Defendants.

<u>Consolidated with:</u>

DAVID LLOYD SAIS; LUCILLE SAIS;
TOMAS APODACA, and CHRISTINE
APODACA,

        Plaintiffs,

vs.                                      No. CIV 18-0496 JB\JHR

UNITED STATES OF AMERICA, and
DOES 1-10,

        Defendants.

HOMESITE INDEMNITY COMPANY
a/s/o DON GILES and BONNIE LONG,

     Plaintiff,

vs.                                     No. CIV 17-1233 JB\SCY

UNITED STATES; UNITED STATES
DEPARTMENT OF AGRICULTURE;
UNITED STATES FOREST SERVICE;
NATURAL RESOURCES
CONSERVATION SERVICE, and
BUREAU OF INDIAN AFFAIRS,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States of America's Motion to Dismiss Claims for Lack of Subject Matter Jurisdiction or in the Alternative for Partial Summary Judgment, and Memorandums in Support, filed November 2, 2018 (Doc. 60)("Independent Contractor Motion"); (ii) the United States of America's Motion to Dismiss *Ohlsen* Plaintiffs'[1]

---

[1]The Ohlsen Plaintiffs are:

Gerald Ohlsen individually and as trustee of The Ohlsen Family Trust u/d/1/1/91, The Ohlsen Family Trust II u/d/1/1/93, The Ohlsen Family Trust III u/d/11/1/94, and the Los Pinos II Limited Partnership, Janet Youngberg, James Farrington, Thomas and Caryn De Rochie, William and Donna McClellan IV, Nancy Higgins, Vernon and Binda Cobb, Christine Wood, Vested Interest, LLC., Donald Giles and Bonnie Long, Thomas and Diane Bragg, Ernest and Frieda Vigil, Brad Wosick, Johnny and Deanne Luna, Marlene Barber, Michael McDaniel and Paula Wiltgen, Martin Valencia, Anthony and Janice Farrington individually and as trustees of The Anthony S and Janice L Farrington Revocable Living Trust, The Michael Farrington Trust, and The Lisa Farrington Trust, Ken and Debbie Kugler, David and Diana Lee individually and as trustee of the Lee Revocable Trust, Joseph and Alica Lee, Ed and Katherine Mortensen, David Coulter, Matt and Marie Urban,

Second Amended Complaint Due to Lack of Subject Matter Jurisdiction, filed November 2, 2018 (Doc. 62)("Ohlsen Motion"); (iii) the Reply in Support of the United States of America's Motion to Dismiss *Ohlsen* Plaintiffs' Second Amended Complaint Due to Lack of Subject Matter Jurisdiction (Doc. 62)("Ohlsen Reply"); (iv) the United States of America's Motion to Dismiss Plaintiff Catherine C De Baca's Amended Complaint and Gary Cianchetti's Complaint Due to Lack of Subject Matter Jurisdiction, filed November 5, 2018 (Doc. 64)("C De Baca Motion"); (v) the United States of America's Motion to Dismiss Plaintiffs Sais, Apodaca and Sorroche's Amended Complaint Due to Lack of Subject Matter Jurisdiction, filed November 15, 2018 (Doc. 80)("Sais Motion"); (vi) the *Ohlsen* Plaintiffs' Objections to Evidence Submitted by the United States in Support of Its Motion to Dismiss or for Summary Judgment, filed December 20, 2018 (Doc. 102)("First Objections"); (vii) the *Ohlsen* Plaintiffs' Objections to Third Declaration of Ian Fox, filed March 5, 2019 (Doc. 134)("Fox Objections"); (viii) the *Ohlsen* Plaintiffs' Motion to Strike Portions of Third Declaration of Ian Fox [Doc. 125] or, Alternatively, Motion for Leave to file Surreply, filed March 5, 2019 (Doc. 135)("Motion to Strike"); (ix) the *Ohlsen* Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion to Strike Portions of Third Declaration of Ian Fox [Doc. 125] or, Alternatively, Motion for Leave to File Surreply, filed April 23, 2019 (Doc. 171)("Motion to Strike Reply"); and (x) the Defendants' Motion for Leave to File

---

Olympia Salas individually and as trustee of The Olympia E Salas Revocable Trust, Michael and Michelle Chavez, Ronald Douglass, Brett Myrick, Rena Shepherd, Manuel Urban, Michael and Herrera Medwin, and Mary Ann Solis.

Ohlsen Plaintiffs' Second Amended Complaint, ¶ 5, at 2-3, filed August 15, 2018 (Doc. 38).

Supplemental Brief, filed May 8, 2019 (Doc. 179)("Supplemental Briefing Motion").[2]  The Court

held hearings on March 8, 2018, see Clerk's Minutes at 1, filed March 8, 2019 (Doc. 146), and on

June 3, 2019, see Clerk's Minutes at 1, filed June 3, 2019 (Doc. 204).  The primary issues are:

(i) whether the Pueblo of Isleta, in thinning[3] Treatment Unit 4[4] ("Unit 4") within the Cibola

_____

[2]As discussed at the hearing, the Court discusses the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, and the Sais Motion in one Memorandum Opinion and Order.  See Draft Transcript of Hearing at 8:10-9:1 (taken March 8, 2019)(Dunn, Mosley, Ortega)("March 8 A.M. Tr.")(The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers).

[3]In forestry, thinning is the selective removal of trees, primarily undertaken to improve the growth rate or health of the remaining trees.  Overcrowded trees are under competitive stress from their neighbors.  Thinning may be done to increase the resistance of the stand to environmental stress such as drought, insect infestation, extreme temperature, or wildfire.

Thinning, Wikipedia, https://en.wikipedia.org/wiki/Thinning (last visited May 23, 2019).

[4]Treatment Unit 4 is the area within which the Dog Head Fire -- the cause of the Plaintiffs' injuries in this case -- ignited on June 14, 2016.  See Independent Contractor Motion ¶ 1, at 3.  For the reader unfamiliar with the Dog Head Fire, the Court provides a brief description of the event.  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion.  "The Dog Head Fire started on June 14, 2016 in Torrance County, [New Mexico,] approximately six miles northwest of Tajique, [New Mexico,] and on June 15 crossed over into Bernalillo County[, New Mexico,]  In total, 17,912 acres were burned."  Dog Head Fire Information, Bernalillo County, https://www.bernco.gov/ (last visited May 16, 2019).  The fire began "in the Manzano Mountains, scorching 17,913 acres, destroying 12 single residences and 44 other minor structures."  Nicole Maxwell, The Dog Head Fire One Year Later, Albuquerque Journal (June 13, 2017), https://www.abqjournal.com/1017328/the-dog-head-fire-one-year-later.html.  On July 1, 2016, the Albuquerque Journal recounted the events immediately following the fire's ignition:

The Isleta masticator [(see infra note 9 for a description of a masticator)] operator called pueblo officials at 11:24 a.m. to report the fire, and pueblo officials notified the U.S. Forest Service Mountainair Ranger District.  Minutes later, about 11:30 a.m., a lookout at Capilla Peak, southwest of the fire, saw smoke and reported it to the U.S. Forest Service dispatch office in Albuquerque.

"They immediately dispatched a battalion chief and two fire engines from Mountainair," [Elaine] Kohrman[, Cibola National Forest Supervisor,] said. "Firefighters were on the scene within an hour."

. . . .

Firefighters arriving at the scene quickly asked for additional resources.

"Retardant was heavily used throughout the afternoon and into the evening, and by the end of the day retardant was being used around the entire perimeter of the fire," Kohrman said. The effort involved two large air tankers, six single-engine air tankers and over 100,000 gallons of retardant placed on the fire by the end of the first day.

"Unfortunately, what happened was firefighters were not able to get a complete line around the fire that evening and the winds took the fire, and we all saw the results the next day," she said.

The fire raged across 28 square miles . . . and forced the evacuation of numerous residents, along with their pets and animals. Evacuation centers were set up in Estancia, [New Mexico,] at the Torrance County Fairgrounds, and in Tijeras at Los Vecinos Community Center."

Rich Nathanson, <u>Brush Clearing Effort Triggered Devastating Dog Head Fire</u>, Albuquerque Journal (July 1, 2016), https://www.abqjournal.com/801828/forest-service-confirms-brush-clearing-started-dog-head-fire-2.html.

National Forest[5] pursuant to the Participating Agreement Between Isleta Pueblo and the USDA [(United States Department of Agriculture)], Forest Service[6] Cibola National Forest and Grasslands, filed November 2, 2018 (Doc. 60-2)("Participating Agreement"), was a federal employee for the purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-80 ("FTCA");[7] (ii) whether the Ohlsen Plaintiffs can sustain a res ipsa loquitur[8] claim against Defendant United States of America based on allegations that the Dog Head Fire started while the thinning crew was masticating[9] Unit 4; (iii) whether the Ohlsen Plaintiffs can

---

[5]The Cibola National Forest . . . is a 1,633,783 acre (6,611.7 km2) United States National Forest in New Mexico, USA. . . . The forest is disjointed with lands spread across central and northern New Mexico, west Texas and Oklahoma. The Cibola National Forest is divided into four Ranger Districts: the Sandia, Mountainair, Mt. Taylor, and Magdalena.

Cibola National Forest, Wikipedia, https://en.wikipedia.org/wiki/Cibola_National_Forest (last visited May 16, 2019).

[6]The United States Forest Service is an agency within the United States Department of Agriculture. See Agencies, USDA, https://www.usda.gov/our-agency/agencies (last visited May 16, 2019); What We Do, USDA, https://www.usda.gov/our-agency/about-usda (last visited May 16, 2019).

[7]The FTCA's sovereign immunity waiver applies to government employees acting within their employment's scope. See, e.g., Tsosie v. United States, 452 F.3d 1161, 1163 (10th Cir. 2006)(citing Curry v. United States, 97 F.3d 412, 414 (10th Cir. 1996)). "The FTCA does not authorize suits based on the acts of independent contractors or their employees." Curry v. United States, 97 F.3d at 414 (citing United States v. Orleans, 425 U.S. 807, 814 (1976); Logue v. United States, 412 U.S. 521, 527 (1973)).

[8]"The doctrine of res ipsa loquitur applies only when evidence establishes that in the ordinary course of events an injury would not occur except through negligence of the person in exclusive control and management of the injuring instrumentality." Trujeque v. Serv. Merch. Co., 1994-NMSC-036, ¶ 6, 872 P.2d 361, 364 (citing N.M. Civ. UJI 13-1623; Hepp v. Quickel Auto & Supply Co., 1933-NMSC-079, ¶ 9, 25 P.2d 197, 199).

[9]One company describes mastication:

sustain a non-delegable duty claim against the United States; (iv) whether the Ohlsen Plaintiffs

exhausted their administrative remedies[10] for their claim that the United States Forest Service and

the thinning crew workers "failed to and were not in the position to suppress the fire at the time of

ignition," Plaintiffs' Claims at 1 (given to the Court at the March 8, 2019, hearing), filed May 31,

2019 (Doc. 202)("Ohlsen Plaintiffs' Claim List"), for their claims against the United States based

on the thinning crew workers' actions, and for their claim that the Forest Service negligently failed

---

     Mastication is a fuel reduction treatment method used in forestry management to reduce wildfire risk, to reduce fuel loadings by returning the forest to natural conditions. Masticating fuels, or mulching the forest, involves the reduction of vegetation into small chunks and is one of the many ways overstocked forest stands are thinned.

. . . .

     A masticator is similar to a wood chipper, it is mounted on an excavator type tractor, which moves through the forest to grind or chip trees and brush, leaving the chips behind.

Diversified Resources Inc., https://www.driforest.com/what-is-forest-mastication (last visited May 16, 2019). A masticator, or a mulcher or brushcutter, uses rotating metal blades to "cut and chop or grind vegetation into particles that are usually left on-site as mulch." Mulchers, U.S. Forest Service, https://www.fs.fed.us/forestmanagement/equipment-catalog/mulchers.shtml (last visited Jan. 3, 2019).

[10]The FTCA provides:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).

to have a fire engine at the thinning site with the masticator; (v) whether the discretionary function

exception[11] divests the Court of subject-matter jurisdiction over the Ohlsen Plaintiffs' claims[12];

---

[11]The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

[12]The claims in question are:

1. The USFS [(United States Forest Service)] negligently directed the mastication of Unit 4 knowing about rocky conditions and high fire danger.

2. The USFS failed to provide two 300-gallon water trucks with knowledge of the mastication being conducted in extreme conditions.
3. USFS failed to implement site specific fire restrictions given the extreme fire danger and fuel load conditions.

4. [The Forest Service violated the] mandatory provision in the PA [(Participating Agreement)] (standard USFS form) that provided that slash [(see infra note 19 for a description of slash)] shall not exceed 18'' in depth.

5. [The United States did not impose fire restrictions, which] are automatically implemented when the ERC [(see infra note 151 for a description of the ERC)] reaches 90.

6. USFS and POI [(Isleta Pueblo)] failed to create and accept a mandatory ("shall" in the PA) "safety plan."

7. The USFS and POI members did not have proper training and equipment to suppress the fire given waist deep slash (slash that exceeds the limit in the PA of 18'').

8. USFS and POI members failed to and were not in the position to suppress the fire at the time of ignition, and the USFS is complicit in that failure because of its prior knowledge of the waist deep slash.

Ohlsen Plaintiffs' Claim List at 1. At the hearing, both the Ohlsen Plaintiffs and the United States provided the Court lists of the claims subject to debate, but the Ohlsen Plaintiffs conceded that their slightly shorter list was the list of their claim in dispute. See March 8 A.M. Tr. at 62:26-63:10 (Court, Dow). The Court uses, thus, the Ohlsen Plaintiffs' list.

(vi) whether Plaintiffs Catherine C De Baca and Gary Cianchetti exhausted the administrative remedies for their claims of the Forest Service's "purported failure to ensure that the equipment used in the forest thinning project was in good order and the proper equipment for the terrain; failure to provide proper fire extinguishment tools; and failure to manage the undergrowth of the forest area where the fire occurred," C De Baca Motion at 1; (vii) whether the discretionary function exception divests the Court of subject-matter jurisdiction over C De Baca's and Cianchetti's claims based on the Forest Service's failure "to allow first responders to put out the initial fire," C De Baca Motion at 9; (viii) whether Plaintiffs David Sais, Lucille Sais, Tomás Apodaca, Christine Apodaca, and Jeff Sorroche (the "Sais Plaintiffs") exhausted their administrative remedies for the same claims as those claims listed in item (vi), and for their claims that the Forest Service "was negligent in leaving slash and boles produced by forest thinning operations on the ground where the fire started; conducting forest thinning operations under unreasonable conditions; failing to employ competent individuals to perform the work; and failing to train, instruct, direct, or supervise the Pueblo crews," Sais Motion at 11-12; (ix) whether the discretionary function exception divests the Court of subject-matter jurisdiction over all the Sais Plaintiffs' claims listed in item (viii) and over their claim that the Forest Service did not permit initial responders to fight the Dog Head Fire; (x) whether, as the Court applies against Plaintiffs State Farm Fire & Casualty Company, Safeco Insurance Company of America and Allstate Insurance Company (the "State Farm Plaintiffs") and Plaintiff Homesite Indemnity Company all the United States' arguments against the other Plaintiffs and adopts for the State Farm Plaintiffs and Homesite Indemnity all other Plaintiffs' responses, see Transcript of Excerpt of Hearing at 117:1-15 (taken March 8, 2019)(Ortega, Court), filed May 31, 2019 (Doc. 199)("March 8 P.M.

Tr.");[13] id. at 118:2-8 (Tosdal), the Court should dismiss the State Farm Plaintiffs' res ipsa loquitur claim and non-delegable duty claim, and whether the discretionary function exception divests the Court of subject-matter jurisdiction over the State Farm Plaintiffs' and Homesite Indemnity's claims; (xi) whether the Court should strike or disregard portions of the First Declaration of Ian Fox, Natural Resource Staff Officer, Cibola National Forest and National Grasslands (dated October 31, 2018), filed November 2, 2018 (Doc. 60-1)("First Fox Decl."), Third Declaration of Ian Fox (dated February 27, 2019), filed February 28, 2019 (Doc. 125)("Third Fox Decl."), and Videotaped Deposition of Everette Jaramillo (dated September 26, 2018), filed November 9, 2018 (Doc. 76-5)("Jaramillo Depo. 76-5"), per the Ohlsen Plaintiffs' requests in the First Objections, the Fox Objections, the Motion to Strike, and the Motion to Strike Reply; (xii) whether the Court should grant the Ohlsen Plaintiffs leave to file a surreply addressing the Third Fox Decl.; and (xiii) whether the Court should grant the United States leave to file supplemental briefing on the question whether the Cooperative Funds and Deposits Act, 16 U.S.C. § 565a ("CFDA"), provides an independent waiver of the United States' sovereign immunity. The Court grants the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, the Sais Motion, the Motion to Strike, and the Supplemental Briefing Motion, and sustains in part and overrules in part the Ohlsen Plaintiffs' Objections in the First Objections, the Fox Objections, the Motion to Strike,

---

[13]The court reporter has filed a final transcript containing an excerpt of the March 8, 2019, hearing. See March 8 P.M. Tr. at 1-25. The excerpt begins with the United States' argument on the independent contractor exception. See March 8 P.M. Tr. at 2:1-5 (Court, Ortega). Only the first nine pages in the 123-page transcript contain argument that occurred before the lunch break. See March 8 P.M. Tr. at 2:1-10:25. As the arguments in the transcript occurred almost entirely in the afternoon of March 8, 2019, the Court refers to the transcript as the "March 8 P.M. Tr."

and the Motion to Strike Reply.[14]  The Court concludes that no genuine dispute of material fact

exists whether Isleta Pueblo was an independent contractor.  The Court also concludes that no

genuine dispute of material fact exists whether the discretionary function exception bars all the

Plaintiffs' claims.  The Court concludes that the Ohlsen Plaintiffs properly exhausted their claim

based on Isleta Pueblo's fire suppression activities and their claim based on the Forest Service's

failure to have a fire engine accompany the masticator.  The Ohlsen Plaintiffs did not, however,

exhaust their claim that the Forest Service failed to suppress the Dog Head Fire or their claims,

---

[14]The Court converts the Independent Contractor Motion, and the Ohlsen Motion's, the C De Baca Motion's, and the Sais Motion's motions to dismiss on grounds that the discretionary function exception divests the Court of jurisdiction over the Ohlsen Plaintiffs', C De Baca's, Cianchetti's, and the Sais Plaintiffs' claims, to rule 56 motions for summary judgment, as the parties agreed at the hearing, see March 8 A.M. Tr. at 7:10-19 (Tosdal); id. at 4:22-5:4 (Ortega), because the jurisdictional arguments are intertwined with the case's merits, see U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1159 (10th Cir. 1999); Redmon By & Through Redmon v. United States, 934 F.2d 1151, 1155 (10th Cir. 1991)("Rule 56 governs because the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues.").  The Court considers the Ohlsen Motion's, the C De Baca Motion's, and the Sais Motion's failure-to-exhaust arguments under the 12(b)(1) standard, see Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 852 (10th Cir. 2005)("Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed.  The requirements are jurisdictional and cannot be waived." (internal quotation marks omitted)(quoting Bradley v. U.S. ex rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)); see also Mendoza v. United States, 661 F. App'x 501, 501-02 (9th Cir. 2016)(affirming a district court's dismissal of an FTCA claim for failure to exhaust on jurisdictional grounds); Caldwell v. Klinker, 646 F. App'x 842, 846 (11th Cir. 2016)("Unless and until a claimant has exhausted his administrative remedies under the FTCA, the district court lacks subject-matter jurisdiction." (citing Turner ex rel. Turner v. United States, 514 F.3d 1194, 1200 (11th Cir. 2008))); cf. Barnes v. United States, 776 F.3d 1134, 1148 (10th Cir. 2015)(treating the FTCA's statute of limitations as a jurisdictional question), because those issues are not intertwined with the case's merits, and the Court may consider outside evidence without converting the motions to rule 56 summary judgment motions, see New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)(permitting district courts to consider outside evidence on rule 12(b)(1) motions without converting the motion into a motion for summary judgment); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(same).

other than the claim about Isleta Pueblo's fire suppression activities, based on the United States' liability for Isleta Pueblo's actions. The Court concludes that C De Baca, Cianchetti, and the Sais Plaintiffs exhausted only their claim that the Forest Service and Isleta Pueblo failed to ensure that the equipment for thinning Unit 4 was in good working order and the proper equipment for the terrain. As the Ohlsen Plaintiffs consented to dismiss their res ipsa loquitur claim and non-delegable duty claim, the Court dismisses those claims. See Draft Transcript of Hearing at 13:25-14:5 (taken March 8, 2019)(Dow)("March 8 A.M. Tr."). As C De Baca, Cianchetti, and the Sais Plaintiffs consent to dismiss their claims regarding the initial suppression of the Dog Head Fire, the Court also dismisses those claims. See Response to United States of America's Motion to Dismiss Plaintiff Catherine C De Baca's Amended Complaint and Gary Cianchetti's Complaint Due to Lack of Subject Matter Jurisdiction and Adoption of the Legal Arguments Contained in All Plaintiffs' Responses to Defendant's Motions to Dismiss at 10, filed December 19, 2018 (Doc. 100)("C De Baca Response"); Response to United States of America's Motion to Dismiss Plaintiffs Sais, Apodaca and Sorroche's Amended Complaint due to Lack of Subject Matter Jurisdiction at 2, filed December 19, 2108 (Doc. 101)("Sais Response"). As the Court applies against the State Farm Plaintiffs the United States' arguments about the Ohlsen Plaintiffs' res ipsa loquitur claim and non-delegable duty claim and the Ohlsen Plaintiffs' responses to those arguments, see Ohlsen Response at 1 n.1; March 8 P.M. Tr. at 117:1-15 (Ortega, Court); id. at 118:2-8 (Tosdal), the Court also dismisses the State Farm Plaintiffs' res ipsa loquitur claim and non-delegable duty claim, because the Ohlsen Plaintiffs responded to the United States by stipulating to dismiss both those claims, see March 8 A.M. Tr. at 13:25-14:5 (Dow). Throughout the Factual Background and the Analysis, the Court makes individualized conclusions regarding

the Ohlsen Plaintiffs' objections in the First Objections, the Fox Objections, the Motion to Strike, and the Motion to Strike Reply. The Court grants the Ohlsen Plaintiffs' and the United States' requests in the Motion to Strike and Supplemental Briefing Motion respectively to file additional briefing to enable the Ohlsen Plaintiffs and the United States to address the Third Fox Decl. and the CFDA issue.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in: (i) the Independent Contractor Motion; (ii) the *Ohlsen* Plaintiffs' Response to Motion to Dismiss and for Partial Summary Judgment for Lack of Subject Matter Jurisdiction, filed December 19, 2018 (Doc. 97)("Ohlsen Independent Contractor Response");[15] (iii) the United States of America's

---

[15]The Court deems the Ohlsen Independent Contractor Response and the Ohlsen Plaintiffs responses at the March 8, 2019, hearing to be also the responses of C De Baca and Cianchetti; the Sais Plaintiffs; Homesite Indemnity; and the State Farm Plaintiffs. Homesite Indemnity responds to the Independent Contractor Motion by incorporating all other responses to the Independent Contractor Motion. See Homesite Indemnity Company's Response to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction or in the Alternative for Partial Summary Judgment and Adoption of All Plaintiffs' Responses to Defendant's Motions ¶ 2, at 1, filed December 19, 2018 (Doc. 99)("Homesite Independent Contractor Response"). The State Farm Plaintiffs similarly respond to the Independent Contractor Motion by "adopt[ing] and incorporat[ing] by reference, any and all responses to Defendant's Motions to Dismiss." Plaintiffs, State Farm Fire & Casualty Company, Safeco Insurance Company of America and Allstate Insurance Company's Response to United States of America's Motion to Dismiss Claims for Lack of Subject Matter Jurisdiction or in the Alternative for Partial Summary Judgment and Adoption of All Plaintiffs' Responses to Defendant's Motions to Dismiss at 1-2, filed December 19, 2018 (Doc. 96)("State Farm Independent Contractor Response"). C De Baca, Cianchetti, and the Sais Plaintiffs "adopt and incorporate by reference, any and all responses to Defendant's Motions to Dismiss." Response to United States of America's Motion to Dismiss Plaintiff Catherine C De Baca's Amended Complaint and Gary Cianchetti's Complaint Due to Lack of Subject Matter Jurisdiction and Adoption of the Legal Arguments Contained in All Plaintiffs' Responses to Defendant's Motions to Dismiss at 4, filed December 19, 2018 (Doc. 100); Response to United States of America's Motion to Dismiss Plaintiffs Sais, Apodaca and Sorroche's Amended

Reply to *Ohlsen* Plaintiffs Response (Doc. 97) to United States' Motion to Dismiss (Doc. 60), filed February 28, 2019 (Doc. 126)("Independent Contractor Reply"); (iv) the Ohlsen Motion; (v) the Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss *Ohlsen* Plaintiffs' Second Amended Complaint due to Lack of Subject Matter Jurisdiction, filed December 19, 2018 (Doc. 98)("Ohlsen Response");[16] (vi) the Ohlsen Reply; (vii) the C De Baca Motion; (viii) the C De Baca Response; (ix) the United States of America's Reply to Plaintiffs Catherine C De Baca's and Gary Cianchetti's Response to United States' Motion to Dismiss Due to Lack of Subject Matter Jurisdiction, filed February 28, 2019 (Doc. 128)("C De Baca Reply"); (x) the Sais Response; and (xi) the United States of America's Reply in Support of Its Motion to Dismiss

---

Complaint due to Lack of Subject Matter Jurisdiction at 1, filed December 19, 2108 (Doc. 101)("Sais Response").

[16]In the Sais Response, the Sais Plaintiffs do not make any statements in response to the United States' proposed undisputed facts in the Sais Motion. See Sais Response at 1-2. The Sais Plaintiffs adopt, rather, all other Plaintiffs' responses to the motions discussed in this opinion, including the Ohlsen Response. See Sais Response at 1. Almost all the United States' proposed undisputed facts in the Sais Motion are identical to the proposed undisputed facts in the Ohlsen Motion; the only difference between the proposed undisputed facts are the paragraph numbers and pagination. Compare Sais Motion ¶¶ 6-39, at 4-10, with Ohlsen Motion ¶¶ 4-34, at 4-10. For all facts other than the facts stating what the Ohlsen Plaintiffs' claim, the Court considers, accordingly, the Ohlsen Plaintiffs' responses to the proposed undisputed facts in the Ohlsen Motion to represent the Sais Plaintiffs' responses to the proposed undisputed facts in the Sais Motion. In the text, the Court provides the citations to the Ohlsen Motion and the Sais Motion, and the citation to the Ohlsen Response. Although the paragraphs in the Ohlsen Motion and consequently the paragraphs referenced in the Ohlsen Response do not match the paragraphs in the Sais Motion, the reader may assume that the statements in the Ohlsen Response respond to the facts asserted in the cited Sais Motion paragraph. The Court also treats the United States' replies to the Ohlsen Response as the United States' replies to the Sais Response, as the United States requests. See United States of America's Reply in Support of Its Motion to Dismiss Plaintiffs Sais, Apodaca and Sorroche's Amended Complaint Due to Lack of Subject Matter Jurisdiction at 3, filed February 28, 2019 (Doc. 129).

Plaintiffs Sais, Apodaca and Sorroche's Amended Complaint Due to Lack of Subject Matter Jurisdiction, filed February 28, 2019 (Doc. 129)("Sais Reply").

On June 14, 2016, the Dog Head Fire started on the Forest Service's Treatment Unit 4, where the thinning crew was masticating a portion of the Cibola National Forest in the Mountaineer Ranger District -- which encompasses the Manzano Mountains -- pursuant to the Participating Agreement, and the Isleta Statement of Work Supplement to Participating Agreement to Implement Approved Tribal Forest Protection Act Project, as modified by Modification of Grant or Agreement (dated February 2016), filed November 2, 2018 (Doc. 60-3)("Statement of Work Modification 3").[17] See Independent Contractor Motion ¶ 1, at 3 (asserting this fact)(citing First

---

[17]The Isleta Statement of Work Supplements to Participating Agreement to Implement Approved Tribal Forest Protection Act Project ("Statements of Work") supplement the Participating Agreement. See Statement of Work Modification 3 at 1. The first Statement of Work was the Isleta Statement of Work Supplement to Participating Agreement to Implement Approved Tribal Forest Protection Act Project (dated February 2014), filed November 2, 2018 (Doc. 97-5)("Statement of Work Original"). Statements of Work modifications supplement the prior Statements of Work's scopes of work and do not entirely replace the earlier versions. See Videotaped Deposition of Elaine Kohrman at 138:10-14 (taken September 10, 2018), filed November 19, 2018 (Doc. 97-4)("Kohrman Depo. 97-4"). The Statement of Work Original has been modified four times. See Ohlsen Independent Contractor Response ¶ 1, at 7 (citing Video Deposition of Mark Dixon at 57:6-8 (taken November 29, 2018), filed December 19, 2018 (Doc. 97-6)("Dixon Depo. 97-6")).

The Ohlsen Plaintiffs and the United States do not dispute the Statements of Work's language. In arguing the Ohlsen Motion, however, the Ohlsen Plaintiffs and the United States generally cite different Statements of Work. In the Ohlsen Motion, the United States tends to cite the Statement of Work Modification 3 when describing the Statements of Works' language, while, in the Ohlsen Response, the Ohlsen Plaintiffs tend to cite the Statement of Work Original. In the text, the Court provides the citations to the documents that the parties cite. As the parties do not dispute the Statements of Works' implications, the Court deems such facts about the language undisputed, but notes here, for the reader's edification, that the Statement of Work Original and Statement of Work Modification 3 contain almost entirely the same language aside from wording describing the scope of work. In the Analysis section where the Court specifically discusses the Statements of Work, the Court provides citations to both the Statement of Work Original and the Statement of Work Modification 3. As the parties do not

Fox Decl. ¶¶ 4, 8, at 1-2; Participating Agreement; Statement of Work Modification 3; Ohlsen Plaintiffs' Second Amended Complaint ¶¶ 9-12, 14, at 3-4, filed August 15, 2018 (Doc. 38)("Ohlsen Complaint")); Ohlsen Independent Contractor Response ¶ 1, at 3 (admitting this fact); Ohlsen Motion ¶ 4, at 4 (asserting this fact)(citing First Fox Decl. ¶¶ 4, 8, at 1-2; Participating Agreement; Statement of Work Modification 3; Ohlsen Complaint ¶¶ 9-12, 14, at 3-4; Second Declaration of Ian Fox ¶¶ 4-5, at 1-2 (taken October 31, 2018), filed November 2, 2018 (Doc. 62-1)("Second Fox Decl.")); Sais Motion ¶ 6, at 4 (asserting this fact)(citing First Fox Decl. ¶¶ 4, 8, at 1-2; Participating Agreement; Statement of Work Modification 3; Ohlsen Complaint ¶¶ 9-12, 14, at 3-4; Second Fox Decl. ¶¶ 4-5, at 1-2); Ohlsen Response ¶ 4, at 18 (admitting this fact).  See also Ohlsen Response ¶ 1, at 3 (citing generally Participating Agreement).[18]  A masticator used in the thinning operations started the fire, see Independent Contractor Motion ¶ 2, at 3 (asserting this fact)(citing First Fox Decl. ¶¶ 4, 8, at 1-2; Plaintiff's Amended Complaint for Negligence Arising Under the Federal Tort Claims Act ¶ 15, at 3, filed November 27, 2017 (Doc. 5)("C De Baca Complaint"); Ohlsen Complaint ¶¶ 10-12, at 3-4; State Farm Fire & Cas. Co. v. United States, No. CIV 18-0367 JB\KK, Nature of Action, filed April 19, 2018 (Doc. 1)("State

_____

dispute the facts of the Statements of Work's language but dispute the language's implications, these dual citations play little role in the Court's analysis.  The Court includes them for the reader's edification.

[18]The United States does not reply to the fact that the Cibola National Forest is in the Mountaineer Ranger District, which includes the Manzano Mountains.  See Ohlsen Reply ¶ 1, at 10.  As the United States does not make any statement about the fact in the text, it does not specifically controvert the fact, and the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Farm Complaint")),[19] when the masticator hit a rock and ignited the slash[20] that had accumulated

during the thinning project, <u>see</u> Ohlsen Independent Contractor Response ¶ 2, at 3 (asserting this

fact)(citing Videotaped Deposition of Aaron Johnson at 16:23-17:10, filed December 19, 2018

(Doc. 97-1)("Johnson Depo. 97-1");[21] Videotaped Deposition of Jeremy Jiron at 29:10-23, filed

December 19, 2018 (Doc. 97-2)("J. Jiron Depo. 97-2"); Report of Investigation at 8, filed

December 19, 2018 (Doc. 97-3)).[22]

_____

[19]The Ohlsen Plaintiffs dispute the United States' wording for this proposed undisputed fact in the text and reword the fact to avoid describing that Isleta Pueblo employees operated the masticator. <u>See</u> Ohlsen Independent Contractor Response ¶ 2, at 3. Both parties agree to the fact that the fire started from the masticator, so the Court deems the fact in the text undisputed.

[20]Slash is the debris remaining from a (what kind of project) project, <u>see</u> Ohlsen Response ¶ 18, at 5 (asserting this fact)(citing Participating Agreement §2, at 3; Videotaped Deposition of Aaron Johnson at 17:15-18 (taken September 11, 2018), filed December 19, 2018 (Doc. 98-3)). The United States disputes the Ohlsen Plaintiffs' description of slash as the "remaining woody parts," Ohlsen Response ¶ 18, at 5, and contends that slash is "all vegetative material," Ohlsen Reply ¶ 18, at 13 (quoting Participating Agreement § 2, at 5). The United States does not, however, dispute that the slash is the debris remaining from the project. The United States does not mention this alleged fact, so the Court deems, accordingly, the fact undisputed. <u>See</u> D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").
    For the reader's edification, the Court provides a fuller description of slash: "In forestry, slash, or slashings are coarse and fine woody debris generated during logging operations or through wind, snow or other natural forest disturbances. Slash generated during logging operations may increase fire hazard, and some North American states have passed laws requiring the treatment of logging slash." <u>Slash (logging)</u>, Wikipedia, https://en.wikipedia.org/wiki/Slash_(logging) (last visited May 17, 2019). The Court does not provide this description as a material fact but hopes to offer the reader a more complete understanding of the case's context.

[21]The parties attach as exhibits excerpts of the relevant depositions. As the parties attach different excerpts to each filing, the Court includes the document number in the short cite, so the reader knows to which set of excerpts the citation refers.

[22]The Ohlsen Plaintiffs include the proposed undisputed fact in the text as additional information omitted from the United States' Independent Contractor Motion ¶ 2, at 3, <u>see</u> Ohlsen Independent Contractor Response ¶ 2, at 3, and the United States replies to the Ohlsen Plaintiffs'

1. **The Participating Agreement, the Statements of Work, and the Modifications.**

The thinning project developed after Isleta Pueblo proposed to the Forest Service "to undertake restoration projects on USFS [(Forest Service)] lands among the boundary with Pueblo lands." Ohlsen Motion ¶ 5, at 4 (asserting this fact)(citing Second Fox Decl. ¶ 6, at 2); Sais Motion ¶ 7, at 4 (asserting this fact)(citing Second Fox Decl. ¶ 6, at 2).[23]  Because the thinning project emerged from Isleta Pueblo's proposal, the Forest Service and Isleta Pueblo undertook the project in part in accordance with the Tribal Forest Protection Act, 25 U.S.C. §§ 1301, 3115a ("TFPA").[24]

_____

Ohlsen Independent Contractor Response ¶ 2, at 3, by asserting that the Ohlsen Plaintiffs do not dispute Independent Contractor Motion ¶ 2, at 3, but does not address the proposed undisputed fact in the text, see Independent Contractor Reply ¶ 2, at 6.  As the United States does not specifically controvert the Ohlsen Plaintiffs' additional information or even address the information, the Court deems the information in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[23]The Ohlsen Plaintiffs dispute the Ohlsen Motion ¶ 5, at 4, because they contend that the Forest Service and Isleta Pueblo did not enter the Participating Agreement solely under the Tribal Forest Protection Act, 25 U.S.C. §§ 1301, 3115a ("TFPA"), but the Plaintiffs make no comment about the proposed undisputed fact.  See Ohlsen Response ¶ 5, at 18-19.  As the Ohlsen Plaintiffs do not specifically controvert the fact in the text, the Court, accordingly, deems the proposed undisputed fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[24]This statute provides:

> Not later than 120 days after the date on which an Indian tribe submits to the Secretary a request to enter into an agreement or contract to carry out a project to protect Indian forest land or rangeland (including a project to restore Federal land that borders on or is adjacent to Indian forest land or rangeland) that meets the criteria described in subsection (c), the Secretary may issue public notice of initiation of any necessary environmental review or of the potential of entering into an agreement or contract with the Indian tribe pursuant to section 347 of the Department of the Interior and Related Agencies Appropriations Act, 1999 (16 U.S.C. 2104 note; Public Law 105-277) (as amended by section 323 of the Department of the Interior and Related Agencies Appropriations Act, 2003 (117

See Ohlsen Motion ¶ 5, at 4 (asserting this fact)(citing Second Fox Decl. ¶ 6, at 4); Sais Motion

¶ 7, at 4 (asserting this fact)(citing Second Fox Decl. ¶ 6, at 2).[25]   The Forest Service and Isleta

Pueblo entered the Participating Agreement under the CFDA[26] and the Wyden Amendment, Pub.

_____

Stat. 275)), or such other authority as appropriate, under which the Indian tribe would carry out activities described in paragraph (3).

25 U.S.C. § 3115a.

[25]The Ohlsen Plaintiffs dispute the alleged undisputed fact that the TFPA is the "only statutory authority for this project," arguing that the Second Fox Decl. is a sham affidavit, and that the Forest Service and Isleta Pueblo entered the Participating Agreement under the CFDA and Wyden Amendment, Pub. L. 105-277 § 323, 122 Stat 2681 (1998), as the Participating Agreement states.  Ohlsen Response ¶ 5, at 18-19.  The United States Court of Appeals for the Tenth Circuit directs a court considering whether an affidavit is a sham to look to:

[(i)] whether the affiant was cross-examined during his earlier testimony, [(ii)] whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and [(iii)] whether the earlier testimony reflects confusion which the affidavit attempts to explain.

Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)(citing Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364-65 (8th Cir. 1983); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).  The Ohlsen Plaintiffs devote one sentence to accusing the Second Fox Decl. of being a sham affidavit, and do not provide the Court more information on which to determine whether the Second Fox Decl. conflicts with earlier testimony or is an effort to create a sham factual issue.  See Ohlsen Response ¶ 5, at 18-19.  The Court cannot deem, therefore, the Second Fox Decl. to be a sham affidavit.  The Ohlsen Plaintiffs do not contend that the Forest Service and Isleta Pueblo did not enter the Participating Agreement pursuant to the TFPA.  As the Plaintiffs do not specifically controvert that the TFPA provided some authority under which the Forest Service and Isleta Pueblo entered the Participating Agreement, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[26]The relevant portion of the CFDA states:

To facilitate the administration of the programs and activities of the Forest Service, the Secretary is authorized to negotiate and enter into cooperative agreements with public or private agencies, organizations, institutions, or persons

L. 105-277 § 323, 122 Stat 2681 (1998), <u>as amended by</u> Pub. L. 111-011, § 3001, 123 Stat 991

(2009)[27] and not under the Indian Self-Determination and Education Assistance Act,

25 U.S.C. § 5321.  <u>See</u> Independent Contractor Motion ¶¶ 5-6, at 4 (asserting this fact)(citing First

Fox Decl. ¶¶ 4-8, at 1-2; Participating Agreement at 1); Ohlsen Independent Contractor Response

---

to construct, operate, and maintain cooperative pollution abatement equipment and facilities, including sanitary landfills, water systems, and sewer systems; to engage in cooperative manpower and job training and development programs; to develop and publish cooperative environmental education and forest history materials; and to perform forestry protection, including fire protection, timber stand improvement, debris removal, and thinning of trees. The Secretary may enter into aforesaid agreements when he determines that the public interest will be benefited and that there exists a mutual interest other than monetary considerations. In such cooperative arrangements, the Secretary is authorized to advance or reimburse funds to cooperators from any Forest Service appropriation available for similar kinds of work or by furnishing or sharing materials, supplies, facilities, or equipment without regard to the provisions of section 3324(a) and (b) of Title 31, relating to the advance of public moneys.

16 U.S.C. § 565a-1.

[27]The Wyden Amendment provides:

For fiscal year 2006 and each fiscal year thereafter, to the extent funds are otherwise available, appropriations for the Forest Service may be used by the Secretary of Agriculture for the purpose of entering into cooperative agreements with willing Federal, tribal, State and local governments, private and nonprofit entities and landowners for the protection, restoration and enhancement of fish and wildlife habitat, and other resources on public or private land, the reduction of risk from natural disaster where public safety is threatened, or a combination thereof or both that benefit these resources within the watershed.

Pub. L. 105-277 § 323, 122 Stat 2681, <u>as amended by</u> Pub. L. 111-011, § 3001, 123 Stat 991 (2009).

¶¶ 4-5, at 3 (admitting this fact); Ohlsen Response ¶ 3, at 3 (asserting this fact)(citing Participating

Agreement at 1); Ohlsen Reply ¶ 3, at 10 (admitting this fact).[28]

In deciding whether to enter a participating agreement, the Forest Service "weighs multiple

public policy considerations." Ohlsen Motion ¶ 6, at 4 (asserting this fact)(citing Second Fox Decl.

¶¶ 15-26, at 3-7); Sais Motion ¶ 8, at 4 (asserting this fact)(citing Second Fox Decl. ¶¶ 15-26, at

3-7).[29] When the Forest Service decided to accept Isleta Pueblo's proposal, for instance, the Forest

Service considered

> whether the Pueblo Proposal, and actions taken in carrying out the Pueblo Proposal,
> served the public policies underlying the statutes that govern the management of
> USFS lands; the agency's mission, which is to sustain the health, diversity, and
> productivity of the Nation's forests and grasslands using the sustainable multiple-
> use management concept to meet the diverse needs of the people; public policies
> and priorities as set forth in the Cibola National Forest Land and Resource

---

[28]The United States contends that the Ohlsen Response's fact is incomplete, but the United
States admits that the Forest Service and Isleta Pueblo entered the Participating Agreement under
the CFDA. See Ohlsen Reply ¶ 3, at 10. The United States makes no comment regarding whether
the Forest Service and Isleta Pueblo entered the Participating Agreement under the Wyden
Amendment or controverting the proposed undisputed fact about the Wyden Amendment, but the
record supports the fact. See Ohlsen Reply ¶ 3, at 10. The Court deems, accordingly, this fact
undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be
deemed undisputed unless specifically controverted.").

[29]The Ohlsen Plaintiffs argue that the fact in the text is "immaterial and irrelevant," Ohlsen
Response ¶ 6, at 19, but the Court "has previously held that a 'relevance argument similarly does
not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section'
of this opinion," Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, No. CIV 16-0127 JB/JHR, 2018
WL 3210531, at *1 (D.N.M. June 29, 2018)(Browning, J.)(quoting S.E.C. v. Goldstone, No. CIV
12-0257, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.)). The Ohlsen
Plaintiffs otherwise state that they "do not have sufficient information to admit or deny" the text's
undisputed fact. Ohlsen Response ¶ 6, at 19. The Ohlsen Plaintiffs must specifically controvert
an alleged undisputed fact, and, as neither admitting nor denying a fact is not specifically
controverting a fact, the Court deems the fact in the text admitted. See D.N.M. LR-Civ. 56.1(b)
("All material facts set forth in the Memorandum will be deemed undisputed unless specifically
controverted.").

Management Plan ("Forest Plan"), the USDA Strategic Plan: FY 2010-2015 ("Strategic Plan"), the Forest Service Southwestern Region Landscape Conservation and Restoration Strategic Action Plan dated January 31, 2011 ("Region 3 Strategic Plan"), and the National Cohesive Wildland Fire Management Strategy ("Cohesive Strategy").[30]

---

[30]In the Ohlsen Motion, the United States explains the priorities that these cited documents establish. See Ohlsen Motion at 16-18. The Court does not present these explanations as undisputed facts but describes them to give the reader additional context for the dispute. According to the United States, the Forest Service's goals in managing the Cibola National Forest is to "provide for multiple use and sustained yield of goods and services from the Forest in a way that maximizes long term net public benefits in an environmentally sound manner." Ohlsen Motion at 16 (internal quotation marks omitted)(quoting Forest Service, Cibola National Forest Land and Resource Management Plan at 1 (dated July 1985)("Forest Plan")). The Forest Plan establishes standards for forest and fire management, see Ohlsen Motion at 16 (citing Forest Plan at 33-34), including, for instance, rules for how many standing dead trees and downed logs, and how much debris to leave per acre of PonderosaPonderosa Pine, see Ohlsen Motion at 17. The Forest Plan additionally provides the following management goals for Management Unit 11, within which Unit 4 is located, see Ohlsen Motion ¶ 15, at 7 (citing Second Fox Decl. ¶ 38, at 9); Sais Motion ¶ 17, at 7 (citing Second Fox Decl. ¶ 38, at 9); Ohlsen Response ¶ 15, at 19):

> "Maintain the forest and watershed health, vigor, and productivity. Provide and maintain wildlife habitat diversity and old growth. Slash from harvest activities will be made available to the public for personal use firewood. Developed recreation sites will be maintained. Trail construction and new trailhead facilities will provide increased opportunities for dispersed recreation use."

Ohlsen Motion at 17 (quoting Forest Plan at 141). The United States Department of Agriculture, Strategic Plan 2010-2015, filed November 2, 2018 (Doc. 62-5)("Strategic Plan"), includes the following goals:

- Working cooperatively on policy matter
- Serving [the Agriculture Department]'s constituents;

- Measuring performance and making management decisions to direct resources to where they are used most effectively.

Ohlsen Motion at 17 (quoting Strategic Plan at iv). The Strategic Plan lists as other goals such objectives as assisting rural communities, restoring and conserving national forests, adapting to climate change, and reducing the risks of catastrophic fires. See Ohlsen Motion at 17 (citing Strategic Plan at v). The United States describes that, based on the Strategic Plan, the Forest Service's Southwestern Region, which includes the Cibola National Forest, adopted the Forest Service Southwestern Region Landscape Conservation and Restoration Strategic Action Plan

Ohlsen Motion ¶ 7, at 5 (asserting this fact)(citing Second Fox Decl. ¶ 15, at 3-4); Sais Motion ¶ 9, at 4-5 (asserting this fact)(citing Second Fox Decl. ¶ 15, at 3-4).[31]  In assessing Isleta Pueblo's proposal under these statutes, the Forest Service considered

> whether the Isleta Restoration Project [(Isleta Pueblo's proposed project)] would reduce threats of catastrophic wildland fire, improve forest health, improve watershed health, improve wildlife habitat, provide job training and development programs, and provide mutual interests other than monetary considerations.  USFS also considered the policy preference for tribally proposed projects on USFS lands, protection of Indian trust resources from fire and disease, health of the proposed project area as compared to the rest of the Forest, Pueblo's experience with similar restoration projects, additional proposed/ongoing projects, relative priority of the projects, and available funding.

Ohlsen Motion ¶ 8, at 6 (asserting this fact)(citing Second Fox Decl. ¶¶ 18-25, at 4-6); Sais Motion ¶ 10, at 5 (asserting this fact)(citing Second Fox Decl. ¶¶ 18-25, at 4-6).[32]

---

(dated January 31, 2011), filed November 2, 2018 (Doc. 62-6)("Landscape Plan"), which prioritizes "working with partners to identify and prioritize restoration projects, while 'creating jobs to support vibrant communities,'" and considering "the values placed on the landscape, threats to those values, the degree of collaboration and local support to restore the landscape, and economics, including job creation and support for local infrastructure."  Ohlsen Motion at 17-18 (citing Landscape Plan at 1-2).

[31]The Ohlsen Plaintiffs state that they "do not have sufficient information to admit or deny" the text's undisputed fact.  Ohlsen Response ¶ 7, at 19.  As neither admitting nor denying a fact is not specifically controverting a fact, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[32]The Ohlsen Plaintiffs state that they "do not have sufficient information to admit or deny" the text's undisputed fact.  Ohlsen Response ¶ 8, at 19.  As neither admitting nor denying a fact is not specifically controverting a fact, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The Participating Agreement states: "The Pueblo shall also supervise and direct the work of its employees, volunteers, and participants performing under this contract." Participating Agreement ¶ V(F), at 5.[33] See Ohlsen Motion ¶ 10, at 6 (asserting that the Participating Agreement delegated responsibility for supervising the thinning crew to Isleta Pueblo)(citing Second Fox Decl. ¶ 27, at 7)); Sais Motion ¶ 12, at 6 (same)(citing Second Fox Decl. ¶ 27, at 7); Ohlsen Response ¶ 10, at 19 (admitting that the Second Fox Decl. ¶ 27, at 7, includes the language about the Participating Agreement and the Statement of Work delegating responsibilities to Isleta Pueblo).[34] The Participating Agreement further describes Isleta Pueblo's responsibilities:

A.      LEGAL AUTHORITY.  The Pueblo shall have the legal authority to enter into this agreement, and the institutional, managerial, and financial capability to ensure proper planning, management, and completion of the project, which includes funds sufficient to pay the nonfederal share of project costs, when applicable.

B.      Contribute personnel, provide equipment and supplies as needed, and manage the employees so that work is completed as mutually agreed upon to the specifications stated in the Statement of Work Supplement, incorporated hereunder as Exhibit A.

_____

[33]In the Independent Contractor Motion, the United States asserts that the Forest Service and Isleta Pueblo agreed that Isleta Pueblo would supervise its own employees, see Independent Contractor Motion, ¶ 6, at 4, and the Ohlsen Independent Contractor Response disputes the United States' proposed undisputed fact, see Ohlsen Independent Contractor Response ¶ 6, at 3.  The parties agree, however, that the Participating Agreement contains the quotation that the Court provides in the text and the record supports that the Participating Agreement contains such language.  See Independent Contractor Motion, ¶ 6, at 4 (citing Participating Agreement ¶ V(F), at 5); Ohlsen Independent Contractor Response ¶ 6, at 7 (quoting Participating Agreement ¶ V(F), at 5).  The Court concludes, accordingly, that the fact in the text is undisputed.

[34]As the Ohlsen Plaintiffs' qualified admission that the Second Fox Decl. ¶ 27, at 7, states the text's fact does not specifically controvert the United States' proposed undisputed fact, the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

C.      Administer agreement funds, including timekeeping payment of salaries and invoices for payment

D.      Provide and maintain work environments and procedures which will safeguard Tribal employees, the public, and Forest Service personnel, property, materials, supplies and equipment exposed to the operations and activities, and avoid interruptions of Government operations and delays of other projects and completion dates.

Participating Agreement ¶¶ III(A)-(D), at 2.[35]   See Ohlsen Motion ¶ 10, at 6 (asserting Isleta

Pueblo's responsibilities)(citing Second Fox Decl. ¶ 27, at 7); Sais Motion ¶ 12, at 6 (same)(citing

---

[35]In the Independent Contractor Motion ¶ 10, at 5-6, the United States summarizes this and other provisions of the Participating Agreement to show Isleta Pueblo's responsibilities in managing the thinning crew.  See Independent Contractor Motion ¶ 10, at 5-6.  The Ohlsen Plaintiffs dispute the United States' reliance on the First Fox Decl. ¶¶ 11-13, 15, at 3, in Independent Contractor Motion ¶ 10, at 5-6, because, in their view, the First Fox Decl. lacks a foundation in personal knowledge and is an inadmissible lay opinion interpreting a contract.  See Ohlsen Independent Contractor Response ¶ 10, at 13-14; First Objections ¶ 2, at 2.  See also Independent Contractor Motion ¶ 10, at 6 (citing First Fox Decl. ¶¶ 11-13, 15, at 3).  "Generally Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge." Gonzales v. City of Albuquerque, 849 F. Supp. 2d 1123, 1179 (D.N.M. 2011)(Browning, J.)(citing Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990),)), aff'd, 701 F.3d 1267 (10th Cir. 2012).  See Walker v. Spina, No. CIV 17-0991 JB\SCY, 2018 WL 6519133, at *1 (D.N.M. Dec. 11, 2018)(Browning, J.)(stating that paragraphs in an affidavit citing photographs and a police report likely did not rely on personal knowledge); Parrish v. Roosevelt Cty. Bd. of Cty. Comm'rs, No. CIV 15-0703 JB/GBF, 2017 WL 5178242, at *1 (D.N.M. March 13, 2017)(Browning, J.)(classifying an affidavit on "the ways in which Roosevelt County generally operates or . . . information contained in Parrish's personnel file" as based on personal knowledge, because "Hamilton, as the Roosevelt County Manager, is intimately acquainted with Roosevelt County's operations and employee classifications, as well as with Parrish's personnel file"); Gonzales v. City of Albuquerque, 849 F. Supp. 2d 1123, 1139 n.10 (D.N.M. 2011)(Browning, J.)("Because Gonzales does not have personal knowledge of the reason for her termination, and because her affidavit sets forth only her belief as to the reason of her termination, the Court finds that her statements in her affidavit do not create a genuine issue of material fact."), aff'd, 701 F.3d 1267 (10th Cir. 2012); Coffey v. United States, Nos. CIV 08-0588 JB/LFG, CIV 09-0028 JB/LFG, 2011 WL 6013611, at *5 n.33 (D.N.M. Nov. 28, 2011)(Browning, J.)(deeming an affidavit including "a variety of observations and interactions with Crutcher" based on personal knowledge), aff'd sub nom., Coffey v. McKinley Cty., 504 F. App'x 715 (10th Cir. 2012)(unpublished); Mata v. Anderson, 685 F. Supp. 2d 1223, 1237 n.2 (D.N.M.

2010)(Browning, J.)("[T]he Court will not . . . give weight to the assertions that the letter from Internal Affairs discouraged others or silenced others; such evidence is inadmissible because it appears to be speculation rather than based on personal knowledge."), aff'd, 635 F.3d 1250 (10th Cir. 2011); Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1315 n.10 (D.N.M. 2010)(Browning, J.)("Because the Court has entered default holding A. Robins liable for participating in a conspiracy that involved the sales of Biomoda's shares, it is reasonable to infer that A. Robins had personal knowledge of the amount the Defendants received for the transfer of the shares."); Barber v. Lovelace Sandia Health Sys., 409 F. Supp. 2d 1313, 1342 (D.N.M. 2005)(Browning, J.)(disregarding an affidavit stating a party's beliefs rather than firsthand knowledge).

The Court agrees with the Ohlsen Plaintiffs that the First Fox Decl. ¶¶ 11-13, 15, at 3, do not show that Ian Fox based his statements about Isleta Pueblo's responsibilities on personal knowledge. Fox states that he makes all the statements in the First Fox Decl. based on personal knowledge. See First Fox Decl. ¶ 3, at 1 ("I make this declaration on personal knowledge."). To support this statement, Fox testifies that he is "the Natural Resources Staff Officer on the Cibola National Forest and National Grasslands," and "is responsible for administering the Participating Agreement" and Statements of Work, including supervising the people who administer and inspect the project. First Fox Decl. ¶¶ 1, 5 at 1-2. None of these statements reflect that Fox knows personally about the thinning crew's work, and, moreover, Fox cites the Participating Agreement to support the statements in the First Fox Decl. ¶¶ 11-13, 15, at 3, which suggests that he draws his information from the Participating Agreement rather than from personal knowledge. To the extent that Fox draws his information from the Participating Agreement, he does not draw it from personal knowledge.

The Court also does not believe that Fox' testimony summarizing or interpreting the Participating Agreement is helpful to the finder of fact -- here, the Court -- and, thus, determines it inadmissible. A lay witness may provide testimony when that opinion is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Interpreting a contract is a matter of law where interpretation does not depend on extrinsic evidence, see Zink v. Merrill Lynch Pierce Fenner & Smith, Inc., 13 F.3d 330, 332 (10th Cir. 1993), but "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704. In the First Fox Decl. ¶¶ 11-13, 15, at 3, Fox does not opine to his understanding of the Participating Agreement as a lay person or purport to present extrinsic evidence. He summarizes nearly verbatim provisions from the Participating Agreement and makes descriptive statements about Isleta Pueblo's supervision of the thinning crew and purchases for the thinning project based on the Participating Agreement. See First Fox Decl. ¶¶ 11-13, 15, at 3. Because a party's actions may differ from what a contract provides, the Court does not find helpful Fox' statements about Isleta Pueblo's activities when he bases his statements on the Participating Agreement.

The Ohlsen Plaintiffs similarly object to the First Fox Decl. ¶¶ 10, 17, 18, 22, and 23, at 2-5, as inadmissible lay opinions, and to the First Fox Decl. ¶¶ 14, 18, 19, 22, 23, and 24, at 3-5, as lacking a foundation in personal knowledge. See First Objections at 2. The United States

responds, regarding the inadmissible lay opinion arguments, that Fox makes statements of fact about unambiguous Participating Agreement provisions and has personal knowledge about the Participating Agreement from his role as Forest Service Natural Resources Staff Officer and from administering the Participating Agreements.  See United States of America's Response to *Ohlsen* Plaintiffs' Objections to Evidence Submitted by the United States ¶ 3, at 2-3, filed February 28, 2019 (Doc. 132)("First Objections Response").  Regarding the personal knowledge arguments, the United States cites the same basis for personal knowledge as it does for the lay opinion arguments. See First Objections Response ¶ 4, at 3.

For the same reasons as the reasoning in the preceding paragraph, the Court concludes that the First Fox Decl. ¶¶ 10, 17, at 2-4, the first sentence of First Fox Decl. ¶ 22, at 4-5, and the first two sentences of First Fox Decl. ¶ 23, at 5, are inadmissible lay opinions.  See First Objections ¶ 4, at 2; First Objections Response ¶ 3, at 2-3.  The Court concludes that the First Fox Decl. ¶ 18, at 4, in which Fox opines that the Forest Service did not have authority to supervise the thinning crew, see First Fox Decl. ¶ 18, at 4, the second through fourth sentences of First Fox Decl. ¶ 22, at 4-5, wherein Fox describes the years when Johnson, Hudson, and Lueras were Project Administrators, and the third sentence of First Fox Decl. ¶ 23, at 5, which verifies the Delegation's accuracy, offer Fox' understanding of the Participating Agreement, see First Fox Decl. ¶ 18, at 4, and offer information on topics other than the Participating Agreement and Statements of Work, see First Fox Decl. ¶¶ 22-23, at 4-5.  The Court deems, according, the First Fox Decl. ¶¶ 10, 17, at 2-4, the first sentence of First Fox Decl. ¶ 22, at 4-5, and the first two sentences of First Fox Decl. ¶ 23, at 5, inadmissible, and the First Fox Decl. ¶ 18, at 4, the second through fourth sentences of First Fox Decl. ¶ 22, at 4-5, and the third sentence of First Fox Decl. ¶ 23, at 5, admissible.

The Court also concludes that the First Fox Decl. ¶¶ 18, 19, at 3-4, the first sentence of First Fox Decl. ¶ 22, at 4-5, and the first two sentences of First Fox Decl. ¶ 23, at 5, lack a foundation in personal knowledge.  See First Objections ¶ 4, at 2.  The Court reasons that Fox' position with the Forest Service gives him an adequate basis in personal knowledge to know whether the Forest Service used its funds to purchase equipment for the thinning project, see First Fox Decl. ¶ 14, at 3, to know when Johnson, Hudson, and Lueras worked as Project Administrators, see First Fox Decl. ¶ 22, at 4-5, to know whether the attached Delegation is accurate, see first Fox Decl. ¶ 23, at 5, and to testify to the logistics the Project Administrators' supervisory practices, see First Fox Decl. ¶ 24, at 5.  The Court deems the the First Fox Decl. ¶¶ 18, 19, at 3-4, the first sentence of First Fox Decl. ¶ 22, at 4-5, and the first two sentences of First Fox Decl. ¶ 23, at 5, inadmissible, and First Fox Decl. ¶ 14, at 3, the First Fox Decl. ¶ 24, at 5, the second through fourth sentences of First Fox Decl. ¶ 22, at 4-5, and the third sentence of First Fox Decl. ¶ 23, at 5, admissible.

Regarding the Independent Contractor Motion ¶ 10, at 5-6, The Ohlsen Plaintiffs do not otherwise dispute or controvert that the Participating Agreement contains the language that the United States cites and the record supports that the Participating Agreement includes the language. The Court, accordingly, deems the language undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Second Fox Decl. ¶ 27, at 7); Ohlsen Response ¶ 10, at 19 (admitting that the Second Fox Decl.

¶ 27, at 7, includes the language about the Participating Agreement and the Statement of Work

delegating responsibilities to Isleta Pueblo).[36]  The Participating Agreement also provides:

> The Pueblo agree(s) that any of their employees, volunteers, and program participants shall not be deemed to be Federal employees for any purposes including Chapter 171 of Title 23, United States Code (Federal Tort Claims Act) and Chapter 81 of Title 5, United States Code (OWCP)[(providing for workers' compensation)], as the Pueblo hereby willingly agree(s) to assume these responsibilities.

> Further, the Pueblo shall provide any necessary training to ensure that such personnel are capable of performing tasks to be completed.  The Pueblo shall also supervise and direct the work of its employees, volunteers, and participants performing under this agreement.

---

The United States also cites the portions of the Participating Agreement that the text quotes to argue that "Pursuant to the Isleta Participating Agreement the Pueblo was responsible for training, instructing, directing, and supervising Pueblo Employees."  See Independent Contractor Motion ¶ 19, at 7.  Isleta Pueblo disputes that Isleta Pueblo alone supervised the thinning crew and cites the Participating Agreement's language providing: "The Pueblo shall also supervise and direct the work of its employees, volunteers, and participants performing under this agreement." Ohlsen Independent Contractor Response ¶ 19, at 16 (internal quotation marks omitted)(quoting Participating Agreement ¶ V(F), at 5).  The United States responds that the Ohlsen Plaintiffs' arguments are immaterial and misstate the evidence.  See Independent Contractor Reply Def.'s UMF No. 19, at 23.  In the Court's view, relevance arguments do not specifically controvert proposed undisputed facts and are "'a legal argument that is best left for the Analysis Section' of this opinion." Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting S.E.C. v. Goldstone, 2015 WL 5138242, at *27 n.95).  Based on the Ohlsen Plaintiffs' and the United States' other arguments, the Court deems, however, the extent of the Forest Service supervision over Isleta Pueblo disputed but concludes that the parties agree that the Participating Agreement includes the language that the text quotes.

[36]As the Ohlsen Plaintiffs' qualified admission that the Second Fox Decl. ¶ 27, at 7, states the text's fact does not specifically controvert the United States' proposed undisputed fact, the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Participating Agreement ¶ V(F), at 5.  See Independent Contractor Motion ¶ 8, at 5 (asserting that the thinning crew workers are not federal employees pursuant to the Participating Agreement)(quoting Participating Agreement ¶ V(F), at 5); Ohlsen Independent Contractor Response ¶ 8, at 13 (admitting that the Participating Agreement contains the quoted language);[37]

---

[37]The Ohlsen Plaintiffs object to the United States' citation to the First Fox Decl. ¶¶ 9-10, at 2-3, to support the alleged undisputed fact that the Forest Service and Isleta Pueblo "agreed to operate under the standard terms and conditions of a participating agreement, including" the provision that the text quotes.  Independent Contractor Motion ¶ 8, at 5 (citing First Fox Decl. ¶¶ 9-10, at 2-3).  See Ohlsen Independent Contractor Response ¶ 8, at 13.  The Ohlsen Plaintiffs specifically object that the First Fox Decl. ¶ 9, at 2 -- reflecting that "[t]he USFS Cibola National Forest enters into between six and twelve participating agreements with various organizations annually and the contractor is always responsible for supervising its own employees," First Fox Decl. ¶ 9, at 2 -- is hearsay, without foundation, irrelevant, and inadmissible under rule 403, see Ohlsen Independent Contractor Response ¶ 8, at 13; First Objections ¶ 2, at 2.  The Court deems the evidence in the First Fox Decl. ¶ 9, at 2, admissible.  "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  The Court reads the First Fox Decl. ¶ 9, at 2, not to refer to statements in the other participating agreements, but to state Fox' impression that, under those agreements, the cooperator supervises its employees.  As a statement of Fox' impression, the First Fox Decl. ¶ 9, at 2, poses no hearsay problems.  The Court infers that such a statement rests on personal knowledge, as Fox' responsibilities include overseeing participating agreements, and Fox does not rely in this paragraph on citations to any of the other participating agreements.  The Ohlsen Plaintiffs' relevance argument does not persuade the Court to disregard the evidence, as relevance arguments do not dispute facts and are "'a legal argument that is best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting S.E.C. v. Goldstone, 2015 WL 5138242, at *27 n.95).  Last, although "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403, the Ohlsen Plaintiffs do not argue why the Court should exclude the First Fox Decl. ¶ 9, at 2, pursuant to rule 403.  The Court sees the evidence's probative value in its support for the Forest Service's understanding of what it agreed in the Participating Agreement.  The Court does not see how the evidence prejudices the Ohlsen Plaintiffs, because the issues in this case and this opinion revolve heavily around the Participating Agreement and one sentence about other agreements does not risk much, or any, prejudice, confusion, or misdirection, or otherwise add significantly to the amount of evidence that the Court must consider.  Accordingly, the Court deems the First Fox Decl. ¶ 9, at 2, admissible.

Ohlsen Independent Contractor Response 6, at 7 (asserting that Participating Agreement ¶ V(F), at 5 contains the last sentence in the quotation supra)(citing Participating Agreement ¶ V(F), at 5).[38] The Participating Agreement continues:

> The Pueblo shall maintain effective control over and accountability for all U.S. Forest Service funds, real property, and personal property assets. The Pueblo shall keep effective internal controls to ensure that all United State Federal funds received are sparely and properly allocated to the activities described in the agreement. The Pueblo shall adequately safeguard all such property and shall ensure that it is used solely for authorized purposes.

Participating Agreement ¶ V(J)(3), at 6, and further states: "The Pueblo shall monitor the performance of the agreement activities to ensure that performance goals are being achieved." Participating Agreement ¶ V(O), at 8.[39] Throughout the Participating Agreement, the document

---

The Court does not deem the First Fox Decl. ¶ 10, at 2, admissible for the same reasons explained supra note 35. See Ohlsen Independent Contractor Response ¶ 8, at 13.

[38]The Ohlsen Plaintiffs quote only the last sentence in the text's Participating Agreement excerpt. See Ohlsen Independent Contractor Response ¶ 6, at 7. The United States disputes the Ohlsen Plaintiffs' proposed undisputed fact, arguing that the Plaintiffs remove the language from context. See Independent Contractor Reply Plaintiffs' § A6, at 10. The parties do not dispute, however, that the Participating Agreement contains this language, and the record supports, moreover, that the Participating Agreement contains this language, so the Court deems the fact undisputed.

[39]The United States summarizes this and other Participating Agreement provisions in the Independent Contractor Motion ¶ 10, at 5-6, to show that Isleta Pueblo had responsibility for managing the thinning crew. See Independent Contractor Motion ¶ 10, at 5-6. The Ohlsen Plaintiffs dispute the United States' citation to the First Fox Decl. ¶¶ 11, 13, at 3, and argue that the First Fox Decl. ¶¶ 11, 13, at 3, lack foundation and are an inadmissible lay opinion. See Ohlsen Independent Contractor Response ¶ 10, at 13-14; First Objections ¶ 2, at 2. The Court deems the First Fox Decl. ¶¶ 11, 13, at 3, inadmissible for the same reasons articulated supra note 35. The Ohlsen Plaintiffs do not, however, dispute that the Participating Agreement contains the language that the United States cites and the record reflects that the Participating Agreement contains the language. The Court deems, accordingly, the language undisputed.

refers to Isleta Pueblo as "Pueblo," "Cooperator," or "Partner."  Ohlsen Independent Contractor Response ¶ 1, at 21-22 (asserting this fact)(quoting Participating Agreement ¶¶ V(F), (L), at 5-6; Agreement Financial Plan at 1, filed December 19, 2081 (Doc. 97-5); Isleta Statement of Work Supplement to Participating Agreement to Implement Approved Tribal Forest Protection Act Project §§ 1(E)-(F), 4-12, at 350-51, 355-70 (dated February 2014), filed November 2, 2018 (Doc. 97-5)("Statement of Work Original")).  See Ohlsen Response ¶ 4, at 3 (asserting this fact)(citing Statement of Work Original §§ 4-12, at 355-70).[40]  By delegating the responsibilities for the thinning to Isleta Pueblo, the Forest Service advanced the same goals that it furthered by accepting Isleta Pueblo's proposal to begin the project, including building partnerships, developing tools for conservation and restoration, and providing jobs.  See Ohlsen Motion ¶ 11, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 32, at 8); Sais Motion ¶ 13, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 32, at 8); Ohlsen Response ¶ 11, at 19 (admitting that the Second Fox Decl. ¶ 32, at 8, includes language stating this fact).[41]

The Statements of Work provide additional instructions for the thinning crew's work, including, for Unit 4, stating:

---

[40]The United States does not offer any response to the proposed undisputed fact in the text. See Ohlsen Reply at 10.  As the United States does not specifically controvert the Ohlsen Plaintiffs' proposed fact, the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[41]As the Ohlsen Plaintiffs' qualified admission that the Second Fox Decl. ¶ 32, at 8, states the text's fact does not specifically controvert the United States' proposed undisputed fact, the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

"The Partner will CUT ponderosa pine and white fir that is greater than 5'' DBH [diameter breast height][42] and alligator juniper and pinion pine that are greater than 5'' DRC [diameter at root collar[43]] that do not have orange paint on them."

"The partner will NOT CUT any hardwoods (i.e. oak trees. etc.) or Douglas-fir trees regardless of size."

"The Partner WILL cut all trees less than 5'' DBH/DRC and greater than 4.5' tall, unless there is evidence of orange paint on the trees bole or foliage."

"The Partner WILL be required to lop and scatter the limbs and tops up to 3'' diameter tops of dropped trees. Maximum slash depth will be 18''."

Ohlsen Independent Contractor Response ¶ 3, at 5 (asserting this fact)(second, third, and fourth

alterations added)(quoting Statement of Work Original § 1(A), at 1). See Independent Contractor

Reply Plaintiffs' § A3, at 9 (admitting this fact).[44] The Statement of Work Original contains

_____

[42]Diameter breast height is the "[d]iameter of the trunk of a tree measured 4-1/2 feet above the ground level on the uphill side of the tree." Statement of Work Modification 3 ¶ 2, at 414.

[43]The United States disputes the Ohlsen Plaintiffs' assertion that DRC is an abbreviation for "diameter root crown," Ohlsen Independent Contractor Response ¶ 3, at 5, and describes that DRC is an abbreviation for "diameter at root collar," Independent Contractor Reply Plaintiffs' § A3, at 9 (citing Statement of Work Modification 3 § 2, at 414). The Supreme Court of the United States has directed district courts: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). The record reflects that the United States, and not the Ohlsen Plaintiffs, correctly defines DRC, so the Court adopts the United States' definition. See Statement of Work Modification 3 § 2, at 414 (defining DRC as "[d]iameter at root collar" and describing diameter at root collar as "[d]iameter of the trunk of a tree measured at ground level").

[44]The United States argues that the text's fact is immaterial, see Independent Contractor Reply Plaintiffs' § A3, at 9, but, as discussed supra note 29, the Court "has previously held that a 'relevance argument similarly does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion," Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting S.E.C. v. Goldstone, 2015 WL 5138242, at *27 n.95). As the United States does not otherwise specifically controvert the text's fact, the Court deems the

detailed provisions for mastication in goshawk[45] foraging and post-fledging areas. See Ohlsen

Independent Contractor Response ¶ 3, at 6 (asserting this fact)(citing Statement of Work Original

§ 1 at 348-49); Independent Contractor Reply Plaintiffs' § A3 at 9 (admitting this fact).[46] The

Statements of Work provide "detailed specifications . . . including descriptions of treatment units

and work items, scope of work, tasks and subtasks, quality performance requirements, resource

protections standards, and safety standards and guidelines." Independent Contractor Motion ¶ 31,

at 9 (asserting this fact)(citing First Fox Decl. ¶ 21, at 4; Statement of Work Modification 3 §§ 1,

3-11, at 410-11, 416-30). See Ohlsen Independent Contractor Response ¶ 31, at 17 (admitting this

fact).

The Participating Agreement also states: "The Project has a silviculture prescription, which

the crew will follow." Ohlsen Independent Contractor Response ¶ 1, at 4 (asserting this fact)(citing

Participating Agreement at 1). See Ohlsen Independent Contractor Reply Plaintiffs' § A1, at 7

---

fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will
be deemed undisputed unless specifically controverted.").

[45]The northern goshawk . . . is a medium-large raptor in the family
Accipitridae, which also includes other extant diurnal raptors, such as eagles,
buzzards and harriers. [T]he goshawk is often considered a "true hawk."

. . . .

It is a widespread species that inhabits many of the temperate parts of the
Northern Hemisphere.

Northern goshawk, Wikipedia, https://en.wikipedia.org/wiki/Northern_goshawk (last visited May
22, 2019).

[46]See supra note 44.

(admitting this fact). The United States has produced twenty-seven pages of silviculture prescriptions that the Forest Service developed. See Ohlsen Independent Contractor Response ¶ 1, at 4 (citing Video Deposition of Mark Dixon at 21:13-16 (taken November 29, 2018), filed December 19, 2018 (Doc. 97-6)("Dixon Depo. 97-6"); id. at 36:21-37:3; id. at 43:5-11; Treatment Prescription and Marking Guide (dated July 6, 2013), filed December 19, 2018 (Doc. 97-7)("Silviculture Prescriptions")).[47] The Silviculture Prescriptions address forest management, and Ian Fox, the Forest Service Natural Resource Officer of the Cibola National Forest and National Grasslands, First Fox Decl. ¶ 1, at 1, and Aaron Johnson, a Forest Service Project Administrator for the thinning project, see Ohlsen Independent Contractor Response ¶ 7, at 7 (asserting this fact)(citing Delegation of Authority Isleta Participating Agreement at 1, filed December 19, 2018 (Doc. 97-10)("Delegation")); Independent Contractor Reply Plaintiffs' § A7, at 10 (admitting this fact),[48] reviewed such documents with Isleta Pueblo officials and the thinning crew, see Ohlsen Independent Contractor Response ¶ 1, at 4 (asserting this fact)(citing Johnson Depo. 97-1 at 53:20-

---

[47]The United States objects to the Ohlsen Plaintiffs' description of the sprescriptions as directions for the thinning crew's work. See Independent Contractor Reply Plaintiffs' § A1, at 7. The United States does not, however, provide facts controverting the fact in the text regarding what the United States has produced. The Court deems, accordingly, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[48]The United States admits the text's undisputed fact but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § A3, at 10. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

21; Dixon Depo. 97-6 at 16:1-8; id. at 19:11-19; id. at 21:21-22:9; id. at 23:5-10).[49]   The

Silviculture Prescriptions detail rules for performing work in different tree stands, including

> the size, location, shape, and species of trees to leave for regeneration openings; the
> size, health, number of trees, stand configuration, and species to leave for areas
> surrounding regeneration areas; the number of snags to leave per acre; what
> constitutes a "desirable," "acceptable," and "undesirable" trees in terms of health,
> pests, and form defects, and how many desirable and acceptable quality trees to
> leave per acre.

Ohlsen Independent Contractor Response ¶ 1, at 4 (asserting this fact)(quoting? Silviculture

Prescriptions; and citing Dixon Depo. 97-6 at 38:4-9; id. at 38:18-39:6).[50]   With the Silviculture

Prescriptions, the Forest Service established treatment prescriptions for its lands.   See Ohlsen

Response ¶ 10, at 4 (asserting this fact)(describing that the Forest Service established treatment

prescriptions regarding where to thin, what to thin, and the manner of thinning, and discussed the

prescriptions with the thinning crew)(citing Silviculture Prescriptions at 20-21; Deposition of

---

[49]The United States objects to the Ohlsen Plaintiffs' description of the Silviculture Prescriptions as directions for the thinning crew's work.  See Independent Contractor Reply Plaintiffs' § A1, at 7.  The United States does not, however, provide facts controverting the proposed undisputed facts in the facts in the text.  The United States admits that the Silviculture Prescriptions informed the work done on treatment units and could be shared with Isleta Pueblo. See Independent Contractor Reply Plaintiffs' § A1, at 7-8.  The Court deems, accordingly, the text's fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[50]The United States objects to the Ohlsen Plaintiffs' description of the Silvicultural Prescriptions as directions for the thinning crew's work.  See Independent Contractor Reply Plaintiffs' § A1, at 7.  The United States does not, however, provide facts controverting what the Silvicultural Prescriptions contain.  The Court deems, accordingly, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Francisco Lueras at 30:19-31:25 (taken December 12, 2018), filed December 19, 2018 (Doc. 98-6)("Lueras Depo. 98-6")); Ohlsen Reply ¶ 10 and 11, at 12 (admitting this fact).

The Participating Agreement and Statements of Work delegate to Isleta Pueblo the responsibility for taking precautions in preventing and suppressing wildfires resulting from the thinning crew's work. See Ohlsen Motion ¶ 10, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 27, at 7); Sais Motion ¶ 12, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 27, at 7); Ohlsen Response ¶ 10, at 19 (admitting that the Second Fox Decl. includes the language about the Participating Agreement and the Statements of Work delegating responsibilities to Isleta Pueblo).[51] Isleta Pueblo, under the Participating Agreement, was, for instance, "responsible for complying with State and Federal fire laws, including tool and equipment guidelines and fire preparedness, abiding by emergency fire precautions, preventing Pueblo employees from setting fires, preventing the escape of fires started as a result of its operations, and extinguishing all such fires which might escape." Ohlsen Independent Contractor Motion (asserting this fact)(citing Participating Agreement ¶¶ III (A)-(D), at 2; id. ¶ (V)(F), at 5; Statement of Work Modification 3 §§ 3-4, 11 at 416, 427-30).[52] Isleta Pueblo could also be held liable for "all damages and for all costs incurred

---

[51]As the Ohlsen Plaintiffs' admission that the Second Fox Decl. ¶ 27, at 7, states the text's fact does not specifically controvert the United States' proposed undisputed fact, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[52]The Ohlsen Plaintiffs offer in response to the text's undisputed fact two additional facts -- that the Forest Service determined fire restrictions and that the Project Administrators should ensure Isleta Pueblo had firefighting tools. See Intendent Contractor Response ¶ 28, at 17. As neither fact specifically controverts the text's undisputed fact, the Court deems this fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

by the Government in controlling or suppressing a fire set or caused by the Pueblo." Independent Contractor Motion ¶ 29, at 8 (asserting this fact)(citing Participating Agreement ¶ (V)(F), at 5; Statement of Work Modification 3 § 11 at 427-30). See Ohlsen Independent Contractor Response ¶ 29, at 17 (admitting this fact).

The Statements of Work also schedule what work the thinning crew should perform. See Ohlsen Independent Contractor Response ¶ 13, at 15 (asserting this fact)(citing Statement of Work Original § 12, at 369-70);[53] Ohlsen Independent Contractor Response ¶ 9, at 7 (asserting this fact)(citing Statement of Work § 12, at 369-70); Independent Contractor Reply Plaintiffs' § A9, at 11 (admitting this fact). The Forest Service, for instance, "scheduled Unit 4 for hand thinning to be done August through November 4." Ohlsen Independent Contractor Response ¶ 9, at 7 (asserting this fact)(citing Statement of Work Original § 12, at 369-70); Independent Contractor Reply Plaintiffs' § A9, at 11 (admitting this fact).

The Participating Agreement provides that the Forest Service will "[r]eimburse the Pueblo for the U.S. Forest Service's share of actual expenses incurred, not to exceed $783,000, as shown in the Financial Plan," "[d]esignate work areas and provide cutting guidelines for achieving desired condition," "[i]nspect the work to provide feedback on how goals are being accomplished," and "[r]eimburse the Pueblo for completed acres at a rate of $300/acre for Treatment Type 1 (hand

---

[53]The United States contends that such a schedule did not determine the thinning crew's daily schedule, but does not dispute whether the text's fact is true. See Ohlsen Independent Contractor Response Def's UMF No. 13, at 22-23. As the United States does not specifically controvert the fact and the United States elsewhere in the Independent Contractor Reply admits the fact, the Court deems it undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

fell) Units, and for completed acres at a rate of $600/acre for Mastication Units." Participating

Agreement ¶¶ IV(A)-(D), at 2-3.[54]  See Independent Contractor Motion ¶ 30, at 8 (asserting this

fact)(citing Participating Agreement ¶¶ IV(A)-(D), at 2-3); Ohlsen Independent Contractor

Response ¶ 30, at 17 (admitting this fact).[55]  See also Ohlsen Independent Contractor Response

¶ 2, at 4 (asserting Participating Agreement ¶ IV(B), at 3's language about work areas)(quoting

Participating Agreement ¶ IV(B), at 3);[56] Ohlsen Independent Contractor Response ¶ 3, at 5

---

[54]The Ohlsen Plaintiffs includes the last quotation in the text's sentence as an additional fact to rebut the United States' Independent Contractor Motion ¶ 10, at 5-6.  See Ohlsen Independent Contractor Response ¶ 10, at 14.  The United States does not respond whether the Participating Agreement contains the language that the text quotes.  See Independent Contractor Reply Def's UMF No. 11, at 20-21.  The United States also cites the text's quoted language in the Independent Contractor Motion ¶ 13, at 6, and, in response to that paragraph, the Ohlsen Plaintiffs do not dispute the Participating Agreement's language.  See Ohlsen Independent Contractor Response ¶ 13, at 15.  The Ohlsen Plaintiffs dispute instead the United States' contention that the Forest Service was not authorized to supervise the thinning crew and the Forest Service's reliance on the First Fox Decl. ¶ 17, at 3-4.  See Ohlsen Independent Contractor Response ¶ 10, at 14; First Objections ¶ 2, at 2.  The Court concludes for the same reasons stated supra note 35, that the First Fox Decl. ¶ 17, at 3-4, is inadmissible.  As, however, the United States also cites the Participating Agreement, both parties reference the text's language, and the record supports that the Participating Agreement contains the language, the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[55]The Ohlsen Plaintiffs argue that the First Fox Decl. ¶ 17, at 3-4, on which the United States relies, is an inadmissible lay opinion.  See First Objections ¶ 3, at 2.  The Court agrees with the Plaintiffs, for the same reasons stated supra note 35. The United States also rests its alleged undisputed fact on the Participating Agreement, so the Court deems the fact supported by the evidence and undisputed as the Ohlsen Plaintiffs do not otherwise controvert the fact.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[56]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply ¶ Plaintiffs' § A2, at 8.  As discussed supra note 29, the Court "has previously held that a 'relevance argument similarly does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion." Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting S.E.C. v.

---

(asserting Participating Agreement ¶ IV(B), at 3's language about cutting guidelines)(quoting Participating Agreement ¶ IV(B), at 3); Independent Contractor Reply Plaintiffs' § A3, at 9 (admitting this fact);[57] Ohlsen Independent Contractor Response ¶ 4, at 6 (asserting Participating Agreement ¶ IV(C), at 3's language)(quoting Participating Agreement ¶ IV(C), at 3); Independent Contractor Reply Plaintiffs' § A4, at 9 (admitting this fact).[58] The Participating Agreement does not contain language stating that it excludes the Forest Service from supervising the thinning crew. See Ohlsen Independent Contractor Response ¶ 6, at 7 (asserting this fact).[59]

The Participating Agreement provides that, should Isleta Pueblo not comply with the Participating Agreement, the Forest Service can:

1.    Temporarily withhold cash payments pending correction of the deficiency by the Pueblo or more severe enforcement action by the U.S. Forest Service;

---

Goldstone, 2015 WL 5138242, at *27 n.95). The Court deems, accordingly, the text's fact undisputed.

[57]The United States admits the text's undisputed fact, but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § A3, at 9. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.-

[58]The United States admits the text's undisputed fact, but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § A4, at 9. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.-

[59]The United States argues that the Ohlsen Plaintiffs draw the alleged undisputed fact from language in the Participating Agreement taken out of context. See Independent Contractor Reply § A5, at 10. The United States does not, however, that the Participating Agreement does not contain such language as the text describes, and the record supports that the Participating Agreement does not contain such language, see Participating Agreement at 1-17. The Court concludes, accordingly, that the alleged undisputed fact is undisputed, see D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

2. Disallow (that is, deny both use of funds and matching credit for) all or part of the cost of the activity or action not in compliance;

3. Wholly or partly suspend or terminate the current agreement for the Pueblo's program;

4. Withhold further awards for the program, or

5. Take other remedies that may be legally available, including debarment procedures under 7 CFR part 3017.

Participating Agreement ¶ V(Y), at 10-11.  See Independent Contractor Motion ¶ 32, at 9 (citing this provision); Ohlsen Independent Contractor Response ¶ 32, at 17 (summarizing and citing this provision); Independent Contractor Reply Def.'s UMF No. 32 at 25-26 (admitting this provision is in the Participating Agreement).  Frank Jiron, "the designated contact for the Pueblo's thinning crew performing work under the Isleta Participating Agreement," Independent Contractor Motion ¶ 41, at 10 (asserting this fact)(citing Videotaped Deposition of Frank Jiron at 16:8-23 (taken September 25, 2018), filed November 9, 2018 (Doc. 76-2)("F. Jiron Depo. 76-2")); see Ohlsen Independent Contractor Response ¶ 41, at 20 (admitting this fact), believed that the Forest Service could stop the thinning crew's work for non-compliance with the instructions for safety and mastication, see Ohlsen Independent Contractor Response ¶ 14, at 12 (asserting this fact)(citing Videotaped Deposition of Frank Jiron at 51:14-52:5 (taken September 25, 2018), filed December

19, 2018 (Doc. 97-9)("F. Jiron Depo. 97-9")),[60] and the Participating Agreement gives the Forest

Service such authority, see Participating Agreement ¶ V(Y)(5), at 10-11.[61]

The Statement of Work Original has been modified four times. See Ohlsen Independent

Contractor Response ¶ 1, at 7 (asserting this fact)(citing Dixon Depo. 97-6 at 57:6-8); Independent

Contractor Reply Plaintiffs' § B1, at 11 (admitting this fact).[62] Modifications supplement earlier

Statements of Work, and the latest modification before any event controls the work at that event's

time. See Ohlsen Independent Contractor Response ¶ 2, at 8 (asserting this fact)(citing Videotaped

Deposition of Elaine Kohrman at 138:10-14 (taken September 10, 2018), filed November 19, 2018

(Doc. 97-4)("Kohrman Depo. 97-4"); id. at 133:16-21); Independent Contractor Reply Plaintiffs'

---

[60]The United States purports to dispute the fact that the Forest Service could suspend the contract for Isleta Pueblo's safety or work violations, but admits that F. Jiron, believed that the Forest Service could impose such a sanction, and the Ohlsen Plaintiffs allege only that F. Jiron believed that such a sanction could occur. See Independent Contractor Reply Plaintiffs' § C14, at 19; Ohlsen Independent Contractor Response ¶ 14, at 12. The Court sees, accordingly, no dispute between the Ohlsen Plaintiffs and the United States, and deems the fact undisputed.

[61]The United States avers that the Forest Service could not "suspend the contract based on non-compliance for safety or instructions regarding mastication," see Independent Contractor Reply Plaintiffs' § C14, at 19 (citing Participating Agreement ¶ 5(y), at 10-11), contrary to F. Jiron's belief, see Ohlsen Independent Contractor Response ¶ 14, at 12 (citing F. Jiron Depo. 97-9 at 51:14-52:5). The Participating Agreement's language, however, gives the Forest Service the authority to suspend the contract for non-compliance. See Participating Agreement ¶ 5(y), at 10-11. The Court follows the Supreme Court's directions and views the text's fact as undisputed, because no reasonable factfinder, based on the record, could reach a different conclusion. See Scott v. Harris, 550 U.S. at 380.

[62]The United States admits the text's undisputed fact, but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § B1, at 11. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

§ B2, at 12 (admitting this fact).[63]  "Modification 1 revised the scope of work by, among other things, decreasing the number of acres to be hand thinned in Unit 4 and increased the per acre cost for doing so."  Ohlsen Independent Contractor Response ¶ 2, at 8 (asserting this fact)(citing Modification of Grant or Agreement at 1-4 (dated September 24, 2014), filed December 19, 2018 (Doc. 97-11)("Statement of Work Modification 1")).  See Independent Contractor Reply Plaintiffs' § B2, at 12 (admitting this fact).[64]  Modification 2 again revised the scope of work and included information on thinning ninety-three "acres of goshawk habitat."  Ohlsen Independent Contractor Response § B2, at 12 (asserting this fact)(citing Modification of Grant or Agreement at 1-32 (dated June 5, 2015), filed December 19, 2018 (Doc. 97-12)("Statement of Work Modification 2")).  See Independent Contractor Reply Plaintiffs' ¶ 2, at 12 (admitting this fact).[65]  The Forest Service and Isleta Pueblo signed Statement of Work Modification 3 -- which provides for masticating Unit 4 -- in May 2016, and, as the last modification before the Dog Head Fire, it controlled the thinning crew's work during that time.  See Ohlsen Independent Contractor Response ¶ 3, at 8 (asserting this fact)(citing generally Statement of Work Modification 3);

---

[63]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § B2, at 12.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[64]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § B2, at 12.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[65]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § B3, at 12.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

Independent Contractor Reply Plaintiffs' § B3, at 12 (admitting this fact).[66] Statement of Work Modification 3 provides for masticating slash in Unit 4. See Ohlsen Independent Contractor Response ¶ 3, at 8 (asserting this fact)(citing generally Statement of Work Modification 3); Independent Contractor Reply Plaintiffs' § B3, at 12 (admitting this fact).[67] Statement of Work Modification 3 contains language indicating "'[m]asticated material should range in size from small grinded material to completely intact bole wood[68]'"; "'the contractor will maintain an average 3-6 pieces of large wood debris (minimum of 8' long and 12'' diameter at mid-point) per acre'"; and "'[a]verage masticated material depth should be 2'' and not exceed 4''.'" Ohlsen Independent Contractor Response ¶ 4, at 8 (asserting this fact)(alterations in Ohlsen Independent Contractor Response)(quoting Statement of Work Modification 3 ¶ 5(c), at 419-20). See Independent Contractor Reply Plaintiffs' § B4, at 8 (admitting that Modification 3 contains this

---

[66]The United States admits the text's undisputed fact, but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § B3, at 12. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[67]The United States admits the text's undisputed fact, but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § B3, at 12. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

The words "activity fuel" in Statement of Work Modification 3 refer to slash. Ohlsen Independent Contractor Response ¶ 3, at 8 (asserting this fact)(citing Johnson Depo. 97-1 at 51:2-6); Independent Contractor Reply Plaintiffs' § B3, at 12 (admitting this fact). The United States admits this alleged undisputed fact, but contends that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § B3, at 12. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[68]Bole wood is "[t]he tree trunk from the ground to the crown break. The bole doesn't include major branches supporting the tree crown, and may/not be straight." Glossary, Forest Learning, http://forestlearning.edu.au/about/forest-terminology-explained.html (last visited May 16, 2019).

language).[69]  Modification 4 became effective after the Dog Head Fire, in 2017, and instituted an operational change requiring a site-by-site evaluation of fire risk rather than a district-wide evaluation.  See Ohlsen Independent Contractor Response ¶ 5, at 8 (asserting this fact)(citing Kohrman Depo. 97-4 at 138:21-139:6; id. at 140:3-7; id. at 140:22-141:8; Dixon Depo. 97-6 at 83:6-10; F. Jiron Depo. 97-9 at 42:2-43:20; Project Fire Precautions Assessment, filed December 19, 2018 (Doc. 97-14)); Independent Contractor Reply Plaintiffs' § B5, at 13 (admitting this fact).[70]

The Statements of Work define a Project Administrator as the "[i]ndividual responsible for on-site administrator for agreement implementation; designation is based on responsibilities assigned by the Project Contact."  Ohlsen Independent Contractor Response ¶ 7, at 7 (asserting this fact)(citing Statement of Work Original § 2(A), at 351).  See Independent Contractor Reply Plaintiffs' § A3, at 10 (admitting this fact).[71]  The Delegation identifies Johnson and Terry Hudson as the Project Administrators.  See Ohlsen Independent Contractor Response ¶ 7, at 7 (asserting this fact)(citing Delegation at 1); Independent Contractor Reply Plaintiffs' § A7, at 10 (admitting

---

[69]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § B4, at 12.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[70]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § B5, at 13.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[71]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § A3, at 10.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

this fact).[72]  The Participating Agreement identifies Fox as the Forest Service "Program Manager Contact," and identifies Isleta Pueblo individual "Frank Jiron, Forest Supervisor" as the Cooperator Project Contact, and Isleta Pueblo individual Steve Abeita as the Cooperator Financial Contact.  Ohlsen Independent Contractor Response ¶ 5, at 6 (asserting this fact)(citing Participating Agreement ¶ V(A), at 3-4); Independent Contractor Reply Plaintiffs' § A5 (admitting the first fact).[73]  The Delegation further identifies Forest Service employees Karen Dyckes Y. Montano as the Administrative Contact (Grants and Agreement Specialist), Fox as the Project Contact (Forestry Program Manager), Johnson as the Project Administrator (Sandia District Forester), Hudson as the Project Administrator (Mountainair District Forester), and Keyco Lueras as the Project Inspector (Zoned Forestry Technician), see Ohlsen Response ¶ 5, at 3-4 (asserting

---

[72]The United States admits the text's undisputed fact, but contends that the fact is immaterial.  See Independent Contractor Reply Plaintiffs' § A3, at 10.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[73]In their Independent Contractor Motion ¶ 5, at 6-7, the Ohlsen Plaintiffs do not include the individuals' titles that the text mentions.  See Independent Contractor Motion ¶ 5, at 6-7.  The Ohlsen Plaintiffs assert that "[n]o Pueblo person is identified as a manager or supervisor -- only as a contact."  Independent Contractor Motion ¶ 5, at 6-7.  The United States disputes whether the Participating Agreement identifies "Pueblo managers or supervisors," but the United States agrees that the Participating Agreement includes the language described in the text.  See Independent Contractor Reply Plaintiffs' § A5, at 10 (citing Participating Agreement ¶ V(A), at 3-4)).  As the Ohlsen Plaintiffs' assertion that the Participating Agreement refers to Isleta Pueblo individuals only as "contacts" aligns with the text's fact and the record supports the fact, the Court deems the fact undisputed.

this fact)(citing Delegation at 1),[74] and describes each individuals' approval authority, see Ohlsen

Reply ¶ 5-6, at 10 (citing Third Fox Decl. ¶¶ 14-15, at 3-4[75]).[76]

---

[74]The United States does not dispute or respond to the individuals' titles stated in the text. As the United States does not, accordingly, specifically controvert the text's fact, the Court deems these positions undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[75]The Ohlsen Plaintiffs' make a general hearsay objection to every statement in the Third Fox Decl. based on Fox' review of the records. See Fox Objections at 1-2. The Court overrules the Ohlsen Plaintiffs' hearsay objection. Hearsay "means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The United States responds to the Ohlsen Plaintiffs' objection by arguing that Fox' statements are admissible under Fed. R. Civ. P. 56(c)(4), which allows for the admission of evidence in a declaration if the evidence would be admissible at trial. See United States of America's Response to Ohlsen Plaintiffs' Objections to Third Declaration of Ian Fox at 1-2, filed April 2, 2019 (Doc. 156)("Fox Objections Response"); Fed. R. Civ. P. 56(c)(4). The United States suggests that the business record hearsay exception makes the evidence admissible. See Fox Objections Response at 2; Fed. R. Civ. P. 803(6). This exception provides:

> A record of an act, event, condition, opinion, or diagnosis if:
>
> > (A) the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;
> >
> > (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> >
> > (C) making the record was a regular practice of that activity;
> >
> > (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> >
> > (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). The Court agrees with the Ohlsen Plaintiffs that the United States has not produced evidence to show that the United States Department of Agriculture, Forest Service, Decision Notice and Finding of No Significant Impact Isleta Collaborative Landscape Analysis

Project at 4 (dated September 18, 2018), filed December 19, 2018 (Doc. 98-10)("Decision Notice"), the Delegation, the Statement of Work Original, the Participating Agreement, or the Change to Scope of Work for the Isleta Participating Agreement (dated September 12, 2014), filed February 28, 2109 (Doc. 125-2), which the Third Fox Decl. cites, satisfy the business records exception. <u>See</u> Third Fox Decl. ¶¶ 5-9, 13-20, 22-24, 28-29, at 2-6. Specifically, the United States has not submitted any evidence related to the documents' time of making, whether the documents were kept in the regular course of business, or whether the documents were a regular business practice. <u>See</u> Fed. R. Evid. 803(6)(A)-(C). The Court concludes, however, that the Third Fox Decl. paragraphs do not refer to the documents' contents for the truths of the matters asserted and so are not hearsay.

To address the Ohlsen Plaintiffs' hearsay objections, the Court takes the Third Fox Decl.'s paragraphs in turn. The Court combines this analysis with a discussion of the Ohlsen Plaintiffs' generalized objection asking that the Court strike "those portions of the declaration in which the declarant has admitted he has: no personal knowledge, no expertise upon which to opine, and no foundation upon which to make statements concerning 'standard form' documents, as that are outside the declarant's personal knowledge, expertise or without proper foundation." Motion to Strike at 1. For those Third Fox Decl. paragraphs that the Court discusses elsewhere in the Memorandum Opinion and Order, the Court provides a footnote or a page reference.

The Third Fox Decl. ¶¶ 4-7, at 2, describe the Decision Notice's purpose and the policies proscribing the thinning crew's actions. <u>See</u> Third Fox Decl. ¶¶ 4-7, at 2. These paragraphs do not discuss the Decision Notice to show the truth of the matters it asserts, but to describe what it contains and the contents' legal significance for the parties. <u>See</u> Third Fox Decl. ¶¶ 4-7, at 2. The Federal Rules of Evidence "exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." <u>Mueller v. Abdnor</u>, 972 F.2d 931, 937 (8th Cir. 1992)(quoting Fed. R. Evid. 801(c) advisory committee's note). <u>See</u> <u>Lorraine v. Markel Am. Ins. Co.</u>, 241 F.R.D. 534, 567 (D. Md. 2007)(Grimm, M.J.)("[T]he hearsay rule does not exclude relevant evidence as to what the contracting parties said or wrote with respect to the making or the terms of an agreement."). Accordingly, no hearsay problem arises. The Ohlsen Plaintiffs do not raise an objection to Fox' personal knowledge about the Decision Notice, so the evidence is admissible.

The Third Fox Decl. ¶ 8, at 2, quotes the Decision Notice at 3, but it quotes the Decision Notice to identify a highlighted section's contents and not for the truth of the matter asserted. <u>See</u> Third Fox Decl. ¶ 8, at 2. No hearsay problems arise, therefore. The Ohlsen Plaintiffs do not object to Fox' personal knowledge about the Decision Notice, so the evidence is admissible.

The Third Fox Decl. ¶ 9, at 2-3, indicates the purpose of the highlighted section that the Third Fox Decl. ¶ 8, at 2 references, but does not otherwise reference any document. <u>See</u> Third Fox Decl. ¶ 9, at 2-3. The paragraph creates no hearsay problems. For a discussion of the foundation for the statement, see <u>infra</u> note 212.

The Third Fox Decl. ¶ 10, at 3, also does not reference any document, so the Ohlsen Plaintiffs' objections do not apply. <u>See</u> Third Fox Decl. ¶ 10, at 3. The Ohlsen Plaintiffs do not

object to Fox' personal knowledge about the Decision Notice. The Court deems, therefore, the paragraph admissible.

The Third Fox Decl. ¶ 11, at 3, summarizes the Decision Notice's contents, but it summarizes the contents to show the policies directing the Forest Service and the thinning crew, and not for the truths of the matter asserted. See Third Fox Decl. ¶ 11, at 3; Planmatics, Inc. v. Showers, 137 F. Supp. 2d 616, 620 (D. Md. 2001)(Williams, J.)(stating that evidence of instructions to show that the instructions were made is not hearsay), aff'd, 30 F. App'x 117 (4th Cir. 2002). The paragraphs are not hearsay. The Ohlsen Plaintiffs do not object to Fox' personal knowledge about the Decision Notice. The evidence is, therefore, admissible.

The Third Fox Decl. ¶ 12, at 3, does not rely on a document, so the Ohlsen Plaintiffs' objections do not apply. In the paragraph, Fox opines to the Forest Service's compliance with the Decision Notice. See Third Fox Decl. ¶ 12, at 3. The Ohlsen Plaintiffs do not raise an objection to Fox' personal knowledge about the Decision Notice. The Court deems, therefore, the evidence admissible.

The Third Fox Decl. ¶¶ 14-15, at 3-4, discuss the Delegation, but they explain Fox' understanding of the Delegation's purpose. See Third Fox Decl. ¶¶ 14-15, at 3-4. The Court concludes, therefore, that the evidence is nonhearsay. The Ohlsen Plaintiffs do not raise an objection to Fox' personal knowledge about the Delegation, so the evidence is admissible.

The Third Fox Decl. ¶¶ 16-17, at 4, discuss the Statement of Work Original and the Participating Agreement, but they discuss the duties that the document assigns to the Ohlsen Plaintiffs and the United States. See Third Fox Decl. ¶¶ 16-17, at 4. The Court deems, therefore, these paragraphs are not hearsay. See, e.g., Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 540 (5th Cir. 1994)("A contract is a verbal act."). For the reasons discussed supra note 35, the Court deems that Fox lacks personal knowledge to make these statements.

The Third Fox Decl. ¶¶ 18-21, at 4, do not rely on documents, see Third Fox Decl. ¶¶ 18-21, at 4, so the Ohlsen Plaintiffs' objections do not apply. As discussed infra note 216, these paragraphs have a foundation in personal knowledge. The Court deems, therefore, the evidence admissible.

The Third Fox Decl. ¶¶ 22-24, 28, at 5, discuss the Statement of Work Modification 2's slash depth requirement. See Third Fox Decl. ¶¶ 21-24, 28, at 5. The Court deems, however, the evidence not to be hearsay, as the United States introduces the evidence for its relation to the parties' duties under the contract and not for the matter's truth. See Third Fox Decl. ¶¶ 21-24, 28, at 5. For the foundation of the statements, see infra note 216. For the Court's conclusions on the Third Fox Decl. ¶ 28, at 5's foundation, see also infra note 214.

The Third Fox Decl. ¶¶ 25-27, at 5, do not rely on a document, so the Ohlsen Plaintiffs' objections do not apply. See Third Fox Decl. ¶¶ 25-27, at 5. The paragraphs explain Fox' reasoning for including the maximum slash depth requirement, and the Court infers that the paragraphs rest on his personal knowledge about developing that requirement in his role as Forest Service Natural Resources Staff Officer. See Third Fox Decl. ¶¶ 25-27, at 5. The Court deems, accordingly, that no hearsay problem exists. For more discussion of the foundation for the Third Fox Decl. ¶¶ 25-27, at 5, see infra pages 265-68.

The Third Fox Decl. ¶ 27, at 5, likewise does not comment on a document's contents, so the Ohlsen Plaintiffs' objections do not apply. See Third Fox Decl. ¶ 27, at 5. The Court deems, accordingly, that the hearsay objection does not preclude the evidence's admission. As the paragraph recounts the Forest Service's and Isleta Pueblo's decision to increase the payment to Isleta Pueblo for Unit 4, the Court infers that the paragraph rests on Fox' personal knowledge as the Forest Service Natural Resources Staff Officer. See Third Fox Decl. ¶ 27, at 5.

The Third Fox Decl. ¶¶ 29-35, at 6-7, do not rely on a document's contents other than to mention the Participating Agreement's provision that the thinning crew should follow the silvicultural prescription. See Third Fox Decl. ¶ 29, at 6. This statement pertains to the contract provisions affecting Isleta Pueblo's duties, so it poses no hearsay problem. The Court deems, accordingly, that the evidence is admissible under the hearsay rules. For a discussion of the the Third Fox Decl. ¶¶ 29, 31, 33-35, at 6-7's foundations, see infra note 194. For the reasons stated infra note 194, the Court also deems the Third Fox Decl. ¶¶ 30, 32, at 6, to have a foundation in personal knowledge and be admissible.

[76]The United States argues that the Delegation does not grant authority for the thinning project or describe each administrator's areas of responsibility, as the Ohlsen Plaintiffs contend, see Ohlsen Response ¶ 5, at 3-4; Ohlsen Response ¶ 7, at 4, but identifies individuals' approval authority, see Ohlsen Reply ¶ 5, at 10; Ohlsen Reply ¶ 7, at 11. The United States argues that the Delegation "was to facilitate communication with the Pueblo, by identifying for Isleta Pueblo the individuals to contact and identifying their responsibilities." Ohlsen Reply ¶ 6, at 10 (citing Third Fox Decl. ¶¶ 14-15, at 3-4). The Court concludes that the United States presents the accurate interpretation of the Delegation. Although the United States presents this statement in its Ohlsen Reply and the Court must be careful about deeming facts from a reply to be undisputed, the Ohlsen Plaintiffs had the opportunity to reply to the fact in the Motion to Strike Reply and at the hearing, and the record supports the United States' proposed fact. See Delegation at 1. The Delegation suggests that the "x's" in the Delegation's chart indicate each administrator's approval authority. See Delegation at 1; Ohlsen Reply ¶ 7, at 11. The Supreme Court has directed district courts: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. at 380. As the Delegation explains how to interpret the document, the Court concludes that the United States' interpretation, which follows the Delegation's text, presents the accurate fact.

The Ohlsen Plaintiffs ask that the Court disregard the Third Fox Decl. ¶¶ 14-15, at 3-4, on which the United States relies, see Ohlsen Reply ¶ 6, at 10 (citing Third Fox Decl. ¶¶ 14-15, at 3-4), because the Ohlsen Plaintiffs disagree with Fox' interpretation of the Delegation, see Motion to Strike Reply at 4. The Ohlsen Plaintiffs do not cite, however, any additional evidence to support their arguments beyond the evidence that they present in the Ohlsen Response and, as discussed in the footnote's preceding paragraph, this evidence does not dispute the text's statement. The Court determines, accordingly, that no factual dispute exists regarding the text's statement. See Motion to Strike Reply at 4.

The Participating Agreement broke the total treatment area in the Cibola National Forest into units. See Ohlsen Motion ¶ 14, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 35, at 9); Sais Motion ¶ 16, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 35, at 9); Ohlsen Response ¶ 14, at 19 (admitting this fact). The Dog Head Fire began in Unit 4, within Management Unit 11. See Ohlsen Motion ¶ 15, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 38, at 9); Sais Motion ¶ 17, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 38, at 9); Ohlsen Response ¶ 15, at 19 (admitting this fact). The Forest Service "designated work areas or units and the type of treatment for those units as described in the Statement of Work." Ohlsen Motion ¶ 16, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 35, at 9); Sais Motion ¶ 18, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 35, at 9). See Ohlsen Response ¶ 16, at 20 (admitting this fact).

> Decisions regarding when and how to treat specific areas of USFS lands were guided by statutes governing management of those lands, the overall mission of the USFS, and importantly here, the Forest Plan, the Strategic Plan, and Region 3 Strategic Plan. The USFS also considered important policy considerations such as anticipated and available funding, competing projects, risk of wildfire, overall health of the forest, and relative health of different areas of the forest, population density, public interests, and other committed resources, while also taking into account the priorities of USFS's partners.

Ohlsen Motion ¶ 17, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 36, at 9); Sais Motion ¶ 19, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 36, at 9).[77] Moreover,

> [a]ligning forest-thinning work on the units with general fire restrictions involves weighing policy considerations. USFS weighs the risk of further restricting forest thinning activity on USFS lands versus the risk of a catastrophic wildfire if the work is not performed in a timely manner. The USFS also has several restoration projects

---

[77]The Ohlsen Plaintiffs do not state that they admit Ohlsen Motion ¶ 17, at 7, but they instead state that the Second Fox Decl. speaks for itself. See Ohlsen Response ¶ 17, at 20. This response does not specifically controvert the Ohlsen Motion's proposed undisputed fact, so the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

> happening in tandem and must take into consideration the timing of each of these
> projects. The USFS must also take into consideration available funding for projects
> and when the projects must take place to take advantage of the funding.

Ohlsen Motion ¶ 29, at 10 (asserting this fact)(citing Second Fox Decl. ¶¶ 53-58, at 12-13); Sais

Motion ¶ 33, at 9-10 (asserting this fact)(citing Second Fox Decl. ¶¶ 53-58, at 12-13).[78] "Decisions

regarding required tools and equipment to mitigate the risk of causing wildfire involves [sic] policy

considerations such as how best to use USFS monetary resources, the benefits of additional tools

and equipment, and the risk that the work will cause a wildfire." Ohlsen Motion ¶ 30, at 9

(asserting this fact)(citing Second Fox Decl. ¶¶ 63-66, at 14-15); Sais Motion ¶ 37, at 10 (asserting

this fact)(citing Second Fox Decl. ¶¶ 63-66, at 14-15). See Ohlsen Response ¶ 29, at 22 (admitting

this fact).

### 2. The Forest Service and Thinning Crew Interactions.

For the restoration project, the thinning crew consisted of a hand crew of generally eight

to ten workers and a mastication crew. See Ohlsen Independent Contractor Response ¶ 2, at 5

(asserting this fact)(citing Dixon Depo. 97-6 at 22:10-23:2); Independent Contractor Reply

Plaintiffs' § A2, at 8 (admitting this fact).[79] As the crew's supervisor and foreman, F. Jiron

attended the thinning project site "at least once a week" and "was on site seventy-five percent

(75%) of the time." Independent Contractor Motion ¶ 42, at 10 (asserting this fact)(citing F. Jiron

---

[78]The Ohlsen Plaintiffs dispute the materiality of the text's fact, but do not controvert the fact. See Ohlsen Reply ¶ 29, at 22. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[79]The United States argues that the undisputed fact in the text is immaterial. See Independent Contractor Reply Plaintiffs' § A2, at 8. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

Depo. 76-2 at 52:12-14; id. at 96:20-25). See Ohlsen Independent Contractor Response ¶ 2, at 9 (asserting this fact)(citing Johnson Depo. 97-1 at 40:16-20; id. at 72:20-73:1).[80]  Marcelini Zuni was the day-to-day supervisor at the thinning site; he was on site most days, and, on the workdays, also reported to F. Jiron in person.  See Independent Contractor Motion ¶ 45, at 11 (asserting that Zuni supervised the thinning crew daily and reported to F. Jiron)(citing F. Jiron Depo. 76-2 at 61:12-23; id. at 94:23-96:25); Ohlsen Independent Contractor Response ¶ 45, at 20 (asserting Zuni was on the project "most days")(citing F. Jiron Depo. 97-9 at 61:12-23).[81]  F. Jiron would personally or through Zuni give the thinning crew orders, see Ohlsen Independent Contractor Response ¶ 43, at 20 (asserting this fact)(citing F. Jiron Depo. 97-9 at 96:4),[82] and the thinning crew met daily to receive instructions from Zuni, see Independent Contractor Motion ¶ 51, at 12 (asserting this fact)(citing Videotaped Deposition of Jeremy Jiron at 95:3-19 (taken September 25, 2018), filed November 9, 2018 (Doc. 76-3)("J. Jiron Depo. 76-3")); Ohlsen Independent

---

[80]The United States argues that the undisputed fact in the text is immaterial.  See Independent Contractor Reply Plaintiffs' § C3, at 14.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[81]Although the United States does not admit the text's fact, the United States describes that the Ohlsen Plaintiffs concede that Zuni was on site most days.  See Independent Contractor Reply Def.'s UMF No. 45, at 29.  Such a response suggests that the United States does not dispute this fact, so the Court deems the fact undisputed.  The United States otherwise argues that the Ohlsen Plaintiffs' response is immaterial.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.

[82]The Ohlsen Plaintiffs do not respond to this portion of the text's undisputed fact.  See Ohlsen Independent Contractor Response ¶ 43, at 10.  As the Ohlsen Plaintiffs do not respond to the fact, they do not specifically controvert the fact, and the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Contractor Response ¶ 51, at 21 (admitting this fact). Mark Dixon[83] visited the thinning site about

six times during the two years before the Dog Head Fire. See Ohlsen Independent Contractor

Response ¶ 2, at 9 (asserting this fact)(citing Dixon Depo. 97-6 at 51:15-22).[84] Jeremy Jiron, the

masticator operator, identified Dixon and F. Jiron as supervisors, and Zuni as the primary

supervisor and the "direct supervisor on a day-to-day basis," J. Jiron Depo. 76-3 at 94:21-95:12;

Eugene Jiron, a thinning crew member, testified that F. Jiron and Zuni were the thinning crew's

---

[83]The Ohlsen Plaintiffs and the United States dispute, based on F. Jiron's, J. Jiron's, Jaramillo's, and Dixon's descriptions of Dixon's position with the restoration and thinning project, Dixon's role with the project, so the Court does not include Dixon's role as an undisputed fact. See Independent Contractor Motion ¶ 9, at 5 (citing F. Jiron Depo. 76-2 at 48:2-8; id. at 83:8-15; J. Jiron Depo. 76-3 at 94:21-25; Jaramillo Depo. 76-5 at 91:3-19); Ohlsen Independent Contractor Response ¶ 9, at 13 (citing Dixon Depo. 97-6 at 137:14-16). As F. Jiron, J. Jiron, Jaramillo, and Dixon testify to their views in depositions, the Court can and will consider all the evidence admissible. See Fed. R. Civ. P. 56(c)(1); F. Jiron Depo. 76-2 at 48:2-8; id. at 83:8-15; J. Jiron Depo. 76-3 at 94:21-25; Jaramillo Depo. 76-5 at 91:3-19; Dixon Depo. 97-6 at 137:14-16. The Ohlsen Plaintiffs ask that the Court ignore Jaramillo's testimony about Dixon's role, because Jaramillo only interned with the thinning crew. The Court considers this request to speak to the weight that a factfinder should give Jaramillo's testimony, and not its admissibility, but the argument suggests a dispute of material fact regarding Jaramillo's statements.

The Court summarizes, however, the parties' arguments here, so the reader has context for Dixon's place in this case. The United States describes Dixon as "responsible for the administration of the [Participating Agreement.]" Independent Contractor Motion ¶ 9, at 5 (citing F. Jiron Depo. 76-2 at 48:2-8; id. at 83:8-15; J. Jiron Depo. 76-3 at 94:21-25; Jaramillo Depo. 76-5 at 91:3-19). The United States further explains, in the Independent Contractor Reply Def.'s UMF No. 9, at 20, that Dixon replaced Abeita as the Administrative Contact for the Participating Agreement. See Independent Contractor Reply Def.'s UMF No. 9, at 20. The Ohlsen Plaintiffs aver that Dixon identified himself as the point of contact for the Participating Agreement. See Ohlsen Independent Contractor Response ¶ 9, at 13 (citing Dixon Depo. 97-6 at 137:14-16).

[84]The United States does not specifically controvert or make any comment on text's fact, but the United States argues that the fact is immaterial. See Independent Contractor Reply Plaintiffs' § C3, at 14. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. As the United States does not specifically controvert the fact, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

day-to-day supervisors, see Videotaped Deposition of Eugene Jiron at 83:10-22 (taken September 26, 2018), filed November 9, 2018 (Doc. 76-4)("E. Jiron Depo. 76-4").  See also Independent Contractor Motion ¶ 49, at 11 (asserting this fact)(citing J. Jiron Depo. 76-3 at 94:21-95:12; E. Jiron Depo. 76-4 at 83:10-22; Jaramillo Depo. 76-5 at 91:3-19[85]).[86]

F. Jiron did not regularly meet with the Forest Service for instructions on the thinning project.  See Independent Contractor Motion ¶ 44, at 11 (asserting this fact)(citing F. Jiron Depo.

---

[85]Everette Jaramillo, an intern with the thinning crew, also identified Zuni, Dixon, and F. Jiron as his supervisors.  See Jaramillo Depo. 76-5 at 91:3-19; Independent Contractor Motion ¶ 49, at 11 (citing Jaramillo Depo. 76-5 at 91:3-19).  The Ohlsen Plaintiffs ask that the Court strike Jaramillo Depo. 76-5 at 91:13-16, because the question is compound.  See First Objections at 2. The United States responds that the question merely clarifies Jaramillo's answer to Jaramillo Depo. 76-5 at 91:3-12.  See First Objections Response at 1.  The Court disagrees with the Ohlsen Plaintiffs' assessment, because the question is one question asking Jaramillo to clarify his preceding testimony.  Moreover, the Court sees no prejudice to the Ohlsen Plaintiffs in admitting the testimony, because Jaramillo Depo. 76-5 at 91:13-16, establishes the same evidence as Jaramillo Depo. 76-5 at 91:3-12.

The Ohlsen Plaintiffs also ask that the Court discount Jaramillo's testimony, because he had worked with the thinning crew for only two weeks before the Dog Head Fire and was a minor at the time.  See Ohlsen Independent Contractor Response ¶ 49, at 21.  The Court considers this argument to attack Jaramillo's credibility rather than the statement's admissibility.  As the Court should not make credibility determinations on a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("Liberty Lobby"), however, the Court deems this argument to create a genuine dispute of material fact.  Accordingly, the Court does not include the evidence as an undisputed fact.

[86]The Ohlsen Plaintiffs purport to dispute the text's fact.  See Ohlsen Independent Contractor Response ¶ 49, at 20.  They dispute, however, the wording of the United States' proposed undisputed fact that E. Jiron, J. Jiron, and Jaramillo testified that Dixon, Jiron, and Zuni were their supervisors and/or day-to-day supervisors, and do not specifically controvert the fact's text.  See Ohlsen Independent Contractor Response ¶ 49, at 20.  The Court discusses Jaramillo's testimony in the preceding footnote.  The Court deems the text's fact undisputed, because the United States cites to the depositions excerpts that the text cites and the Plaintiffs do not specifically controvert the fact.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

76-2 at 49:14-125).[87] Over the course of the thinning project, F. Jiron met, for example, five times with Fox in the Cibola National Forest. See Ohlsen Independent Contractor Response ¶ 14, at 12 (asserting this fact)(citing F. Jiron Depo. 97-9 at 32:5-12); Independent Contractor Reply § C14, at 19 (admitting this fact).[88]

The Forest Service monitored and ensured, however, that the thinning crew performed work according to the Participating Agreement and the Statements of Work. See Ohlsen Independent Contractor Response ¶ 10, at 14 (asserting this fact).[89] See also Ohlsen Motion ¶ 12, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 31, at 8); Sais Motion ¶ 14, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 31, at 8); Ohlsen Response ¶ 12, at 19 (admitting this fact). The Forest Service approved the thinning crew's work and told the thinning crew what to do to meet the Forest Service's prescriptions. See Ohlsen Response ¶ 13, at 5 (asserting this fact)(citing

---

[87]The Ohlsen Plaintiffs do not dispute this statement but dispute only how frequently F. Jiron met with Johnson. See Ohlsen Independent Contractor Response ¶ 44, at 20. As the Plaintiffs do not specifically controvert the text's undisputed fact, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[88]The United States argues that the fact in the text is immaterial. See Independent Contractor Reply Plaintiffs' § C14, at 19. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. As the United States does not otherwise controvert the fact's text, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[89]Isleta Pueblo includes the fact in the text as an additional fact to rebut the United States' Independent Contractor Motion ¶ 10, at 5-6. See Ohlsen Independent Contractor Response ¶ 10, at 14. The United States avers that Isleta Pueblo did not show that a genuine issue of material fact exists as to its proposed undisputed facts and that the alleged fact in the text is immaterial, but does not respond to the alleged fact's veracity. See Independent Contractor Reply Def's UMF No. 11, at 20-21. The record, moreover, supports the alleged fact in the text. Accordingly, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Lueras Depo. 98-6 at 33:12-35:20; id. at 39:2-16; id. at 52:8-25; Videotaped Deposition of Aaron Johnson at 65:6-9 (taken September 11, 2018), filed December 19, 2018 (Doc. 98-3)("Johnson Depo. 98-3"); id. at 128:20-24); Ohlsen Reply ¶ 13-16, at 13 (admitting this fact). When Johnson visited the site, he inspected the work and gave the thinning crew workers suggestions for improvement. See Ohlsen Independent Contractor Response ¶ 53, at 21 (asserting this fact)(citing J. Jiron Depo. 76-3 at 24:3-25:6).[90] Johnson would sometimes create a "Participating Agreement Site Visit Report" -- or "Inspection Report" or "Contract Daily Diary Report" -- to record events such as when the thinning crew completed a unit and to note concerns with the thinning crew's work; he might provide the report and verbal directions to the thinning crew through F. Jiron or through the crew lead. See Independent Contractor Motion ¶ 36, at 9-10 (asserting this fact)(citing Videotaped Deposition of Aaron Johnson at 56:6-18 (taken September 11, 2018), filed November 2, 2018 (Doc. 60-5)("Johnson Depo. 60-5"); F. Jiron Depo. 76-2 at 18:25-24:18; id. at 96:3-11);[91] Ohlsen Independent Contractor Response ¶ 36, at 19 (asserting this fact)(citing Johnson Depo. 97-1 at 56:6-15; id. at 67:14-21);[92] Ohlsen Independent Contractor Response ¶ 3, at 9-10 (asserting

---

[90]The United States disputes the relevance of the text's undisputed fact, but the United States does not specifically controvert the fact. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[91]The Ohlsen Plaintiffs dispute the wording of the United States' alleged undisputed fact and provide additional facts regarding the United States' alleged undisputed fact. See Ohlsen Independent Contractor Response ¶ 36, at 19. The Ohlsen Plaintiffs' contentions and additional facts do not controvert that Johnson completed reports and conveyed concerns through the foreman or lead on the thinning project site, so the Court deems the fact undisputed.

[92]The United States avers that the Ohlsen Plaintiffs' additional facts do not create a material dispute. See Independent Contractor Reply Def.'s UMF No. 36, at 27-28. The United States does

this fact); Independent Contractor Reply Plaintiffs' § C3, at 15 (admitting this fact).[93]  If Johnson

determined that the thinning crew's work was unacceptable, he directed the crew to redo the work.

See Ohlsen Independent Contractor Response ¶ 12, at 12 (asserting this fact)(citing F. Jiron Depo.

97-9 at 20:8-24).[94]  On April 4, 2014, Hudson told F. Jiron "'to remove slash from the road,'"

which was typical of the directions Johnson and Hudson gave the thinning crew.  Ohlsen

Independent Contractor Response ¶ 4, at 10 (asserting this fact)(quoting Participating Agreement

Site Visit Report at 1 (dated April 4, 2014), filed December 19, 2018 (Doc. 97-17)("Site Visit

Report"); and citing Johnson Depo. 97-1 at 70:4-8); Independent Contractor Reply Plaintiffs' § C4,

at 15 (admitting this fact).[95]  On May 5, 2015, Johnson told F. Jiron and a masticator operator to

start masticating Unit 2, and the three men went to Unit 2 where Johnson discussed the "unit

---

not aver that the basic facts as described in the text are not true.  See Ohlsen Independent Contractor
Response Def.'s UMF No. 36, at 27-28.  The Court deems, accordingly, the fact undisputed.

   [93]The United States disputes the text's undisputed fact's relevance, but the United States
does not specifically controvert the fact.  See Independent Contractor Reply Plaintiffs' § C3, at 15.
For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.
Accordingly, the Court deems the alleged undisputed fact undisputed.  See D.N.M. LR-Civ.
56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

   [94]The United States makes no statement about the text's undisputed fact.  See Independent
Contractor Reply Plaintiffs' § C12, at 18.  As the United States makes no response, it does not
specifically controvert the alleged undisputed fact, so the Court deems the fact undisputed.  See
D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed
unless specifically controverted.").

   [95]The United States disputes the materiality of the text's fact.  See Independent Contractor
Reply Plaintiffs' § C4, at 15.  For the Court's rulings on relevance arguments in summary
judgment motions, see supra note 29.  Accordingly, the Court deems the alleged undisputed fact
undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be
deemed undisputed unless specifically controverted.").

boundary, specifications of work, and the work prescription." Ohlsen Independent Contractor Response ¶ 5, at 8 (asserting this fact)(citing Contractor Daily Diary at 1 (dated May 5, 2015), filed December 19, 2018 (Doc. 97-18)("Contractor Daily Diary 97-18"); Johnson Depo. 97-1 at 71:7-16); Independent Contractor Reply Plaintiffs' § C5, at 15 (admitting this fact).[96] At another time, Johnson asked F. Jiron to instruct the crew to spend less time addressing the slash and increase the pace of thinning per acre. See Independent Contractor Motion ¶ 6, at 10 (asserting this fact)(citing Contract Daily Diary at 1 (dated May 9, 2015), filed December 19, 2018 (Doc. 97-19)("Contract Daily Diary 97-19"); Johnson Depo. 60-5 at 71:19-72:4); Independent Contractor Reply Plaintiffs' § C6, at 15-16 (admitting this fact).[97] Johnson also directed the crew lead, E. Jiron, at one point, to change the size of the mastication grindings to reduce their depth, because Johnson had the discretion as the inspector to make this request. See Ohlsen Independent Contractor Response ¶ 7, at 10 (asserting this fact)(citing Johnson Depo. 97-1 at 73:4-74:23; Contract Daily Diary at 1 (dated May 9, 2014), filed December 19, 2018 (Doc. 97-20)("Contract Daily Diary 97-20"); Independent Contractor Reply Plaintiffs' § C7, at 16 (admitting this fact).[98]

---

[96]The United States disputes the materiality of the text's fact. See Independent Contractor Reply Plaintiffs' § C5, at 15. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[97]The United States disputes the materiality of the text's fact. See Independent Contractor Reply Plaintiffs' § C6, at 15-16. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[98]The United States disputes this statement's materiality. See Independent Contractor Reply Plaintiffs' § C7, at 16. For the Court's rulings on relevance arguments in summary

Lueras also heard Johnson "tell the thinning crew to take care getting the diameters right because they may be leaving too many big trees." Ohlsen Independent Contractor Response ¶ 13, at 12 (asserting this fact)(citing Deposition of Francisco Lueras at 36:3-18 (taken December 12, 2018), filed December 19, 2018 (Doc. 97-29)("Lueras Depo. 97-29")).[99]

Johnson largely communicated with F. Jiron and Zuni. See Independent Contractor Motion ¶ 54, at 12 (asserting this fact)(citing J. Jiron Depo. 76-3 at 47:1-15; id. at 95:1-97:24); Ohlsen Independent Contractor Response ¶ 54, at 21 (admitting this fact). Jaramillo, for instance, received instructions from people from Isleta Pueblo, see Independent Contractor Motion ¶ 58, at 12 (asserting this fact)(citing F. Jiron Depo. 76-2 at 27:25-28:10; id. at 9:18-10:7; id. at 15:8-22; id. at 91:3-93:15); Ohlsen Independent Contractor Response ¶ 58, at 12 (admitting this fact), and, although he worked with the thinning crew every other day for a couple weeks before the Dog Head Fire, he had never heard of Johnson, see Independent Contractor Motion ¶ 59, at 12 (asserting this fact)(citing Jaramillo Depo. 76-5 at 11:24-12:4; id. at 15:8-22; id. at 90:12-16); Ohlsen Independent Contractor Response ¶ 59, at 21 (admitting this fact). J. Jiron spoke "a little bit" to Johnson about the Project; Independent Contractor Motion ¶ 53, at 12 (asserting this fact)(citing

judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[99]The United States disputes this statement's materiality but does not otherwise controvert the statement. See Independent Contractor Reply Plaintiffs' § C13, at 19. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

J. Jiron Depo. 76-3 at 24:3-25:6),[100] but he never received written instructions from Johnson, see Independent Contractor Motion ¶ 55, at 12 (asserting this fact(citing J. Jiron Depo. 76-3 at 48:6-22).[101]

When Johnson visited the site and F. Jiron was available, Johnson gave verbal instructions to F. Jiron, which F. Jiron followed, and when F. Jiron was not at the site, Johnson instructed the thinning crew. See Ohlsen Independent Contractor Response ¶ 12, at 11-12 (asserting this fact)(citing F. Jiron Depo. 97-9 at 20:8-24; id. at 50:1-10; id. at 23:17-20); Independent Contractor Reply Plaintiffs' § C12, at 18 (admitting this fact).[102] If Johnson raised an issue with F. Jiron, he expected F. Jiron to raise the issue with the thinning crew. See Independent Contractor Motion ¶ 6, at 10 (asserting this fact)(citing Johnson Depo. 97-1 at 71:19-72:4); Independent Contractor Reply Plaintiffs' § C6, at 15-16 (admitting this fact). F. Jiron would communicate the report to

---

[100]The Ohlsen Plaintiffs purport to dispute the text's undisputed fact, but they add additional facts about the substance of Johnson and F. Jiron's conversations. See Ohlsen Independent Contractor Response ¶53, at 21. These comments do not specifically controvert that Jiron spoke to Johnson a "little bit," so accordingly, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[101]The Ohlsen Plaintiffs do not respond to this specific fact, although they argue about whether Johnson gave the thinning crew workers verbal instructions. See Ohlsen Independent Contractor Response ¶ 55, at 21. As the Ohlsen Plaintiffs do not address the text's undisputed fact, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[102]The United States disputes the text's undisputed fact's relevance, but the United States does not specifically controvert the fact. See Independent Contractor Reply Plaintiffs' § C12, at 18. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

the thinning crew in person or through Zuni. See Ohlsen Independent Contractor Response ¶ 43, at 20 (asserting this fact)(citing F. Jiron Depo. 97-9 at 96:4).[103] If Johnson gave the thinning crew workers directions, they followed the directions, because Johnson occupied a position of authority. See Ohlsen Independent Contractor Response ¶ 10, at 11 (asserting this fact)(citing Videotaped Deposition of Eugene Jiron at 46:14-47:4 (taken September 26, 2018), filed December 19, 2018)(Doc. 97-15)("E. Jiron Depo. 97-15"); id. at 79:8-14);[104] Ohlsen Independent Contractor Response ¶ 11, at 11 (asserting this fact)(citing J. Jiron Depo. 97-2 at 81:19-82:2; F. Jiron Depo. 97-9 at 49:10-50:3; id. at 98:12-25); Independent Contractor Reply Plaintiffs' § C11, at 17-18 (admitting that Johnson and Lucero inspected the project).[105]

---

[103]The United States asserts "Frank Jiron would instruct or order the crew to do certain tasks, and would communicate compliance report requests to the crew on the ground either in person or through Pueblo employee Marcelino Zuni." Independent Contractor Motion ¶ 43, at 10. The Ohlsen Plaintiffs reply clarifying that F. Jiron instructed Zuni on the thinning project and that the testimony refers to "contract daily diary reports" rather than the "compliance report requests" to which the United States refers. Independent Contractor Motion ¶ 43, at 10. See Ohlsen Independent Contractor Response ¶ 43, at 20. The record supports the Ohlsen Plaintiffs' statements, and, in the Independent Contractor Reply, the United States admits "Jiron testified that he supervised the crew chief, Marcelino Zuni, based on status reports from the USFS." Independent Contractor Reply Def.'s UMF No. 43, at 29. The Court deems, accordingly, that the facts in the text are undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[104]The United States purports to dispute the text's undisputed fact, but the United States agrees that Johnson would inspect the masticator's work and the United States does not make any statement in response to the allegation that E. Jiron followed what Johnson directed him to do. See Independent Contractor Reply Plaintiffs' § C10, at 17. The Court deems, accordingly, the facts in the text undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[105]The United States makes no statement regarding the Ohlsen Plaintiffs' proposed undisputed fact that, if Johnson gave instructions to the thinning crew, the thinning crew members followed the notes because he occupied a position of authority. See Independent Contractor Reply Plaintiffs' § C11, at 17-18. As the United States offers no response, the United States does not

Lueras inspected the Project site about once a week.  See Ohlsen Independent Contractor Response ¶ 13, at 12 (asserting this fact)(citing Delegation at 1; Lueras Depo. 97-29 at 33:8-23; id. at 52:20-23); Independent Contractor Reply Plaintiffs' § C13, at 18-19 (admitting this fact); Ohlsen Response ¶ 12, at 4-5 (asserting this fact); Ohlsen Reply ¶ 12, at 12-13 (admitting this fact). Lueras inspected treatment areas both before and after the thinning crew completed the work to check that the thinning crew followed the prescriptions.  See Ohlsen Independent Contractor Response ¶ 13, at 12 (asserting this fact)(citing Delegation at 1; Lueras Depo. 97-29 at 33:8-23; id. at 52:20-23); Independent Contractor Reply Plaintiffs' § C13, at 18-19 (admitting this fact); Ohlsen Response ¶ 14, at 5 (asserting this fact)(citing Lueras Depo. 98-6 at 33:2-17; id. at 35:3-20); Ohlsen Reply ¶ 13-16, at 13 (admitting this fact).  After the thinning crew finished a unit, Lueras inspected it to make sure the thinning crew completed the area properly and reported on the site to Johnson.  See Ohlsen Independent Contractor Response ¶ 13, at 12 (asserting this fact)(citing Lueras Depo. 97-29 at 35:9-36:2); Independent Contractor Reply Plaintiffs' § C13, at 18-19 (admitting this fact);[106] Ohlsen Response ¶ 15, at 5 (asserting this fact)(citing Lueras Depo. 98-6 at 39:2-16); Ohlsen Reply ¶¶ 13-16, at 13 (admitting this fact).  Johnson then "inspected the units and provided an inspection report and corrections, as necessary."  Ohlsen Response ¶ 16, at

specifically controvert the alleged undisputed fact, so the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[106]The United States disputes this statement's materiality.  See Independent Contractor Reply Plaintiffs' § C13, at 18-19.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  Accordingly, the Court deems the alleged undisputed fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

5 (asserting this fact)(citing Johnson Depo. 98-3 at 65:6-66:9; id. at 123:11-124:23; id. at 128:20-24).  See Ohlsen Reply ¶ 13-16, at 13 (admitting this fact).

Johnson and Hudson also provided the thinning crew more detailed prescriptions for their work than those prescriptions that the Statements of Work provide and specifically gave the thinning crew additional prescriptions for Treatment Type 1 and 2 units.  See Ohlsen Independent Contractor Response ¶ 3, at 6 (asserting this fact)(citing Johnson Depo. 97-1 at 37:17-38:9); Independent Contractor Reply Plaintiffs' § A3, at 9 (admitting this fact).[107]  The Statements of Work contain language, for instance, about the treatment units being mapped and their boundaries being marked with orange flags, numbers, and blue flags on the ground.  See Statement of Work Original §§ 1(D)-(E), at 349-50.[108]  See also Ohlsen Independent Contractor Response ¶ 2, at 4-5 (asserting this fact)(citing Statement of Work § 1(D)-(E), at 349-50);[109] Independent Contractor

---

[107]The United States disputes this statement's materiality.  See Independent Contractor Reply Plaintiffs' § A3, at 9.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  Accordingly, the Court deems the alleged undisputed fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[108]The Ohlsen Plaintiffs state that the Statements of Work assign to the Forest Service the responsibility of mapping and marking boundary trees, see Ohlsen Independent Contractor Response ¶ 11, at 14, and the United States replies that the Statements of Work do not require that the Forest Service perform any task, but rather describe mapping and boundary marking that the Forest Service has completed, see Independent Contractor Reply Def.'s UMF No. 11, at 21-22.  As the parties agree that the Statements of Work contain language describing the mapping and the boundaries and as the parties dispute only the text's implications, the Court deems the language's presence in the Statements of Work undisputed.

[109]The United States disputes this statement's materiality.  See Independent Contractor Reply Plaintiffs' § A2, at 8.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  Accordingly, the Court deems the alleged undisputed fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Reply Plaintiffs' § A2, at 8 (admitting this fact); Ohlsen Motion ¶ 13, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 33, at 8); Sais Motion ¶ 15, at 6 (asserting this fact)(citing Second Fox Decl. ¶ 33, at 8); Ohlsen Response ¶ 13, at 19 (admitting this fact). The mapping designates some units for hand thinning and some units for mastication, and Hudson designated the units. See Ohlsen Independent Contractor Response ¶ 2, at 5 (asserting this fact)(citing Isleta Participating Agreement Units Funded by Modification, filed December 19, 2018 (Doc. 97-8)); Independent Contractor Reply Plaintiffs' § A2, at 8 (admitting this fact).[110] The Forest Service also designated some trees with orange paint, indicating that the thinning crew should not cut those trees. See Ohlsen Independent Contractor Response ¶ 3, at 6 (asserting this fact)(citing F. Jiron Depo. 97-9 at 69:1-13); Independent Contractor Reply Plaintiffs' § A3, at 9 (admitting this fact).[111] Forest Service employees performed the tasks of marking boundaries and trees. See Independent Contractor Motion ¶ 18, at 6 (asserting this fact)(citing First Fox Decl. ¶ 21, at 4; F. Jiron Depo. 76-2 at 108:24-109:17); Ohlsen Independent Contractor Response ¶ 18, at 16 (admitting this fact); Ohlsen Response ¶ 11, at 4 (asserting that the Forest Service designated and marked boundaries and trees to cut)(citing Lueras Depo. 98-6 at 30:19-31:7; Videotaped Deposition of Elaine Kohrman at 101:2-104:23 (taken September 10, 2018), filed December 19, 2018 (Doc. 98-

---

[110]The United States disputes this statement's materiality. See Independent Contractor Reply Plaintiffs' § A2, at 8. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[111]See supra note 109.

9)("Kohrman Depo. 98-9"); Silviculture Prescriptions); Ohlsen Reply ¶ 10 and 11, at 12 (admitting this fact).

The thinning crew knew where to work and what to do, because the Forest Service marked the boundaries with flags or paint, and because Hudson and Johnson showed the crew the unit and the boundaries on a map and in person, and described the thinning crew's work. See Ohlsen Independent Contractor Response ¶ 2, at 5 (asserting this fact)(citing Johnson Depo. 97-1 at 35:24-36:3; id. at 36:6-37:8; Dixon Depo. 97-6 at 23:8-24:7); Independent Contractor Reply Plaintiffs' § A2, at 8 (admitting this fact).[112] Johnson met with the thinning crew's "foreman and crew at the beginning of work on a unit to discuss boundaries, prescription or scope of work, and guidelines." Independent Contractor Motion ¶ 37, at 10 (asserting this fact)(citing First Fox Decl. ¶ 22, at 4-5;[113] Johnson Depo. 60-5 at 36:6-38:3; id. at 39:17-40:22; id. at 52:11-54:25; E. Jiron Depo. 76-4 at 46:3-47:4). See Ohlsen Independent Contractor Response ¶ 37, at 19 (admitting this fact).

---

[112]The United States disputes this statement's materiality. See Independent Contractor Reply Plaintiffs' § A2, at 8. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. Accordingly, the Court deems the alleged undisputed fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[113]In the First Objections, the Plaintiffs object that the First Fox Decl. ¶ 22, at 4-5, on which the United States relies, is an inadmissible lay opinion and lacks a foundation in personal knowledge. See First Objections ¶ 3, at 2. The United States argues that the First Fox Decl. ¶ 22, at 4-5, contains a statements of facts, because Fox comments on unambiguous Participating Agreement provisions, and is supported by Fox' personal knowledge from his position as Forest Service Natural Resources Staff Officer and experience administering the Participating Agreement. See First Objections Response ¶ 3, at 2-3 (citing First Fox Decl. ¶¶ 3-8, at 1-2). For the same reasons, the United States argues that the First Fox Decl. ¶ 22, at 4-5, is based on Fox' personal knowledge. See First Objections Response ¶ 4, at 3.

As discussed supra note 35, the Court agrees in part with the Ohlsen Plaintiffs. The Court concludes that the first sentence of the First Fox Decl. ¶ 22, at 4, is an inadmissible lay opinion interpreting the Participating Agreement and lacks a foundation in personal knowledge. In that

The Forest Service did not, however, set the thinning crew's daily schedule; the thinning crew could decide not to work on a certain day if the thinning crew met the specifications for the thinning project.  See Ohlsen Motion ¶ 28, at 8-9 (asserting this fact)(citing Second Fox Decl. ¶ 55, at 12); Sais Motion ¶ 32, at 9 (asserting this fact)(citing Second Fox Decl. ¶ 55, at 12).[114]  See also Independent Contractor Motion ¶ 60, at 13 (asserting this fact)(citing E. Jiron Depo. 76-4 at 90:16-25; Jaramillo Depo. 76-5 at 92:5-12); Ohlsen Independent Contractor Response ¶ 60, at 21 (admitting this fact).[115]  Isleta Pueblo stopped the thinning crew's work "when it was not feasible

_____

sentence, Fox nearly quotes word-for-word the Participating Agreement ¶¶ III(A)-(D), at 2.  See First Fox Decl. ¶ 22, at 4.  For the reasons cited supra note 35, the Court does not view this paraphrasing -- and near quoting -- of the Participating Agreement helpful to the trier of fact.  As Fox relies nearly entirely on the Participating Agreement's language for the First Fox Decl. ¶ 22, at 4, the Court also concludes that the First Fox Decl. ¶ 22, at 4-5, does not have a foundation in personal knowledge.  See supra note 35.  The Court will consider the remainder of the First Fox Decl. ¶ 22, at 4-5, which details Johnson's, Hudson's, and Lueras' roles with the thinning project, and their time in those roles, admissible, because Fox, by identifying their roles and their time in the roles, does more than paraphrase the Participating Agreement such that he states the Participating Agreement's prescriptions as facts describing real events.  The Court deems this portion of the First Fox Decl. ¶ 22, at 4-5, not to be an inadmissible lay opinion or to lack a foundation in personal knowledge.  As the United States also provides other evidence to support the fact in the text, the Court deems the fact admissible without the support of the First Fox Decl. ¶ 22, at 4-5.

[114]The Ohlsen Plaintiffs purport to dispute the text's undisputed fact, but they cite no evidence discussing who controlled the thinning crew's daily activity and instead cite evidence about when the thinning crew received instructions not to work.  See Ohlsen Reply ¶ 28, at 22).  As the Ohlsen Plaintiffs do not specifically controvert the text's undisputed fact, the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[115]The Ohlsen Plaintiffs purport to dispute in part the text's undisputed fact.  See Ohlsen Independent Contractor Response ¶ 60, at 21.  They argue that the Forest Service established when and where they worked.  See Ohlsen Independent Contractor Response ¶ 60, at 21 (citing Johnson Depo; 36:6-14; Statement of Work § 12, at 18-19).  The evidence that the Ohlsen Plaintiffs cite does not, however, controvert the United States' proposed undisputed fact that Isleta Pueblo determined the thinning crew's daily work schedule.  The Court deems, accordingly, the text's fact

to work due to fire restrictions or inclement weather of for traditional activities, or during special

projects within the Pueblo." Independent Contractor Motion ¶ 61, at 13 (asserting this fact)(citing

F. Jiron Depo. 76-2 at 46:4-15; J. Jiron Depo. 76-3 at 51:11-52:10; E. Jiron Depo. 76-4 at 90:15-

25). See Ohlsen Independent Contractor Response ¶ 61, at 21 (admitting this fact).

The Forest Service did not provide or purchase liability insurance for the thinning work.

See Independent Contractor Motion ¶¶ 20-21, at 7 (asserting this fact)(citing First Fox Decl. ¶¶ 15-

16, at 3; Participating Agreement ¶¶ III(A)-(D), at 2; Participating Agreement ¶ V(F), at 5); Ohlsen

Independent Contractor Response ¶¶ 20-21, at 16 (admitting this fact).[116] Isleta Pueblo "owned

and maintained the masticator" that the thinning crew operated on June 14, 2016. Independent

Contractor Motion ¶ 26, at 8 (asserting this fact)(citing First Fox Decl. ¶ 12, at 3;[117] Participating

Agreement ¶ III(B), at 2; id. ¶ V(S), at 9; Statement of Work Modification 3 §§ 3-4, at 416; J. Jiron

undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[116]As the Ohlsen Plaintiffs admit the facts in the text, however, the Court deems that fact undisputed. The Ohlsen Plaintiffs contend, however, that the First Fox Decl. ¶ 15, at 3 -- stating that Isleta Pueblo purchased its own liability insurance -- is inadmissible lay testimony opining on the Participating Agreement. See First Objections ¶ 3, at 2. The United States raises the same arguments in response as it raises in response to the First Fox Decl. ¶ 22, at 4-5. See supra note 35. The Court agrees with the Ohlsen Plaintiffs for the reasons stated supra note 35. The Court concludes that the United States' other evidence suggesting that Isleta Pueblo purchased its own liability insurance -- Participating Agreement ¶¶ III(A)-(D), at 2; Participating Agreement ¶ V(F), at 5 -- is insufficient to show that Isleta Pueblo acted on its responsibility to purchase liability insurance. The Court does not, therefore, include this fact -- that Isleta Pueblo purchased liability insurance as an undisputed fact. See Independent Contractor Motion ¶¶ 20-21, at 7.

[117]See supra note 35. As the Ohlsen Plaintiffs admit this fact, however, the Court deems this fact undisputed.

Depo. 76-3 at 27:6-28:10; id. at 99:6-11).  See Ohlsen Independent Contractor Response ¶ 26, at 17 (admitting this fact).

The Forest Service also did not offer Forest Service employees to help with the thinning work, and no Forest Service employees performed thinning work -- either hand thinning or masticating.  See Independent Contractor Motion ¶ 17, at 6 (asserting this fact)(citing First Fox. Decl. ¶ 19, at 4; F. Jiron Depo. 76-2 at 109:4-7; J. Jiron Depo. 76-3 at 101:21-102:4); Ohlsen Independent Contractor Response ¶ 17, at 15-16 (admitting this fact).[118] Johnson did not provide the thinning crew guidance on operating the masticator, see Independent Contractor Motion ¶ 40, at 10 (asserting this fact)(citing Videotaped Deposition of Aaron Johnson at 111:16-112:1, filed December 19, 2018 (Doc. 76-1)("Johnson Depo. 76-1")),[119] although the Statements of Work provide specifications for masticating -- including "maintenance of three to six pieces of large wood debris per acre and a material depth of two to four inches," Ohlsen Independent Contractor Response ¶ 40, at 20 (asserting this fact)(citing Statement of Work Modification 3 § 5(C) at

---

[118]The Ohlsen Plaintiffs argue that the First Fox Decl. ¶ 19, at 4, lacks a foundation in personal knowledge and is an inadmissible lay legal opinion.  See Ohlsen Independent Contractor Response ¶ 12-16, at 14-15; First Objections ¶ 3, at 2.  The United States raises the same arguments in response that it raises in response to the First Fox Decl. ¶ 22, at 4-5.  See supra note 35.  The Court agrees with the Ohlsen Plaintiffs for the reasons stated supra note 35.  As the Court concludes that other evidence supports the text's facts and as the Ohlsen Plaintiffs admit the fact, the Court deems the fact undisputed.

[119]The Ohlsen Plaintiffs purport to dispute this fact, but they do not controvert the text's undisputed fact and instead provide additional facts about the Statements of Work.  See Ohlsen Independent Contractor Response ¶ 40, at 20.  The Court, accordingly, deems the text's fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

419).[120]  Moreover, under the Participating Agreement, Isleta Pueblo had authority to subcontract and "hired a subcontractor to hand-cut trees, remove them from the field, and stack them for fuel wood."  Independent Contractor Motion ¶ 27, at 8 (asserting this fact)(citing Participating Agreement ¶ V(U), at 9; Videotaped Deposition of Frank Jiron at 107:10-25 (dated September 25, 2018), filed November 9, 2018 (Doc. 76-2)("F. Jiron Depo. 76-2")).  See Ohlsen Independent Contractor Response ¶ 27, at 17 (admitting this fact).

### 3.    The Events in Unit 4.

The Forest Service initially designated Unit 4 as a Treatment Type 1 Unit, meaning that the public could gather fuel for firewood from the slash on the ground.  See Ohlsen Motion ¶ 18, at 7 (asserting this fact)(citing Second Fox Decl. ¶ 42, at 10); Sais Motion ¶ 22, at 8 (asserting this fact)(citing Second Fox Decl. ¶ 42, at 10); Ohlsen Response ¶ 18, at 20 (admitting this fact); Ohlsen Response ¶ 20, at 5 (citing Johnson Depo. 98-3 at 32:6-18).[121]  "The planned treatment on Unit 4 served the objectives of the Isleta Restoration Project, including improving forest health, providing work for USFS partners, and serving the public's interest in obtaining firewood from the Forest."  Ohlsen Motion ¶ 19, at 7 (asserting this fact)(citing Second Fox Decl. ¶¶ 43-44, at

---

[120]The United States provides no statement whether the Statement of Work Modification 3 contains the language that the Plaintiffs paraphrase.  As the United States makes no statement, it does not specifically controvert the fact, so the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[121]The United States purports to dispute Ohlsen Response ¶ 20, at 5-6.  See Ohlsen Reply ¶ 20, at 14-15.  The United States does not, however, discuss whether Unit 4 was a Treatment Type 1 Unit in the Ohlsen Reply ¶ 20, at 14-15, and, in Ohlsen Motion ¶ 18, at 7, states that Unit 4 was a Treatment Type 1 Unit.  See Ohlsen Motion ¶ 18, at 7.  The Court deems, accordingly, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

10); Sais Motion ¶ 23, at 8 (asserting this fact)(citing Second Fox Decl. ¶¶ 43-44, at 10).  See Ohlsen Response ¶ 19, at 20 (admitting this fact).  After the thinning crew first treated Unit 4, the Forest Service approved the thinning crew's work.  See Ohlsen Response ¶ 26, at 6 (asserting this fact)(citing Contract Daily Diary (dated July 31, 2015), filed December 19, 2018 (Doc. 98-12); Contract Daily Diary at 1 (dated August 12, 2015), filed December 19, 2018 (Doc. 98-13)("Contract Daily Diary 98-13").[122]  Following the prescriptions for Treatment Type 1 Units, the Forest Service opened the area to the public to collect firewood, but the public did not gather as much material -- slash -- as anticipated or as necessary to meet the Forest Service's goals.  See Ohlsen Motion ¶¶ 20-21 (asserting this fact)(citing Second Fox Decl. ¶¶ 45-46, at 10); Sais Motion ¶¶ 24-25, at 8 (asserting this fact)(citing Second Fox Decl. ¶ 45-46, at 10); Ohlsen Response ¶ 20-21, at 20 (admitting this fact).

---

[122]The United States disputes the Ohlsen Response ¶ 26, at 6, but the United States does not address whether the United States inspected and approved the work on Unit 4.  See Ohlsen Reply ¶ 26, at 16-17.  As the United States does not mention the fact and thus does not specifically controvert the fact, and the record supports the fact, the Court deems the fact undisputed.  The Court deems, accordingly, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Because of the heavy fuel load[123] in Unit 4 following these events, about a year before the Dog Head Fire, the Forest Service had concerns about performing a prescribed burn[124] in the treatment unit.  See Ohlsen Response ¶ 21, at 6 (asserting this fact)(citing Video Deposition Martinez at 24:10-25:16 (taken November 27, 2018), filed December 19, 2018 (Doc. 98-4)("Martinez Depo. 98-4"); id. at 26:12-17; id. at 27:1-4; id. at 27:12-28:9).[125]  The Forest Service did not complete a prescribed burn in the unit.  See Ohlsen Response ¶ 25, at 6 (asserting this

---

[123]The amount of flammable material that surrounds a fire is referred to as the fuel load.  Fuel load is measured by the amount of available fuel per unit area, usually tons per acre.

A small fuel load will cause a fire to burn and spread slowly, with a low intensity.  If there is a lot of fuel, the fire will burn more intensely, causing it to spread faster.

Kevin Bonsor, How Wildfires Work, Howstuffworks, https://science.howstuffworks.com/nature/natural-disasters/wildfire1.htm (last visited June 4, 2019)(emphasis omitted)

[124]"A controlled or prescribed burn . . . is a wildfire set intentionally for purposes of forest management, farming, prairie restoration or greenhouse gas abatement.  A controlled burn may also refer to the intentional burning of slash and fuels through burn piles."  Controlled Burn, Wikipedia, https://en.wikipedia.org/wiki/Controlled_burn (last visited June 6, 2019).

[125]The United States objects to the Ohlsen Plaintiffs' description of "the heavy fuel load" as caused "by [the thinning crew's] breach of the 18-inch maximum slash height."  Ohlsen Response ¶ 21, at 6.  See Ohlsen Reply ¶ 21, at 15-16.  The United States objects specifically, however, to the Ohlsen Plaintiffs' connecting the fuel load to the slash depth, relating the slash depth to the Forest Service's concerns about a prescribed burn, and associating a prescribed burn with the risk of causing specific forms of wildfire.  See Ohlsen Reply ¶ 21, at 15-16.  The United States does not, however, mention an objection to the core allegation that the Forest Service had concerns about the performing a prescribed burn, and, moreover, the record supports this fact.  The Court, accordingly, deems the fact in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

fact)(citing Johnson Depo. 98-3 at 45:2-46:14).[126]  Johnson testified that the Forest Service did not

pile and burn the slash, because such an undertaking was too expensive.  See Ohlsen Response

¶ 33, at 7 (asserting this fact)(citing Johnson Depo. 98-3 at 46:19-20).[127]  The cost of a prescribed

burn is around $75.00 to $150.00 per acre.  See Ohlsen Response ¶ 33, at 7 (asserting this

fact)(citing Fox Depo. at 31:13-24).[128]  The Forest Service reimbursed Isleta Pueblo $600.00 per

acre for mastication.  See Ohlsen Response ¶ 33, at 7 (asserting this fact)(citing Participating

Agreement ¶ IV(D), at 3).[129]

The Forest Service knows that green slash, after it falls, dries, becomes harder, and is more

likely to catch fire.  See Ohlsen Response ¶¶ 31-32, at 7 (asserting this fact)(citing Johnson Depo.

---

[126]The United States argues that the text's fact is irrelevant and does not otherwise dispute, or specifically controvert, the fact.  See Ohlsen Reply ¶ 25, at 16.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  Accordingly, the Court deems the text's fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[127]The United States argues that the Ohlsen Response ¶ 33, at 7, is misleading, because Johnson and Fox -- whose statements the Court describes in the next sentence in the text -- are discussing different things -- respectively, piling and burning, and burning.  See Ohlsen Reply ¶ 33, at 19.  The United States does not, however, aver that the text's fact is incorrect or controvert the fact.  The Court deems, accordingly, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[128]See supra note 127.

[129]The United States does not respond to the text's undisputed fact; it makes no comment on the fact.  The United States, thus, does not specifically controvert the fact, and the Court deems it undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

98-3 at 19:16-20:10).[130]   In March, 2016, the Forest Service prioritized masticating the fuel loads in Unit 4.  See Ohlsen Response ¶ 22, at 6 (asserting this fact)(citing Videotaped Deposition of Mark Dixon at 64:6-17 (taken November 29, 2018), filed December 19, 2018 (Doc. 98-2)("Dixon Depo. 98-2"); id. at 65:18-66:14).[131]   The mastication effort was intended to reduce the risk of wildfire.  See Ohlsen Motion ¶ 27, at 8 (asserting this fact)(citing Second Fox Decl. ¶ 52, at 11); Sais Motion ¶ 31, at 9 (asserting this fact)(citing Second Fox Decl. ¶ 52, at 11); Ohlsen Response ¶ 27, at 21-22 (admitting this fact).

On June 14, 2016, no Forest Service employees were at Unit 4.  See Independent Contractor Motion ¶ 47, at 11 (asserting this fact)(citing First Fox Decl. ¶ 20, at 4; J. Jiron 76-3 at 27:6-28:10; E. Jiron Depo. 76-4 at 91:1-92:2; Jaramillo Depo. 76-5 at 9:18-10:7); Ohlsen Independent Contractor Response ¶ 48, at 20 (admitting this fact).  E. Jiron, J. Jiron, and Jaramillo were the only individuals at Unit 4, although, when the fire started, E. Jiron, an equipment operator, and Jaramillo were standing near the service truck, 500 to 600 feet away from the masticator.  See Independent Contractor Motion ¶ 47, at 11 (asserting that E. Jiron, J. Jiron, and Jaramillo were at

---

[130]The United States does not respond to the text's undisputed fact, but rather argues whether the dry slash caused the Dog Head Fire and disputed that the Forest Service was supposed to burn the slash in Unit 4.  See Ohlsen Reply ¶¶ 33-34, at 18-19.  As the United States makes no comment regarding the fact in the text, the Court concludes that the United States does not specifically controvert the fact and deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[131]The United States contends that the text's undisputed fact inaccurately characterizes the testimony, but does not allege or produce evidence disputing the text's facts.  See Ohlsen Reply ¶ 22, at 16.  The Court deems, accordingly, the statement undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Unit 4)(citing First Fox Decl. ¶ 20, at 4; J. Jiron Depo. 76-3 at 27:6-28:10; E. Jiron Depo. 76-4 at 91:1-92:2; Jaramillo Depo. 76-5 at 9:18-10:7).[132]  See Ohlsen Independent Contractor Response ¶ 47, at 20 (asserting that J. Jiron operated the masticator alone, and that E. Jiron and Jaramillo were near the service truck)(citing J. Jiron Depo. 97-2 at 33:21-34:3).[133]  E. Jiron was the most senior member of the thinning crew on the site, see Independent Contractor Motion ¶ 56, at 12 (asserting this fact)(citing E. Jiron Depo. 76-4 at 91:1-92:2); Ohlsen Independent Contractor Response ¶ 56, at 21 (admitting this fact), but J. Jiron was driving the masticator alone, see Independent Contractor Motion ¶ 50, at 11 (asserting this fact)(citing E. Jiron 76-4 at 27:6-30:12); Ohlsen Independent Contractor Response ¶ 50, at 21 (admitting this fact).  When J. Jiron first saw the fire, it was several square feet in size, and he did not believe that he could safely extinguish it. See Ohlsen Response ¶¶ 62-64, at 14 (asserting this fact)(citing J. Jiron Depo. 97-2 at 30:23-32:3; Report of Investigation at 1).[134]  This fire became the Dog Head Fire that injured the Plaintiffs.

---

[132]The Ohlsen Plaintiffs purport to dispute the text's undisputed fact, but they support their argument only by clarifying that J. Jiron worked the masticator alone on June 14, 2016, and that E. Jiron and Jaramillo were near the service truck.  See Ohlsen Independent Contractor Response ¶ 47, at 20.  These clarifications do not specifically controvert the facts in the Independent Contractor Motion; accordingly, the Court deems the alleged undisputed facts in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[133]The United States argues that whether J. Jiron was the only person near the masticator is immaterial, because E. Jiron and Jaramillo were at the site near the truck.  See Ohlsen Independent Contractor Response Def.'s UMF No. 47.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  Moreover, the United States alleges the same fact that the Plaintiffs allege, so the Court deems the fact undisputed.

[134]The Ohlsen Plaintiffs and the United States dispute whether, when J. Jiron first saw the fire, the fire was four-by-four feet or five-by-five feet.  See Ohlsen Response ¶ 63, at 14 (citing Videotaped Deposition of Jeremy Jiron at 30:23-31:21 (dated September 25, 2018), filed December 19, 2018 (Doc. 98-18)("F. Jiron Depo. 98-18"); Report of Investigation at 1, filed

### 4. **Fire and Equipment Safety.**

The thinning site had a high fire risk, see Ohlsen Response ¶ 2, at 3 (asserting this fact)(citing Johnson Depo. 98-3 at 23:24-24:3); Ohlsen Reply ¶ 2, at 10 (admitting this fact). A risk of fire existed everywhere in the treatment area, including Unit 4. See Ohlsen Response ¶ 51, at 11 (asserting this fact)(citing Kohrman Depo. 98-9 at 83:22-84:1).[135] The Forest Service knew that heavy equipment, like a masticator, could start a fire. See Ohlsen Response ¶ 37, at 8 (asserting this fact)(citing Lueras Depo. 98-6 at 46:21-47:14; Johnson Depo. 98-3 at 16:20-17:14).[136]

The operating manual for the masticator instructs that, should a fire start, the masticator operator should stop the masticator, extinguish the fire with a fire extinguisher if possible, make

---

December 19, 2018 (Doc. 98-30)); Ohlsen Reply ¶ 63 and 64, at 28-29 (citing J. Jiron Depo. 98-18 at 29:14-30:8). The Ohlsen Plaintiffs and the United States also dispute why J. Jiron could not stop the fire safely. See Ohlsen Response ¶ 63, at 14; Ohlsen Reply 63 and 64, at 28-29. The Ohlsen Plaintiffs and the United States agree, however, to the basic facts described in the text -- that the fire was several square feet and that J. Jiron could not safely stop the fire. The Court accordingly records those facts as undisputed.

[135]The United States avers that Ohlsen Response ¶ 51, at 26, is misleading, because a risk of fire exists in every forest. See Ohlsen Reply ¶ 51, at 26 (citing Second Fox Decl. ¶ 57, at 12-14); Kohrman Depo. 98-9 at 83:22-84:1). The United States does not, however, dispute the truth of the text's fact; it does state whether it agrees with the text's fact and admits the fact by averring that all forests, including Unit 4, have a risk of fire. The Court deems, accordingly, the text's fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[136]The United States argues that Lueras did not testify to knowing that a masticator, as opposed to heavy equipment, could start a fire, and that Johnson's knowledge that a masticator might start a fire did not create a genuine risk that the masticator would start a fire. See Ohlsen Reply ¶ 37, at 20-21. Neither of these statements controverts the text's fact, so the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

sure the fire does not spread, and request help.  See Ohlsen Response ¶ 62, at 13 (asserting this

fact)(citing Operator Manual Crawler Tractor RT400 at 36, filed December 19, 2018 (Doc. 98-

29)).[137]  Moreover, a person should receive special training before operating the masticator.  See

Ohlsen Response ¶ 67, at 14 (asserting this fact)(citing Videotaped Deposition of Eugene Jiron at

12:13-19 (September 26, 2018), filed December 19, 2018)(Doc. 98-14)("E. Jiron Depo. 98-14");

id. at 62:17-63:8).[138]  E. Jiron received the training to operate the masticator, but could not properly

train someone else, and J. Jiron did not receive formal training on the masticator.  See Ohlsen

Response ¶ 68, at 14 (citing E. Jiron 98-14 at 12:13-19; id. at 91:19-21; J. Jiron Depo. 98-18 at

39:6-17; id. at 44:19-21).[139]  When the masticator was inspected after the Dog Head Fire, several

---

[137]The United States makes no statement regarding the portion of the Ohlsen Plaintiffs' proposed undisputed fact that the Court includes in the text.  See Ohlsen Response ¶ 62, at 28.  As the United States makes no comments about the fact, the United States does not specifically controvert the fact, and the Court deems the fact undisputed.  The Court deems, accordingly, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[138]The United States argues that the Ohlsen Response ¶ 67, at 14, is "not relevant and" is "misleading," because, Isleta Pueblo and not the Forest Service was responsible for training the thinning crew, and because J. Jiron's operation of the masticator did not cause the fire.  Ohlsen Reply ¶ 67 and 68, at 29.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  The United States' other arguments do not specifically controvert that a person should receive special training to operate the masticator.  See Ohlsen Reply ¶ 67 and 68, at 29.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[139]The United States argues that the Ohlsen Response ¶ 68, at 14, is "not relevant and" is "misleading."  Ohlsen Reply ¶ 67 and 68, at 29.  For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29.  For the United States' arguments about why Ohlsen Response ¶ 68, at 14, is misleading, see supra note 139.  The United States' contentions do not specifically controvert the text's fact.  The United States does not mention in the Ohlsen Reply the thinning crew workers' training.  The Court deems, accordingly, the text's fact undisputed.

broken teeth were discovered. See Ohlsen Response ¶ 38, at 8 (asserting this fact)(citing Dixon Depo. 98-2 at 209:16-23).[140]

Fox and Johnson had the responsibility of ensuring that Isleta Pueblo had the required fire equipment. See Ohlsen Independent Contractor Response ¶ 28, at 17 (asserting "[i]t was the job of the USFS Project Administrator to ensure the project workers had the firefighting tools on the job required by the Statement of Work Supplements")(citing Kohrman Depo. 97-4 at 205:22-24); Independent Contractor Reply Def.'s UMF No. 28, at 25 (asserting this fact)(citing Kohrman Depo. 97-4 at 205:13-24).[141] The Statements of Work contain a "detailed plan for emergencies

---

See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[140]The United States argues that the text's undisputed fact is irrelevant but does not otherwise respond to the fact. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The Court deems, accordingly, the text's fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[141]The United States argues that the Ohlsen Plaintiffs do not have evidence to support their allegation in the Ohlsen Independent Contractor Response ¶ 28, at 17 -- which the Court quotes in the citation in the text -- but the United States admits that the evidence supports the alleged fact in the text. See Independent Contractor Reply Def.'s UMF No. 28, at 25. The United States writes:

> Plaintiffs' contention that "[i]t was the job of the USFS Project Administrators to ensure the project workers had the firefighting tools on the job required by the Statement of Work Supplements" is not supported by Plaintiffs' cited evidence, which actually states that "based on [Kohrman's] reading the investigative report, they had the equipment required in the PA" and that it was Ian Fox and Aaron Johnson's job to ensure that they had the required equipment.

Independent Contractor Reply Def.'s UMF No. 28, at 25. Fox had a role in administering the Participating Agreement, and Johnson was a Project Administrator administrator roles with the thinning project, see Ohlsen Independent Contractor Response ¶ 5, at 6 (citing Participating Agreement ¶ V(A), at 3-4); Independent Contractor Reply Plaintiffs' § A5; Ohlsen Response ¶ 5, at 3-4 (citing Delegation at 1), and the United States cites the same testimony as the Plaintiffs, see

and fires, and Johnson would speak with the thinning crew when it began a new unit about the restrictions in effect and the equipment necessary." Ohlsen Independent Contractor Response ¶ 8, at 7 (asserting this fact)(citing Statement of Work Original § 11, at 364-68; Johnson Depo. 97-1 at 57:20-58:1); Independent Contractor Reply Plaintiffs' § A8, at 11 (admitting this fact).[142] Additionally, the Statements of Work require that the thinning crew have "[o]ne shovel, one axe . . . and a fully charged fire extinguisher . . . on each truck, personnel vehicle, tractor, grader and other heavy equipment." Statement of Work Original § 11(b), at 365. Ohlsen Response ¶ 55, at 12 (asserting this fact)(citing Statement of Work Original § 11(b), at 365).[143] The Statements of Work also recommend

> that a sealed box of tools be located within the operating area at a point accessible in the event of fire. This fire tool box should at a minimum contain:
>
> 1. One 5-gallon, backpack pump-type fire extinguisher filled with water.
>
> 2. Two axes

Ohlsen Independent Contractor Response ¶ 28, at 17; Independent Contractor Reply Def.'s UMF No. 28, at 25. The Court determines, therefore, that the Ohlsen Plaintiffs and the United States agree to the fact and deems, accordingly, the text's fact undisputed.

[142]The United States argues that the text's undisputed fact is immaterial, but does not otherwise respond to the fact. See Independent Contractor Reply Plaintiffs' § A8, at 11. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The Court deems, accordingly, the text's fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[143]The United States avers that the text's fact is irrelevant and misleading. See Ohlsen Reply ¶ 55 and 56, at 26-27. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The United States argues that the fact is misleading, because Isleta Pueblo was responsible for its equipment and fire safety. See Ohlsen Reply ¶¶ 55-56, at 26-27. These contentions do not, however, specifically controvert the text's fact. The Court deems, accordingly, the text's fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

3. Two McLeod fire tools.[144]

4. One serviceable chain saw of three and one-half or more horsepower with a cutting bar 20 inches in length or longer

5. Sufficient number of shovels so that each employee at the operation can be equipped to fight fire.

6. The Partner should make available this box of firefighting tools for use at location(s) of the work. The fire toolbox shall remain unlocked, but should be sealed to prevent use for other than emergency use only.

Statement of Work Modification 3 § 11(b), at 428; Statement of Work Original § 11(b), at 365.

See Ohlsen Response ¶ 56, at 12 (asserting this fact regarding Statement of Work Modification 3)(citing Statement of Work Modification 3 § 11(B), at 428;[145] Ohlsen Response ¶ 58, at 13 (asserting this fact regarding the Statement of Work Original)(citing Statement of Work Original § 11(b), at 365).[146] Although Johnson observed firefighting tools in the thinning crew's trucks, Johnson did not inspect the equipment, including the number of each item or the items' conditions.

---

[144]A McLeod tool (or rakehoe) is a two-sided blade -- one a rake with coarse tines, one a flat sharpened hoe -- on a long, wooden handle. It is a standard tool during wildfire suppression and trail restoration.

 The McLeod was designed to rake fire lines with the teeth and cut branches and sod with the sharpened hoe edge, but it has found other uses.

McLeod (tool), Wikipedia, https://en.wikipedia.org/wiki/McLeod_(tool) (last visited May 22, 2019)(footnotes omitted).

[145]See supra note 143.

[146]The United States makes no comment in response to the text's undisputed fact. See Ohlsen Reply at 27. As the United States makes no comment, it does not specifically controvert the fact, and the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

See Ohlsen Response ¶ 59, at 13 (asserting this fact)(citing Johnson Depo. 98-3 at 135:24-138:25); Ohlsen Reply ¶ 59, at 27 (asserting this fact)(citing Johnson Depo. 98-3 at 136:15-138:3).[147]

The Forest Service determines when to enter fire restrictions. See Ohlsen Independent Contractor Response ¶ 28, at 17 (citing Statement of Work Original § 11, at 366-68; Kohrman Depo. 97-4 at 117:15-121:6).[148] See also Ohlsen Independent Contractor Response ¶ 11, at 14 (asserting this fact)(citing Statement of Work Original § 11, at 366-68; Kohrman Depo. 97-4 at 117:15-121:6; id. at 205:22-24).[149] Before the Dog Head Fire occurred, the Forest Service Mountainair District was in the process of entering Stage I restrictions. See Ohlsen Response ¶ 46, at 10 (asserting this fact)(citing Martinez Depo. 98-4 at 58:10-25).[150] The Forest Service enters

---

[147]The Ohlsen Plaintiffs argue that Johnson "never verified that the crew members had the required tools, or if they were in good workable condition," Ohlsen Responses ¶ 59, at 13, and the United States counters that Johnson observed tools in the thinning crew's trucks, but did not count the equipment or check the amount of water in the bladder pumps, see Ohlsen Reply ¶ 59, at 27. The record supports that Johnson saw the tools but did not closely inspect them, and, as both the Ohlsen Plaintiffs and the United States agree to this fact, the Court deems the fact undisputed. The United States also attacks the fact's relevance. See Ohlsen Responses ¶ 59, at 13. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The Court deems, accordingly, the text's fact undisputed.

[148]The United States avers that the Ohlsen Plaintiffs' contentions are immaterial. See Independent Contractor Reply Def.'s UMF No. 28, at 25. The United States does not otherwise dispute or even discuss the fact in the text, so the United States does not specifically controvert the fact. The Court deems, accordingly, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[149]The United States makes no response to the text's fact. See Independent Contractor Reply at 22. As the United States makes no statement on the fact, it does not specifically controvert the fact, and the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[150]The United States does not respond in any form to the Ohlsen Response ¶ 46, at 10. See Ohlsen Reply at 24. As the United States makes no comment on the proposed undisputed fact, the

Stage I restrictions when the Energy Release Component ("ERC")[151] is eighty-five percent or higher, and other considerations counsel toward entering restrictions, and, like Stage II restrictions, which are entered when the ERC is ninety-percent or higher, Stage I restrictions require a fire guard at the mastication site. See Ohlsen Response ¶ 47, at 10 (asserting Stage I restrictions are entered when the ERC is eighty-five percent or higher)(citing Cibola National Forest and Grasslands Fire Danger Operating Plan at 5-7, filed December 19, 2018 (Doc. 98-25)("Fire Plan")); Ohlsen Reply ¶ 47, at 24 (asserting Stage I restrictions are entered when the ERC is 85% or higher, and other conditions counsel toward entering restrictions)(citing Fire Plan at 6).[152] The

---

United States does not specifically controvert the fact, and the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[151]The Florida Department of Agriculture and Consumer Services describes ERC:

As moisture levels in both live and dead fuels go down, more fuel becomes available to a fire in that area. More fuel burning results in more heat being released. This amount of energy release is what the ERC measure . . . . If the environment were to be compared to a charcoal grill, the ERC could be seen as a measure of how many briquettes are in the grill. The ERC is valuable to determining fire danger because it acts as a composite fuel moisture index, as it has contributions from all types of live and dead fuels. Changes in the "heavy" fuels, which are 6 inches or larger in diameter, have a greater impact on the ERC than a change in the "fine" fuels, which are 1/4 inch or less in diameter.

What is the Energy Release Component (ERC)?, Florida Department of Agriculture and Consumer Services, https://www.freshfromflorida.com/Divisions-Offices/Florida-Forest-Service/Wildland-Fire/Fire-Weather/Links-and-Information/Wildland-Fire-Danger-Index-FDI/Wildland-Fire-Danger-Index-FDI-FAQ/What-is-the-Energy-Release-Component-ERC (last visited May 2, 2019).

[152]The United States argues that the Ohlsen Response ¶ 47, at 10, is irrelevant and misstates the evidence. See Ohlsen Reply ¶ 47, at 24. The United States argues that the Mountainair Ranger District was not under fire restrictions on the day of the Dog Head Fire and that restrictions were not warranted. See Ohlsen Reply ¶ 47, at 24. These statements do not, however, controvert the

Statements of Work outline the same rules for fire restrictions and state that Isleta Pueblo would provide the fire guard should the Forest Service enter fire restrictions. See Ohlsen Response ¶ 48, at 10 (asserting this fact)(citing Statement of Work Original § 11, at 364-68).[153]

The Forest Service did not enter Stage I restrictions on or before June 14, 2016, but the Forest Service entered Stage II restrictions on June 15, 2016. See Ohlsen Response ¶ 49, at 10 (asserting this fact)(citing Martinez Depo. 98-4 at 61:16-18); Ohlsen Reply ¶ 49, at 25 (admitting this fact). The Southwest Interagency Fire Restrictions and Closure Master Operating Plan at 16 (dated 2014), filed December 19, 2018 (Doc. 98-26), states that "operating any internal combustion engine" is prohibited during Stage II restrictions. Ohlsen Response ¶ 50, at 11 (asserting this fact).[154]

---

text's facts regarding the Fire Plan. Moreover, the record supports the text's facts. The United States also adds that considerations other than the ERC factor into the decision whether to enter fire restrictions, and because the record supports these statements, the Court incorporates them into the text. The Court must be careful when incorporating additional facts asserted in a reply; however, the Ohlsen Plaintiffs had the opportunity to and did file a surreply -- the Motion to Strike Reply, which does not address the United States' proposed undisputed fact incorporated into the text, and the record supports the United States' assertions. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The Court deems, accordingly, the text's fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[153]The United States describes the text's facts as irrelevant. See Ohlsen Reply ¶ 48, at 25. For the Court's rulings on relevance arguments in summary judgment motions, see supra note 29. The United States also argues that the text's facts misstates the evidence, but the United States does not contend that the Statement of Work Original does not contain the paraphrased language and suggests that the Statements of Work contain such language. The Court deems, accordingly, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[154]The United States avers that the text's statement is irrelevant, because the Forest Service had not entered fire restrictions on June 14, 2016, and does not otherwise discuss the text's statement. See Ohlsen Reply ¶ 50, at 25. For the Court's rulings on relevance arguments in

"The Mountainair Ranger District has two subunits: the Manzano Mountains and Gallinas," which both contain several ecosystems. See Ohlsen Response ¶ 70, at 15 (asserting that the Mountainair Ranger District has two subunits)(citing Lueras Depo. 98-6 at 14:5-10); Ohlsen Response ¶ 71, at 15 (asserting that the subunits contain multiple ecosystems)(citing Lueras Depo. 98-6 at 17:8-19:10).[155] Within an area, every ten miles might have different environmental conditions. See Ohlsen Response ¶ 72, at 15 (asserting this fact)(citing Lueras Depo. 98-6 at 31:21-32:4; Martinez Depo. 98-4 at 70:22-25).[156] Before the Dog Head Fire, the Forest Service had no "site-specific fuel moisture sample sheets" for Unit 4, but, after the fire, the Forest Service developed a form to monitor. See Ohlsen Response ¶ 73, at 15 (asserting this fact)(citing Martinez Depo. 98-4 at 71:8-19; id. at 116:2-18; id. at 87:1-88:3).[157]

---

summary judgment motions, see supra note 29. As the United States does not otherwise dispute, and does not specifically controvert the text's fact, the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[155]The United States does not specifically admit or deny the text's alleged undisputed facts, and makes no comment about the facts' veracity. See Ohlsen Reply ¶¶ 70-71, at 30. The United States does not, thus, specifically controvert the facts, and the Court deems the facts undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[156]The United States avers that the Ohlsen Plaintiffs misstate the evidence and emphasizes that Anthony Martinez, Forest Service Fire Management Officer, see Ohlsen Reply ¶ 12, at 12, testified that every ten miles could possibly have different conditions, see Ohlsen Reply ¶ 72, at 30. The Court does not read the Ohlsen Plaintiffs' alleged undisputed fact as wholly misstating the evidence. The Ohlsen Plaintiffs state that conditions could vary five or ten miles away, although they also state in Ohlsen Response ¶ 72, at 15, that "[e]very site has different conditions." Ohlsen Response ¶ 72, at 15. The Court incorporates into the text the undisputed portion of the Ohlsen Plaintiffs' Ohlsen Response ¶ 72, at 15 -- that environmental conditions might vary.

[157]The United States makes no comments in reply to the Ohlsen Plaintiffs' proposed undisputed fact. See Ohlsen Reply at 30. As the United States makes no reply, the United States

The Forest Service has two fire engines, with four-wheel drive, capable of carrying 300 gallons of water, staffed with five people, and capable of going off-road.  See Ohlsen Response ¶ 41, at 9 (asserting this fact)(citing Martinez Depo. 98-4 at 44:8-21; id. at 48:12-13; id. at 50:12-14).[158]  The fire engines patrol areas with fire risks and a public presence.  See Ohlsen Response ¶ 41, at 9 (asserting this fact)(citing Martinez Depo. 98-4 at 47:19-23).[159]  In determining fire suppression activities, the Forest Service considers the "safety of firefighters, suppression costs, resource loss, environmental damages, threat of wildland fire escaping onto non-Federal lands, availability of suppression resources; values of the natural resources and property at risk."  C De Baca Motion ¶¶ 4, at 3-4 (asserting this fact)(citing Declaration of Anthony Martinez ¶¶ 41-43, at 7 (dated October 30, 3018), filed November 5, 2018 (Doc. 64-1)("Martinez Decl.").[160]

---

does not specifically controvert the text's undisputed fact.  The Court deems, accordingly, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[158]The United States characterizes Ohlsen Response ¶ 41, at 9, as misleading, because the Ohlsen Plaintiffs aver that the fire engines "were supposed to roam the area on a regular basis," see Ohlsen Response ¶ 41, at 9 (citing Martinez Depo. at 44:8-21; 47:19-49:19; 51:4-11), a statement for which, the United States avers, the Plaintiffs lack the evidence, see Ohlsen Reply ¶ 41, at 22 9 (citing Martinez Depo. 98-4 at 45:4-46:25; Second Declaration of Anthony Martinez ¶¶ 10-13, at 2-3 (dated February 28, 2019), filed February 28, 2019 (Doc. 127-1)("Second Martinez Decl.")).  The United States does not, however, address the Ohlsen Plaintiffs' other facts about the fire engines.  See Ohlsen Reply ¶ 41, at 22.  Because the United States does not mention the text's undisputed facts, the United States does not specifically controvert the facts, and the Court deems the facts undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[159]See supra note 158.

[160]C De Baca and Cianchetti argue that the United States' proposed undisputed fact that "[d]ecision regarding suppression of wildland fire are guided by public policy considerations including" those factors listed in the text is a legal conclusion.  C De Baca Response ¶ 4, at 4.  C De Baca and Cianchetti do not present evidence controverting that the Forest Service considers

Additionally, before the fire, Anthony Martinez, Forest Service Fire Management Officer, see Ohlsen Response ¶ 43, at 9 (asserting this fact),[161] spoke with Dixon at annual cooperator meetings and throughout the year, generally on the telephone, about updates on the forest area, including information about fires. See Ohlsen Response ¶ 54, at 12 (asserting this fact)(citing Martinez Depo. 98-4 at 98:2-99:25).[162]

## PROCEDURAL BACKGROUND

The Court has consolidated C De Baca v. United States of America, No. 17-1661 JB\KK; Cianchetti v. United States of America, No. CIV 17-1186 JB\KK; Ohlsen v. United States of America, No. CIV 18-0096 JB\KK; State Farm Fire and Casualty Co. v. United States, No. CIV 18-0367 JB\KK; Homesite Indemnity Co. v. United States, No. CIV 17-1233 JB\SCY; and Sais v.

---

[161]those factors listed in the text in making decisions about fire suppression, but rather argue that the United States cannot assert that the Forest Service makes such decisions on "public policy considerations." C De Baca Response ¶ 4, at 4. The record supports that the Forest Service contemplates those factors that the text lists in making fire suppression decisions, so the Court considers the fact in the text as an undisputed fact. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). The Court does not incorporate, however, as an undisputed fact that the Forest Service bases such decisions on public policy considerations, because the Court will address the legal question whether the Forest Service bases the decisions on public policy considerations in the Analysis.

[161]Although the United States disputes the fact in which the Ohlsen Plaintiffs' provide Martinez' job title, the United States does not specifically controvert the job title and refers to Martinez by the same title. See Ohlsen Reply ¶ 42, at 22. See also Ohlsen Reply ¶ 12, at 12. The Court deems, accordingly, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[162]The United States disputes the Ohlsen Plaintiffs' allegations that Martinez did not tell Dixon that the Forest Service was beginning the process of entering Stage I fire restrictions before June 14, 2016, but the United States does not comment on the text's undisputed fact. See Ohlsen Reply ¶ 54, at 26. As the United States makes no statement about the proposed undisputed fact, the United States does not controvert the fact, and the Court deems the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

United States, No. CIV 18-0496 JB\JHR. See Order Granting Unopposed Motion to Consolidate at 1, filed June 5, 2018 (Doc. 20); Order Granting Motion to Consolidate at 2, filed November 5, 2018 (Doc. 69). In this Procedural Background section, the Court briefly discusses the Ohlsen Plaintiffs', C De Baca's, Cianchetti's, and the Sais Plaintiffs' notices of claims. It then addresses the claims in each case consolidated into this matter. Where the complaints raise the same claims in the same language, the Court discusses the claims together. The Court then turns to the motions that are the subject of this Memorandum Opinion and Order.

        **1.**        **C De Baca's and Cianchetti's Notices of Claim.**

C De Baca "filed a supplemental notice of claim on her behalf with the USDA on April 25, 2017." C De Baca Motion ¶ 1, at 3 (citing Declaration of Merlina N. Valdez ¶ 3, at 1 (taken September 20, 2018), filed November 2, 2018 (Doc. 63)("First Valdez Decl."). See C De Baca Response ¶ 1, at 2. On May 28, 2017, Cianchetti filed his notice of claim. See C De Baca Motion ¶ 2, at 3 (citing First Valdez Decl. ¶ 4, at 1); C De Baca Response ¶ 2, at 3. The Claim for Damage, Injury, or Death (dated January 31, 2017), filed December 19, 2018 (Doc. 100-1)("C De Baca Notice of Claim"), and the Claim for Damage, Injury, or Death (dated May 22, 2017), filed December 19, 2018 (Doc. 100-2)("Cianchetti Notice of Claim"), state: "As a result of negligent operation of equipment, and/or negligence in commencing fire suppression activity, the Dogs Head Fire commenced and spread. Claimant suffered a loss of all real and personal property due to this fire." C De Baca Notice of Claim at 4; Cianchetti Notice of Claim at 4. See C De Baca Motion ¶ 3, at 3; C De Baca Response ¶ 3, at 3. C De Baca attaches to the C De Baca Notice of Claim form a chart of her damages, a narrative of the harms the Dog Head Fire caused her, and a description of her home that burned in the fire. See C De Baca Notice of Claim at 6-10. Cianchetti

likewise attaches to the Cianchetti Notice of Claim a chart of his damages, a narrative of the harms that he suffered, an Affidavit with Torrance County describing his damages, the U.S. Dep't of Agri., Dog Head Fire Report at 5-11, 14-18 (2016), filed December 19, 2018 (Doc. 100-2)("Dog Head Fire Report")[163], and two news articles on the Dog Head Fire: (i) Rich Nathanson, Brush Clearing Effort Triggered Devastating Dog Head Fire, Albuquerque Journal (July 1, 2016), filed December 19, 2018 (Doc. 100-2); and (ii) Todd G. Dickson, Dog Head Report Finds Fault with Crew, Procedures, MVTelegraph (Oct. 14, 2016), filed December 19, 2018 (Doc. 100-2). See Cianchetti Notice of Claim at 5-35.

## 2. The Sais Plaintiffs' Notices of Claim.

On October 23, 2017, the Sais' filed a notice of claim with the United States Department of Agriculture. See Ohlsen Motion ¶ 1, at 3 (citing First Valdez Decl. ¶ 6, at 2; Claim for Damage, Injury, or Death (dated October 20, 2017), filed November 2, 2018 (Doc. 63-4)("Sais Notice of Claim")). The Apodacas filed a notice of claim with the Agriculture Department on November 20, 2017. See Ohlsen Motion ¶ 2, at 3 (citing First Valdez Decl. ¶ 5, at 1-2; Claim for Damage, Injury, or Death (dated November 15, 2017), filed November 2, 2018 (Doc. 63-3)("Apodaca Notice of Claim")). Sorroche likewise filed a notice of claim with the Agriculture Department on May 25, 2018. See Ohlsen Motion ¶ 3, at 3 (citing Second Declaration of Merlinda N. Valdez ¶ 9, at 2, filed November 15, 2018 (Doc. 79)("Second Valdez Decl."); Claim for Damage, Injury, or Death (dated May 24, 2018), filed November 15, 2018 (Doc. 79-4)("Sorroche Notice of Claim")). Each notice of claim states: "As a result of negligent operation of equipment, and/or negligence in

---

[163]The Ohlsen Plaintiffs file the same document as United States Department of Agriculture, Dog Head Fire Report at 5-11, 14-18 (2016), filed December 19, 2018 (Doc. 98-33). The Court will refer to this document generally as the "Dog Head Fire Report."

commencing fire suppression activity, the Dogs Head Fire commenced and spread. Claimant

suffered a loss of real . . . property due to this fire." Sais Notice of Claim at 1 (stating "real and

personal property" instead of "real property"); Apodaca Notice of Claim at 1 (stating "real,

personal and business property" instead of "real property"); Sorroche Notice of Claim at 1 (stating

only "real property")(collectively, the "Sais Plaintiffs' Notice of Claim").

### 3. The Ohlsen Notice of Claim.

In their various notices of claims,[164] the Ohlsen Plaintiffs allege:

> (1.) The Dog Head Fire started on June 14, 2016, and quickly got out of control, burning over 17,000 acres and causing the damage alleged in this claim.

> (2.) The fire started on Forest Service land in the Cibola or Mountain Air Ranger Districts, south of Albuquerque, New Mexico. The land where the Dog Head Fire was ignited was a public place and open to the public.

> (3.) The fire was the result of mechanical mastication operations being conducted in a fire prone area with a nearby history of recent wildfire.

> (4.) The mastication operations were being conducted by a crew of a contractor which had been contracted to perform fuel reduction work by one or more agencies or partners involved in or by a partnership known as the "Isleta Collaborative Landscape Restoration Project," of which the USFS, [Natural Resources Conservation Service (''NRCS'[165]], [Bureau of Indian Affairs ('BIA')[166]], and other groups and agencies are participants and partners. . . . The agency which is the subject of this claim directed and/or approved the conduct which caused the fire and each agency was the agent of the other partners and

---

[164]The Ohlsen Plaintiffs and the United States agree that the Ohlsen Plaintiffs each filed identical notices of claim. See Ohlsen Motion ¶ 1, at 1; Ohlsen Response ¶ 1, at 17. Accordingly, the Court includes only this excerpt of the notices' language and refers to the notices of claims collectively as the Ohlsen Notice of Claim.

[165]The NRCS is a department within the Agriculture Department. See Agencies, supra note 6.

[166]The BIA is a bureau within the Interior Department. See Bureaus, U.S. Department of the Interior, https://www.doi.gov/bureaus (last visited June 4, 2019).

participants in the Project and/or of the Project itself acting within the scope of its agency.

(5.)     The fuel reduction project had been ongoing several years before the fire.

(6.)     At the direction and/or approval of an agent or employee of the agency named in this claim, and/or by the contract with the agency or with the Project, the crew(s) thinned trees and left for years piles of slash (woody debris) and bole (tree trunks) in the forest in the area where the fire ignited. Given the long-standing drought conditions in New Mexico and the previous fires in the area, it was both foreseeable and known to the Project and the agency named in this claim the piles of slash and bole would quickly dry and pose a major fire hazard if ignited in any manner.

(7.)     At the direction and/or approval of an agent or employee of the Project and/or agency named in this claim, and/or by the contract with the agency or with the Project, the contractor and crew were directed and/or approved to masticate the piles of dry slash and bole using the subject mechanical masticator.

(8.)     The mechanical masticator involved in the ignition of the fire is a piece of heavy machinery, which uses large metal teeth to grind trees, bole, and slash. It was foreseeable and known by the Project and the agency named in this claim that leaking hot fluids or sparks from the masticator's teeth striking rocks or metal are capable of starting fires. In public statements, the USFS has stated the fire was ignited by sparks from the masticator striking a rock(s).

(9.)     The mastication operation causing the fire was being performed in June, which the Project and agency named in this claim knew was New Mexico's fire season, and was being performed in hot, dry, and windy conditions. Only five years before, in June 2011, the Las Conchas Fire was started by an electric line in the Jemez Mountains. The fire rapidly spread out of control, burned 245 square miles in over five weeks, and caused massive damage. This fire and others in New Mexico during the months June-September were highly publicized throughout the state.

(10.)    The Project and the agency named in this claim directed, approved, knew, and/or failed to prevent the mechanical mastication of very dry piles of slash and bole during the fire season and in dry, hot and windy conditions in an area with a recent history of wildfires.

(11.)    The Project and agency named in this claim did not reasonably employ a competent and careful contractor to perform the work and did not train, direct, or supervise the contractor and crew with regard to fire danger evaluation,

proper operational procedures, fire prevention, and fire suppression procedures and techniques. Accordingly, the masticator was operated at an unreasonable time during fire season, in unreasonable conditions of rocky soil and very dry slash and bole, and in an unreasonable manner, resulting in the ignition of the fire. Public statements by the USFS indicate the crew did not attempt to suppress the fire in its very small incipient state, but rather they removed the masticator to safety and called in the fire department.

(12.) The fire suppression equipment required by the Project and agency named in this claim to be on hand during the mastication operation was insufficient to suppress the fire in its incipient state. The Project and agency named in this claim unreasonably did not require any equipment be on hand to put out an incipient fire in slash or wood.

(13.) The Project and agency named in this claim failed to reasonably exercise its retained control of the work being performed, resulting in the ignition of the fire.

(14.) The Project and agency named in this claim had a special relationship with the public and nearby property owners, and the work of mastication by heavy machinery during fire season of dry slash and bole was inherently dangerous, creating a peculiar risk of harm by fire to claimants and others. The Project and agency named in this claim failed to take reasonable precautions as to these contractor operations, thereby causing the fire.

By these acts, and others presently unknown to claimants, the Project and agency named in this claim negligently caused the Dog Head Fire, which caused the damages as set forth below.

Claim for Damage, Injury, or Death at 3-4 (dated January 10, 2018), filed December 19, 2018

(Doc. 98-32)("Ohlsen Notice of Claim").

4.      **C De Baca's, Cianchetti's, and the Sais Plaintiffs' Claims**.

C De Baca, Cianchetti and the Sais Plaintiffs bring negligence claims against the United

States. See C De Baca Complaint ¶¶ 36-50, at 5-7; Cianchetti v. United States of America, No.

CIV 17-1186 JB\KK, Plaintiff's Complaint for Negligence Arising Under the Federal Tort Claims

Act ¶¶ 30-44, at 4-6, filed December 1, 2017 (Doc. 1)("Cianchetti Complaint"); Sais v. United

States, No. CIV 18-0496 JB\JHR, Plaintiff's Amended Complaint for Negligence Arising under

the Federal Tort Claims Act ¶¶ 55-69, at 7-9, filed November 6, 2018 (Doc. 16)("Sais Complaint").  They allege that: (i) the Forest Service did not "ensure that the equipment, its employees, and agents used was in good working order, and/or was the proper equipment for the terrain," C De Baca Complaint ¶ 40, at 5; Cianchetti Complaint ¶ 34, at 4-5; Sais Complaint ¶ 62, at 8; (ii) the Forest Service did not "provide proper fire extinguishment tools for the 3-man crew working the masticator," C De Baca Complaint ¶ 41, at 5; Cianchetti Complaint ¶ 35, at 5; Sais Complaint ¶ 63, at 8; (iii) the Forest Service "declined first responders access to Department of Agriculture maintained forest property.  Defendant through its employees and agents directed first responders to take no action to contain or quash the initial fire, despite the ability to put the fire out," C De Baca Complaint ¶ 43, at 6; Cianchetti Complaint ¶ 37, at 5; Sais Complaint ¶ 63, at 8; and (iv) the Forest Service had "not properly maintained or fulfilled forest management responsibilities, the area in which the fire occurred had a high amount of unmanaged undergrowth and low forest fuels," C De Baca Complaint ¶ 45, at 6; Cianchetti Complaint ¶ 39, at 5; Sais Complaint ¶ 68, at 9.  The Sais Plaintiffs additionally allege that the Forest Service "produced and negligently left on the ground, for a period of years, slash and boles produced by forest thinning operation where the fire started," Sais Complaint ¶ 30, at 5; "[p]roduc[ed] and [left] slash and boles on the ground for several years permitt[ing] them to harden and become dry fuel for fire," Sais Complaint ¶ 31, at 5; "did not reasonably employ competent individuals to perform the mastication work," Sais Complaint ¶ 36, at 5; and "had a duty to train, instruct, direct, and/or supervise the individuals and crews performing forest thinning and mastication with regard to fire danger evaluation, proper operational procedures, fire prevention, and immediate fire suppression techniques," Sais Complaint ¶ 64, at 8.

5.    **The Ohlsen Plaintiffs' Claims.**

The Ohlsen Plaintiffs bring three claims against the United States.  See Ohlsen Complaint

¶¶ 21-39, at 6-8.  The Ohlsen Plaintiffs first bring a negligence claim in which they allege that the

Forest Service

> failed to exercise ordinary care in the hiring of a careful and competent contractor, the training and direction of the contractor and forest thinning crew, the control each Defendant retained over the forest thinning operations, the conduct of the forest thinning operations, and the failure to suppress the fire, which caused the Dog Head Fire.

Ohlsen Complaint ¶ 23, at 6.  The Ohlsen Plaintiffs allege, among other things, the United States

liability for the Forest Service's

- Employing inappropriate contractor for the forest thinning project;

- Failing to train, instruct, direct, and/or supervise the contractor;

- Leaving slash and boles produced by prior forest thinning operations on the forest floor;

- Allowing forest thinning and mastication under unsuitable conditions (rocky landscape, dry slash and bole on forest floor, and hot, dry, and windy conditions);

- Failing to use available fire suppression resources;

Ohlsen Motion ¶ 2, at 3-4 (citing Ohlsen Complaint ¶¶ 10, 16-19, 20, 23, at 3-6).  The Ohlsen

Plaintiffs further allege that "it was fire season in New Mexico, and the masticator can cause sparks

while it is in operation."  Ohlsen Response ¶ 2, at 18 (citing Ohlsen Complaint ¶¶ 10, 17, 18, 20,

at 3, 5).

The Ohlsen Plaintiffs next bring a non-delegable duty claim in which they argue that: (i) the

Forest Service employed a contractor for forest thinning operations; (ii) the Forest Service was

aware of special dangers associated with the operations; (iii) the Forest Service had a non-

delegable duty to take reasonable precautions to avoid such dangers; and (iv) the Forest Service

failed to take reasonable precautions against such dangers.  See Ohlsen Complaint ¶¶ 28-30, at 6-

7.  Last, the Ohlsen Plaintiffs allege that the United States is liable under res ipsa loquitur, because

> 35.    The harm to Plaintiffs was caused by the forest thinning operation in the Cibola National forest which was the responsibility of Defendants to manage and control.

> 36.    The fire which caused harm to Plaintiffs was of a kind which does not ordinarily occur in the absence of negligence on the part of Defendants in control of the forest thinning operations in the Cibola National Forest.

> 37.    The negligence of Defendants, and each of them, caused the Dog Head Fire, which harmed Plaintiffs' real and personal property.

Ohlsen Complaint ¶¶ 35-37, at 7.

**6.      The State Farm Plaintiffs' Claims.**

The State Farm Plaintiffs also bring three claims against the United States.  See State Farm

Complaint ¶¶ 24-49, at 7-10.  The State Farm Plaintiffs bring first a claim for negligence in which

they allege that the Forest Service committed several negligent acts or omissions:

> a.      Negligently failing to properly train, instruct, direct, and/or supervise their forestry crew with regard to fire hazards, fire prevention, and fire suppression as well as to proper heavy machinery operating procedures; and
> b.      Negligently employing a contractor that failed to properly train, instruct, direct, and/or supervise their forestry crew with regard to fire hazards, fire prevention, and fire suppression as well as to proper heavy machinery operating procedures;

> c.      Negligently allowing for accumulated slash and boles to harden, dry and transform into an abundant dead vegetative fuel load for fire;

> d.      Negligently conducting forest thinning and mechanical mastication during the New Mexico wildfire season;

> e.      Negligently operating mastication machinery on rocky terrain at a time of elevated fire risk;

and that the Forest Service was "otherwise negligent." State Farm Complaint ¶ 30 (a)-(f), at 8. The State Farm Plaintiffs next bring a claim for res ipsa loquitur and allege that:

> 35. The Wildfire was the type of event which does not occur in the absence of negligence.
>
> 36. The Wildfire and subsequent damage was caused by the forest thinning and mechanical mastication operations conducted as part of the Isleta Project.
>
> 37. The forest thinning and mechanical mastication operations were under the exclusive management and control of the Defendants and were not due to any voluntary action or contribution on the part of the Plaintiffs.

State Farm Complaint ¶¶ 35-37, at 9. Last, the State Farm Plaintiffs bring a non-delegable duty claim in which they allege:

> 42. Defendants contracted with Isleta Pueblo and/or its forestry crew to conduct forest thinning and mechanical mastication operations.
>
> 43. Defendants knew or should have known that these operations involved a peculiar risk and/or special danger of harm to others unless reasonable precautions were taken to guard against risk of wildfire.
>
> 44. Defendants had a non-delegable duty to ensure that reasonable precautions were taken with regard to fire hazards, fire prevention, fire suppression as well as employing proper heavy machinery operating procedures.
>
> 45. Defendants failed to take reasonable precautions with regard to fire hazards, fire prevention, fire suppression and/or employing proper heavy machinery operating procedures.

State Farm Complaint ¶¶ 42-45, at 9-10.

### 7.  **Homesite Indemnity's Claims.**

Last, Homesite Indemnity brings a negligence claim against the United States in which it alleges that the Forest Service committed a series of negligent actions:

> (a)    carelessly and negligently operating a masticator;
>
> (b)    operating a masticator in a manner that resulted in a fire;

(c)     operating a masticator when Defendants knew or should have known that there were rocks present in the area and that striking a rock can cause a fire;

(d)     operating a masticator near highly-combustible materials;

(e)     acting in a manner that caused a fire;

(f)     failing to prevent a fire from spreading;

(g)     failing to keep the necessary fire-prevention equipment and personnel at the subject work site;

(h)     operating a masticator in a negligent manner;

(i)     failing to pay attention to the surrounding area and conditions when operating a masticator;

(j)     using a masticator when it was unsafe to do so;

(k)     failing to take evasive measures to avoid striking a rock while operating a masticator;

(l)     failing to hire, train, select, and supervise their employees, workers and contractors with care; and/or

(m)     violating, and/or failing to comply with, applicable rules, codes, laws, regulations, and industry standards.

Homesite Indemnity Co. v. United States, No. CIV 17-1233 JB\KK, Complaint ¶ 25(a)-(m), at 5, filed December 15, 2017 (Doc. 1)("Homesite Complaint").

### 8.     The Independent Contractor Motion.

The United States asks that the Court dismiss for lack of subject-matter jurisdiction the portions of the C De Baca Complaint, the Cianchetti Complaint, the Sais Complaint, the Ohlsen Complaint, the State Farm Complaint, and the Homesite Complaint alleging Isleta Pueblo negligence in operating the thinning operations, because the FTCA's independent contractor exception divests the Court of subject-matter jurisdiction. See Independent Contractor Motion at

2.  The United States requests that, in the alternative, the Court grant the United States summary judgment on grounds that the independent contractor exception precludes the Plaintiffs' liability. See Independent Contractor Motion at 2.  According to the United States, the Court should treat the United States' rule 12(b)(1) of the Federal Rules of Civil Procedure motion as a rule 12(b)(6) of the Federal Rules of Civil Procedure motion or a rule 56 of the Federal Rules of Civil Procedure motion.  See Independent Contractor Motion at 13.  The United States explains that it will face essentially the same burden under rule 12(b)(6) that it will face under rule 56 -- proving the Court's lack of subject-matter jurisdiction by a preponderance of the evidence.  See Independent Contractor Motion at 13 n.6.

The United States takes the position that Isleta Pueblo is an independent contractor.  See Independent Contractor Motion at 17.  The United States applies the factors that the United States Court of Appeals for the Tenth Circuit articulated in Lilly v. Fieldstone, 876 F.2d 857 (10th Cir. 1989)("Lilly"):

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Independent Contractor Motion at 17 (quoting Woodruff v. Covington, 389 F.3d 1117, 1126 (10th Cir. 2004)).  The United States indicates that the statutory authority under which the Forest Service and Isleta Pueblo entered the Participating Agreement indicates the Forest Service's and Isleta Pueblo's intents for Isleta Pueblo to work as an independent contractor.  See Independent Contractor Motion at 17.  The United States explains that the CFDA provides the authority under which the United States and Isleta Pueblo entered the Participating Agreement.  See Independent

Contractor Motion at 18. According to the United States, the language in the CFDA's § 565a-1 reflects that an independent contractor relationship exists unless the parties agree otherwise under § 565a-2. See Independent Contractor Motion at 18. The United States indicates that the Forest Service and Isleta Pueblo did not agree that the Forest Service would supervise the thinning crew but instead agreed that the thinning crew would work without Forest Service supervision. See Independent Contractor Motion at 18. The United States contends that, given the number of contracts that the Forest Service enters with third parties to manage the Cibola National Forest alone, Congress could not have intended to waive sovereign immunity whenever the Forest Service enters a contract under the CFDA's authority. See Independent Contractor Motion at 18. The United States directs the Court to Tsosie v. United States, 452 F.3d 1161, 1163 (10th Cir. 2006), in which the Tenth Circuit states "that a provision providing an option for FTCA coverage for practitioners recognized that there would be instances practitioners would not be covered." Independent Contractor Motion at 18.

The United States contends that the Participating Agreement's plain language also manifests the Forest Service's and Isleta Pueblo's intents to have an independent contractor relationship. See Independent Contractor Motion at 18. The United States avers that the Participating Agreement states that the thinning crew workers would not be federal employees and that Isleta Pueblo would supervise the thinning crew. See Independent Contractor Motion at 18. The United States contends that the Participating Agreement reveals that the Forest Service and Isleta Pueblo contemplated Isleta Pueblo directing the thinning crew, providing training and payroll, and maintaining the thinning crew's work environment. See Independent Contractor Motion at 19. According to the United States, the Participating Agreement shows that the Forest

Service and Isleta Pueblo intended that the Forest Service would inspect the thinning crew's work and designate where within the Cibola National Forest the thinning crew would work.  See Independent Contractor Motion at 19-20.

The United States turns to the second Lilly factor and argues that Isleta Pueblo "controlled the manner and method of reaching the goals of the thinning projects and the United States controlled the end-result."  Independent Contractor Motion at 20.  The United States directs the Court to the Participating Agreement and the Statements of Work for evidence that Isleta Pueblo controlled the thinning crew's daily operations.  See Independent Contractor Motion at 20.  The United States describes that Dixon administered the Participating Agreement but that Isleta Pueblo's employees F. Jiron and Zuni oversaw the thinning crew's daily work.  See Independent Contractor Motion at 20.  The United States describes that Isleta Pueblo had responsibility for "contributing personnel and managing employees so that the work described in the Statement of Work Supplements was completed to specifications; training, instructing, directing, and supervising those employees; providing equipment; maintaining work environments and procedures to safeguard Tribal, public, and USFS interests; timekeeping; paying salaries; and setting work schedules."  Independent Contractor Motion at 20.  According to the United States, Isleta Pueblo decided when the thinning crew should stop work, and only the thinning crew was present at the thinning project site on June 14, 2016.  See Independent Contractor Motion at 20. The United States explains that the Forest Service recorded the thinning crew's progress, designated work areas, provided guidelines and feedback on how the thinning crew accomplished the Participating Agreement's goals, and reimbursed Isleta Pueblo.  See Independent Contractor Motion at 21.  The United States explains that, in performing the Forest Service's oversight duties,

Johnson "would occasionally meet with the crew to discuss boundaries, guidelines, scope of work, and prescriptions at the beginning of a unit, and visit the Pueblo's worksite to the extent necessary to ensure compliance with the specifications set forth in the Statement of Work Supplements [(Statements of Work)]." Independent Contractor Motion at 21. See id. at 21-22.

The United States continues to the third Lilly factor and notes that Isleta Pueblo used its own equipment, and that Isleta Pueblo had the duty to ensure that the thinning crew used equipment that was in working order and that was appropriate for the terrain. See Independent Contractor Motion at 22. The United States avers that Isleta Pueblo "owned and maintained the masticator" that allegedly started the Dog Head Fire. See Independent Contractor Motion at 22. The United States argues regarding the remaining Lilly factors that Isleta Pueblo provided its own liability insurance, paid its the thinning crew's salaries and social security taxes, provided and managed the thinning crew, and "could, and did, subcontract under the Isleta Participating Agreement." Independent Contractor Motion at 22. In the United States' view, the Forest Service's ability to inspect the thinning crew's work did not give the Forest Service sufficient control to make the relationship an employee -- rather than an independent contractor -- relationship. See Independent Contractor Motion at 23-24.

### 9. The Ohlsen Independent Contractor Response.

The Ohlsen Plaintiffs agree that the Court should analyze the Independent Contractor Motion under rule 56's standard but ask that the Court deny the Independent Contractor Motion, because the independent contractor exception does not apply. See Ohlsen Independent Contractor Response at 1. The Ohlsen Plaintiffs ask in the alternative that the Court conclude that a genuine issues of material fact exists whether Isleta Pueblo was an independent contractor. See Ohlsen

Independent Contractor Response at 2.  The Ohlsen Plaintiffs incorporate their response to the Ohlsen Motion into this Ohlsen Independent Contractor Response.  See Ohlsen Independent Contractor Response at 2.

The Ohlsen Plaintiffs contend that the CFDA, and not the independent contractor exception, provides the standard for determining whether Isleta Pueblo's workers were federal employees for the FTCA's purposes.  See Ohlsen Independent Contractor Response at 22-23. According to the Ohlsen Plaintiffs, the CFDA gives the Forest Service authority to enter cooperative relationships with third parties.  See Ohlsen Independent Contractor Response at 24. The Ohlsen Plaintiffs quote the CFDA: "To facilitate the administration of the programs and activities of the Forest Service, the Secretary is authorized to negotiate and enter into cooperative agreements with the public . . . to perform forestry protection, including fire protection."  Ohlsen Independent Contractor Response at 24 (citing 16 U.S.C. § 565a-1).  According to the Ohlsen Plaintiffs, "[a] cooperative agreement contemplates substantial involvement by the government." Ohlsen Independent Contractor Response at 24 (citing 31 U.S.C. § 6405; Forest Service Grants and Agreements, Forest Service Handbook, filed December 19, 2018 (Doc. 97-26)("Forest Service Grants and Agreements, Forest Service Handbook")).  The Ohlsen Plaintiffs aver that the Participating Agreement reflects that such a cooperative relationship existed between the Forest Service and Isleta Pueblo, because the Participating Agreement describes Isleta Pueblo as a "Partner" or "Cooperator," and not as a "Contractor."  Ohlsen Independent Contractor Response at 24.

The Ohlsen Plaintiffs aver that the FTCA does not exclude cooperators from its waiver of immunity and repeat that the CFDA mandates that cooperators are federal employees as long as

the cooperator "work[s] under supervision of the Forest Service . . . as mutually agreed to." Ohlsen Independent Contractor Response at 24 (quoting 16 U.S.C. § 565a-2).  The Ohlsen Plaintiffs quote § 565a-2:

> In any agreement authorized by section 565a-1 of this title, cooperators and their employees may perform cooperative work under supervision of the Forest Service in emergencies or otherwise as mutually agreed to, but shall not be deemed to be Federal employees other than for purposes of chapter 171 of Title 28 [FTCA] and chapter 81 of Title 5 [(Federal Employees' Compensation Act)].

Ohlsen Independent Contractor Response at 24-25 (quoting 16 U.S.C. § 565a-2).  The Ohlsen Plaintiffs admit that they cannot find a case "interpreting or applying 16 U.S.C. § 565a-2." Ohlsen Independent Contractor Response at 25.  The Ohlsen Plaintiffs aver, however, that, as a policy matter, reading cooperation agreements to waive FTCA immunity will not harm the United States, because the Forest Service and the cooperator must agree to Forest Service supervision and because the Forest Service may enter with prospective contractors forms of agreements other than cooperative agreements.  See Ohlsen Independent Contractor Response at 25.

The Ohlsen Plaintiffs apply their interpretation of § 565a-2 to this case and contend that the thinning crew worked under the Forest Service's supervision.  See Ohlsen Independent Contractor Response at 25.  The Ohlsen Plaintiffs urge that the Court give the word "supervise" its plain meaning.  See Ohlsen Independent Contractor Response at 25-26.  The Ohlsen Plaintiffs cite Martarano v. United States, 231 Fed. Supp. 805, 807 (D. Nev. 1964)(Thompson, J.), in which the Honorable Bruce Thompson, then-United States District Judge for the United States DIstrct Court for the District of Nevada, found that an employee whom a state agency hired under authority granted in a cooperative agreement was a federal employee, because the federal agency supervised the employee's work duties although the state agency hired and paid the employee.  See

Ohlsen Independent Contractor Response at 25-26. The Ohlsen Plaintiffs aver that the United States' position depends on a strained reading of § 565a-2. See Ohlsen Independent Contractor Response at 26. The Ohlsen Plaintiffs describe that the Forest Service provided the thinning crew guidelines and "work prescriptions," and that these guidelines and prescriptions included directions about, among other things, the "size location, shape, species of trees" that "are desirable, acceptable and undesirable." Ohlsen Independent Contractor Response at 26. The Ohlsen Plaintiffs contend that the Project Administrators regularly visited the Project's site and directed the thinning crew. See Ohlsen Independent Contractor Response at 27. The Ohlsen Plaintiffs aver that: (i) Johnson visited the Project site around twice a week; (ii) Lueras visited the Project site once a week, and (iii) Fox often visited the site. See Ohlsen Independent Contractor Response at 27. According to the Ohlsen Plaintiffs, the Forest Service and Isleta Pueblo had frequent conversations about the Project. See Ohlsen Independent Contractor Response at 27. In the Ohlsen Plaintiffs' view, such regular oversight and communication indicate that the Forest Service was cooperating with Isleta Pueblo and do not show that the Forest Service was only monitoring Isleta Pueblo's compliance with the Participating Agreement. See Ohlsen Independent Contractor Response at 27. The Ohlsen Plaintiffs also request that the Court disregard the First Fox Decl., because the First Fox Decl. is more argument than it is testimony on facts. See Ohlsen Independent Contractor Response at 26.

The Ohlsen Plaintiffs argue that the Forest Service and Isleta Pueblo mutually agreed that the Forest Service would supervise Isleta Pueblo. See Ohlsen Independent Contractor Response at 29. The Ohlsen Plaintiffs contend that § 565a-2 does not require that the Forest Service and the cooperator enter a written agreement that the Forest Service will supervise the cooperator, and that

the Forest Service and Isleta Pueblo's actions reveal that they mutually agreed to the Forest Service's supervision of Isleta Pueblo. See Ohlsen Independent Contractor Response at 29. According to the Ohlsen Plaintiffs, the Participating Agreement is ambiguous about the Forest Service and Isleta Pueblo's relationship, because the Participating Agreement does not ban Forest Service supervision, but the Participating Agreement gives the Forest Service the power to comment on how the Project's goals are accomplished and to "supervise and direct" Isleta Pueblo's work. Ohlsen Independent Contractor Response at 29 (quoting Participating Agreement ¶ V(F), at 5). The Ohlsen Plaintiffs argue, however, that the Forest Service's and Isleta Pueblo's course of performance manifests their agreement that the Forest Service would supervise Isleta Pueblo, because the Forest Service routinely supervised the thinning crew without Isleta Pueblo complaining about the supervision. See Ohlsen Independent Contractor Response at 29.

The Ohlsen Plaintiffs argue in the alternative that the Court should deny the Independent Contractor Motion under the independent contractor test. See Ohlsen Independent Contractor Response at 29. Regarding the first Lilly factor, the Ohlsen Plaintiffs describe that the Forest Service's and Isleta Pueblo's intentions about their relationship are not clear. See Ohlsen Independent Contractor Response at 30. According to the Ohlsen Plaintiffs, Dixon does not know whether the Forest Service and Isleta Pueblo intended that the thinning crew workers would be federal employees, but the Participating Agreement notes that the thinning crew workers are not federal employees. See Ohlsen Independent Contractor Response at 30. The Ohlsen Plaintiffs contend, regarding the second factor, that the Forest Service "controlled the manner and method of reaching the [Project's] result and did not control only the end result" for the Project. Ohlsen Independent Contractor Response at 30. Regarding the third factor, the Ohlsen Plaintiffs describe

that the Forest Service funded Isleta Pueblo's purchase of equipment, including "chain saws, tools, parts for the masticator, rental trucks, and other equipment." Ohlsen Independent Contractor Response at 30-31. Turning to the fourth factor, the Ohlsen Plaintiffs state that Isleta Pueblo provided liability insurance, but that it did not waive its sovereign immunity. See Ohlsen Independent Contractor Response at 31. Regarding the fifth factor, the Ohlsen Plaintiffs describe that Isleta Pueblo remitted social security taxes, but that Isleta Pueblo itemized its taxes for the Forest Service before Isleta Pueblo received payment from the Forest Service for the thinning crew's work. See Ohlsen Independent Contractor Response at 31. Turning to the remaining factors, the Ohlsen Plaintiffs further argue that federal regulations do not prevent federal employees from performing the thinning crew's tasks, and that Isleta Pueblo could and did subcontract with third parties for work related to the Project. See Ohlsen Independent Contractor Response at 31.

10.     **The Independent Contractor Reply.**

The United States avers that any Plaintiffs who did not respond to the Independent Contractor Motion waive their arguments to that motion. See Independent Contractor Reply at 1 n.1 (citing D.N.M. LR-Civ. 7.1(b)). The United States avers that, although the Forest Service and Isleta Pueblo entered the Participating Agreement under authority from the CFDA, the CFDA does not provide a test for determining a contractor's employment status. See Independent Contractor Reply at 35. The United States argues that the Ohlsen Plaintiffs rely on the Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. §§ 6301-08 ("FGCAA"), for the proposition that cooperative agreements necessitate substantial involvement between the executive agency and the cooperator, see Independent Contractor Reply at 36, but that the CFDA's statutory history reflects

that the statute is not subject to the FGCAA, see Independent Contractor Reply at 36. The United

States adds that, even if the FGCAA applies, no language in the FGCAA defines "cooperators" or

"substantial involvement." See Independent Contractor Reply at 36. The United States avers,

furthermore, that courts have found parties working under cooperation agreements to be

independent contractors. See Independent Contractor Reply at 36-37 (citing Walding v. United

States, 955 F. Supp. 2d 759, 795 (W.D. Tex. 2013)(Rodriguez, J.)). The United States adds that

the Ohlsen Plaintiffs cite no caselaw for their interpretation of § 565a-2. See Independent

Contractor Reply at 37.

According to the United States, § 565a-2 provides that cooperators "'*may* perform

cooperative work under supervision of the USFS *in emergencies* or *otherwise as mutually agreed*

*to*.'" Independent Contractor Reply at 37 (emphasis in Independent Contractor Reply)(quoting

16 U.S.C. § 565a-2). For the United States, the word "may" reflects that the cooperators have an

option whether to work under the Forest Service's supervision. See Independent Contractor Reply

at 37-38. The United States argues that, if courts deem all parties working under § 565a-1 to be

supervised by the Forest Service and to be federal employees for the FTCA's purposes, § 565a-2

would serve no purpose. See Independent Contractor Reply at 38. The United States quotes the

§ 565a-2's legislative history:

> "The authority in section 2 to *permit* the Forest Service to supervise the cooperator
> and his employees would broaden and facilitate opportunities for cooperation and
> clarify the relationship of the parties. . . . It is *sometimes* desirable as part of the
> agreement for cooperators or program participants to work under Forest Service
> supervision."

Independent Contractor Reply at 38 (quoting H.R. Rep. 94-611 at 4-5 (1975)[167]).

The United States further contends that the Ohlsen Plaintiffs cannot show that either an emergency or a mutual agreement between the United States and Isleta Pueblo for United States supervision existed. See Independent Contractor Reply at 38. The United States emphasizes that the Participating Agreement § V(F), at 5, provides that the thinning crew workers are not federal employees. See Independent Contractor Reply at 39. The United States disputes whether the Participating Agreement is ambiguous, and takes the position that the Participating Agreement clearly reflects an agreement between the Forest Service and Isleta Pueblo that Isleta Pueblo "would contribute personnel, equipment and supplies and manage the employees . . . and that the Pueblo employees were not federal employees for any purpose." Independent Contractor Reply at 40 (citing Participating Agreement ¶¶ III-V, at 2-3).

Regarding the Ohlsen Plaintiffs' contentions about the Forest Service Grants and Agreements, Forest Service Handbook, the United States argues that the Forest Service Handbook does not provide a test for determining whether workers are federal employees. See Independent Contractor Reply at 40. The United States describes that the Forest Service and Isleta Pueblo entered the Participating Agreement pursuant to the CFDA's and the Wyden Amendment's authority. See Independent Contractor Reply at 41 (citing Chapter 70.1-79.2 Partnership Agreements, Forest Service Handbook 1509.11 § 71.1(a)-(b), at 13-14, https://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?1509.11.. (last visited May 4, 2019)("Forest Service Handbook Ch.

---

[167]In January, 2019, the Ohlsen Plaintiffs filed this House of Representatives Report as supplemental authority. See H.R. Rep. 94-611 at 1-2 (1975), filed January 7, 2019 (Doc. 106-2)("H.R. Rep. 94-611"). As the United States filed the Independent Contractor Reply before the Ohlsen Plaintiffs filed the H.R. Rep. 94-611 and did not quote, therefore, the exhibit H.R. Rep. 94-611, the Court does not provide the full citation to the Ohlsen Plaintiffs' exhibit in the text here.

70")).  According to the United States, the Forest Service Handbook Ch. 70 § 72.11(8), at 18, provides that, for agreements entered on CFDA's authority, "'[c]ooperators and their employees *may be considered* Federal employees for purposes of tort and worker's compensation, *only when the Forest Service supervises their work*.'"  Independent Contractor Reply at 41 (emphasis in Independent Contractor Reply)(quoting Forest Service Handbook Ch. 70 § 72.11(8), at 18).  The United States describes that the Wyden Amendment "does *not* provide conveyance of Federal employee status toward cooperator's employees and therefore, does not provide tort and worker's compensation coverage under such circumstances."  Independent Contractor Reply at 42 (emphasis in Independent Contractor Reply)(citing Forest Service Handbook Ch. 70 § 72.21(8), at 23).  The United States then reiterates the <u>Lilly</u> factors and its arguments from the Ohlsen Motion that Isleta Pueblo was an independent contractor.  <u>See</u> Independent Contractor Reply at 42.  The United States also differentiates <u>Martarano v. United States</u> from this case's facts, reasoning that <u>Martarano v. United States</u> involved an employee whom a state loaned to the United States.  <u>See</u> Independent Contractor Reply at 44.  According to the United States, Isleta Pueblo loaned no employees to the Forest Service.  <u>See</u> Independent Contractor Reply at 44-45.

The United States cites <u>Autery v. United States</u>, 424 F.3d 944, 958 (9th Cir. 2005), and <u>Walding v. United States</u> to support its arguments.  <u>See</u> Independent Contractor Reply at 45.  The United States argues that, in <u>Autery v. United States</u>, wherein wildfire victims sued the United States for negligence, the United States Court of Appeals for the Ninth Circuit held that a cooperative agreement between the Department of Energy and a private company hired to perform work on federal land created an independent contractor relationship, because the contract's textual provisions delegated to the contractor the responsibility to engage in fire protection and prevention.

See Independent Contractor Reply at 45. According to the United States, the Ninth Circuit focused on whether the United States Department of Energy had authority to control the private company's daily operations. See Independent Contractor Reply at 45. According to the United States, in Walding v. United States, the Honorable Xavier Rodriguez, United States District Judge for the United States District Court for the Western District of Texas, concluded that an employer-employee relationship did not exist among the United States Department of Homeland Security, the Office of Refugee Resettlement, and the contractor Away From Home, Inc., where the Officer of Refugee Resettlement filled a consultant role and did not daily supervise Away From Home, Inc.'s employees. See Independent Contractor Reply at 46.

The United States argues that the Forest Service did not exercise daily supervision over the thinning crew. See Independent Contractor Reply at 47-48. The United States avers, for instance, that Isleta Pueblo performed day-to-day supervision, including organizing the thinning crew's daily projects, see Independent Contractor Reply at 47-48, that J. Jiron saw Johnson a couple times a month and that Jaramillo never received instructions from the Forest Service, see Independent Contractor Reply at 47. The United States avers that the Tenth Circuit case Curry v. United States, 97 F.3d 412 (10th Cir. 1996), resembles this case. See Independent Contractor Reply at 48. According to the United States, in Curry v. United States, the Forest Service had authority to oversee Joe Roybal's work and even gave him instructions about the debris to clear from the road that the Forest Service hired Roybal to maintain and grade,[168] but the Tenth Circuit concluded that

---

[168]"Grading in civil engineering and landscape architectural construction is the work of ensuring a level base, or one with a specified slope, for a construction work such as a foundation, the base course for a road or a railway, or landscape and garden improvements, or surface drainage." Grading (engineering), Wikipedia, https://en.wikipedia.org/wiki/Grading_(engineering) (last visited June 1, 2019).

Roybal was an independent contractor.  See Independent Contractor Reply at 48 (citing Curry v. United States, 97 F.3d at 413, 415).

### 11.    The State Farm Independent Contractor Motion Response.

The State Farm Plaintiffs also filed a response.  See Plaintiffs, State Farm Fire & Casualty Company, Safeco Insurance Company of America and Allstate Insurance Company's Response to United States of America's Motion to Dismiss Claims for Lack of Subject Matter Jurisdiction or in the Alternative for Partial Summary Judgment and Adoption of All Plaintiffs' Responses to Defendant's Motions to Dismiss, filed December 19, 2018 (Doc. 96)("State Farm Independent Contractor Response").  The State Farm Plaintiffs "adopt and incorporate by reference, any and all responses to Defendant's Motions to Dismiss."  State Farm Independent Contractor Response at 1-2.

### 12.    The Homesite Independent Contractor Response.

Homesite Indemnity also filed a response.  See Homesite Indemnity Company's Response to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction or in the Alternative for Partial Summary Judgment and Adoption of All Plaintiffs' Responses to Defendant's Motions, filed December 19, 2018 (Doc. 99)("Homesite Independent Contractor Response").  Homesite Indemnity incorporates into its Homesite Independent Contractor Response all other responses to the Independent Contractor Motion and asks that the Court deny the Independent Contractor Motion.  See Homesite Independent Contractor Response ¶ 2, at 1.

### 13.    The State Farm Reply and the Homesite Indemnity Reply.

The United States files identical documents in reply to the State Farm Plaintiffs and Homesite Indemnity; the United States changes only the parties' names.  Compare United States

of America's Reply in Support of its Motion to Dismiss Plaintiffs' Complaints Due to Lack of Subject Matter Jurisdiction at 1-2, filed February 28, 2019 (Doc. 131)("State Farm Reply"), with United States of America's Reply in Support of its Motion to Dismiss Plaintiffs' Complaints due to Lack of Subject Matter Jurisdiction at 1-2, filed February 28, 2019 (Doc. 130)("Homesite Indemnity Reply").  The United States "incorporates by reference all arguments made in those replies filed in support of its motions to dismiss the claims of" the State Farm Plaintiffs and Homesite Indemnity.  State Farm Reply at 2; Homesite Indemnity Reply at 2.

      **14.**    **The Ohlsen Motion.**

In the Ohlsen Motion, the United States requests that the Court dismiss the Ohlsen Plaintiffs' claims, because: (i) the United States is not liable for the Ohlsen Plaintiffs' damages under res ipsa loquitur; (ii) the United States has not waived sovereign immunity "for non-delegable duty claims"; (iii) the Ohlsen Plaintiffs did not exhaust their administrative remedies for claims based on the Forest Service's "purported failure to suppress the fire"; and (iv) the FTCA's discretionary function exception bars all the Ohlsen Plaintiffs' claims.  Ohlsen Motion at 2.  First, the United States argues that it would not be liable under res ipsa loquitur.  See Ohlsen Motion at 10.  The United States argues that it did not exclusively control the forest thinning operations, but that Isleta Pueblo controlled the operations.  See Ohlsen Motion at 12.  The United States next argues that it has not waived sovereign immunity for non-delegable duty claims.  See Ohlsen Motion at 12 (citing Rothenberger v. United States, 931 F.2d 900, 1991 WL 70719, at *2 (10th Cir. 1991)(unpublished table opinion); Flynn v. United States, 631 F.2d 678, 681-82 (10th Cir. 1980); United States v. Page, 350 F.2d 28, 33 (10th Cir. 1965)).  The United States then avers that the Ohlsen Plaintiffs did not exhaust their administrative remedies, because the Ohlsen Plaintiffs

did not mention in their Ohlsen Notice of Claim their concerns about how the Forest Service fought the Dog Head Fire. See Ohlsen Motion at 12-14.

Last, the United States argues that the Court should dismiss the Ohlsen Plaintiffs' claims, because the claims fall within the FTCA's discretionary function exception. See Ohlsen Motion at 13. The United States describes the two-part test for the discretionary function exception: (i) a court should ask whether the alleged act is based on "an element of judgment or choice," Ohlsen Motion at 14 (quoting United States v. Gaubert, 499 U.S. 315, 321 (1991)), and (ii) whether the determination involved in the alleged act is based on policy considerations, see Ohlsen Motion at 14-15 (citing Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988)). The United States begins its argument by listing several statutes, regulations, and other authorities that govern the Forest Service. See Ohlsen Motion at 15-21. The United States describes that the Organic Administration Act of 1897, 16 U.S.C. §§ 473-79, 551, delegated to the Agriculture Department the management of United States National Forests. See Ohlsen Motion at 15 (citing 16 U.S.C. § 551). According to the United States, the Multiple Use Sustained Yield Act of 1960, 16 U.S.C. §§ 528-31, guides the Forest Service's management of the National Forests and directs the Forest Service to administer the National Forests

> "to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States" and "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."

Ohlsen Motion at 15 (first quoting 16 U.S.C. § 475; then quoting 16 U.S.C. § 528; and citing 16 U.S.C. §§ 529-31). The United States explains that the National Environmental Policy Act, 42 U.S.C. §§ 4321, 4331-35, 4341-46, 4346a, 4346b, 4347, directs the Forest Service to consider the environmental impacts of proposed United States actions that would affect the National

Forests.  See Ohlsen Response at 15.  The United States describes that the National Forest Management Act, 16 U.S.C. §§ 472a, 521b, 1600, 1611-14 ("NFMA"), provides a framework for managing Forest Service lands.  See Ohlsen Motion at 16 (16 U.S.C. §§ 472a, 521b, 1600, 1611-14).

Turning to Forest Service policies, the United States explains that the Forest Service adopted the Forest Service, Cibola National Forest Land and Resource Management Plan (dated July 1985)("Forest Plan"),[169] "[p]ursuant to NFMA."  Ohlsen Motion at 16.  The United States explains that the Forest Plan describes that the Forest Service's goals in managing the Cibola National Forest include "'provid[ing] for multiple use and sustained yield of goods and services from the Forest in a way that maximizes long term net public benefits in an environmentally sound manner.'" Ohlsen Motion at 16 (quoting Forest Plan at 1).  According to the United States, the Forest Plan establishes standards for forest and fire management, see Ohlsen Motion at 16 (citing Forest Plan at 33-34), including, for instance, rules for how many standing dead trees and downed logs, and how much debris, the Forest Service should leave per acre of Ponderasa Pine, see Ohlsen Motion at 17.  According to the United States, the Forest Plan provides the following management goals for Management Unit 11, within which Unit 4 is located:

> "Maintain the forest and watershed health, vigor, and productivity.  Provide and maintain wildlife habitat diversity and old growth.  Slash from harvest activities will be made available to the public for personal use firewood.  Developed recreation sites will be maintained.  Trail construction and new trailhead facilities will provide increased opportunities for dispersed recreation use."

---

[169] Available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3799884.pdf (last visited May 2, 2019).

Ohlsen Motion at 17 (quoting Forest Plan at 141). The United States also discusses the United States Department of Agriculture, Strategic Plan 2010-2015, filed November 2, 2018 (Doc. 62-5)("Strategic Plan"), which includes the following Agriculture Department goals:

- Working cooperatively on policy matters;

- Serving [Agriculture Department]'s constituents;

- Measuring performance and making management decisions to direct resources to where they are used most effectively.

Ohlsen Motion at 17 (quoting Strategic Plan at iv). According to the United States, the Strategic Plan lists as other goals such objectives as assisting rural communities, restoring and conserving national forests, adapting to climate change, and reducing the risks of catastrophic fires. See Ohlsen Motion at 17 (citing Strategic Plan at v). The United States describes that, based on the Strategic Plan, the Forest Service's Southwestern Region, which includes the Cibola National Forest, adopted the Forest Service Southwestern Region Landscape Conservation and Restoration Strategic Action Plan (dated January 31, 2011), filed November 2, 2018 (Doc. 62-6)("Landscape Plan"), which prioritizes "working with partners to identify and prioritize restoration projects, while 'creating jobs to support vibrant communities,'" and considering "the values placed on the landscape, threats to those values, the degree of collaboration and local support to restore the landscape, and economics, including job creation and support for local infrastructure." Ohlsen Motion at 17-18 (quoting Landscape Plan at 1; and citing Landscape Plan at 3).

The United States then discusses the authorities that govern wildfire management. See Ohlsen Motion at 18. The United States lists several relevant statutes, and then specifies that, in response to the Federal Land Assistance and Management and Enhancement Act of 2009,

43 U.S.C. §§ 1748-48b ("FLAME Act"),[170] the United States Secretary of the Interior and the United States Secretary of Agriculture ("Agriculture Department Secretary") developed the <u>A National Cohesive Wildland Fire Management Strategy</u> (dated 2011)("Cohesive Strategy")[171] and the <u>A National Cohesive Wildland Fire Management Strategy Phase II National Report</u> (dated May 2012)("Cohesive Strategy Phase II").[172]   The United States explains that the Cohesive Strategy "recognizes the need for 'building new relationships among . . . stakeholders,'" Ohlsen Motion at 18 (quoting Cohesive Strategy at 1), and "encourages increased use of partnerships, grants, and other funding opportunities," Ohlsen Motion at 18 (citing Cohesive Strategy at 4).  The United States lists several principles that the Cohesive Strategy requires agencies to consider in developing regional strategies:

- Reducing risk to firefighters and the public is the first priority in every fire management activity.

- Sound risk management is the foundation for all management activities.

- *Actively manage the land* to make it more resilient to disturbance, in accordance with management objectives.

 . . . .

- *Rigorous wildfire prevention programs are supported across all jurisdictions*.

 . . . .

---

[170]The FLAME Act requires the United States Secretary of the Interior and the United States Secretary of Agriculture to submit a joint report on "wildfire management strategy." 43 U.S.C. § 1748b.

[171]Available at https://www.fs.fed.us/rm/pubs_other/rmrs_2011_usda_fs001.pdf (last visited May 2, 2019).

[172]Available at https://www.hsdl.org/?view&did=712329 (last visited May 2, 2019).

- Fire management decisions are based on the best available science, knowledge and experience, and used to evaluate risk versus gain.

- *Federal agencies, local, state, tribal governments support one another with wildfire response, including engagement in collaborative planning* and the decision-making processes that take into account all lands and recognize the interdependence and statutory responsibilities among jurisdictions.

  . . . .

- *Fire management programs and activities are economically viable and commensurate with values to be protected, land and resource management objectives, and social and environmental quality considerations.*

Ohlsen Motion at 19 (emphasis in Ohlsen Motion)(quoting Cohesive Strategy at 6). The United States explains that the Cohesive Strategy reflects a view of wildfire as a risk that the United States seeks to manage but "not a risk that can, or even should, be eliminated." Ohlsen Motion at 19 (citing Cohesive Strategy at 13). The United States argues that "effective management requires taking into consideration values at risk, local and regional concerns, risk tolerance, and '[r]eal world constraints on funding, available resources, and administrative flexibility.'" Ohlsen Motion at 19-20 (quoting Cohesive Strategy at 13).

The United States also describes various statutes' and policies' emphases on partnership. See Ohlsen Motion at 20. The United States argues that the TFPA directs the United States Department of the Interior and the Agriculture Department "to consider tribal partners and tribally proposed projects to protect tribal natural." Ohlsen Motion at 21 (citing 25 U.S.C. §§ 3101, 3115a). The United States notes that the forestry project that included Unit 4's thinning "has been held out as an example of a project that 'provide[s] fuel wood, create[s] local employment opportunities for Hispanic and Native American youth, and increase[s] the small-scale wood products industry.'" Ohlsen Motion at 20 (quoting Improving Interagency Forest Management to

Strengthen Tribal Capabilities for Responding to and Preventing Wildfires before the Sen. Comm. on Indian Affairs and, S. 3014 To improve the Management of Indian forest land, and for other purposes, 114 Cong. 6-7 (2016)(statement of James Hubbard, Deputy Chief, State & Private Forestry, United States Forest Service)). The United States describes that the CFDA provides for the Forest Service to use cooperative agreements "to perform forestry protection projects, including fire protection" and authorizes the Agriculture Department Secretary to enter such agreements when the agreements benefit the public. Ohlsen Motion at 20. According to the United States, in 2014, the Forest Service and the NRCS created "the Joint Chiefs' Landscape Restoration Partnership in 2014 ('JCLRP') with the goal of reducing wildfire threats to communities, to protect water quality and supply, and to improve wildlife habitat for at risk species." Ohslen Motion at 21. The JCLRP funds conservation projects on private and public lands, and its goals include: "(1) reducing and mitigating wildfire threats to communities and landowners; (2) protecting water quality and supply for communities and industry; and (3) improving habitat quality or at-risk or ecosystem surrogate species." Ohlsen Motion at 21 (citing Joint Chiefs' Landscape Restoration Partnership Proposal Solicitation for FY 2018, Joint Forestry Team, http://www.jointforestryteam.org/joint-chiefs-landscape-restoration-partnership-proposal-solicitation-fy2018/ (last visited May 2, 2019)).

The United States then applies the discretionary function exception's two-part test to this case. See Ohlsen Motion at 21. The United States argues that the Ohlsen Plaintiffs cite no specific statute or regulation that removes the Forest Service's allegedly negligent actions from the discretionary function exception. See Ohlsen Motion at 21. The United States indicates that the Ohlsen Plaintiffs

contend that [the Forest Service] 1) contracted with an inappropriate contractor for the forest thinning project; 2) failed to train, instruct, direct, and supervise the contractor or its crew; 3) left slash produced by prior forest thinning operations on the forest floor; and 4) allowed forest thinning and mastication under unsuitable conditions.

Ohlsen Motion at 22. The United States argues that the Court should assume that the Forest Service exercised discretion, because the policies articulated above give the Forest Service discretion. See Ohlsen Motion at 22.

The United States adds that this case's facts also show that the Forest Service exercised discretion. See Ohlsen Motion at 22. The United States avers that the Forest Service's decision to enter the Participating Agreement involved numerous public policy considerations based on the authorities that the United States previously discussed, including

actively managing USFS lands; responding to local interest; taking advantage of contributions of a diverse workforce, creating jobs; promoting job training and development programs; promoting a strong partnership with the Pueblo; promoting forest health; promoting watershed health; promoting wildlife habitat; making firewood available for the public; mitigating threats to USFS lands; supporting the Pueblo in collaborative planning and decision-making processes; taking advantage of partnership grants and funding opportunities; and demonstrating the value of the Pueblo's land and the Pueblo's cultural interests on USFS lands.

Ohlsen Motion at 22-23. The United States avers that several courts have recognized that an agency's choice of contractor is grounded on policy choices. See Ohlsen Motion at 23 (citing Carroll v. United States, 661 F.3d 87, 100 (1st Cir. 2011); Layton v. United States, 984 F.2d 1496, 1501-02 (8th Cir. 1993); Guile v. United States, 422 F.3d 221, 231 (5th Cir. 2005); Williams v. United States, 50 F.3d 299, 310 (4th Cir. 1995); Begay v. United States, No. CIV 15-0358 JB/SCY, 2016 WL 6394925, at *31 (D.N.M. Sept. 30, 2016)(Browning, J.); Coffey v. United States, 906 F. Supp. 2d 1114, 1157-1159 (D.N.M. 2012)(Browning, J.)). According to the United States, although the Tenth Circuit has not directly addressed this issue, the Tenth Circuit seems to agree

with the other courts.  See Ohlsen Motion at 23-24 (citing Domme v. United States, 61 F.3d 787, 792 (10th Cir. 1995)).

The United States next addresses several other Forest Service decisions that the Ohlsen Plaintiffs' claims attack.  See Ohlsen Motion at 24-27.  The United States argues that the Forest Service chose to allow Isleta Pueblo to supervise the thinning crew because of the same public policy concerns that underlay its decision to work with Isleta Pueblo.  See Ohlsen Motion at 24. The United States contends that decisions about overseeing contractors, about training workers, and about delegating safety responsibilities are all discretionary.  See Ohlsen Motion at 25.  The United States likewise argues that the Forest Service's decision to leave slash on the ground "so that members of the public, by permit, could collect the wood for fuel was based on important public policy considerations, such as the public's demand for firewood and the underlying purpose of the Multiple Use Sustained Yield Act of 1960."  Ohlsen Motion at 25.  The United States contends that Isleta Pueblo had the responsibility to decide under which daily conditions to masticate and that the Forest Service made a discretionary decision when it delegated this responsibility to a contractor -- Isleta Pueblo.  See Ohlsen Motion at 26.  The United States avers that, in determining the general timing of mastication, the Forest Service made a discretionary decision that turned on "all other scheduled [Forest Service] projects, the risk of wildfire presented by the project, the risk of a catastrophic wildfire should the project be delayed, and available funding."  Ohlsen Motion at 26 (citing Safeco Ins. v. United States, No. 98-17409, 202 F.3d 279, 1999 WL 1038272, at *1 (9th Cir. Nov. 12, 1999)(unpublished table opinion)).  The United States also contends that Forest Service's choices about Unit 4's treatment were also policy decisions and explains that

because of the widely varying nature of forestlands throughout the country, the Forest Service delegates decisionmaking regarding treatment of forestlands to the local level. District-level silviculturalists, foresters, and timber markers all rely on their experience and judgment in making decisions regarding which stands of trees and which individual trees need treatment in order to further the Forest Service's policy of improving timber quality, and in deciding which treatment methods will best serve those goals.

Ohlsen Motion at 26-27 (quoting <u>Layton v. United States</u>, 984 F.2d at 1501-02). Last, the United States avers that the Forest Service had to decide what to do with the slash that the public had not collected for firewood. <u>See</u> Ohlsen Motion at 27. According to the United States, in reaching the decision to masticate the slash, the Forest Service considered policy objectives "such as forest health, improving wildlife habitat, weighing the risk of wildfire, public access to Unit 4, aesthetics, and available resources." Ohlsen Motion at 27.

### 15.  **The Ohlsen Response.**

The Ohlsen Plaintiffs respond. <u>See</u> Ohlsen Response at 1-37. The Ohlsen Plaintiffs state that the Plaintiffs agree that the Ohlsen Response applies to all Plaintiffs. <u>See</u> Ohlsen Response at 1 n.1. The Ohlsen Plaintiffs contend first that the test for exhaustion of administrative remedies is a "pragmatic" test. Ohlsen Response at 23 (quoting <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d 840, 853 (10th Cir. 2005)). The Ohlsen Plaintiffs aver that, in a notice of claim, they must notify the Forest Service only of the facts that underlie their claim. <u>See</u> Ohlsen Response at 23. The Ohlsen Plaintiffs contend that they state in the Ohlsen Complaint the same facts about the Dog Head Fire's suppression that they state in the Ohlsen Notice of Claim. <u>See</u> Ohlsen Response at 24. The Ohlsen Plaintiffs describe that, in their notice of claim, they state:

> (11.) The Project and agency named in this claim did not reasonably employ a competent and careful contractor to perform the work and did not train, direct, or supervise the contractor and crew with regard to fire danger evaluation, proper operational procedures, fire prevention, and **fire suppression procedures and**

**techniques**.  Accordingly, the masticator was operated at an unreasonable time during fire season, in unreasonable conditions of rocky soil and very dry slash and bole, and in an unreasonable manner, resulting in the ignition of the fire.  Public statements by the USFS indicate the crew did not attempt to suppress the fire in its very small incipient state, but rather they removed the masticator to safety and called in the fire department.

(12.) The **fire suppression equipment** required by the Project and agency named in this claim to be on hand during the mastication operation was insufficient to suppress the fire in its incipient state.  The Project and agency named in this claim unreasonably did not require any equipment be on hand to put out an incipient fire in slash or wood.

Ohlsen Response at 24 (emphasis in Ohlsen Response)(quoting Ohlsen Notice of Claim ¶¶ 11-12, at 4).  According to the Ohlsen Plaintiffs, in their Ohlsen Complaint, they allege: "Defendants, by and through their agents and employees did not reasonably employ a competent and careful contractor to perform the work and did not train, direct, or supervise the contractor and crew with regard to fire danger evaluation, proper operational procedures, fire prevention, and fire suppression techniques."  Ohlsen Response (citing Ohlsen Complaint ¶ 19, at 5).  The Ohlsen Plaintiffs contend that they make the same allegation in the Ohlsen Notice of Claim.  See Ohlsen Response at 24.  The Ohlsen Plaintiffs contend that the Ohlsen Complaint's allegation that the thinning "'crew was not adequately trained or equipped to prevent or immediately suppress a fire and made no attempt to immediately suppress the fire,'" Ohlsen Response at 25 (quoting Ohlsen Complaint ¶ 19, at 5), is in the Ohlsen Notice of Claim, in which the Ohlsen Plaintiffs write "the crew did not attempt to suppress the fire in its very small incipient state," Ohlsen Response at 25 (quoting Ohlsen Notice of Claim at 2).  According to the Ohlsen Plaintiffs, the Ohlsen Notice of Claim's allegations about the firefighting crew and equipment also "cover[s]" the Ohlsen Complaint's allegation "that the Defendants 'declined and did not use available fire suppression resources.'"  Ohlsen Response at 25 (no citation provided).  The Ohlsen Plaintiffs argue that the

Ohlsen Notice of Claim sufficiently alerted the United States to the Ohlsen Plaintiffs' complaints about how the Forest Service responded to the Dog Head Fire, see Ohlsen Response at 25, and that the Agriculture Department investigated these topics, see Ohlsen Response at 25 (citing Dog Head Fire Report at 5-11, 14-18).

The Ohlsen Plaintiffs also aver that the discretionary function exception to the FTCA does not bar their claims. See Ohlsen Response at 26. The Ohlsen Plaintiffs cite Smith v. United States, 546 F.2d 872, 877 (10th Cir. 1976), and Coffey v. United States to argue that the discretionary function does not except the United States' actions after the United States has used its discretion to choose a course of action. See Ohlsen Response at 27-28. The Ohlsen Plaintiffs contend that, once the Forest Service decided to thin Cibola National Forest, the Forest Service had a duty to perform the thinning in a safe manner. See Ohlsen Response at 28-29. According to the Ohlsen Plaintiffs, the Forest Service could not abdicate this responsibility, because the Forest Service still owned the Cibola National Forest, and "controlled the depth of the slash, when to do a controlled burn, when fire restrictions were put in place, when the public could use the forest, when contractors could work there and what type of equipment they could operate." Ohlsen Response at 28-29. The Ohlsen Plaintiffs argue, therefore, that, although the United States' decision whether and what safety procedures to adopt is discretionary, the United States' decision to follow the policies is not discretionary. See Ohlsen Response at 29 (citing Maryls Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior, 241 F.3d 1208, 1215 (9th Cir. 2000); Faber v. United States, 56 F.3d 1122, 1126 (9th Cir. 1995); Berkovitz by Berkovitz v. United States, 486 U.S. at 544; McGarry v. United States, 549 F.2d 587, 591 (9th Cir. 1976)). The Ohlsen Plaintiffs aver that, by permitting the slash to reach a depth of three feet and allowing the slash to remain at that depth over a year,

the Forest Service, through Fox and Johnson, violated the Participating Agreement, which mandates a maximum slash depth of eighteen inches.  See Ohlsen Response at 30.  The Ohlsen Plaintiffs add that the Forest Service knew that Unit 4 had a high fire risk and was treating Unit 4 because of that risk.  See Ohlsen Response at 31.

The Ohlsen Plaintiffs then contend that the Forest Service's policies required that the thinning crew burn the accumulated slash.  See Ohlsen Response at 31 (citing U.S. Dep't of Agri. Forest Serv., Decision Notice and Finding of No Significant Impact Isleta Collaborative Landscape Analysis Project at 4 (dated September 18, 2018), filed December 19, 2018 (Doc. 98-10)("Decision Notice")).  The Ohlsen Plaintiffs argue that, after the Forest Service allowed the slash to reach three feet, it could not burn the slash and thus violated the Decision Notice, and that, because the slash's depth alone influenced the Forest Service's decision not to perform a prescribed burn, the decision did not involve economic choices.  See Ohlsen Response at 31-32. The Ohlsen Plaintiffs additionally argue that

> the actions cannot meet the second prong as the prescriptions for burning did not entail policy considerations.  Nor would any discretion in setting the conditions be susceptible to a policy analysis.  *See Gaubert*[,] 499 US at 324-25.  Setting the prescriptions involved safety considerations mandated by state tort law and the day-to-day management of the project at the operational level.  *Gaubert*, 499 US at 325.

Ohlsen Response at 32.  The Ohlsen Plaintiffs argue that the Forest Service's failure to engage in a prescribed burn enabled the accumulated slash "to become a perfect fuel load," and that the "deep dry slash also resulted in a fire that quickly grew and spread."  Ohlsen Response at 32.  The Ohlsen Plaintiffs add that "failure to follow the prescribed burn guidelines and instead directing Isleta Pueblo to use a masticator, which is known to cause sparks, to manage the dried slash was the proximate cause of the fire."  Ohlsen Response at 33.

The Ohlsen Plaintiffs aver that the United States also violated the Participating Agreement by allowing Isleta Pueblo to ignore several safety requirements. See Ohlsen Response at 33. According to the Ohlsen Plaintiffs, Isleta Pueblo did not: (i) create a safety plan; (ii) carry appropriate fire safety equipment; (iii) have the proper tools for its work; (iv) have a tool box; (v) suppress the fire when the fire ignited; or (vi) properly train a masticator operator. See Ohlsen Response at 33-34. The Ohlsen Plaintiffs also argue that these actions do not involve policy considerations, see Ohlsen Response at 34, and that "case law directs that, by nature, *matters of routine maintenance are not protected by the discretionary function exception* because they generally do not involve policy-weighing decisions or actions," Ohlsen Response at 35 (emphasis in Ohlsen Response)(quoting Terbush v. United States, 516 F.3d 1125, 1133-1134 (9th Cir. 2008)). The Ohlsen Plaintiffs aver that, even if the Court concludes that the Forest Service's decisions involved policy considerations, the Forest Service cannot ignore its basic duties under tort law when performing the work that it decides to undertake. See Ohlsen Response at 35.

The Ohlsen Plaintiffs also contend that "[t]he discretionary function does not shield the [United States] if it acts with blatant disregard for the public's wellbeing." Ohlsen Response at 35. The Ohlsen Plaintiffs argue that the Forest Service "acted negligently by 1) implementing no proper fire restrictions knowing the fire risk was high, and failing to relay that risk to [Isleta] Pueblo, and 2) Not completing a site specific analysis of the fire risk." Ohlsen Response at 35 (citing Aslakson v. United States, 790 F.2d 688, 693 (8th Cir. 1986)). The Ohlsen Plaintiffs argue that the Forest Service told Isleta Pueblo when to work and when to stop working because of fire risks. See Ohlsen Response at 35-36. According to the Ohlsen Plaintiffs, although the ERC was over ninety percent on June 14, 2016, and, "[w]henever the ERC is 90% or more, the USFS must

go into mandatory forest closures," the Forest Service did not direct Isleta Pueblo to cease work on June 14, 2016. Ohlsen Response at 36. The Ohlsen Plaintiffs also aver that, despite the Forest Service's knowledge that masticators may spark and cause fires and that Unit 4 had deep slash that would fuel a fire, the Forest Service directed Isleta Pueblo to masticate on Unit 4's rocky ground in deep slash during the fire season and in weather conditions that threatened fire. See Ohlsen Response at 36. The Ohlsen Plaintiffs additionally contend that the Forest Service acted negligently, because the Forest Service did not perform a site-specific analysis to consider Unit 4's fire risk, and because, on June 14, 2016, the Forest Service did not have its fire engines patrolling for fires or accompanying the masticator. See Ohlsen Response at 36-37.

**16.** **The Ohlsen Reply.**

The United States replies. See Ohlsen Reply at 1-48. First, the United States asks that the Court dismiss the Ohlsen Plaintiffs' res ipsa loquitur claim and non-delegable duty claim, because the Ohlsen Plaintiffs do not respond to the United States' arguments about these claims. See Ohlsen Reply at 1. The United States also contends that the Ohlsen Plaintiffs concede that the United States' decisions to enter the Participating Agreement and to delegate to Isleta Pueblo the responsibility to supervise the thinning crew fall under the discretionary function exception. See Ohlsen Reply at 1. The United States argues, moreover, that the Ohlsen Plaintiffs' response to the United States' discretionary function arguments focuses on Isleta Pueblo's violations of the Participating Agreement, see Ohlsen Reply at 2, and that the Ohlsen Plaintiffs did not exhaust their administrative remedies for such theories, because the Ohlsen Plaintiffs did not notify the Forest Service in the Ohlsen Notice of Claim that the Ohlsen Plaintiffs allege the United States' liability for Isleta Pueblo's actions. See Ohlsen Reply at 2. The United States further argues that the

Independent Contractor Motion shows that the United States is not liable for Isleta Pueblo's actions. See Ohlsen Reply at 2.

The United States first addresses its arguments about the Ohlsen Plaintiffs' failure to exhaust and argues that the Ohlsen Plaintiffs did not address the United States' argument regarding the Ohlsen Plaintiffs' claim that the Forest Service "*was negligent in fighting the Dog Head Fire* (as opposed to USFS's alleged negligence in supervising or training Pueblo employees)." Ohlsen Reply at 31 (emphasis in Ohlsen Reply). The United States also contends that the Ohlsen Plaintiffs did not "preserve a claim that *the Pueblo failed* to adequately respond to the fire." Ohlsen Reply at 31 (emphasis in Ohlsen Reply). According to the United States, in the Ohlsen Notice of Claim, the Ohlsen Plaintiffs focus on the United States' actions. See Ohlsen Reply at 31-32. The United States also argues that the Ohlsen Plaintiffs raise for the first time in the Ohlsen Response the theory that the Forest Service acted negligently by not having a fire engine at the thinning site with the masticator. See Ohlsen Reply at 32-33. The United States then argues that it finished the Dog Head Fire Report on October 13, 2016, before the Ohlsen Plaintiffs submitted the Ohlsen Notice of Claim. See Ohlsen Reply at 33. The United States argues that, even should it have foreseen the Ohlsen Plaintiffs' claims, the Ohlsen Plaintiffs cannot now bring a claim that they did not include in the Ohlsen Notice of Claim. See Ohlsen Reply at 33 (citing Benally v. United States, 735 F. App'x 480, 491 n.13 (10th Cir. 2018)). The United States adds that it does not need to investigate a claim for the exhaustion requirement to apply. See Ohlsen Reply at 33 (citing 28 U.S.C. § 2675(a)).

Turning to the FTCA's discretionary function exception, the United States enumerates several theories that the Ohlsen Plaintiffs propose for the Forest Service's negligence:

- General duty to protect the public, [Ohlsen Response] at 28

- Enforcement of obligations of the Pueblo under P.A. (such as slash depth, "allowed for improper training") *Id.* at 28, 30, 33

- Failing to conduct prescribed burn on Unit 4, *Id.* at 28, 30

- Allowing the Pueblo to conduct mastication operations under purportedly unsafe conditions, *Id.* at 28, 29

- Allowing accumulation of slash, *Id.* at 30

- Preventing "the required response to the fire," *Id.* at 30

- Failing to implement fire restrictions, *Id.* at 35

- Failing to complete a site specific analysis of the fire risk, *Id.* at 35

- Failing to have fire engines at Unit 4 during the mastication work, *Id.* at 35.

Ohlsen Reply at 35. The United States adds in a footnote that the Forest Service did not initiate the decision to thin the Cibola National Forest and that the Forest Service did not perform the work, but that the Forest Service contracted with Isleta Pueblo for the thinning. See Ohlsen Reply at 35-36 n.9. The United States also disputes the proposition that it has a special duty to ensure fire safety, see Ohlsen Reply at 35-36, and argues that the Tenth Circuit has narrowly construed Smith v. United States, on which the Ohlsen Plaintiffs rely, and that the cases from the Ninth Circuit and the United States Court of Appeals for the Eighth Circuit that the Plaintiffs cite are inapt, see Ohlsen Reply at 36-37. The United States also disagrees with the Ohlsen Plaintiffs that state tort law can override the discretionary function exception. See Ohlsen Reply at 37-38.

The United States then replies to the Ohlsen Plaintiffs' application of the discretionary function. See Ohlsen Reply at 38. The United States contends that the Ohlsen plaintiffs do not identify a directive regarding the United States' oversight of Isleta Pueblo's work and discuss only

the Participating Agreement's requirements for Isleta Pueblo. See Ohlsen Reply at 38. The United States avers that the United States had no responsibility for enforcing safety measures but that Isleta Pueblo had such responsibilities. See Ohlsen Reply at 38-39. The United States explains that the Participating Agreement provides that the United States will inspect the thinning crew's work and provide feedback, but that the Participating Agreement does not require United States supervision over the thinning crew's compliance with the Participating Agreement and the Statements of Work. See Ohlsen Reply at 39. According to the United States, the Tenth Circuit has routinely held that United States' decisions regarding the extent to supervise an independent contractor are discretionary. See Ohlsen Reply at 39 (citing Garcia v. U.S. Air Force, 533 F.3d 1170, 1178 (10th Cir. 2008); Domme v. United States, 61 F.3d at 791; Fritz v. United States, 42 F.3d 1406, 1994 WL 678495 (10th Cir. 1994)(unpublished table opinion)).

The United States adds that, to defeat the discretionary function exception, the Ohlsen Plaintiffs must show that the United States' purported violations of its mandatory duties caused the Ohlsen Plaintiffs' injuries. See Ohlsen Reply at 40. According to the United States, no evidence shows that the slash depth, safety equipment at the worksite, or operation of the masticator contributed to the Dog Head Fire. See Ohlsen Reply at 40-41. Regarding the safety equipment, the United States argues that only J. Jiron was qualified to fight the fire and that no evidence suggests that Isleta Pueblo would have extinguished the fire. See Ohlsen Reply at 41.

Turning to the other alleged actions and specifically the Forest Service's alleged failure to perform a prescribed burn, the United States avers that the Forest Service planned to perform such a burn after mastication. See Ohlsen Reply at 43. According to the United States, the decision when to perform a prescribed burn rests on considerations about forest resources and is a

discretionary decision. See Ohlsen Reply at 43-44. Regarding the arguments about when and where mastication should have occurred, the United States argues that the Ohlsen Plaintiffs do not identify specific rules about these matters and points the Court to the United States' Ohlsen Motion. See Ohlsen Reply at 44. Regarding the Ohlsen Plaintiffs' other allegations, the United States avers that the Ohlsen Plaintiffs illustrate no mandatory requirements that the United States violated and takes the position that the decisions were discretionary. See Ohlsen Reply at 44-48. The United States specifically argues that the Ohlsen Plaintiffs' contentions about the mandatory fire restrictions are based on two incorrect factual assumptions -- that the ERC value was ninety-percent on June 14, 2016, and that, if the ERC value is ninety-percent, the Forest Service must enact restrictions. See Ohlsen Reply at 45. Regarding the decision to masticate on June 14, 2016, the United States adds that the Forest Service balanced the risk of restricting the thinning activities with the risk of a wildfire. See Ohlsen Reply at 45-46. The United States also specifically avers that Isleta Pueblo's work would have continued even if a site-specific analysis had occurred, so the lack of a site-specific analysis did not cause the Plaintiffs' injuries. See Ohlsen Reply at 46. Regarding the placement of the fire engines, the United States explains that the Mountainair Ranger District includes the Manzano Mountains and the Gallinas Mountains, and that, in directing the fire engines, the Forest Service must consider the weather, wildlife, general needs for the fire engines, and the need for firefighters to interact with the public to raise fire awareness. See Ohlsen Reply at 47-48.

### 17. **The C De Baca Motion.**

The United States asks that the Court dismiss C De Baca's and Cianchetti's claims, because neither plaintiff exhausted the administrative remedies for claims of the Forest Service's

"purported failure to ensure that the equipment used in the forest thinning project was in good order and the proper equipment for the terrain; failure to provide proper fire extinguishment tools; and failure to manage the undergrowth of the forest area where the fire occurred." C De Baca Motion at 1. The United States also contends that the discretionary function exception bars C De Baca's and Cianchetti's claims that the Agriculture Department "purportedly declined to allow first responders to put out the initial fire." C De Baca Motion at 2. The United States notes that, as it argues in its Independent Contractor Motion, the independent contractor exception also bars C De Baca's and Cianchetti's claims "based on their allegation that the masticator was not in proper working condition or was not the proper equipment for the terrain and USFS purportedly failed to provide the proper 'fire extinguishment tools.'" C De Baca Motion at 3. Regarding the failure to exhaust, the United States first contends that the C De Baca Notice of Claim and the Cianchetti Notice of Claim did not "mention maintenance of the equipment used in the forest thinning project, provision of fire extinguishing tools, nor management of undergrowth in the forest area." C De Baca Motion at 5. The United States explains that, in the C De Baca Notice of Claim and the Cianchetti Notice of Claim, C De Baca and Cianchetti allege only that Isleta Pueblo negligently operated equipment. See C De Baca Motion at 6.

Turning to the discretionary function argument, the United States next avers that C De Baca's and Cianchetti's claims based on the Forest Service's alleged decision not to permit first responders to extinguish immediately the Dog Head Fire falls within the FTCA's discretionary function exception. See C De Baca Motion at 9. The United States notes that C De Baca and Cianchetti cite no authority that the Forest Service violated. See C De Baca Motion at 10. The United States explains that, in making firefighting decisions, the Forest Service considers

suppression costs, resource loss, and the values to be protected.  See C De Baca Motion at 10-11.

According to the United States, in Hardscrabble Ranch, LLC v. United States, 840 F.3d 1216 (10th

Cir. 2016), the Tenth Circuit held that decisions about fighting wildfire are "'susceptible to a policy

analysis.'"  C De Baca Motion at 13 quoting Hardscrabble Ranch, LLC v. United States, 840 F.3d

at 1222.  The United States explains that, here, the Forest Service decided that fighting the Dog

Head Fire on the ground initially would endanger the firefighters, and assigned the Torrance

County, New Mexico volunteer firefighters duties consistent with their skills and training when

they arrived.

### 18.    The C De Baca Response.

C De Baca and Cianchetti ask that the Court ignore the United States' arguments about the

independent contractor exception, because the United States does not raise the argument in the C

De Baca Motion or incorporate the argument from other filings.  See C De Baca Response at 1-2.

C De Baca and Cianchetti also ask that the Court disregard the C De Baca Motion, because the

United States does not specify under which legal standard the Court should dismiss the C De Baca

Complaint and the Cianchetti Complaint.  See C De Baca Response at 2 (citing Fed. R. Civ. P.

7.1(a)).  C De Baca and Cianchetti "adopt and incorporate by reference, any and all responses to

Defendant's Motions to Dismiss."  C De Baca Response at 4.  C De Baca and Cianchetti contend

that, in arguing that C De Baca and Cianchetti did not exhaust their administrative remedies, the

United States looks at each individual allegation, but, in C De Baca's and Cianchetti's views, the

negligence claim in the C De Baca Notice of Claim and the Cianchetti Notice of Claim puts the

United States on notice of all the specific allegations.  See C De Baca Response at 7-8.  C De Baca

and Cianchetti also aver that the United States had sufficient legal notice to investigate and to

possibly settle their claims.  See C De Baca Response at 8.  C De Baca and Cianchetti consent to dismissal of their claim regarding the Forest Service's decisions about suppressing the Dog Head Fire.  See C De Baca Response at 10.

19. **C De Baca Reply.**

The United States summarizes that C De Baca and Cianchetti agreed to dismiss their "claim of negligence based on USFS's purported decision to decline to allow first responders to put out the fire falls within the discretionary function exception to the FTCA," C De Baca Reply at 1, and avers that the United States filed a separate motion about the independent contractor arguments and stated in the C De Baca Motion's first sentence that it seeks dismissal under 12(b)(1), see C De Baca Response at 1-2.  The United States identifies as the only remaining issue whether C De Baca and Cianchetti exhausted their administrative remedies on the three additional claims in the C De Baca and the Cianchetti Complaints, see C De Baca Response at 2, and, on this point, it repeats its earlier arguments, see C De Baca Response at 5-6.  The United States adds that whether it investigated the claim in the C De Baca Notice of Claim and Cianchetti Notice of Claim is irrelevant to the administrative exhaustion requirement.  See C De Baca Response at 6-7.

20. **The Sais Motion.**

The United States asks that the Court dismiss the Sais Plaintiffs' claims, because the Sais Plaintiffs failed to exhaust their administrative remedies for all their claims and because the claims are within the discretionary function exception and/or the independent contractor exception.  See Sais Motion at 1.  The United States avers that, for the reasons provided in the C De Baca Motion, the Sais Plaintiffs failed to exhaust their claims about the Forest Service:

[i]] purportedly failing to ensure that the equipment used in the forest thinning project was in good working order and the proper equipment for the terrain; [[ii]]

purportedly failing to provide proper fire extinguishment tools; and [(iii)] purportedly failing to manage undergrowth of the forest area where the fire occurred.

Sais Motion at 11. The United States argues that the Sais Plaintiffs' Notice of Claim gives as the claims' basis "that USFS negligently operated equipment and negligently commenced fire suppression activity." Sais Motion at 12. According to the United States, for the reasons it set forth in the Ohlsen Motion, several of the Sais Plaintiffs' claims also fall under the discretionary function exception, including the claims about the Forest Service:

- Producing and leaving "on the ground, for a period of years, slash and boles produced by forest thinning operation where the fire started," thereby allowing the "slash and boles on the ground . . . to harden and become dry fuel for fire." . . . .

- Conducting forest thinning operations under unreasonable conditions, "during a drought and in hot, dry, and winding conditions and during a period known to be a high fire season in New Mexico." . . . .

- Failing "to employ competent individuals to perform the mastication work." . . . .

- Failing to "train, instruct, direct, and/or supervise" the Pueblo crews "with regard to fire danger evaluation, proper operational procedures, fire prevention, and immediate fire suppression techniques." . . . .

Sais Motion at 15 (not providing citations for the quotations). The United States incorporates from the C De Baca Motion its arguments about the claim regarding the Forest Service's decision not to allow first responders to extinguish the Dog Head Fire, see Sais Motion at 15, and adopts against the Sais Plaintiffs its arguments from the Independent Contractor Motion, see Sais Motion at 17.

The United States last avers that the Sais Plaintiffs' allegation that the Forest Service "failed to manage undergrowth of the forest area falls within the discretionary function exception to the FTCA." Sais Motion at 15. According to the United States, the Sais Plaintiffs cite no

authority that the Forest Service violated.  See Sais Motion at 16.  The United States argues that, in managing the forest, an environmental assessment must occur; a restoration project must be considered in the context of the Cibola National Forest and of other Forest Service lands; the Forest Service must balance competing projects; and the Forest Service sets priorities based on the forest health, wildlife, cultural resources, and other concerns.  See Sais Motion at 17.

**21.     The Sais Response.**

The Sais Plaintiffs respond, and "adopt and incorporate by reference, any and all Responses to Defendant's Motions to Dismiss."  Sais Response at 2.  The Sais Plaintiffs specifically adopt C De Baca's and Cianchetti's arguments on exhaustion, see Sais Response at 2, and, like C De Baca and Cianchetti, consent to dismissal of their claim based on the Forest Service's decisions about the initial suppression of the Dog Head Fire, see Sais Response at 2.  The Sais Plaintiffs also specifically incorporate the Ohlsen Independent Contractor Response.  See Sais Response at 2.

The Sais Plaintiffs additionally argue that the thinning crew workers are de facto federal employees.  See Sais Response at 2.  The Sais Plaintiffs contend that § 565a-2 provides that all cooperators and their employees work "under the supervision of the Forest Service."  Sais Response at 3 (quoting 16 U.S.C. § 565a-2).  The Sais Plaintiffs argue that Congress has elsewhere waived immunity under the FTCA for cooperators.  See Sais Response at 3-4 (citing 16 U.S.C. § 558(c); Trujillo v. United States, 313 F. Supp. 2d 1146, 1150 (D.N.M. 2003)(Johnson, J.)).

The Sais Plaintiffs posit that, "[e]ven in the absence of specific statutory authority identifying individuals as federal employees for FTCA purposes, individual [sic] performing federal functions and supervised by federal agencies are federal employees for FTCA purposes."

Sais Response at 4.  The Sais Plaintiffs quote <u>Cannady v. United States</u>, 155 F. Supp. 2d 1379, 1381-82 (M.D. Ga. 2001)(Owens, J.), which defines an "employee of the government":

> The FTCA defines "employee of the government" to include "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C.A. § 2671(1). Federal courts apply a "control test" to determine whether a person is an employee of the government for purposes of the FTCA. *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999)(citing *Logue v. United States*, 412 U.S. 521 . . . (1973)). Under the control test, "a person is not an 'employee of the government' for FTCA purposes unless the government controls and supervises the day-to-day activities of the individual." *Id.* As the United States Court of Appeals for the Eleventh Circuit noted in *Means*, "The central jurisdictional question under the FTCA remains whether the alleged tortfeasor is an 'employee of the government' and that determination is made by reference to the degree of physical control the government exercised." *Id.* at 1380.

Sais Response at 4-5.  The Sais Plaintiffs contend that, because the thinning crew performed thinning and mastication for the Forest Service, their activities meet this standard.  <u>See</u> Sais Response at 5.

### 22.    **The Sais Reply.**

The United States replies.  <u>See</u> Sais Reply at 1-6.  The United States contends that, because the Sais Plaintiffs do not respond to several arguments in the Sais Motion, the Sais Plaintiffs implicitly consent to dismissing their claims that:

- USFS was negligent in leaving slash and boles produced by forest thinning operations on the ground where the fire started;

- USFS was negligent in conducting forest thinning operations under unreasonable conditions;

- USFS negligently failed to employ competent individuals to perform the work;

- USFS failed to train, instruct, direct, or supervise the Pueblo crews.

Sais Reply at 2.  The United States otherwise repeats its arguments from the Sais Motion.  See Sais Reply at 3.

### 23.  The Notices of Supplemental Authority.

The Ohlsen Plaintiffs filed two notices of supplemental authority.  See Notice of Supplemental Authority, filed January 7, 2019 (Doc. 106)("Jan. Notice of Supp. Authority"); *Ohlsen* Plaintiffs' Notice of Supplemental Authority, filed March 6, 2019 (Doc. 144)("March Notice of Supp. Authority").  In the Jan. Notice of Supplemental Authority, the Ohlsen Plaintiffs direct the Court to the CFDA's legislative history as supplemental authority for their Ohlsen Independent Contractor Response and the Ohlsen Response, and, to the notice, attach that history for the Court's reference.  See Jan. Notice of Supp. Authority at 1-2; Pub. L. 94-148, 89 Stat 804 (1975), filed January 7, 2019 (Doc. 106-1).  The March Notice of Supplemental Authority supplements the Independent Contractor Motion and the Ohlsen Response with citation to two authorities on the Forest Service's "duty to 'protect against destruction by fire,'" March Notice of Supp. Authority at 1: (i) 16 U.S.C. § 551, which according to the Ohlsen Plaintiffs, states: "[t]he Secretary of Agriculture shall make provisions for the protection against destruction by fire and depradations upon the public forests and national forests'"; and (ii) Rounds v. United States Forest Service, 301 F. Supp. 2d 1287, 1292 (D. Wyo. 2004)(Brimmer, J.).  March Notice of Supplemental Authority at 1.

### 24.  The Additional Evidentiary Briefings.

The Ohlsen Plaintiffs also file several objections to the United States' evidence.  See First Objections; Fox Objections; Motion to Strike.  To support their Fox Objections, the Ohlsen Plaintiffs alsosubmit an excerpt from the Fox Depo.  See *Ohlsen* Plaintiffs' Notice of Filing of

Deposition Excerpt of Ian Fox at 1, filed March 11, 2019 (Doc. 145). In these documents, the Ohlsen Plaintiffs object to various portions of the United States' evidence. See First Objections at 1-2; Fox Objections at 1-4; Motion to Strike at 3-4. With the Motion to Strike, the Ohlsen Plaintiffs include additional evidence to rebut the Third Fox Decl. and ask, on page one, that, should the Court deny the Motion to Strike, the Court grant the Ohlsen Plaintiffs leave to file a surreply, see Motion to Strike at 1, and, on page six, that the Court consider the Motion to Strike a surreply, see Motion to Strike at 6. The United States responds to the various evidentiary arguments in the United States of America's Response to *Ohlsen* Plaintiffs' Objections to Evidence Submitted by the United States, filed February 28, 2019 (Doc. 132)("First Objections Response"); the United States of America's Response to *Ohlsen* Plaintiffs' Objections to Third Declaration of Ian Fox at 1-5, filed April 2, 2019 (Doc. 156)("Fox Objections Response"); the United States of America's Response to *Ohlsen* Plaintiffs' Motion to Strike Portions of Third Declaration of Ian Fox at 1-7, filed April 2, 2091 (Doc. 157)("Motion to Strike Response"). The United States concedes that the Court may consider the Motion to Strike a surreply. See Motion to Strike Response at 7. The Ohlsen Plaintiffs reply to the United States' arguments in the *Ohlsen* Plaintiffs' Reply in Support of Objections to Third Declaration of Ian Fox, filed April 23, 2019 (Doc. 170), and the Motion to Strike Reply at 2-7.

25. **The Motion to Strike Reply.**

In the Motion to Strike Reply, the Ohlsen Plaintiffs clarify that they specifically claim:

1) the USFS failed to implement site-specific fire restrictions given the extreme fire danger and fuel load conditions, given the mandatory provision in the Participating Agreement ("PA")(standard USFS form) that provided that slash shall not exceed 18" in depth; 2) Anthony Martinez, USFS Fire Management Officer, testified that fire restrictions are automatically implemented when the ERC (Energy Release Component) reaches 90; and, 3) the USFS and Pueblo members did not have proper

training and equipment to suppress the fire given waistdeep slash (slash that exceeds the limit in the PA [(Participating Agreement)] of 18").

Motion to Strike Reply at 2. The Ohlsen Plaintiffs devote the rest of the Motion to Strike Reply to evidentiary arguments as discussed in the Factual Background's and the Analysis' footnotes.

## 26. **The March 8, 2019, Hearing.**

The Court began the hearing by asking the parties whether they agreed that it should decide the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, and the Sais Motion under rule 56's standard, because the motions' jurisdictional issues are intertwined with the merits and the parties submitted considerable materials outside the pleadings to support their arguments. See March 8 A.M. Tr at 4:8-21 (Court). The United States agreed with the Court. See March 8 A.M. Tr. at 4:22-5:4 (Ortega). The Ohlsen Plaintiffs raised concerns about the Third Fox Decl. on which the United States relies for the first time in its Independent Contractor Reply and Ohlsen Reply and to which the Plaintiffs have had no opportunity to respond. See March 8 A.M. Tr. at 5:8-6:4 (Dow). The Court stated that it perceives that the situation poses two questions: (i) whether the Court should consider the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, and the Sais Motion as rule 56 motions; and (ii) how the Court should mitigate the harm that the Third Fox Decl. causes the Plaintiffs. See March 8 A.M. Tr. at 6:11-7:9 (Court). The Court explained that it had studied the facts and that it seemed that the parties disputed the facts' implications more than the facts themselves, so the Court thought that it could address the Ohlsen Plaintiffs' concerns about the Third Fox Decl. in the Memorandum Opinion and Order's footnotes. See March 8 A.M. Tr. at 6:11-6:9 (Court). The Ohlsen Plaintiffs responded that the Court should consider the Motions under rule 56's standard and opined that such standard provides the Court means to address their concerns about the Fox Decl. See March 8 A.M. Tr. at 7:10-19

(Tosdal). The Court stated that it would allow the Plaintiffs to argue their concerns about the Fox Decl. at the hearing, or to file a surreply or other briefing. See March 8 A.M. Tr. at 7:20-8:4 (Court). The State Farm Plaintiffs also agreed to construe the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, and the Sais Motion as rule 56 motions and to the Court's proposed solutions regarding the Third Fox Decl. See March 8 A.M. Tr. at 8:7-9 (Court, Mosley). The Court then asked if the parties would consent to the Court deciding the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, and the Sais Motion in one Memorandum Opinion and Order. See March 8 A.M. Tr. at 8:10-9:1 (Court). The Court asked the parties whether it could put the facts from every motion into one factual background section. See March 8 A.M. Tr. at 8:10-9:1 (Court). The Plaintiffs and the United States agreed to the Court's proposal. See March 8 A.M. Tr. at 9:8-14 (Dunn, Mosley, Ortega).

The United States began the arguments with the Ohlsen Motion's discretionary function issue. See March 8 A.M. Tr. at 10:11-14 (Keegan); id. at 10:16-18 (Keegan). The United States first explained that the Third Fox Decl. addresses unsupported facts that the Ohlsen Plaintiffs include in their Ohlsen Response. See March 8 A.M. Tr. at 12:5-15 (Keegan). The United States also indicated its assumption that the Ohlsen Plaintiffs concede their res ipsa loquitur claim and their non-delegable duty claim, see March 8 A.M. Tr. at 12:16-13:5 (Keegan), and that the Ohlsen Plaintiffs conceded that the choices to hire an independent contractor and which contractor to hire were discretionary decisions, see March 8 A.M. Tr. at 13:6-11 (Keegan).

The Ohlsen Plaintiffs stipulated to dismissal of their res ipsa loquitur claim and their non-delegable duty claim. See March 8 A.M. Tr. at 13:25-14:5 (Dow). The Ohlsen Plaintiffs would not stipulate that hiring an independent contractor is a discretionary decision and stated that the

United States did not include this argument in the Ohlsen Motion. See March 8 A.M. Tr. at 14:5-19 (Dow). C De Baca, Cianchetti, the Sais Plaintiffs, and the State Farm Plaintiffs took the same position as the Ohlsen Plaintiffs. See March 8 A.M. Tr. at 14:20-24 (Court, Dunn, Mosley). The United States contended that it includes the arguments about the choice to hire an independent contractor in the Ohlsen Motion. See March 8 A.M. Tr. at 15:3-5 (Keegan). The Court interjected to express its assumption that the Plaintiffs chose not to sue Isleta Pueblo because of concerns about Tribal Court and/or because of the Pueblo's sovereign immunity. See March 8 A.M. Tr. at 18:22-19:3 (Court). The United States confirmed the Court's assumption. See March 8 A.M. Tr. at 19:4-7 (Keegan).

Turning to its discretionary function arguments, the United States reiterated background about the authorities under which the Forest Service operates. See March 8 A.M. Tr. at 16:1-17:16 (Keegan). The United States then repeated that, in the Ohlsen Response, the Ohlsen Plaintiffs allege that the Forest Service violated requirements governing Isleta Pueblo's actions and not the Forest Service's conduct. See March 8 A.M. Tr. at 18:15-21 (Keegan). The United States repeated its arguments from the Ohlsen Motion and Ohlsen Response. See March 8 A.M. Tr. at 19:8-20:2 (Keegan); id. at 20:3-10 (Keegan). The United States added that the Ohlsen Plaintiffs incorrectly identify the maximum slash depth as eighteen inches, see March 8 A.M. Tr. at 20:10-13 (Keegan), and explained that the Statement of Work Modification 2 changes the maximum height to twenty-four inches, see March 8 A.M. Tr. at 15-21:1 (Keegan). According to the United States, moreover, the Participating Agreement requires that the thinning crew comply ninety-five percent of the time with the maximum slash height, i.e., ninety-five percent of the slash should comply with the height. See March 8 A.M. Tr. at 21:6-9 (Keegan).

The United States emphasized that no evidence shows that the slash depth relates to the Dog Head Fire.  See March 8 A.M. Tr. at 22:22-23:3 (Keegan).  The United States explained, that in the Third Fox Decl., Fox describes that he drew the Participating Agreement's maximum slash depth from Forest Service timber contracts and that the maximum slash depth balances aesthetics with the cost of keeping the slash depth lower.  See March 8 A.M. Tr. at 21:10-22:1 (Keegan).  The United States described that Fox states in the Third Fox Decl. that he has no knowledge of the slash depth's connection to fire risk.  See March 8 A.M. Tr. at 22:2-8 (Keegan).  According to the United States, Martinez also testified that he worried about performing a controlled burn in Unit 4 not because of the slash depth, but because of "the amount of fuel on the forest floor and the size, the diameter[,] of the fuel because it will burn longer, hotter, and make it harder to control."  March 8 A.M. Tr. at 22:18-21 (Keegan).  See id. at 22:9-21 (Keegan).

The United States then grouped together several of the Forest Service's purported violations, including the failure to provide a safety plan for the thinning crew and fire engines to accompany the masticator, and arqued that such actions did not cause the Dog Head Fire.  See March 8 A.M. Tr. at 23:8-13 (Keegan).  According to the United States, J. Jiron testified that, after he saw the fire ignite, he considered circling the fire with the masticator to reduce the fuel around the fire and slow the burning, but stated that he did not believe that he could achieve that action in time to escape the fire.  See March 8 A.M. Tr. at 23:25-24:8 (Keegan).  The United States explained that J. Jiron also testified that E. Jiron and Jaramillo "were not qualified to fight wildland fires."  March 8 A.M. Tr. at 24:12-14 (Keegan).  The United States added that J. Jiron was qualified to fight such fires and that he testified that fighting the fire would have required twenty men.  See March 8 A.M. Tr. at 24:14-21 (Keegan).  The United States also commented that J. Jiron's training

on the masticator is irrelevant to the case, because the "evidence shows that the fire started" from a spark from the masticator and was sustained by the heavy fuel on the forest floor, March 8 A.M. Tr. at 25:4-9 (Keegan), so J. Jiron's driving did not start the fire, see March 8 A.M. Tr. at 25:9-12 (Keegan).

The United States then reiterated from the Ohlsen Motion its argument that the Forest Service had no mandatory duty dictating how it supervised Isleta Pueblo and that Fox drafted the Participating Agreement based on his discretion. See March 8 A.M. Tr. at 25:14-26:1 (Keegan). The Court asked: "But isn't the reality you're setting up a situation where the Government hides behind sovereign immunity and you've got the tribe [hiding] behind sovereign immunity[;] you're creating a situation [where] the public . . . can't hold anybody [liable] for this conduct?" March 8 A.M. Tr. at 26:2-7 (Court). The United States opined that it could not speak for Isleta Pueblo. See March 8 A.M. Tr. at 26:9-10 (Keegan). The Court and the United States then had the following exchange:

> THE COURT: Well, why did you go get the pueblo [for the thinning work], what was your reason for it.
>
> KEEGAN: Oh, as set forth in the brief there were so many reasons Your Honor. There are statutes that encourage the United States to with tribal lands.
>
> THE COURT: I know those. I'm aware of those statutes. But the reality is you're setting up [a] situation where nobody can be sued if you're out there doing a lot of work in the community with impunity.

Tr. at 26:12-22 (Court, Keegan). The United States replied that Isleta Pueblo proposed the restoration project to the United States, because Isleta Pueblo had done considerable restoration work on its land and wanted to create a boundary in the Cibola National Forest to further protect its land. See March 8 A.M. Tr. at 26:23-27:10 (Keegan). The United States emphasized that, in

entering the contract with Isleta Pueblo, the Forest Service advanced its objectives of furthering the partnership with Isleta Pueblo, creating jobs in the local community, and assisting Isleta Pueblo in achieving its own goals. See March 8 A.M. Tr. at 31:16-32:1 (Keegan). The United States explained that the Forest Service had experience with Isleta Pueblo, which had done effective forest restoration work on its own lands, and many members of which were "red-carded" -- certified to fight wildland fires.[173] March 8 A.M. Tr. at 32:1-12 (Keegan).

The United States repeated its arguments about the decision to allow slash to accumulate, not to engage in a controlled burn, to masticate under unsafe conditions, not to permit early responders to fight the Dog Head Fire, and where to locate the fire engines. See March 8 A.M. Tr. at 33:21-34:25 (Keegan); id. at 33:24-25 (Keegan); id. at 35:19-23 (Keegan); id. at 36:15-37:6 (Keegan); id. at 38:6-24 (Keegan); id. at 38:25-40:13 (Keegan); id. at 46:9-20 (Keegan); id. at 47:25-48:5 (Keegan); id. at 48:16-49:14 (Keegan). Regarding the Ohlsen Plaintiffs' complaints that the Forest Service did not impose fire restrictions on Isleta Pueblo on June 14, 2016, the United States argued that the Fire Plan provides that the Forest Service should consider Stage I Restrictions when the ERC exceeds eighty-five percent, see March 8 A.M. Tr. at 40:24-41:14 (Keegan), but must also consider other factors -- such as the risks that restrictions pose for communities, and natural and cultural resources, and the restrictions' limiting public access to national lands -- in deciding whether to enter fire restrictions, see March 8 A.M. Tr. at 41:14-16

---

[173]According to the United States, the Forest Service regulations require that firefighters undergo specified training and tests before being permitted to fight wildfires. See March 8 A.M. Tr. at 46:23-47:2 (Keegan). The United States explained that the Forest Service qualifies firefighters at different levels, according to the danger of fire that they are certified to fight, see March 8 A.M. Tr. at 47:2-14 (Keegan), and refers to this credentialing as being red carded, see March 8 A.M. Tr. at 47:1-2 (Keegan).

(Keegan); id. at 43:22-44:2 (Keegan); id. at 44:1-5 (Keegan).  The United States explained that the ERC on June 14, 2016, was seventy-seven percent, so, even under the Fire Plan, the Forest Service did not need to enter fire restrictions, see March 8 A.M. Tr. at 43:12-19 (Keegan), and that the Ohlsen Plaintiffs' argument that the Forest Service did not tell Isleta Pueblo that it was entering fire restrictions on June 14, 2016, is a "nonissue, because there were no fire restrictions in place that day," March 8 A.M. Tr. at 44:25-45:1 (Keegan).  Regarding the Ohlsen Plaintiffs' arguments that the Forest Service did not perform a site-specific risk assessment, the United States avers that Isleta Pueblo would have masticated on June 14, 2016, even had the Forest Service performed such an assessment, because the Forest Service determined that the risk of masticating was less than the risk of not masticating and, in reaching a determination when to masticate, the Forest Service considered the public's use of the Cibola National Forest, the Forest Service's funding, and the importance of finishing the treatment in Unit 4.  See March 8 A.M. Tr. at 45:7-46:8 (Keegan).

The Ohlsen Plaintiffs began by describing that an increased fuel load substantially increases the fire risk, see March 8 A.M. Tr. at 56:21-57:5 (Dow), by explaining that Martinez made the risk assessments to determine when to masticate and when to perform a prescribed burn, see March 8 A.M. Tr. at 57:6-17 (Dow), and by repeating that, once the Forest Service undertook a known risk, like masticating in the conditions that it masticated, the Forest Service had a duty to perform the action non-negligently, see March 8 A.M. Tr. at 59:24-61:10 (Dow).  The Court asked, given the Ohlsen Plaintiffs' theory, where the Ohlsen Plaintiffs would draw the line for what conduct is discretionary.  See March 8 A.M. Tr. at 61:11-15 (Court).  To this question, the Ohlsen Plaintiffs opined that the United States Post Office's decision to deliver mail is discretionary, but

running a yellow light to deliver the mail is not discretionary.  See March 8 A.M. Tr. at 61:16-18 (Dow); id. at 16-17 (Dow).  The Ohlsen Plaintiffs explained that the Forest Service made a discretionary decision when it chose to masticate, but that the Forest Service's actions became non-discretionary when the agency began actions that involved others' safety.  See March 8 A.M. Tr. at 61:16-62:22 (Dow).  In the Ohlsen Plaintiffs' view, accordingly, the Forest Service had a duty to engage in a risk assessment once it knew that the slash depth exceeded the maximum slash depth in the Participating Agreement and that the fuel load had doubled.  See March 8 A.M. Tr. at 67:23-68:1 (Dow).[174]

Regarding the United States' comments about the maximum slash depth, the Ohlsen Plaintiffs conceded that, at the end of the summer of 2014, Statement of Work Modification 2 raised the maximum slash depth from eighteen to twenty-four inches.  See March 8 A.M. Tr. at 66:21-67:6 (Dow).  The Ohlsen Plaintiffs described that, in Statement of Work Modification 3, which governed from May 2016 -- the year of the Dog Head Fire -- the Participating Agreement provides for no maximum slash depth.  See March 8 A.M. Tr. at 67:17-23 (Dow).

The Ohlsen Plaintiffs then turned to the Forest Service's actions that the United States asks that the Court subject to the discretionary function analysis.  See March 8 A.M. Tr. at 68:2 (Dow).  The Ohlsen Plaintiffs conceded that the Forest Service's decision to masticate Unit 4 was a discretionary decision, see March 8 A.M. Tr. at 68:15-18 (Dow), but argued that the decision is "not subject to policy analysis," because the Forest Service had control over how Isleta Pueblo performed the task, see March 8 A.M. Tr. at 68:18-21 (Dow).  In the Ohlsen Plaintiffs' view, the

---

[174]The Ohlsen Plaintiffs explained that a higher slash depth indicates a heavier fuel load, which increases the fire risk.  See March 8 A.M. Tr. at 86:3-7 (Dow).

Forest Service failed to reasonably undertake its responsibility of supervising the thinning. See March 8 A.M. Tr. at 86:2-74:1 (Dow).

The Court asked the Ohlsen Plaintiffs why they could not sue Isleta Pueblo. See March 8 A.M. Tr. at 74:5-8 (Court). The Ohlsen Plaintiffs replied that Isleta Pueblo has sovereign immunity and that the Ohlsen Plaintiffs would have to proceed through Tribal Court. See March 8 A.M. Tr. at 74:12-15 (Court, Dow). The Court then asked the Ohlsen Plaintiffs about Isleta Pueblo's insurance policy, and the Ohlsen Plaintiffs replied that the policy has several exclusions and a five-million-dollar maximum. See March 8 A.M. Tr. at 74:20-75:2 (Court, Dow). C De Baca, Cianchetti, and the Sais Plaintiffs interjected that they agree to dismiss their claims about the Forest Service's and Isleta Pueblo's fire suppression activities. See March 8 A.M. Tr. at 75:14-76:11 (Dunn).

The United States replied to the Ohlsen Plaintiffs' arguments. See March 8 A.M. Tr. at 76:21 (Keegan). The United States described that the Ohlsen Plaintiffs make several arguments that the record does not support and asks that the Court look at the record. See March 8 A.M. Tr. at 76:21-77:7 (Keegan). The United States also described that Statement of Work Modification 3 addresses masticating Unit 4 so does not contain the slash depth requirements that a contract about trimming or other treatments contains, but noted that Statement of Work Modification 3 indicates a maximum slash depth of two to four inches for smaller and dispersed slash. See March 8 A.M. Tr. at 78:11-79:2 (Keegan). The United States indicated that some ambiguity appears in Statement of Work Modification 2, which specifies a maximum slash depth of eighteen inches on the front page and a maximum slash depth of twenty-four inches on a later page, but argued that the record does not support that Isleta Pueblo did not comply with the twenty-four inch maximum slash depth.

See March 8 A.M. Tr. at 79:19-22 (Keegan); id. at 80:1-6 (Keegan). The United States, in response to the Ohlsen Plaintiffs' comments, differentiated, furthermore, fuel load and slash depth, and explained that the fuel load refers to the weight of the material and that slash depth references the material's height. See March 8 A.M. Tr. at 79:11-19 (Keegan). The United States also returned to the Ohlsen Plaintiffs' initial comments whether a decision to hire a contractor is discretionary and indicated that the United States addresses the topic in the Ohlsen Motion at page 23. See March 8 A.M. Tr. at 80:22-81:7 (Keegan).

The Court asked the United States for its thoughts on the Ohlsen Plaintiffs' interpretation of the discretionary function exception -- that the Post Office's decision to deliver mail is a discretionary decision but a Post Office employee's decision to run a yellow light is negligence. See March 8 A.M. Tr. at 82:23-83:5 (Court). The United States replied that it agreed with that example. See March 8 A.M. Tr. at 83:6-8 (Keegan). According to the United States, the example does not apply here, however, because all the Forest Service's decisions involved policy considerations. See March 8 A.M. Tr. at 83:13-19 (Keegan).

The Ohlsen Plaintiffs responded that the ERC on June 14, 2016 was ninety percent, as several experts would testify. See March 8 A.M. Tr. at 84:23-85:7 (Dow). The United States insisted that Martinez testified that the ERC on June 14, 2106 was seventy-seven percent. See March 8 A.M. Tr. at 86:15-23 (Keegan). The Court concluded that it would need to review the record and that, at the time, it could not indicate its inclination on the discretionary function exception as applied to the Ohlsen Plaintiffs' claims. See March 8 A.M. Tr. at 87:21-88:5 (Court).

The United States turned to the exhaustion-of-administrative-remedies arguments, and repeated its arguments from the Ohlsen Motion and the Ohlsen Reply. See March 8 A.M. Tr. at

88:6-8 (Court, Keegan); id. at 89:2-90:24 (Keegan). The Ohlsen Plaintiffs responded that the United States knew the facts surrounding the fire and that the Ohlsen Plaintiffs did not know all those facts when they filed the Ohlsen Notice of Claim. See March 8 A.M. Tr. at 92:7-15 (Dow). The Ohlsen Plaintiffs contended that they raised concerns about the Project, which "includes all of those members, and the agency failure to supervise," and the lack of "proper operation and procedures, fire prevention, fire suppression, [and] fire suppression equipment." March 8 A.M. Tr. at 93:12-17 (Dow). To the United States' arguments, the Ohlsen Plaintiffs replied that they alleged that the Dog Head Fire resulted from the Isleta Collaborative Restoration Project, which included the Forest Service, the BIA, and other entities, but that the Ohlsen Plaintiffs did not know which crew caused the fire or Isleta Pueblo's relationship with the United States. See March 8 A.M. Tr. at 92:16-93:9 (Dow).

The Court expressed its concern about the breadth of the Ohlsen Plaintiffs' claims and whether the claims gave the United States notice of the alleged torts' narrowness. See March 8 A.M. Tr. at 93:25-94:8 (Court). The Ohlsen Plaintiffs argued that the United States desires too much detail in the notice of claim, and the Ohlsen Plaintiffs took the position that all the Ohlsen Plaintiffs have to allege to overcome the exhaustion requirement is that the Dog Head Fire occurred and that it caused damage. See March 8 A.M. Tr. at 94:9-95:2 (Dow). The United States replied that the Tenth Circuit has directed district courts to focus on the notice of claim and not on what plaintiffs did or did not know. See March 8 A.M. Tr. at 97:3-12 (Keegan). The Court indicated its initial impression that the Ohlsen Plaintiffs might not have exhausted the administrative remedies for some of their claims. See March 8 A.M. Tr. at 98:7-18 (Court).

The parties moved to the Independent Contractor Motion.  See March 8 P.M. Tr. at 2:1-5 (Court, Ortega).   The United States repeated its arguments from its Independent Contractor Motion.   See March 8 Tr. at 2:24-9:8 (Ortega); id. at 9:19-10:24 (Ortega); id. at 12:8-15:13 (Ortega); id. at 16:6-16:24 (Ortega).  The United States argued that the Plaintiffs take the CFDA out of context where they argue that the Isleta Pueblo was a United States employee, because, according to the United States, the Participating Agreement states that Isleta Pueblo and its employees are not federal employees and because no mutual agreement to Forest Service supervision exists, as the Participating Agreement gives supervisory authority to Isleta Pueblo. See March 8 P.M. Tr. at 16:25-17:17 (Ortega); id. at 17:21-18:14 (Ortega); id. at 18:16-20:25 (Ortega).  The Court inquired when and why the United States extends federal employee status to contractors, and the United States replied that it extends coverage in, for instance, the context of American Indian health services "to encourage the provision of competent medical care and competent subspecialty services out in rural hospitals."  March 8 P.M. Tr. at 21:19-21 (Ortega). See id. at 21:1-25 (Court, Ortega).

Turning to the Plaintiffs, the Court asked first which facts the Plaintiffs dispute.  See March 8 P.M. Tr. at 25:24-26:4 (Court).  The Ohlsen Plaintiffs responded that, in their view, the key fact in dispute is the Forest Service supervision.  See March 8 P.M. Tr. at 26:5-11 (Tosdal).  The Court asked whether the parties dispute the extent of Forest Service supervision, because the United States concedes that some Forest Service supervision existed and because an employer-employee relationship may not exist where a principal reviews a contractors' work but does not engage in close, daily supervision.  See March 8 P.M. Tr. at 26:12-17 (Court); id. at 26:24-27:13 (Court).

The Ohlsen Plaintiffs responded that, under the CFDA, such supervision as the Court describes shows an employer-employee relationship. See Tr. at 27:19-22 (Tosdal).

The Court indicated that although some statutes waive sovereign immunity, the Court hesitates to read a statute to perform that function. See March 8 P.M. Tr. at 28:2-16 (Court). In response, the Plaintiffs directed the Court's attention to the CFDA's legislative history, reading:

> [S]ection 2 authorizes Forest Service personnel to supervise such cooperators and their employees in emergencies or otherwise as [mutually] agreed to, and [in] such cases said cooperators and their employees [will] be covered under federal tort liability and work injur[y compensation] laws but would not be considered federal employees for other purposes,

which the Plaintiffs take to mean that the CFDA waives sovereign immunity. See March 8 P.M. Tr.at 28:25-29:6 (Tosdal). The Court replied that the statute's language says nothing about waiving sovereign immunity, and that the Court reads the statute as authorizing the Forest Service to enter cooperative agreements and as providing that the FTCA, including the FTCA's exceptions, will govern sovereign immunity. See March 8 P.M. Tr. at 30:20-23 (Court); id. at 31:1-12 (Court). The Ohlsen Plaintiffs emphasized the CFDA's words "other than" in the phrase the cooperator "shall not be deemed to be federal employees other than for the purposes of the FTCA," and suggested that the statute defines who are federal employees. See March 8 P.M. Tr. at 33:8-23 (Tosdal). The Ohlsen Plaintiffs argued that, because they and the Court disagree about the statute's language, the language is ambiguous and the legislative history provides the answer to interpreting the statute. See March 8 P.M. Tr. at 33:24-34:8 (Tosdal). The Ohlsen Plaintiffs added that the Forest Service Grants and Agreements, Forest Service Handbook reflects that cooperators are federal employees when the Forest Service supervises the cooperators' work, and that neither the CFDA nor the Forest Service Grants and Agreements, Forest Service Handbook incorporate the

judicially created Lilly factors.  See March 8 P.M. Tr. at 34:10-35-12 (Tosdal).  The Ohlsen Plaintiffs emphasize that the independent contractor tests contain factors, like who purchases equipment and who pays insurance and social security taxes, irrelevant to the CFDA.  See March 8 P.M. Tr. at 36:24-37:11 (Tosdal).

The Court asked why Congress would not have written that the cooperator is a federal employee for FTCA purposes, see March 8 P.M. Tr. at 37:25-38:15 (Court), to which the Plaintiffs pointed the Court again to the legislative history, see March 8 P.M. Tr. at 38:16-39:2 (Tosdal). The Court then asked from what statutes' coverage the CFDA removes cooperators, and the Plaintiffs named employment laws and civil service laws.  See March 8 P.M. Tr. at 40:23-41:13 (Court, Tosdal).  The Ohlsen Plaintiffs explained that the CFDA contemplates the Forest Service retaining under cooperative agreement firefighters year-round and for non-fire-related work during non-fire seasons.  See March 8 P.M. Tr. at 41:15-42:7 (Tosdal).  According to the Plaintiffs, because the CFDA establishes Isleta Pueblo's federal employee status, the Participating Agreement cannot override that status.  See March 8 P.M. Tr. at 31:8-14 (Tosdal).  The Ohlsen Plaintiffs add that the Participating Agreement cannot defeat the CFDA, because contracts cannot violate the federal statutes' policies.  See March 8 P.M. Tr. at 42:23-43:13 (citing Fomby-Denson v. Dep't of the Army, 247 F.3d 1366, 1374 (Fed. Cir. 2001)).  The Ohlsen Plaintiffs asked that the Court apply the plain meaning of the word "supervision" to determine whether the Forest Service and Isleta Pueblo agreed to supervision, and opined that an employee may have more than one supervisor.  See March 8 P.M. Tr. at 43:14-44:13 (Tosdal).

Regarding whether the United States and Isleta Pueblo agreed to Forest Service supervision, the Plaintiffs argued that the Project Administrators worked on the ground to

supervise and direct the Project.  See March 8 P.M. Tr. at 45:5-47:15 (Tosdal); id. at 47:17-52:7 (Tosdal).  The Court asked how a cooperator could not have agreed to Forest Service supervision, see March 8 P.M. Tr. at 52:8-10 (Court), and the Plaintiffs described that the Participating Agreement could have given Isleta Pueblo specifications for thinning and an area to thin, and that the Forest Service could have reviewed the work when completed.  See March 8 P.M. Tr. at 52:15-24 (Tosdal).  The Court queried how to give the word "supervision" independent meaning when all cooperative agreements would provide for such supervision, and the Plaintiffs responded that they had not seen other cooperative agreements and that the test for mutual agreement to Forest Service supervision is fact specific.  See March 8 P.M. Tr. at 52:25-53:21 (Tosdal).  The Court asked how the Ohlsen Plaintiffs' proposed test differs from the Lilly factors, and the Plaintiffs explained that they proposed a narrower analysis that excluded such concerns as the equipment used and the taxes paid.  See March 8 P.M. Tr. at 53:22-54:9 (Court, Tosdal).  The Court asked why it should not borrow the Lilly factors to identify mutual agreement to Forest Service supervision, and the Plaintiffs replied that the Court should borrow the test somewhat but should examine only whether the Forest Service controlled Isleta Pueblo's work.  See March 8 P.M. Tr. at 54:10-14 (Court, Tosdal).  The Ohlsen Plaintiffs explained that they deemed the verbal instructions at the worksite of primary importance in this analysis then argued that the Participating Agreement, Statements of Work, and Silviculture Prescriptions further dictated the work.  See March 8 P.M. Tr. at 56:5-58:17 (Tosdal, Court); id. at 59:8-24 (Tosdal); id. at 60:3-52:3 (Tosdal).

The Ohlsen Plaintiffs offered comments on a couple additional issues.  See March 8 P.M. Tr. at 62:12-13 (Tosdal).  The Ohlsen Plaintiffs averred that Fox tries to rewrite the Participating Agreement through the Third Fox Decl. and that Fox, who testifies to visiting the thinning crew

four to six times a year, lacks personal knowledge to testify what occurred at the work site.  See March 8 P.M. Tr. at 62:14-63:17 (Tosdal).  The Ohlsen Plaintiffs also opined that a question of fact at least exists whether Isleta Pueblo was a federal employee.  See March 8 P.M. Tr. at 63:23-64:6 (Tosdal).

Responding to some United States statements, the Plaintiffs first noted that the Dog Head Fire was not a fluke, because equipment frequently is fires' cause.  See March 8 P.M. Tr. at 64:12-21 (Tosdal).  The Ohlsen Plaintiffs also stated that a Participation Agreement remains in force until a modification is made and averred that, because Statement of Work Modification 3, but not Statement of Work Modification 2, affects Unit 4, the maximum slash depth for Unit 4 was eighteen inches.  See March 8 P.M. Tr. at 69:21-70:17 (Tosdal).

The Court asked the Plaintiffs more about their independent contractor theory, and first clarified that the parties were debating the CFDA's mutually-agreed-to predicate and not the emergency predicate, to which the Plaintiffs answered that they believe that the mutually-agreed-to predicate applies.  See March 8 P.M. Tr. at 73:25-74:14 (Court, Tosdal).  The Court also asked the Plaintiffs if they see the word "supervise" in the Participating Agreement, and the Plaintiffs identified one location where the word appears -- where the Participating Agreement provides that Isleta Pueblo will also supervise the thinning crew.  See March 8 P.M. Tr. at 74:15-23 (Court, Tosdal).  The Court followed this question by inquiring where the Plaintiffs see the mutual agreement in this case, and the Plaintiffs responded that the CFDA does not require that the Forest Service and the cooperator contract to mutual agreement to Forest Service supervision and that the facts in this case manifest such mutual agreement.  See March 8 P.M. Tr. at 74:24-76:12 (Court, Tosdal).

Turning to the United States, the Court asked if it had found authority interpreting the CFDA and whether the United States believes that the Court must address the statute, to which the United States replied that it has not found a case on point, but that the Court does not need to interpret the CFDA, because the Participating Agreement provides that Isleta Pueblo is not a federal employee. See March 8 P.M. Tr. at 76:25-79:7 (Court, Ortega). The United States explained: "[The Participating Agreement] was brought under [§ ]565a-1. But then the Government specifically excluded any dealing of federal employees that is allowed under [§ ]565a-2." March 8 P.M. Tr. at 119:19-22 (Ortega). The Court directed the United States to the CFDA and asked if it agreed that the Participating Agreement is a CFDA contract, and the United States agreed with the Court. See March 8 P.M. Tr. at 79:12-22 (Court, Ortega). The Court pressed whether the CFDA overrides the Participating Agreement, and the United States opined that, pursuant to the Forest Service Handbook Ch. 70 § 72.21(8), at 23, the Wyden Amendment, under which authority alongside the CFDA the Forest Service and Isleta Pueblo entered the Participating Agreement, allows for the United States to exclude contractors from the FTCA. See March 8 P.M. Tr. at 79:23-80:14 (Court, Ortega). The Court asked the United States whether it agrees with the Ohlsen Plaintiffs' interpretation of the CFDA, and the United States stated its agreement. See March 8 P.M. Tr. at 66:24-68:19 (Court, Ortega). The United States opined, however, that the Wyden Amendment overrides the CFDA. See March 8 P.M. Tr. at 80:21-81:15 (Ortega). The Court pursued this line of questioning by asking when Congress enacted the Wyden Amendment, and the United States replied that the enactment occurred in 1999. See March 8 P.M. Tr. at 84:2-85:1 (Court, Ortega). The Court asked for the Wyden Amendment's language, but the United States directed the Court to the Forest Service Handbook Ch. 70 § 72.21(8), at 23, and admitted

that it did not have before it the Wyden Amendment's exact language. See March 8 P.M. Tr. at 85:2-3 (Court, Ortega). The Court then inquired about the Wyden Amendment's purpose, given that no court has addressed the CFDA language at issue, and the United States replied: "I believe it was to broaden the scope of agreements that the Forest Service could enter but also to provide insulation or protection from liability to the Forest Service." March 8 P.M. Tr. at 85:11-14 (Ortega). See March 8 P.M. Tr. at 85:5-14 (Court, Ortega). The United States averred that, if the Court accepts that the Forest Service and Isleta Pueblo entered the Participating Agreement pursuant to the CFDA and the Wyden Amendment, the Court does not need to decide the CFDA issue. See March 8 P.M. Tr. at 85:16-21 (Ortega).

The Court asked whether, if it determines that the Wyden Amendment does not override the CFDA, the United States agrees that the Isleta Pueblo and its employees were federal employees. See March 8 P.M. Tr. at 85:22-86:2 (Court). The United States replied in the negative, because neither the Participating Agreement nor the performance under the Participating Agreement contemplated such an employer-employee relationship. See March 8 P.M. Tr. at 86:3-6 (Ortega). The United States admitted, however, in response to the Court's pressing, that it would have difficulty saying that the Participating Agreement overrides the CFDA. See March 8 P.M. Tr. at 86:7-13 (Court, Ortega).

Turning to the facts about Forest Service supervision, the United States averred that no mutual agreement for Forest Service supervision existed. See March 8 P.M. Tr. at 86:16-23 (Ortega). The United States argued that the Forest Service reimbursed Isleta Pueblo for the amount of the Participating Agreement, that the Participating Agreement allowed for specific cutting prescriptions, and that the Silviculture Prescriptions were an internal document. See March 8 P.M.

Tr. at 87:4-20 (Ortega).  According to the United States, the Forest Service also had the right to inspect the thinning crew's work, and Johnson and Lueras inspected the work irregularly.  See March 8 P.M. Tr. at 87:21-88:2 (Ortega, Court).  The United States emphasized that independent-contractor cases require evidence of daily supervision to show an employer-employee relationship, and, when the Court replied that no supervision occurs continuously, explained that everyone who hires someone to do yard work hires independent contractors, but still instructs the workers when they incorrectly cut branches.  See March 8 P.M. Tr. at 88:7-90:2 (Ortega, Court).  Responding to two comments from the Ohlsen Plaintiffs, the United States concluded by noting that the Forest Service did not approach the thinning work with a cavalier attitude, but attempted to reduce the work's dangers, that negligence did not cause Dog Head Fire, and that the Forest Service cannot face strict liability for its role in the fire.  See March 8 P.M. Tr. at 92:1-93:1 (Ortega).

The Ohlsen Plaintiffs replied, regarding the Wyden Amendment, that nothing in the Wyden Amendment modifies the CFDA and that the two statutes have different purposes -- respectively, forest protection, and fish and wildlife protection.  See March 8 P.M. Tr. at 93:15-94:2 (Tosdal).  The Court asked for the Ohlsen Plaintiffs' interpretation of the tension between the two statutes.  See March 8 P.M. Tr. at 94:3-5 (Court).  The Ohlsen Plaintiffs described that, in their view, the Forest Service wrote the Participating Agreement based on statutes with different provisions regarding federal employee status, but the Wyden Amendment cannot negate the CFDA.  See March 8 P.M. Tr. at 94:6-15 (Tosdal).  The Court queried whether the Plaintiffs agree that the Court cannot read the Participating Agreement to negate the CFDA, see March 8 P.M. Tr. at 94:16-95:4 (Court, Tosdal), and the Plaintiffs agreed with the Court's assessment, see March 8 P.M. Tr. at 95:5-14 (Tosdal).  The Ohlsen Plaintiffs concluded by noting their opinion that Johnson

sufficiently supervised Unit 4 to meet the CFDA's mutual agreement to Forest Service supervision predicate.  See March 8 P.M. Tr. at 95:21-96:21 (Tosdal).

The United States replied by clarifying that it does not view the CFDA as a waiver of sovereign immunity, but as a provision for the option to work under Forest Service supervision, which the Forest Service and Isleta Pueblo declined to use, see March 8 P.M. Tr. at 97:9-13 (Ortega), and that

> [t]he language of [§ ]565a-1 specifically contemplates an independent contractor relationship where the contractor is to perform forestry protection without supervision unless it's agreed to pursuant to [§ ]565a-2.  And to repeat what we've said, that was specifically excluded by the parties in this [case].

March 8 P.M. Tr. at 97:2-8 (Ortega).  The Court concluded the discussion of the independent-contractor arguments by noting that it has no inclination on the statutory interpretation questions, but that it inclines toward thinking that the Lilly factors counsel deeming Isleta Pueblo an independent contractor.  See March 8 P.M. Tr. at 97:16-12 (Court).

The Court turned to the First Objections, the Fox Objections, and the Motion to Strike.  See March 8 P.M. Tr. at 98:13-15 (Court).  The Court indicated that it would likely resolve the objections in the Memorandum Opinion and Order's footnotes.  See March 8 P.M. Tr. at 98:18-25 (Court).  The Ohlsen Plaintiffs argued that the Court should ignore Fox' legal conclusions and conclude that he lacks personal knowledge to opine on the matters at the thinning project site.  See March 8 P.M. Tr. at 99:2-12 (Tosdal).  The Ohlsen Plaintiffs expressed concern with Fox' statements about whether a masticator could spark and cause a fire, and about the slash depth not being related to fire risk.  See March 8 P.M. Tr. at 100:15-101:7 (Dow).  Regarding Fox' personal knowledge, the Plaintiffs opined that Fox did not have much involvement in the thinning project site, that Johnson attended the site and its operational details, and that Fox testified that the project

occupied one small part of his job.  See March 8 P.M. Tr. at 102:9-12 (Tosdal).  The United States directed the Court to its First Objections Response for its arguments about Fox' personal knowledge, and stated that it had not yet filed its Fox Objections Response or Motion to Strike Response.  See March 8 P.M. Tr. at 103:14-104:7 (Ortega).  The Court proposed to grant the Plaintiffs a surreply and to give the United States the opportunity to file a surreply as well, and the parties accepted its proposal.  See March 8 P.M. Tr. at 104:8-25 (Court, Dow, Ortega).  The Court also granted, with the United States' concession, the Ohlsen Plaintiffs' request to file with the surreply a Fox Depo. excerpt.  See March 8 P.M. Tr. at 105:4-5 (Tosdal, Court, Ortega, Keegan).

The Court turned to the C De Baca Motion.  See March 8 P.M. Tr. at 106:13-19 (Court).  The United States repeated its arguments from the C De Baca Motion and C De Baca Reply.  See March 8 P.M. Tr. at 107:10-108:20 (Ortega).  The Court stated that it believed that C De Baca had filed additional pages to the C De Baca Notice of Claim that it would need to consider in deciding exhaustion.  See March 8 P.M. Tr. at 108:21-24 (Court).  The United States agreed that the Court should consider claims on additional pages, but stated that it believed that, on the extra pages, C De Baca chronicled her losses and did not add claims.  See March 8 P.M. Tr. at 110:4-7 (Ortega); id. at 110:9-12 (Ortega).  C De Baca and Cianchetti responded that negligent operation of equipment includes negligent maintenance of equipment and that negligent fire suppression encompasses the failure to have proper fire suppression equipment.  See March 8 P.M. Tr. at 111:11-112:18 (Dunn).  The Court concluded the discussion by indicating that it might trim C De Baca's and Cianchetti's claims, although it would likely liberally construe the C De Baca Notice of Claim and the Cianchetti Notice of Claim.  See March 8 P.M. Tr. at 113:18-114:2 (Court).

Turning to the Sais Motion, the United States explained that it resembled the C De Baca Motion and repeated its arguments from the Sais Motion.  See March 8 P.M. Tr. at 114:7-115:14 (Ortega).  The Sais Plaintiffs agreed that the C De Baca Response also applies to the Sais Motion. See March 8 P.M. Tr. at 115:19-24 (Dunn).  The United States then indicated that it adopted all its arguments on dismissal and/or summary judgment against the State Farm Plaintiffs and Homesite Indemnity, but noted that it might file an additional motion on these parties' failures to exhaust. See March 8 P.M. Tr. at 117:1-15 (Ortega, Court).  The State Farm Plaintiffs and Homesite Indemnity agreed that the United States' motions to dismiss and for summary judgment applied to them, and that they joined and adopted the other Plaintiffs' responses.  See March 8 P.M. Tr. at 118:2-8 (Tosdal).

### 27.    **Supplemental Briefing Motion.**

On May 8, 2019, the United States filed the Supplemental Briefing Motion.  See Supplemental Briefing Motion at 3.  The United States argues that whether the CFDA "provides an independent waiver of the United States sovereign immunity arose for the first time" at the March 8, 2019, hearing.  Supplemental Briefing Motion at 2.  According to the United States, it will argue in supplemental briefing that "that the CFDA does not provide an independent waiver of sovereign immunity and does not expand the FTCA's waiver of sovereign immunity." Supplemental Briefing Motion at 2 (citing Flute v. United States, 808 F.3d 1234, 1239 (10th Cir. 2015)).  The United States adds that the Court has previously permitted supplemental briefing when new issues arises at a hearing and asks that the Court reach a similar conclusion here.  See Supplemental Briefing Motion at 3 (citing Pueblo of Pojoaque v. State, 233 F. Supp. 3d 1021, 1104 (D.N.M. 2017)(Browning, J.)).

28.    **Supplemental Briefing Response.**

The Ohlsen Plaintiffs respond, see *Ohlsen* Plaintiffs' Response to Defendant's Motion for Leave to File Supplemental Brief at 1-2, filed May 21, 2019 (Doc. 190)("Supplemental Briefing Response"), and C De Baca, Cianchetti, and the Sais Plaintiffs join the Supplemental Briefing Response, see Plaintiffs' Motion to Join Other Plaintiffs' Responses to United States' Motion for Leave to File Supplemental Brief, filed May 21, 2019 (Doc. 191). The Ohlsen Plaintiffs, C De Baca, Cianchetti, and the Sais Plaintiffs argue that the Plaintiffs raised no new issues at the hearing, and that, throughout the case, the Plaintiffs have raised the legal issue whether the Lilly test or the CFDA provides the test whether Isleta Pueblo was an employee or an independent contractor. See Supplemental Briefing Response at 1. According to the Ohlsen Plaintiffs, C De Baca, Cianchetti, and the Sais Plaintiffs, they do not argue that the CFDA independently waives the United States' sovereign immunity, but that the CFDA "sets forth the proper test for federal employee status under the Tort Claims Act for conduct undertaken under Forest Service cooperative agreements authorized by the CFDA." Supplemental Briefing Response at 2.

29.    **Supplemental Briefing Reply.**

The United States replies. See Defendant's Reply to Ohlsen Plaintiffs' Response to Defendant's Motion for Leave to File Supplemental Brief at 1-3, filed May 31, 2019 (Doc. 198)("Supplemental Briefing Reply"). The United States explains that, in the supplemental briefing, it will argue that the CFDA neither waives sovereign immunity nor extends the FTCA. See Supplemental Briefing Reply at 1 (citing United States v. Nordic Vill., Inc., 503 U.S. 30, 33 (1992); Comes Flying v. U.S. through Burau of Indian Affairs, 830 F. Supp. 529, 530 (D.S.D. 1993)(Bogue, J.)). The United States adds that the Ohlsen Plaintiffs, C De Baca, Cianchetti, and

the Sais Plaintiffs have not shown how supplemental briefing would prejudice them.  See Supplemental Briefing Reply at 2.

30.    **The June 3, 2019, Hearing.**

At the June 3, 2019, hearing, the Court explained to the parties that it had completed much of this Memorandum Opinion and Order, and described this Memorandum Opinion and Order's likely conclusions which included disposing of all the Plaintiffs' claims.  See Draft Transcript of Hearing at 4:12-9:24 (Court)(taken June 3, 2019)("June 3 Tr.").  The United States, nevertheless, indicated that it would "rest on the pleadings" for the supplemental briefing and repeated its request for such briefing.  June 3 Tr. at 12:4-5 (Ortega).  See id. at 12:5-7 (Ortega).  The Court indicated that it was inclined to grant the United States' request and turned to the Plaintiffs.  See June 3 Tr. at 12:8-15 (Court).  The Ohlsen Plaintiffs[175] reiterated their arguments from the Supplemental Briefing Response and added that, given the that the Memorandum Opinion and Order would likely dismiss their case, further briefing would impose a burden on them.  See June 3 Tr. at 12:18-13:17 (Tosdal).  The Court stated that it would grant the Supplemental Briefing Motion.  See June 3 Tr. at 14:5-6 (Court).

31.    **The Independent Contractor Motion Supplemental Brief.**

The United States repeats its argument that

a mutual agreement for supervision must be included within[1] the Participating Agreement[2] for Section 565a-2 to apply.  Even if 16 U.S.C. § 565a-2 were applicable, it does not provide a waiver of the United States' sovereign immunity; rather, it merely *allows* a cooperator to be considered a federal employee for FTCA purposes.

---

[175]Although all the Plaintiffs did not file a briefing stating that they joined the Supplemental Briefing Response, at the hearing's beginning, the Ohlsen Plaintiffs stated that they "might be carrying the ball for some of the other plaintiffs."  June 3 Tr. at 3:1-2 (Dow).  The Court treats, therefore, the statements at the hearing as representing all Plaintiffs' views.

United States' Supplemental Brief at 1, filed June 7, 2019 (Doc. 206)("Independent Contractor Motion Supplemental Brief")(emphasis in Independent Contractor Motion Supplemental Brief, and footnotes omitted)). The United States avers that "16 U.S.C. § 565a-2 merely *allows* a cooperator to be considered a federal employee for FTCA purposes, and only if certain conditions are met, i.e., the cooperators are expressly authorized under an agreement to work under the supervision of the USFS and in fact work under that supervision." Independent Contractor Motion Supplemental Brief at 4-5 (emphasis in Independent Contractor Motion Supplemental Brief). The United States adds "that cooperators working under an agreement are automatically covered by the FTCA." Independent Contractor Motion Supplemental Brief at 5. The United States contends that, had Congress intended "to extend FTCA coverage," the CFDA would provide that cooperators are federal employess for FTCA purposes. Independent Contractor Motion Supplemental Brief at 5. According to the United States,

> [i]n addition, the CFDA does not contain provisions that relate to an extension of FTCA coverage. For example, the USFS is not required to insure cooperators, and actions against cooperators are not deemed actions against the United States. *See* 16 U.S.C. §565a-2. Finally, Congressional intent behind 16 U.S.C. § 565a-2 was to provide the USFS the option to supervise cooperators, rather than to extend the FTCA's umbrella coverage to cooperators. In this case, the USFS did not exercise that option, and therefore, the Participating Agreement did not provide for USFS supervision of the Pueblo of Isleta.

Independent Contractor Motion Supplemental Brief at 5. The United States asks, accordingly, that the Court apply the <u>Lilly</u> test. <u>See</u> Independent Contractor Motion Supplemental Brief at 6.

### 32.    **The Independent Contractor Supplemental Brief Response.**

The Ohlsen Plaintiffs respond and repeat their arguments about § 565a-2. <u>See</u> Ohlsen Plaintiffs' Response to United States' Supplemental Brief at 2-6, filed June 10, 2019

(Doc. 208)("Independent Contractor Supplemental Brief Response"). According to the Ohlsen

Plaintiffs, § 565a-2's language "shall not be deemed to be Federal employees other than for

purposes of chapter 171 of Title 28 and chapter 81 of Title 5" means that cooperators are Federal

employees for FTCA purposes. Independent Contractor Supplemental Brief Response at 2

(quoting 16 U.S.C. § 565a-2). The Ohlsen Plaintiffs emphasize that the legislative history supports

this interpretation. See Independent Contractor Supplemental Brief Response at 3-4. The Ohlsen

Plaintiffs also ask that the Court disregard the United States' arguments in the Independent

Contractor Supplemental Brief that the Forest Service did not supervise the thinning crew, because

the Court did not give the United States the opportunity to "re-hash" this contention. Independent

Contractor Brief Response at 6. See Independent Contractor Brief Response at 6-7.

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those

cases authorized and defined in the Constitution which have been entrusted to them under a

jurisdictional grant by Congress." Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th

Cir. 1994)(citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, (1986); United States

v. Nixon, 418 U.S. 683 (1974); Tafoya v. U.S. Dep't of Justice, Law Enf't Assistance Admin., 748

F.2d 1389, 1390 (10th Cir. 1984)). A plaintiff generally bears the burden of demonstrating the

court's jurisdiction to hear his or her claims. See Steel Co. v. Citizens for a Better Env't, 523 U.S.

83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its

existence."). "[Because] federal courts are courts of limited jurisdiction, we presume no

jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." U.S. ex

rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999). Rule 12(b)(1)

allows a party to raise, by motion, the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897 (1981). But when the attack is factual,

> > a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

> Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(citations omitted).

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9 (D.N.M. March 11, 2009)(Browning, J.), aff'd on other grounds by 634 F.3d 1170 (10th Cir. 2011). See World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1086-87 (D.N.M. 2019)(Browning, J.). The United States Court of Appeals for the Fifth Circuit has stated:

> "[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56. See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'" Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)). "When subject-matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined." Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *9 (D.N.M. March 30, 2009)(Browning, J.)(citing Wheeler v. Hurdman, 825 F.2d at 259; Holt v. United States, 46 F.3d at 1003).

# LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citing Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991)). The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "'At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318

JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., No. CIV 17-1010 JB\SMV, 2019 WL 1434971, at *52 (D.N.M. March 29, 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). "A court will not construe a plaintiff's pleadings 'so liberally that it becomes his advocate.'" Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *48 (quoting Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.)). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

      "When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

      In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the

motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).[176] In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit

---

[176]Nard v. City of Okla. City is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Okla. City, Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009)(unpublished), Mecca v. United States, 389 F. App'x 775 (10th Cir. 2010)(unpublished), Morrison v. Kache, 576 F. App'x 715 (10th Cir. 2014)(unpublished), Ruppert v. Aragon, 448 F. App'x 862 (10th Cir. 2012)(unpublished), Stevens v. United States, 61 F. App'x 625 (10th Cir. 2003)(unpublished), Garling v. United States Environmental Protection Agency, 849 F.3d 1289, 2017 WL 894432 (10th Cir. 2017)(unpublished), Bethel v. United States, 456 F. App'x 771 (10th Cir. 2012)(unpublished), McDaniel v. United States, 53 F. App'x 8 (10th Cir. 2002)(unpublished), Clark v. United States, 695 F. App'x 378 (10th Cir. 2017)(unpublished), Fritz v. United States, 42 F.3d 1406, 1994 WL 678495 (10th Cir. 1994)(unpublished table opinion), Rothenberger v. United States, 931 F.2d 900, 1991 WL 70719 (10th Cir. 1991)(unpublished table opinion), Barnes v. United States, 707 F. App'x 512 (10th Cir. 2017)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[177] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). Alternatively, the movant may show that the nonmoving party lacks the evidence to establish its case at trial, and the nonmovant will have the burden of showing that it can produce sufficient evidence to establish the essential elements of its case. See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M.

---

[177]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor); 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018). In American Mechanical Solutions, LLC v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court confronted such a situation in which the movant did not offer evidence disproving the nonmovant's allegations, but, rather, argued, under the second option in Celotex, that the nonmovant lacked evidence to establish an element of its claim. See 184 F. Supp. 3d at 1075. The Court granted summary judgment for the movant, because the nonmovant -- the plaintiff -- did not offer expert evidence supporting causation or proximate causation for its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims as New Mexico law requires to establish a prima facie case for those elements. See 184 F. Supp. 3d at 1075.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("'However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" (quoting Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d at 1241)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (internal quotation marks omitted)(quoting Coleman v. Darden, 595 F.2d, 533, 536 (10th Cir. 1979)). A party may not "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (citing Vitkus v. Beatrice Co., 11 F.3d at 1539;

Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted)(citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Dombrowski v. Eastland, 387 U.S. 82, 87 (1967)). Where a rational trier of fact, considering the whole record, cannot find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that

summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott[ v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets from Thomson v. Salt Lake Cty. omitted).

"The Tenth Circuit, in Rhoads v. Miller, 352 F. App'x 289 [, 291 (10th Cir.

2009)(unpublished),] . . . explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

## LAW REGARDING THE FTCA

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206, 212 (1983)(citing United States v. Sherwood, 312 U.S. 584, 586 (1941); 14 Charles Wright, Arthur Miller & Edward Cooper, Federal Practice and Procedure § 3654, at 156-157 (1976).  See Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.)("The United States cannot be sued without its consent.  Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction.").  The law generally places the burden of proving federal jurisdiction on the proponent of jurisdiction, and the party suing the United States thus similarly bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  See also Garcia v. United States, 709 F. Supp. 2d at 1138 ("The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims.").  The terms of the United States' consent define the federal court's jurisdiction to entertain suits against the country.  See United States v. Orleans, 425 U.S. 807, 814 (1976); Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985).  Although a "waiver of immunity should be neither extended nor narrowed beyond that which Congress intended," United States v. Kubrick, 444 U.S. 111, 117-18 (1979); see Ewell v. United States, 776 F.2d at 248, "[w]aivers of sovereign immunity are to be read narrowly," James v. United States, 970 F.2d at 753 (citing Engel v. United States (Estate of Johnson), 836 F.2d 940,

943 (5th Cir. 1988); Schmidt v. King, 913 F.2d 837, 839 (10th Cir. 1990)). "A waiver of sovereign immunity 'cannot be implied and must be unequivocally expressed.'" United States v. Mitchell, 445 U.S. 535, 538 (1980)(quoting United States v. King, 395 U.S. 1, 4, 89 (1969)). See United States v. Nordic Vill., Inc., 503 U.S. at 33-34; United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice. See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010)(unpublished). It has explained: "'A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.'" Mecca v. United States, 389 F. App'x at 780 quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)). The Tenth Circuit held in Mecca v. United States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims. See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile. We therefore remand with instructions to enter dismissal of these claims without prejudice.").

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity for some tort actions against the United States seeking money damages. See 28 U.S.C. § 1346(b); Fed. Deposit Ins. v. Meyer, 510 U.S. 471, 475 (1994); Warren v. United States, 244 F. Supp. 3d 1173, 1212 (D.N.M. 2017)(Browning, J.); Romanach v. United States, 579 F. Supp. 1017, 1019

(D.P.R. 1984)(Laffitte, J.).  In enacting the FTCA, Congess waived the United States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d at 304-05).  Moreover, the only proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236 (N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

Even when the FTCA waives the United States' sovereign immunity, the United States is liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  "The Tort Claims Act was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances."  Richards v. United States, 369 U.S. 1, 6 (1962).  The FTCA leaves untouched the states' laws that might apply to the United States once Congress removes that immunity.  The Supreme Court has noted:

> Rather, [the FTCA] was designed to build upon the legal relationships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the generally interstitial character of federal law. If Congress had meant to alter or supplant the legal relationships developed by the States, it could specifically have done so to further the limited objectives of the Tort Claims Act.

Richards v. United States, 369 U.S. at 6-7. Accordingly, "the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred." Cortez v. EEOC, 585 F. Supp. 2d at 1284. Cf. Garcia v. United States, No. CIV 08-0295 JB/WDS, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)("The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." (citing 28 U.S.C. § 1346(b)). See Richards v. United States, 369 U.S. at 9; Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970)).

The United States' liability is coextensive with that of private individuals under the respective states' law, even if comparable government actors or public entities would have additional defenses or additional obligations under that state's law. See United States v. Olson, 546 U.S. 43, 44-47 (2005); In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)("Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy. Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." (citing LaBarge v. Cty. of Mariposa, 798 F.2d 364, 366-69 (9th Cir. 1986); United States v. Olson, 546 U.S. at 47)); DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007)("Under the FTCA, the federal government can only be held liable for breaches of duties

imposed on private, rather than state, parties."); Ewell v. United States, 776 F.2d at 248-49; Cox

v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(stating that "[t]his and other courts have

applied the same rationale in holding that the United States may invoke the protection of a [private]

recreational use statute"); Proud v. United States, 723 F.2d 705, 706 (9th Cir. 1984)("But

appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii

Legislature -- determined the tort liability of the United States. And the FTCA specifically

provides that the federal government's tort liability is co-extensive with that of a private individual

under state law."). The Tenth Circuit reasoned in Ewell v. United States:

> The main goal of the FTCA was to waive sovereign immunity so that the
> federal government could be sued as if it were a private person for ordinary torts.
> Congress was primarily concerned with allowing a remedy where none had been
> allowed. There is no evidence that Congress was concerned with the prospect that
> immunities created solely for private persons would shield the United States from
> suit. The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963),
> considered whether it is appropriate to apply immunities created by state law to the
> United States when it is sued under the FTCA. The Court was concerned with state
> laws that immunized prison officials from suits by prisoners and concluded that it
> is "improper to limit suits by federal prisoners because of restrictive state rules of
> immunity." 374 U.S. at 164 . . . . The immunity under consideration in that case
> applied to state, county and municipal prison officials. Noting its decision in Indian
> Towing Co. v. United States, 350 U.S. [61]at 65 [(1955)] . . . wherein the Court
> determined that federal liability had to be determined as if it were a private person
> and not as if it were a municipal corporation, it concluded that state law immunity
> applicable to state, county and municipal prison officials would not be applicable
> to a private person and, therefore, not applicable to the federal government in a suit
> under the FTCA.

> Thus, while immunities afforded state, county and municipal employees are
> not applicable to the federal government when sued under the FTCA, immunities
> created by state law which are available to private persons will immunize the
> federal government because it is liable only as a private individual under like
> circumstances. It is evident, therefore, that the Utah district court was correct in
> granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

The FTCA "does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs." United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999). The Tenth Circuit has recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action." United States v. Agronics Inc., 164 F.3d at 1345. Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as: (i) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (ii) the Agriculture Department's failure to prohibit the exportation of disease-exposed cattle; and (iii) various agencies' noncompliance with proper rulemaking procedures. See United States v. Agronics Inc., 164 F.3d at 1346 (collecting cases).

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d at 1157. In that case, a plaintiff brought a wrongful death and negligence action against the BIA based on its decision to contract with a county detention center. See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption. See 906 F. Supp. 2d at 1121. The Court agreed on both points. See 906 F. Supp. 2d at 1121. It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption. 906 F. Supp. 2d at 1157. It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions. 906 F. Supp. 2d at 1164.

# LAW REGARDING THE FTCA'S EXHUASTION REQUIREMENT AND STATUTE OF LIMITATIONS

Two procedural steps limit plaintiffs' abilities to sue pursuant to the FTCA: (i) an administrative exhaustion requirement; and (ii) a statute of limitations.  See Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015).  Together the steps define the time period within which the plaintiff may bring a suit.  See Barnes v. United States, 776 F.3d at 1139.  A plaintiff must provide the agency notice of his, her, or its claims, see 28 U.S.C. § 2675(a), and must present the claim within a limited time after the claim accrues, see 28 U.S.C. § 2401(b).

## 1.    Exhaustion Requirements.

The exhaustion requirement is "'jurisdictional and cannot be waived.'"  Morrison v. Kache, 576 F. App'x 715, 717 (10th Cir. 2014)(unpublished)(quoting Bradley v. U.S. ex rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)).  Before bringing an action in federal court, a claimant must present the claim to the appropriate federal agency; the FTCA's jurisdictional statute provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).  This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 (quoting Bradley v. U.S. ex rel. Veterans Admin., 951 F.2d at 270).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'" Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d 881, 884 (10th Cir. 2005)(quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853). The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly." Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853. Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law. See Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d at 884; Warren v. United States, 244 F. Supp. 3d at 1213.

### 2.   Filing Deadlines.

Once a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim in writing to the appropriate federal agency. See 28 U.S.C. § 2401(b) (explaining that claim is "forever barred" unless presented within two years). If the agency denies the claim, the claimant has six months to file suit in federal court. See 28 U.S.C. § 2401(b). The Tenth Circuit has clarified that a party must satisfy both of § 2401's prongs: "28 U.S.C. § 2401(b) bars a tort claim against the United States 'unless it is presented to the proper agency within two years of its accrual *and* suit is commenced within six months of notice of the claim's denial by the agency.'" Ponce v. United States, No. CIV 13-0334 JB/ACT, 2013 WL 6503535, at *14 (D.N.M. Nov. 25, 2013)(Browning, J.)(emphasis in Ponce v. United States)(quoting Indus. Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d 963, 968 (10th Cir. 1994)).

If the agency fails to make a final disposition of the claim within six months, the claimant may "deem . . . " that failure a "final denial of the claim," and proceed with his or her suit under the FTCA. 28 U.S.C. § 2675(a). In the Tenth Circuit, "(at least until there has been a final denial

by the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a deemed denial." Barnes v. United States, 776 F.3d at 1140. An agency may "trigger . . . § 2401(b)'s six-month limitations period through final denial of administrative FTCA claims after a 'deemed denial.'" Barnes v. United States, 776 F.3d at 1141. See Warren v. United States, 244 F. Supp. 3d at 1213.

### 3.        Effect of Failure to Exhaust.

"[A]s a general rule, a premature 'complaint cannot be cured through amendment, but instead, plaintiff must file a new suit.'" Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. 1999)(quoting Sparrow v. U.S. Postal Serv., 825 F. Supp. 252, 255 (E.D. Cal. 1993)(Wagner, J.)). This rule exists, because "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Courts must dismiss these claims "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012)(unpublished). Even the filing of an amended complaint may not serve to cure a prematurely filed original complaint. See Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(unpublished).

There is at least one limited exception to the general rule. Duplan v. Harper recognizes an exception where the United States "expressly agreed" to the district court's decision to treat the amended complaint as a new action. 188 F.3d at 1199. See Mires v. United States, 466 F.3d 1208, 1211 (10th Cir. 2006)(concluding that there is a new action where plaintiff "sought permission to

file -- and, with the government's consent and district court's permission, did file -- an amended complaint").  See also Warren v. United States, 244 F. Supp. 3d at 1214.

### 4.  **Definition of "Sufficient Notice."**

Courts define "sufficient notice" based on the facts of each case before them.  In Estate of Trentadue ex rel. Aguilar v. United States, the United States contended that the plaintiffs' administrative claim was insufficient for notice of intentional infliction of emotional distress, because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the allegations did not discuss the specific grounds on which the district court relied in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval." 397 F.3d at 852.  The Tenth Circuit disagreed, holding that the "plaintiffs' administrative claim provided notice that [the United States Department of Justice ('DOJ')] should investigate the prison officials' conduct."  397 F.3d at 853.  The Tenth Circuit reasoned that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints."  397 F.3d at 853.

The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34 (1st Cir. 2000), where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arose out of two separate

incidences.  221 F.3d at 40.  The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it."  221 F.3d at 40.  The First Circuit thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim."  221 F.3d at 40 (emphasis omitted).

In Glade ex rel. Lundskow v. United States, 692 F.3d 718 (7th Cir. 2012), a man receiving mental health treatment at a Veterans Administration ("VA") facility alleged that his therapist worsened his condition by initiating a sexual relationship with him.  See 692 F.3d at 720.  He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist."  692 F.3d at 722.  The United States Court of Appeals for the Seventh Circuit, reviewing the notice, commented that "reading the administrative claim you would think the plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery, and we know that such a theory won't fly under the Tort Claims Act."  692 F.3d at 722.  The plaintiff recognized this problem before filing his complaint and thus asserted a "special relationship" theory of liability instead.  692 F.3d at 723.  The Seventh Circuit affirmed the district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts that would clue a legally trained reader to the theory's applicability.  *Palay v. United States,* 349 F.3d 418, 425-26 (7th Cir. 2003); *Murrey v. United States,* 73 F.3d 1448, 1452-53 (7th Cir. 1996).  The plaintiff's claim didn't do that.  The legally trained reader would assume that the plaintiff simply was unaware that the mere fact of a battery by a VA employee would not impose liability on the employer.  We're about to see that the "special relationship" tort theory advanced in the plaintiff's complaint (as distinct from the administrative claim) is outside the bounds of plausibility -- hardly the sort of theory that the VA's legal department should have guessed would be the ground of a lawsuit.

Glade ex rel. Lundskow v. United States, 692 F.3d at 722-23.  See Warren v. United States, 244 F. Supp. 3d at 1215.

## LAW REGARDING THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA contains several exceptions to its waiver of immunity.  See 28 U.S.C. § 2680. The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).  These exceptions must be strictly construed in the United States' favor.  See U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992)("Waivers of immunity must be 'construed strictly in favor of the sovereign' and not 'enlarge[d] . . . beyond what the language requires.'"  (alterations in U.S. Dep't of Energy v. Ohio)(first quoting McMahon v. United States, 342 U.S. 25, 27 (1951); then quoting E. Transp. Co. v. United States, 272 U.S. 676, 686 (1927)).

The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Its application is a threshold jurisdictional issue in any FTCA case.  See Johnson v. U.S. Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991).  Cf. Warren v. United States, 244 F. Supp. 3d at 1233 (noting that, at the motion-to-dismiss stage, in an FTCA case, a plaintiff "must establish more than . . . abstract negligence" "and, instead, must also first establish that her claims are not based upon actions immunized from liability under the FTCA's discretionary function exception").  In Berkovitz by Berkovitz v. United

States, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies. See 486 U.S. at 536; Domme v. United States, 61 F.3d at 789-90; Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73 (10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-03 (10th Cir. 1993). First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536). Second, the conduct must be "'based on considerations of public policy.'" United States v. Gaubert, 499 U.S. at 323 quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537). See Garling v. U.S. Envtl. Prot. Agency, 849 F.3d 1289, 1294-95, 2017 WL 894432, at *3 (10th Cir. 2017)(unpublished).

An action is not discretionary where a statute, regulation, or policy mandates certain conduct, because the employee has "no room for choice." United States v. Gaubert, 499 U.S. 315, 324 (1991). See Garcia v. U.S. Air Force, 533 F.3d at 1176 ("Conduct is not discretionary if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.'" (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537)). On the other hand,

> [w]here Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs.

United States v. Gaubert, 499 U.S. at 323.

Berkovitz by Berkovitz v. United States' second prong protects conduct if it was or could have been "'based on considerations of public policy.'" Kiehn v. United States, 984 F.2d at 1105

- 189 -

quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537). This principle is a result of the rule that the second prong requires that the challenged conduct must be, by its nature, "susceptible to policy analysis." United States v. Gaubert, 499 U.S. at 325. Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy. United States v. Gaubert, 499 U.S. at 324. Where a plaintiff alleges a negligent omission, it is "irrelevant whether the [omission] was a matter of 'deliberate choice,' or a mere oversight," Kiehn v. United States, 984 F.2d at 1105 (quoting Allen v. United States, 816 F.2d 1417, 1422 n.5 (10th Cir. 1987)), because "[t]he failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability," Kiehn v. United States, 984 F.2d at 1105.

The two-prong test in Berkovitz by Berkovitz v. United States applies equally to all government employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 813. See United States v. Gaubert, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 811 ("'Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.'" (quoting Dalehite v. United States, 346 U.S. 15, 35-36 (1953))).

In applying the Berkovitz by Berkovitz v. United States analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA

applies regardless of 'whether or not the discretion involved be abused.'" Redman v. United States, 934 F.2d 1151, 1157 (10th Cir. 1991)(quoting 28 U.S.C. § 2680(a)). A court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the government's duties under the common law. Domme v. United States, 61 F.3d at 789. The Tenth Circuit has explained:

> Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place. Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a *federal* policy incorporating state tort law as a limit on the discretion of federal employees with the meaning of the FTCA.

Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008).[178]

---

[178]Post-Berkovitz by Berkovitz v. United States and United States v. Gaubert, the Tenth Circuit has limited the theory that the discretionary function exception does not protect the United States from its duty to exercise due care. See, e.g., Domme v. United States, 61 F.3d at 789 n.1. Although, in Smith v. United States, the Tenth Circuit suggested that the discretionary function exception could not defeat the United States' duties of due care as a landowner, Smith v. United States, 546 F.2d at 876, the Tenth Circuit has recognized that it decided Smith v. United States before the Supreme Court decided Berkovitz by Berkovitz v. United States. See Domme v. United States v. Smith, 61 F.3d at 789 n.1. The Tenth Circuit has consequently narrowed Smith v. United States' holding. See, e.g., Clark v. United States, 695 F. App'x at 387-88 (focusing on Smith v. United States' facts); Domme v. United States, 61 F.3d at 789 (describing Smith v. United States as fact-specific); Zumwalt v. United States, 928 F.2d 951, 955 (10th Cir. 1991)(describing the failure to warn in Smith v. United States as not based on a policy decision). The Tenth Circuit has likewise cabined the import of Indian Towing Co. v. United States, wherein the Supreme Court held that, once the Coast Guard decided to undertake service of a lighthouse, it had a duty to perform the task with due care. See Indian Towing Co. v. United States, 350 U.S. at 69; Sydnes v. United States, 523 F.3d at 1186 n.6. The Tenth Circuit has noted that, after United States v. Gaubert, Indian Towing Co. v. United States does not provide particularly persuasive authority on the discretionary function exception, see Sydnes v. United States, 523 F.3d at 1186 n.6, because, in Indian Towing Co. v. United States, the government conceded the discretionary function issue, see Black Hills Aviation, Inc. v. United States, 34 F.3d at 977, and because the Supreme Court has since rejected the distinction between high-level policy and operational decisions on which Indian Towing Co. v. United States relied, see Harrell v. United States, 443 F.3d 1231, 1237 (10th Cir.

- 191 -

## LAW REGARDING THE FTCA'S INDEPENDENT CONTRACTOR EXCEPTION

Torts committed through independent contractors' acts are also excepted from the FTCA, although not pursuant to 28 U.S.C. § 2680's exceptions. See Curry v. United States, 97 F.3d at 414 (citing United States v. Orleans, 425 U.S. at 814; Logue v. United States, 412 U.S. 521, 527 (1973)). The FTCA's waiver of sovereign immunity applies to government employees acting within their employment's scope, see, e.g., Tsosie v. United States, 452 F.3d at 1163 (citing Curry v. United States, 97 F.3d at 414), and the statute defines the term "federal employees" for FTCA purposes as "officers or employees of any federal agency," and "federal agency" to include "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States," but not to "include any contractor with the United States," 28 U.S.C. § 2671. Accordingly, government employees include "officers and employees of federal agencies," but not independent contractors and their employees. Tsosie v. United States, 452 F.3d at 1163 (citing Curry v. United States, 97 F.3d at 414).

---

2006). But cf. Lopez v. United States, 376 F.3d 1055, 1059 (10th Cir. 2004)(discussing the plaintiffs' arguments about Indian Towing Co. v. United States and distinguishing Indian Towing Co. v. United States without noting the limits on Indian Towing Co. v. United States' persuasive authority).

Although the Court previously relied on Indian Towing Co. v. United States and Smith v. United States, see Coffey v. United States, 906 F. Supp. 2d at 1157 (stating "when the government exercises its discretion and chooses to participate in an activity, the discretionary-function exception does not protect the government from failing to provide due care in its performance of the activity" (citing Indian Towing Co. v. United States, 350 U.S. at 69),)); id. at 1161-64, it recognizes the limits on the common law duty of due care's ability to overcome the discretionary function exception. Once the government makes a discretionary decision, it cannot undertake without due care the non-discretionary conduct that the decision or policy dictate. See Coffey v. United States, 906 F. Supp. 2d at 1163. The duty of due care does not narrow, however, the discretionary function exception's bounds.

"[T]he question whether one is an employee of the United States is to be determined by federal law."  Waconda v. United States, No. CIV 06-0101 JB/ACT, 2007 WL 2219472, at *10 (D.N.M. May 23, 2007)(Browning, J.)(quoting Lurch v. United States, 719 F.2d 333, 337 (10th Cir. 1983)).  Under federal law, the analysis focuses on whether the alleged principal controls the contractor's physical performance of his, her, or its work.  See Lurch v. United States, 719 F.2d at 337 (citing United States v. Orleans, 425 U.S. at 814).[179]  If the principal controls the conduct, the contractor is an employee rather than an independent contractor.  See Lurch v. United States, 719 F.2d at 337.  "The key inquiry under this control test is whether the Government supervises the day-to-day operations of the individual."  Lurch v. United States, 719 F.2d at 337 (citing United States v. Orleans, 425 U.S. at 815).  The Tenth Circuit has directed courts engaging in this inquiry to consider:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859).

---

[179]In drawing this distinction between independent contractors and employees, the Supreme Court imported the common law of tort's test for identifying employer-employee relationships, see Logue v. United States, 412 U.S. at 525-28, and, as early as 1973, described this test as one of the alleged principal's control, and, thus, of the alleged principal's supervision, over the contractor's work, see Logue v. United States, 412 U.S. at 527; cf. United States v. Orleans, 425 U.S. at 814-15 (describing that, as in Logue v. United States, and Maryland v. United States, 381 U.S. 41 (1965), "the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government").

## RELEVANT LAW REGARDING THE CFDA

The CFDA provides authority under which the Forest Service may enter cooperative agreements with outside entities, including public and private agencies, and other organizations and persons. See 16 U.S.C. § 565a to a-1.[180] Congress enacted the statute to resolve concerns about the extent of the Forest Service's authority to enter such agreements. See S. Rep. 94-476 at 1 (1975), reprinted in 1975 U.S.C.C.A.N. 1581, 1582, filed January 7, 2019 (Doc. 106-3)("S. Rep. 94-476"); H.R. Rep. 94-611 at 1-2 (1975), filed January 7, 2019 (Doc. 106-2)("H.R. Rep. 94-611")). The Senate Report contains a description of the problems before the CFDA's passage:

> At times the Forest Service has been unable to enter into cooperative arrangements because of the lack of statutory authority. In other cases, there have been inconsistent and uneven administrative practices throughout the country because of the lack of clear authority either to negotiate an agreement or to

---

[180]The CFDA specifically provides:

> To facilitate the administration of the programs and activities of the Forest Service, the Secretary is authorized to negotiate and enter into cooperative agreements with public or private agencies, organizations, institutions, or persons to construct, operate, and maintain cooperative pollution abatement equipment and facilities, including sanitary landfills, water systems, and sewer systems; to engage in cooperative manpower and job training and development programs; to develop and publish cooperative environmental education and forest history materials; and to perform forestry protection, including fire protection, timber stand improvement, debris removal, and thinning of trees. The Secretary may enter into aforesaid agreements when he determines that the public interest will be benefited and that there exists a mutual interest other than monetary considerations. In such cooperative arrangements, the Secretary is authorized to advance or reimburse funds to cooperators from any Forest Service appropriation available for similar kinds of work or by furnishing or sharing materials, supplies, facilities, or equipment without regard to the provisions of section 3324(a) and (b) of Title 31, relating to the advance of public moneys.

16 U.S.C. § 565a-1.

reimburse cooperators for work performed or for services, facilities, or equipment provided by the cooperator.

S. Rep. 94-476 at 2.  By passing the CFDA, Congress specifically sought to address concerns about the Forest Service's and states' inabilities to maintain firefighting crews on continuous bases throughout the year such that the crews were immediately available during wildfires.  See S. Rep. 94-476 at 2.  The Senate Report states:

> The authority provided by the bill will enable States to make maximum use of fire crews in order that they may be maintained on a year-round basis.  States such as Oregon are having difficulty maintaining their crews throughout the year, thus endangering the renewable resources contained in national forest lands within their boundaries.  The new authority would allow the use and reimbursement of these crews on needed nonfire work, such as reforestation, in national forests during periods of relatively low fire hazard as part of the cooperative arrangements and assure that the crews would be readily available in emergency fire situations.

S. Rep. 94-476 at 2; H.R. Rep. 94-611 at 2.  See 121 Cong. Rec. H34922-23 (daily ed. Nov. 4, 1975)(statements of Rep. AuCoin and Rep. Litton), filed January 7, 2019 (Doc. 106-4)(describing a similar outcome foreseen from the CFDA);

The CFDA's § 565a-2 defines the cooperators' relationship with the Forest Service.  See 16 U.S.C. § 565a-2.  The section grants the Forest Service authority to supervise the cooperators in specified situations, and provides that, in those situations, other than for the FTCA's and workers' compensation laws' purposes, the cooperators are not federal employees.  See 16 U.S.C. § 565a-2.  Specifically, the section states:

> In any agreement authorized by section 565a-1 of this title, cooperators and their employees may perform cooperative work under supervision of the Forest Service in emergencies or otherwise as mutually agreed to, but shall not be deemed to be Federal employees other than for the purposes of chapter 171 of Title 28 [FTCA] and chapter 81 of Title 5.

16 U.S.C. § 565a-2.

The Court concludes that § 565a-2 permits a sovereign immunity waiver where the Lilly factors counsel an employer-employee relationship between the Forest Service and the cooperator. "A waiver of sovereign immunity by the United States must be strictly construed and may not be extended by implication." Comes Flying v. U.S. through Bureau of Indian Affairs, 830 F. Supp. at 530 (United States v. Nordic Vill., Inc., 503 U.S. at 112). "Waivers of the Government's sovereign immunity, to be effective, must be 'unequivocally expressed.'" United States v. Nordic Vill. Inc., 503 U.S. at 33-34 (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990)). Section 565a-2 expressly and unambiguously permits the FTCA sovereign immunity waiver to apply where the cooperators "perform cooperative work under supervision of the Forest Service in emergencies or otherwise as mutually agreed to." 16 U.S.C. § 565a-2.[181] It does not provide,

---

[181]Congress has passed several statutes providing for supervision or control over volunteers, cooperators, or similar people in the federal government, and exempting those individuals from federal employee status for all but some statutes, often including the FTCA. See, e.g., 5 U.S.C. § 3161(a), (i)(4) (stating that volunteers for organizations established for a study or project to last less than three years are federal employees for FTCA, workers' compensation and conflicts-of-interest purposes); 10 U.S.C. § 1588(b)(2), (d) (providing that United States Department of Defense volunteers, who must be supervised to the same extent as a compensated employee, are federal employees for FTCA, workers' compensation, maintenance of records, conflicts-of-interest, and legal malpractice purposes); 16 U.S.C. § 952(a), (c)(1) (stating that commissioners for the Inter-American Tropical Tuna Commission -- "an international commission responsible for the conservation and management of tuna and other marine resources in the eastern Pacific Ocean," Inter-American Tropical Tuna Commission, Wikipedia, https://en.wikipedia.org/wiki/Inter-American_Tropical_Tuna_Commission (last visited May 25, 2019) -- are subject to United States Secretary of State supervision but are not federal employees other than for FTCA and workers' compensation purposes); 25 U.S.C. § 2012(l)(3) (providing that volunteers at BIA schools are federal employees for FTCA purposes); 38 U.S.C. § 7361, 65 (providing that, where employees of Veterans Health Administration research organizations have an appointment with the VA, the employees engage in research or education, and the VA supervises their duties, the employees are federal employees for FTCA purposes and for the purposes of 38 U.S.C. § 7316, which governs medical malpractice claims against the United States); 42 U.S.C. § 12655n(b)(3) (providing participants and leaders working, through the American Conservation and Youth Service Corps, with programs receiving grants from the

however, an independent sovereign immunity waiver or extend the FTCA's waiver; its language excludes only federal employee status for most statute's purposes. See 16 U.S.C. § 565a-2. As § 565a-2 contains no language to define the breadth of its sovereign immunity waiver other than providing that the FTCA waiver may apply when cooperators work "under supervision of the Forest Service in emergencies or otherwise as mutually agreed to," 16 U.S.C. § 565a-2,[182] the

---

Agriculture Department Secretary or the Secretary of the Interior, are federal employees for FTCA purposes); 43 U.S.C. § 1475b(b)(4), (d) (providing that volunteers trained in the United States' civil service classification system, aiding the BIA's, United States Geological Survey's, United States Bureau of Reclamation's and Secretary of the Interior's activities; and supervised in their work by the respective agency, are not federal employees for purposes other than FTCA, workers' compensation, and lost property claim purposes); 49 U.S.C. § 44922(a), (e) (providing that state or local law enforcement officers deputized to perform airport security tasks are federal employees for the FTCA's purposes while under the federal government's "supervision and control"). The Court has not located, however, any statutes with language similar to the CFDA's "work under supervision of the Forest Service . . . otherwise as mutually agreed to." 16 U.S.C. § 565a-2.

[182]The Forest Service and the Cooperator must agree to Forest Service supervision and not agree only that the cooperator will perform cooperative work. "[O]therwise as mutually agreed to" modifies working "under supervision of the Forest Service" and not "perform[ing] cooperative work." 16 U.S.C. § 565a-2. The statute's legislative history reflects that the statute authorizes Forest Service personnel to "supervise such cooperators and their employees in emergencies or otherwise as mutually agreed to." S. Rep. 94-476 at 3. James Phil Campbell, the Under Secretary of the Agriculture Department when Congress enacted the CFDA, in discussing § 565a-2, reveals a similar understanding of the statute and implies that the statute contemplates situations in which the Forest Service benefits from agreeing with the cooperators to Forest Service supervision:

> The authority in section 2 to permit the Forest Service to supervise the cooperator and his employees would broaden and facilitate opportunities for cooperation and clarify the relationship of the parties. For example, the Forest Service participates with other agencies in cooperative agreements to provide meaningful work experience in various public manpower and youth development programs. It is sometimes desirable as part of the agreement for cooperators or program participants to work under Forest Service supervision.

S. Rep. 94-476 at 4; H.R. Rep. 94-611 at 4-5.

Court concludes that § 565a-2 applies the FTCA's sovereign immunity waiver where the supervision rises to the level such that FTCA caselaw deems the relationship an employer-employee relationship.[183]   Cf. S. Rep. 94-476 at 3 (stating that cooperators will be federal employees for FTCA purposes); Forest Service Handbook Ch. 70 § 72.11(8), at 18 ("Cooperators and their employees may be considered Federal employees for the purposes of tort and worker's compensation, only when the Forest Service supervises their work.").[184]   "Waivers of sovereign

---

[183]The United States' argument that the Forest Service and a cooperator can enter an agreement "under [§ ]565a-1," but "exclude[] any dealing of federal employees that is allowed under [§ ]565a-2," March 8 P.M. Tr. at 119:19-22 (Ortega), does not persuade the Court. The United States suggests that a court should not even ask whether an agreement is within §565a-2, when an agreement does not provide for Forest Service supervision. See March 8 P.M. Tr. at 119:4-8 (Ortega); Independent Contractor Motion Supplemental Brief at 5, 5 n.4. The United States' argument does not convince the Court. The core of the United States' argument is that the test for mutual agreement to Forest Service Supervision should turn solely on the agreement between the Forest Service and the cooperator, such that a contractual provision removes the Forest Service and the cooperator's relationship from § 565a-2. For the reasons discussed in the text, the Court believes that applying the Lilly factors provide the best test for the mutual agreement to Forest Service supervision predicate.

[184]The Court cites the Forest Service Handbook Ch. 70 § 72.11(8), at 18, to support its position, but does not give special weight to the Forest Service's interpretation of the CFDA. The Court does not need to accord Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron"), deference to the Forest Service's interpretation of the CFDA.

> Interpretations such as those in opinion letters -- like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law -- do not warrant Chevron-style deference. See, e.g., Reno v. Koray, 515 U.S. 50, 61 . . . (1995)(internal agency guideline, which is not "subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment," entitled only to "some deference" (internal quotation marks omitted)); EEOC v. Arabian American Oil Co., 499 U.S. 244, 256-258 . . . (1991)(interpretative guidelines do not receive Chevron deference); Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157 . . . (1991)(interpretative rules and enforcement guidelines are "not entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers"). See generally 1 K[enneth] Davis & R[ichard]

immunity are to be read narrowly," James v. United States, 970 F.2d at 753 (citing Engel v. United

States (Estate of Johnson), 836 F.2d at 943; Schmidt v. King, 913 F.2d at 839), and the statute does

not explicitly extend the sovereign immunity waiver beyond the waiver in the caselaw describing

the supervision that establishes federal employee status, cf. United States v. Nordic Vill., Inc., 503

U.S. at 112; United States v. Mitchell, 445 U.S. at 538 ("A waiver of sovereign immunity 'cannot

be implied and must be unequivocally expressed.'" (quoting United States v. King, 395 U.S. at 4,

89).[185]

---

Pierce, Administrative Law Treatise § 3.5 (3d ed. 1994). Instead, interpretations
contained in formats such as opinion letters are "entitled to respect" under our
decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 . . . (1944)[("Skidmore")],
but only to the extent that those interpretations have the "power to persuade," *ibid.*
*See Arabian American Oil Co.*, *supra*, at 256-258 . . . .

Christensen v. Harris Cty., 529 U.S. 576, 587 (2000). The Forest Service Handbook Ch.
70 § 72.11(8), at 18, statement is not a statement with the "force of law." United States v. Mead
Corp., 533 U.S. 218, 229 (2001). Forest Service officers enact the Forest Service Handbook as an
internal agency guideline under the "authority to issue direction that sets forth authorities,
management objectives, policies, responsibilities, delegations, standards, procedures, and other
instructions that are continuing and that apply to or are needed by more than one unit" and not
under authority to promulgate legally binding authority. Forest Service Handbook (FSH) 1509.11,
https://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?1509.11 (last visited May 27, 2019). The
Court owes, accordingly, no Chevron-style deference to the Forest Service Handbook Ch.
70 § 72.11(8), at 18. See Christensen v. Harris Cty., 529 U.S. 576 (2000).
    Were the Court to apply Skidmore deference, the Court's analysis would not proceed past
the first step. Under Skidmore deference, where a Congressional statute is ambiguous, the Court
must give the interpretation a measure of deference proportional to the "'thoroughness evident in
its consideration, the validity of its reasoning, its consistency with earlier and later
pronouncements, and all those factors which give it power to persuade.'" United States v. Mead
Corp., 533 U.S. at 219 (quoting Skidmore, 323 U.S. at 140). See Navajo Health Found.-Sage
Mem'l Hosp., Inc. v. Burwell, 256 F. Supp. 3d 1186, 1234 (D.N.M.
2015)(Browning, J.)(describing Skidmore deference). As discussed in the text supra, the CFDA
is not ambiguous. The Court does not, therefore, cite the Forest Service Handbook Ch.
70 § 72.11(8), at 18, as a sign of special respect for the agency's interpretation.

    [185]The Court concludes, accordingly, that the best approach to deciding whether the Forest

Moreover, Congress did not enact the CFDA against an empty backdrop in the realm of supervision's relation to the FTCA; Congress likely understood that Forest Service supervision might bring the cooperator into an employer-employee relationship with the Forest Service. The Supreme Court, before the CFDA's enactment, articulated "supervision" over a contractor as a central factor indicating, for the control test distinguishing federal employees from independent contractors, that an employer-employee relationship exists. See Logue v. United States, 412 U.S. at 531-32. The phrase "work under supervision of the Forest Service . . . otherwise as mutually agreed to" keys into the common-law principles of agency and of employment underlying the test, 16 U.S.C. § 565a-2; see Logue v. United States, 412 U.S. at 525-28 (describing the control test's origins in common law); employer-employee relationships require mutual assent to agency relationships and employer control over employee daily work activities, i.e., close supervision over a contractor's work, required for employment relationships, see Restatement (Second) of Agency § 1 (1958)(describing a principal/agent relationship as depending on mutual consent for the agent to act on the principal's behalf); id. § 2, § 2 comments a-b (describing that an agent who agrees to work with the principal controlling the physical conduct of his work is a servant, or employee); id. § 220 comment h ("The relation of master and servant is indicated by the following factors: an agreement for close supervision or de facto close supervision of the servant's work."); id. § 1 ("The relation which the law calls agency does not depend upon the intent of the parties to create it, nor

---

Service and a third party mutually agreed to Forest Service supervision is to view the relationship through the Lilly test's lens. Without an explicit statement from Congress, the Court sees no reason to expand the sovereign immunity waiver beyond the bounds of well-established caselaw. Defining a new approach to identifying employer-like supervision serves little purpose other than to expand the sovereign immunity waiver, and to upset the law on which federal agencies and actors currently plan their relationships.

their belief that they have done so. To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties."). Although the large body of caselaw, including the Lilly test, that has developed to expand on the ideas of control and supervision for FTCA federal employee status did not exist when Congress enacted the statute CFDA, the enactment occurred against the backdrop of Logue v. United States and the existing common law. See, e.g., Tsosie v. United States, 452 F.3d at 1163-65 (describing and applying the control test for independent contractors); Johnson v. United States, 132 F. App'x 715, 716 (9th Cir. 2005)(applying the control test for independent contractors); Hentnik v. United States, No. 02 CIV. 9498 (DC), 2003 WL 22928648, at *3 (S.D.N.Y. Dec. 10, 2003)(Chin, J.)(describing the control test for independent contractors).[186] Congress chose, accordingly, to waive sovereign immunity where the FTCA's waiver applies.[187]

---

[186]Moreover, how Congress imagined "Forest Service supervision" influences how courts should understand § 565a-2. If Congress imagined that cooperators under Forest Service supervision would resemble employees, Congress might have enacted § 565a-2 primarily to bar the cooperators from receiving federal employee status except in limited circumstances. The statutory language counsels slightly toward the possibility that Congress envisioned this result. Congress writes that the cooperators and their employees are not federal employees, and adds afterward that the bar does not apply to the FTCA and workers' compensation laws. Had Congress wanted to clarify that it was bringing the cooperators and their employees into the FTCA and workers' compensation laws, it could have written that the cooperators and their employees are federal employees for those statutes. Most people would likely choose this latter approach if they understood themselves to be directing a person to classify something as a thing that it is not. That this interpretation of § 565a-2 is persuasive adds some weight toward applying the Lilly test in § 565a-2's context.

[187]The Court concludes that § 565a-2 does not contain literal predicates to the FTCA's sovereign immunity waiver. Contra, e.g. March 8 P.M. Tr. at 73:25-74:14 (Court, Tosdal); Independent Contractor Supplementaion Brief at 5, 5 n.4. Although § 565a-2 permits the FTCA's application where "cooperators and their employees . . . perform cooperative work under supervision of the Forest Service in emergencies or otherwise as mutually agreed to," supervision, as discussed supra in the text, is a component in the FTCA independent contractor test.

The Court concludes, accordingly, that the best approach to deciding whether such Forest Service supervision exists that the FTCA sovereign immunity waiver applies is to view the relationship through the Lilly test's lens. This test includes:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859).[188]

_____

16 U.S.C. § 565a-2. The Court reads § 565a-2's first and second clauses to authorize the Forest Service to engage in supervision, and the last clause to permit a sovereign immunity waiver where such supervision exists that the cooperator becomes a federal employee under FTCA caselaw. See 16 U.S.C. § 565a-2.

The Ohlsen Plaintiffs' argument that the legislative history means that, where Forest Service supervision exists, the cooperator is a federal employee for FTCA purposes does not convince the Court. See Independent Contractor Supplemental Brief Response at 3-4. The Senate Report states:

> Section 2 authorizes Forest Service personnel to supervise such cooperators and their employees in emergencies or otherwise as mutually agreed to. In such cases, the cooperators and their employees would be covered under Federal tort liability and work injury laws, but would not be considered Federal employees for other purposes.

S. Rep. 94-476 at 3; H.R. Rep. 94-611 at 3. Although the legislative history equates Forest Service supervision to federal employee status, the legislative history suggests, equally to the Ohlsen Plaintiffs' interpretation, that Congress envisioned Forest Service supervision would involve such supervision that the cooperator would be a federal employee under FTCA caselaw. The Court believes that this interpretation's plausibility supports its reading of the CFDA. Moreover, that the statutory text and the legislative history welcome multiple interpretations reflects that the CFDA does not unambiguously waive soverign immunity beyond the FTCA's bounds, as the Ohlsen Plaintiffs would have the Court conclude.

[188]The Court notes that, were it to apply the United States' or the Ohlsen Plaintiffs' proposed approaches to the CFDA, it would reach the same conclusion that it reaches infra. Regarding the United States' proposed approach, the Participating Agreement ¶ V(F), at 5,

# ANALYSIS

The Court grants the Independent Contractor Motion,[189] the Ohlsen Motion, the C De Baca

Motion,[190] the Sais Motion, the Motion to Strike, and the Supplemental Briefing Motion, and

sustains in part and overrules in part the Ohlsen Plaintiffs' objections in the First Objections, the

Fox Objections, the Motion to Strike, and the Motion to Strike Reply. The Court concludes that

the Plaintiffs show no genuine dispute of material fact whether Isleta Pueblo was an independent

contractor. The Court also concludes that the Plaintiffs show no genuine dispute of material fact

whether the discretionary function exception bars the Plaintiffs' claims. The Court concludes that

---

unambiguously provides that Isleta Pueblo is not a federal employee and will supervise the thinning crew, and does not provide for Forest Service supervision, and, as discussed infra, the Participating Agreement as a whole contemplates Isleta Pueblo supervision, and not Forest Service supervision, over the thinning crew. See Independent Contractor Supplemental Brief at 5, n. 5. Therefore, according to the United States, the Court should still apply the Lilly factors, which, as the Court discusses infra in the text, counsel an independent contractor relationship. See Independent Contractor Supplemental Brief at 6. Regarding the Ohlsen Plaintiffs' proposed altered Lilly test, excluding such factors as the equipment used and the taxes paid, see March 8 P.M. Tr. at 53:22-54:9 (Court, Tosdal), the Court concludes, as discussed infra, that Lilly factors one, two, six, and seven counsel an independent contractor relationship. Likewise, were the Court to apply the Sais Plaintiffs' test from Cannady v. United States, the Court would still apply the control test, which, for the Tenth Circuit, is the Lilly test, and conclude that Isleta Pueblo was an independent contractor. See Sais Response at 4-5 (quoting Cannady v. United States, 155 F. Supp. 2d at 1381-82 (applying the control test)).

[189]Contrary to C De Baca and Cianchetti's argument in the C De Baca Response, see C De Baca Response at 1-2, the United States' independent contractor arguments apply to C De Baca and Cianchetti. The United States raises the independent contractor arguments in the Independent Contractor Motion, and the United States brings that Independent Contractor Motion against all Plaintiffs. See Independent Contractor Motion at 1-2.

[190]The Court will not disregard the C De Baca Motion, as C De Baca and Cianchetti request, because of the United States' failure to specify a legal standard for dismissing the C De Baca Complaint and the Cianchetti Complaint. See C De Baca Response at 2 (citing Fed. R. Civ. P. 7.1(a)). The United States identifies rule 12(b)(1) as the standard under which it seeks the C De Baca Complaint's and the Cianchetti Complaint's dismissal, so the United States specified a legal standard. See C De Baca Motion at 1.

the Ohlsen Plaintiffs properly exhausted their claim based on Isleta Pueblo's fire suppression activities and their claim based on the Forest Service's failure to have a fire engine accompany the masticator. The Ohlsen Plaintiffs did not, however, exhaust their claim that the Forest Service failed to suppress the Dog Head Fire or their claims, other than the claim about Isleta Pueblo's fire suppression activities, based on the United States' liability for Isleta Pueblo's actions. The Court concludes that C De Baca, Cianchetti, and the Sais Plaintiffs exhausted only their claim that the Forest Service and Isleta Pueblo failed to ensure that the equipment for thinning Unit 4 was in good working order and the proper equipment for the terrain. As the Ohlsen Plaintiffs consented to dismiss their res ipsa loquitur claim and non-delegable duty claim, the Court dismisses those claims. See March 8 A.M. Tr. at 13:25-14:5 (Dow). As the Court applies against the State Farm Plaintiffs the United States' arguments about the Ohlsen Plaintiffs' res ipsa loquitur claim and non-delegable duty claim and the Ohlsen Plaintiffs' responses to those arguments, see Ohlsen Response at 1 n.1; March 8 P.M. Tr. at 117:1-15 (Ortega, Court); id. at 118:2-8 (Tosdal), the Court also dismisses the State Farm Plaintiffs' res ipsa loquitur claim, see State Farm Complaint ¶¶ 35-37, at

9,[191] and non-delegable duty claim, <u>see</u> State Farm Complaint ¶¶ 42-45, at 9-10,[192] because the

Ohlsen Plaintiffs responded to the United States by stipulating to dismiss both those claims, <u>see</u>

---

[191]For the reasons discussed in the text <u>infra</u>, the Court concludes that, even had the State Farm Plaintiffs and the United States not agreed to apply against the State Farm Plaintiffs the United States' arguments in all the motions and the other Plaintiffs' responses, it would dismiss the State Farm Plaintiffs' res ipsa loquitur claim for lack of subject-matter jurisdiction. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). <u>See, e.g.</u>, <u>Mansfield, Coldwater & Lake Mich. Ry. v. Swan</u>, 111 U.S. 379, 382 (1884)(holding that the nature and limits of federal judicial power require that the court raise the issue of subject-matter jurisdiction sua sponte); <u>Clymore v. United States</u>, 415 F.3d 1113, 1118 n.6 (10th Cir. 2005)(addressing sovereign immunity sua sponte); <u>Singletary v. United States</u>, 82 F. App'x 621, 624 (10th Cir. 2003)(affirming a district court's sua sponte decision to raise the discretionary function exception); <u>Estate of Vera Cummings v. United States</u>, No. CIV 12-0081 WJ/GBW, 2015 WL 11111356, at *1 (D.N.M. Feb. 10, 2015)(Johnson, J.)(addressing sua sponte the FTCA's sovereign immunity waiver), <u>aff'd in part, vacated in part, remanded sub nom.</u> Estate of Cummings v. United States, 651 F. App'x 822 (10th Cir. 2016), <u>as clarified on reh'g</u> (June 24, 2016); <u>De Yapp v. United States</u>, No. CIV 10-0024 WJ/WPL, 2011 WL 13277508, at *2-3 (D.N.M. Dec. 22, 2011)(Johnson, J.)(considering sua sponte the FTCA's independent contractor exception). The Court would dismiss the claim based on the independent contractor exception to the extent the claims rests on Isleta Pueblo's actions, for the reasons the Court discusses in the text <u>infra</u>, and it would dismiss the claim under the discretionary function exception to the extent the claim rests on the Forest Service's actions, because the Forest Service's decisions to hire Isleta Pueblo and delegate to it the responsibility for the thinning operations are within the Forest Service's discretion, as the Court discusses in the text <u>infra</u>.

[192]The Court would dismiss the non-delegable duty claim had the State Farm Plaintiffs and the United States not agreed to apply against the State Farm Plaintiffs the United States' arguments in all the motions and the other Plaintiffs' responses. The Tenth Circuit has held that "the government has not waived its immunity from tort actions arising out of [non-delegable duty claims]." <u>Rothenberger v. U.S. By & Through U.S. Air Force</u>, 931 F.2d 900, 1991 WL 70719, at *2. <u>See</u> <u>Flynn v. United States</u>, 631 F.2d at 681-82 ("[T]he United States may not be held liable on any absolute liability theory. The United States can be sued only to the extent that it has waived its immunity." (citing <u>United States v. Orleans</u>, 425 U.S. at 814; <u>Gibson v. United States</u>, 567 F.2d 1237, 1244 (3rd Cir. 1977))); <u>United States v. Page</u>, 350 F.2d at 33 ("[The FTCA] does not by its terms include liability imposed by other doctrines having their origin in warranties, in product liability, or in absolute liability."). "[T]he United States may not be sued without its consent and . . . the existence of consent is a prerequisite for jurisdiction." <u>United States v. Mitchell</u>, 463 U.S. at 212 (citing <u>United States v. Sherwood</u>, 312 U.S. at 586). <u>Accord</u> <u>Garcia v. United States</u>, 709 F. Supp. 2d at 1137. As Congress has not consented to waive sovereign immunity for absolute liability theory claims, including non-delegable duty claims, the Court concludes that it lacks

March 8 A.M. Tr. at 13:25-14:5 (Dow).  As C De Baca, Cianchetti, and the Sais Plaintiffs consent to dismiss their claims regarding the initial suppression of the Dog Head Fire, the Court also dismisses those claims.  <u>See</u> C De Baca Response at 10; Sais Response at 2.  Throughout the Factual Background and the Analysis, the Court makes individualized conclusions regarding the Ohlsen Plaintiffs' requests in the First Objections, the Fox Objections, the Motion to Strike, and the Motion to Strike Reply.  The Court grants the Ohlsen Plaintiffs' and the United States' requests in the Motion to Strike and Supplemental Briefing Motion respectively to file additional briefing to enable the Ohlsen Plaintiffs and the United States to address the Third Fox Decl. and the CFDA issue.

I.   **THE OHLSEN PLAINTIFFS AND THE UNITED STATES MAY FILE SURREPLIES TO ADDRESS THE THIRD FOX DECL., AND THE UNITED STATES AND THE PLAINTIFFS MAY FILE SUPPLEMENTAL BRIEFING <u>SURREPLY TO ADDRESS THE CFDA THEORY.</u>**

The Ohlsen Plaintiffs and the United States may file surreplies to address the Third Fox Decl., and the United States and the Plaintiffs may file supplemental briefing on the issue whether the CFDA provides an independent sovereign immunity waiver or extends the FTCA's sovereign immunity waiver.  Regarding supplemental briefing, the Court has previously explained:

> "Whether to allow supplemental briefing on a newly-raised issue is a 'supervision of litigation' question" that the Tenth Circuit reviews for abuse of discretion.  <u>Geddes v. United Staffing All. Emp. Med. Plan</u>, 469 F.3d 919, 928

---

subject-matter jurisdiction to hear such a claim.  <u>See</u>, <u>e.g.</u>, <u>Mansfield, Coldwater & Lake Mich. Ry. v. Swan</u>, 111 U.S. at 382.  The Court would dismiss, accordingly, the State Farm Plaintiffs' non-delegable duty claim for lack of subject-matter jurisdiction.  <u>See</u> <u>Rothenberger v. U.S. By & Through U.S. Air Force</u>, 931 F.2d 900, 1991 WL 70719, at *2 (holding that the FTCA does not permit non-delegable duty claims and that "the delegation of responsibility for the design, implementation, and enforcement of safety programs and procedures to the contractor, was a permissible exercise of policy-grounded judgment" (citing <u>Berkovitz by Berkovitz v. United States</u>, 486 U.S. at 536-37; <u>Zumwalt v. United States</u>, 928 F.2d at 955-56).

(10th Cir. 2006)(articulating this standard in the summary judgment context)(quoting Pippin v. Burlington Res. Oil & Gas, 440 F.3d 1186, 1192 (10th Cir. 2006)). "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." Nova Health Sys. v. Edmondson, 460 F.3d 1295, 1299 (10th Cir. 2006)(internal quotation marks omitted).

Pueblo of Pojoaque v. State, 233 F. Supp. 3d at 1104. The Court has granted leave for supplemental briefing where the briefing would address new issues. See Pueblo of Pojoaque v. State, 233 F. Supp. 3d at 1104-05. Although the Ohlsen Plaintiffs leave ambiguous in the Motion to Strike whether they desire the Court to consider the Motion to Strike a surreply or seek leave to file a surreply, compare Motion to Strike at 1, with Motion to Strike at 6, at the March 8, 2019, hearing, the Court granted Ohlsen Plaintiffs a surreply to address the Third Fox Decl., and the United States the opportunity to file a surreply in response, the Court treats the Motion to Strike as objections, see March 8 P.M. Tr. at 104:8-25 (Court, Dow, Ortega). The Court concludes that granting the surreply is proper to allow both parties the opportunities to debate the Third Fox Decl., which the United States first includes with the Independent Contractor Reply and the Ohlsen Reply. The Court also concludes that, although the Ohlsen Plaintiffs first raised their CFDA theory in their Ohlsen Independent Contractor Response, see Ohlsen Independent Contractor Response at 24-25, and not at the March 8, 2019, hearing, the CFDA issue poses a question of first impression on which the Court will benefit the most from having the parties' views fully and clearly articulated. As the United States indicated that its supplemental briefing would approximately be less than ten pages, see June 3 Tr. at 18:20-22 (Ortega), permitting the United States to file the briefing and the Plaintiffs to respond will not unduly burden the Plaintiffs.

## II. THE COURT CONVERTS THE INDEPENDENT CONTRACTOR MOTION, AND THE OHLSEN MOTION'S, THE C DE BACA MOTION'S, AND THE SAIS MOTION'S REQUESTS FOR DISMISSAL ON DISCRETIONARY FUNCTION EXCEPTION GROUNDS TO RULE 56 MOTIONS FOR SUMMARY JUDGMENT.

The Court converts the Independent Contractor Motion and the Ohlsen Motion's, the C De Baca Motion's, and the Sais Motion's motions to dismiss on grounds that the discretionary function exception divests the Court of subject-matter jurisdiction over the Ohlsen Plaintiffs', C De Baca's, Cianchetti's, and the Sais Plaintiffs' claims to rule 56 motions for summary judgment, as the parties agreed at the hearing, see March 8 A.M. Tr. at 7:10-19 (Tosdal); id. at 4:22-5:4 (Ortega), because the jurisdictional arguments are intertwined with the case's merits, see Redmon By & Through Redmon v. United States, 934 F.2d 1151, 1155 (10th Cir. 1991)("Rule 56 governs because the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues."); U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d at 1159. The Court considers the Ohlsen Motion's, the C De Baca Motion's, and the Sais Motion's failure-to-exhaust arguments under the 12(b)(1) standard, see Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 ("'Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed. The requirements are jurisdictional and cannot be waived.'" (quoting Bradley v. U.S. ex rel. Veterans Admin., 951 F.2d at 270)); see also Mendoza v. United States, 661 F. App'x 501, 501-02 (9th Cir. 2016)(affirming a district court's dismissal of an FTCA claim for failure to exhaust on jurisdictional grounds); Caldwell v. Klinker, 646 F. App'x 842, 846 (11th Cir. 2016)("Unless and until a claimant has exhausted his administrative remedies under the FTCA, the district court lacks subject-matter jurisdiction." (citing Turner ex rel. Turner v. United States, 514 F.3d 1194, 1200 (11th Cir. 2008))); cf. Barnes

v. United States, 776 F.3d at 1148 (treating the FTCA's statute of limitations as a jurisdictional question), because those issues are not intertwined with the case's merits. The Court may consider outside evidence on the failure-to-exhaust arguments without using the rule 56 standard. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 (permitting district courts to consider outside evidence on rule 12(b)(1) motions without converting the motion into a motion for summary judgment); Holt v. United States, 46 F.3d at 1003 (same).

III. **THE PLAINTIFFS DO NOT SHOW A GENUINE ISSUE OF MATERIAL FACT WHETHER THE FOREST SERVICE AND ISLETA PUEBLO MUTUALLY AGREED TO FOREST SERVICE SUPERVISION SUCH THAT SECTION 565a-2'S PROVISION MAKING COOPERATORS FEDERAL EMPLOYEES APPLIES.**

The Court concludes that Isleta Pueblo was not a federal employee for FTCA purposes. As the Forest Service and Isleta Pueblo entered the Participating Agreement pursuant to the CFDA, see Independent Contractor Motion ¶ 5-6, at 4 (citing First Fox Decl. ¶ 4-8, at 1-2; Participating Agreement at 1); Ohlsen Independent Contractor Response ¶¶ 4-5, at 3; Ohlsen Response ¶ 3, at 3 (citing Participating Agreement at 1); Ohlsen Reply ¶ 3, at 10, the Court asks whether the Forest Service and Isleta Pueblo mutually agreed to Forest Service supervision such that Isleta Pueblo is a federal employee for FTCA purposes. See 16 U.S.C. § 565a-2. The Court first reasons that the Wyden Amendment does not override the CFDA's FTCA provisions. Then, as the Court discusses in the Relevant Law Regarding the CFDA section, the Court applies the Lilly test to determine whether the Forest Service and Isleta Pueblo mutually agreed to Forest Service supervision:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859). Based on this analysis, the Court concludes that the Plaintiffs have not shown a genuine dispute of material fact whether, taking the Forest Service and Isleta Pueblo's relationship as a whole, they agreed to Forest Service supervision. See 16 U.S.C. § 565a-2. The Court, accordingly, grants the Independent Contractor Motion.

### A.   THE WYDEN AMENDMENT DOES NOT OVERRIDE § 565a-2.

Preliminarily, the Court concludes that, contrary to the United States' arguments, see March 8 P.M. Tr. at 65:13-66:3 (Court, Ortega), the Wyden Amendment does not override the CFDA's FTCA provision. "'[W]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437, 445 (1987)(emphasis in Crawford Fitting Co. v. J. T. Gibbons, Inc.; alteration added)(quoting Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976)). The Wyden Amendment contains no provisions discussing the FTCA or the CFDA. See Pub. L. 105-277 § 323, 122 Stat 2681, as amended by Pub. L. 111-011, § 3001, 123 Stat 991 (2009). It does not discuss the Forest Service's supervisory powers or authority to enter cooperative agreements, but authorizes the Forest Service to use appropriations to enter cooperative agreements aimed at protecting resources within a watershed from natural disaster, and protecting wildlife habitats and other lands; the Wyden Amendment specifically provides:

> For fiscal year 2006 and each fiscal year thereafter, to the extent funds are otherwise available, appropriations for the Forest Service may be used by the Secretary of Agriculture for the purpose of entering into cooperative agreements with willing Federal, tribal, State and local governments, private and nonprofit entities and landowners for the protection, restoration and enhancement of fish and wildlife habitat, and other resources on public or private land, the reduction of risk from natural disaster where public safety is threatened, or a combination thereof or both that benefit these resources within the watershed.

(b) DIRECT AND INDIRECT WATERSHED AGREEMENTS. -- The Secretary of Agriculture may enter into a watershed restoration and enhancement agreement --

(1) directly with a willing private landowner; or

(2) indirectly through an agreement with a State, local or tribal government or other public entity, educational institution, or private nonprofit organization

(c) TERMS AND CONDITIONS. -- In order for the Secretary to enter into a watershed restoration and enhancement agreement --

(1) the agreement shall -

(A) include such terms and conditions mutually agreed to by the Secretary and the landowner, state or local government, or private or nonprofit entity;

(B) improve the viability of and otherwise benefit the fish, wildlife, and other resources on national forests lands within the watershed;

(C) authorize the provision of technical assistance by the Secretary in the planning of management activities that will further the purposes of the agreement;

(D) provide for the sharing of costs of implementing the agreement among the Federal Government, the landowner(s), and other entities, as mutually agreed on by the affected interests; and

(E) ensure that any expenditure by the Secretary pursuant to the agreement is determined by the Secretary to be in the public interest; and

(2) the Secretary may require such other terms and conditions as are necessary to protect the public investment on non-Federal lands, provided such terms and conditions are mutually agreed to by the Secretary and other landowners, State and local governments or both.

Pub. L. 105-277 § 323, 122 Stat 2681, as amended by Pub. L. 111-011, § 3001, 123 Stat 991. The United States rests its argument about the Wyden Amendment on the Forest Service Handbook Ch. 70 § 72.21(8), at 23's statement that the amendment's "authority does not provide conveyance of Federal employee status towards cooperator's employees and, therefore, does not provide tort and worker's compensation coverage under such circumstances." Forest Service Handbook Ch.

70 § 72.21(8), at 23.  See Independent Contractor Reply at 42; March 8 P.M. Tr. at 65:13-66:3 (Court, Ortega).  This statement does not, however, speak to the Wyden Amendment's relation to the CFDA or offer any guidance on whether the Wyden Amendment's general provisions trump the CFDA's specific provisions.  Following the interpretative canon articulated above, the Court will not read the Wyden Amendment's general provisions to override the CFDA's specific language about the FTCA.  Congress chose to include in the FTCA's sovereign immunity waiver certain of the Forest Service's cooperators, and the Court will not omit these cooperators from the waiver without clear Congressional intent, which the Wyden Amendment does not provide.

### B. THE CFDA, PARTICIPATING AGREEMENT, AND THE STATEMENTS OF WORK REFLECT AN INTENT TO HAVE AN INDEPENDENT CONTRACTOR RELATIONSHIP BETWEEN THE FOREST SERVICE AND ISLETA PUEBLO.

The first factor in the Lilly test -- the United States' and the contractors' intents -- points toward an independent contractor relationship.  See Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859).  Although statutory language may evidence parties' intents regarding their relationship, see Logue v. United States, 412 U.S. at 528-29, neither the CFDA nor the Wyden Amendment under which the Forest Service and Isleta Pueblo entered the Participating Agreement speak to the Forest Service's and the Isleta Pueblo's intents about the Forest Service's supervision of the thinning crew, see 16 U.S.C. §565a-2; Pub. L. 105-277 § 323, 122 Stat 2681, as amended by Pub. L. 111-011, § 3001, 123 Stat 991.  Contra Independent Contractor Motion at 18.  The Wyden Amendment contains language about neither the Forest Service's supervisory powers nor about the FTCA.  See Pub. L. 105-277 § 323, 122 Stat 2681, as amended by Pub. L. 111-011, § 3001, 123 Stat 991.  Although the CFDA contemplates cooperative agreements that provide for Forest Service supervision, see 16 U.S.C. §565a-2, that the CFDA accounts for such agreements

does not shed light on the Forest Service's and Isleta Pueblo's intents. The option to enter an agreement providing for Forest Service supervision reflects that the Forest Service and Isleta Pueblo may have but also may not have entered such an agreement.

The Participating Agreement evidences that the Forest Service and Isleta Pueblo did not intend the Forest Service to supervise the thinning crew's work. The parties generally agree to the Participating Agreement's, Statements of Work's, and Silviculture Prescriptions' contents, although they dispute the contents' implications. See, e.g., Independent Contractor Motion ¶ 6, at 4 (citing Participating Agreement ¶ V(F), at 5); Ohlsen Independent Contractor Response at 3-13.[193] As, unless a contractual provision is ambiguous, the meaning of a contract's terms is a question of law, Evensen v. Pubco Petroleum Corp., 274 F.2d 866, 872 (10th Cir. 1960)("Interpretation of contractual language is a question of law, but where the meaning depends upon extrinsic evidence there may result a material conflict or possibility of more than one reasonable inference, and this presents a question of fact rather than law."), the parties' assertions about the Participating Agreement's meanings do not control the Court's decision.

Preliminarily, as the United States concedes, the Participating Agreement's statement that Isleta Pueblo is not a federal employee does not override the § 565a-2. See March 8 P.M. Tr. at 71:13-19 (Court, Ortega). Contra March 8 P.M. Tr. at 63:1-7 (Court, Ortega). That this

---

[193]The parties dispute, for instance, whether the Forest Service and Isleta Pueblo agreed that the Forest Service would supervise the thinning crew's work. See Independent Contractor Motion ¶ 6, at 4 (citing Participating Agreement ¶ V(F), at 5); Ohlsen Independent Contractor Response at 3-13. The United States cites the First Fox Decl. ¶ 10, at 2-3, to support the proposition that the Forest Service and Isleta Pueblo did not agree to Forest Service supervision. See Independent Contractor Motion ¶ 6, at 4. For the reasons stated supra note 35, the Court does not deem the First Fox Decl.'s statement sufficient evidence to support the United States' assertion. The United States cites, however, sufficient other evidence, including the Participating Agreement itself on which Fox relies, to support its assertions in Independent Contractor Motion ¶ 6, at 4.

Participating Agreement provision and the Participating Agreement, Statements of Work, and Agreement Financial Plan generally do not refer to Isleta Pueblo as an "employee" support, however, that the Forest Service and Isleta Pueblo intended an independent contractor relationship. In resolving the United States' and contractors' intents whether the contractor is an employee or independent contractor, the Tenth Circuit has weighed heavily contractual provisions identifying the contractor as an employee or as an independent contractor. See, e.g., Bethel v. United States, 456 F. App'x 771, 778-79 (10th Cir. 2012)(unpublished)("The express language of the contract identifying [University of Colorado School of Medicine] as an independent contractor coupled with the lack of evidence manifesting an intent to create an employee relationship tip the second factor in favor of independent contractor status."); Tsosie v. United States, 452 F.3d at 1164 (considering a contract's express provision that an entity is an independent contractor); Duplan v. Harper, 188 F.3d at 1200 (considering relevant evidence of an independent contractor relationship that the contract identified the physician in question as an independent contractor); Norton v. Murphy, 661 F.2d 882, 884-85 (10th Cir. 1981)(emphasizing that the contracts in question referred to the mail carrier at issue as a contractor and not an employee); Begay v. United States, 188 F. Supp. 3d 1047, 1082-83 (D.N.M. 2016)(Browning, J.)(considering an independent contractor provision evidence of an independent contractor relationship). Here, the Participating Agreement states:

> The Pueblo agree(s) that any of their employees, volunteers, and program participants shall not be deemed to be Federal employees for any purposes including Chapter 171 of Title 23, United States Code (Federal Tort Claims Act) and Chapter 81 of Title 5, United States Code (OWCP), as the Pueblo hereby willingly agree(s) to assume these responsibilities.

Participating Agreement ¶V(F), at 5.  See Independent Contractor Motion ¶ 8, at 5 (quoting Participating Agreement ¶ V(F), at 5); Ohlsen Independent Contractor Response ¶ 8, at 13; Ohlsen Independent Contractor Response  6, at 7 (citing Participating Agreement ¶ V(F), at 5).  The Participating Agreement and the Statements of Work likewise refer to Isleta Pueblo as "Pueblo," "Cooperator," or "Partner."  Ohlsen Independent Contractor Response ¶ 1, at 21-22 (quoting Participating Agreement ¶ V(F), (L), at 5-6; Agreement Financial Plan at 1; Statement of Work Original § 1(E)-(F), at 350-51; id. at §§ 4-12, at 355-370); Statement of Work Modification 3 §§ 1(G)-(H), at 411; Ohlsen Response ¶ 4, at 3 (quoting Statement of Work Original §§ 4-12, at 355-70); Statement of Work Modification 3 §§ 4-11, at 416-430.

Although "Pueblo," "Cooperator," or "Partner" differ from "independent contractor," the Participating Agreement's, Statements of Work's, and Agreement Financial Plan's language does not mean that Isleta Pueblo is a federal employee.  Participating Agreement ¶ V(F), (L), at 5-6; Agreement Financial Plan at 1; Statement of Work Original § 1(E)-(F), at 350-51; id. at §§ 4-12, at 355-370; Statement of Work Modification 3 §§ 1(G)-(H), at 411.  The Participating Agreement never characterizes Isleta Pueblo as an "employee."  Moreover, the CFDA provides for a cooperative agreement and not an independent contractor agreement, see 16 U.S.C. § 565a-2, so language describing Isleta Pueblo as an independent contractor would be inapt.

The Participating Agreement's division of duties between the Forest Service and Isleta Pueblo also weighs toward deeming Isleta Pueblo an independent contractor.  In describing the Forest Service's and Isleta Pueblo's duties, the Participating Agreement gives to Isleta Pueblo the responsibilities of supervising and directing the thinning crew's work.  See Duplan v. Harper, 188 F.3d at 1200 (considering as factors pointing to an independent contractor relationship that the

contract gave the entity in question "the responsibility of selection, assignment, reassignment, transfer, supervision, management, and control of contract doctors," and of designating a doctor to act with "direct supervisory authority"). The Participating Agreement states: "The Pueblo shall also supervise and direct the work of its employees, volunteers, and participants performing under this contract." Participating Agreement ¶ V(F), at 5. See Ohlsen Motion ¶ 10, at 6 (citing Second Fox Decl. ¶ 27, at 7); Sais Motion ¶ 12, at 6 (citing Second Fox Decl. ¶ 27, at 7); Ohlsen Response ¶ 10, at 19. The Court disagrees with the Ohlsen Plaintiffs' suggestion that the "also" in this provision means that Isleta Pueblo has supervisory authority alongside Forest Service supervisory authority because the Participating Agreement does not exclude the Forest Service from supervising the thinning crew. See Ohlsen Independent Contractor Response ¶ 6, at 8. In the Court's view, the "also" here builds on duties that the Participating Agreement imposes in the preceding sentence: "Further, the Pueblo shall provide any necessary training to ensure that such personnel are capable of performing tasks to be completed. The Pueblo shall *also* supervise and direct the work of its employees, volunteers, and participants performing under this agreement." Participating Agreement ¶¶ V(F), at 5 (emphasis added). These sentences appear, moreover, in the same Participating Agreement section as the sentence classifying Isleta Pueblo as not a federal employee:

> The Pueblo agree(s) that any of their employees, volunteers, and program participants shall not be deemed to be Federal employees for any purposes including Chapter 171 of Title 23, United States Code (Federal Tort Claims Act) and Chapter 81 of Title 5, United States Code (OWCP), as the Pueblo hereby willingly agree(s) to assume these responsibilities.

> Further, the Pueblo shall provide any necessary training to ensure that such personnel are capable of performing tasks to be completed. The Pueblo shall also supervise and direct the work of its employees, volunteers, and participants performing under this agreement.

Participating Agreement ¶¶ V(F), at 5. Accordingly, the provisions are most logically read as describing the tasks that Isleta Pueblo will perform as an independent contractor.

The Participating Agreement likewise assigns the tasks of managing the thinning crew's daily operations to Isleta Pueblo. It states: "The Pueblo shall monitor the performance of the agreement activities to ensure that performance goals are being achieved." Participating Agreement ¶ V(O), at 8. It gives Isleta Pueblo the duties of operating the thinning project and the thinning crew's daily working environment:

A. LEGAL AUTHORITY. The Pueblo shall have the legal authority to enter into this agreement, and the institutional, managerial, and financial capability to ensure proper planning, management, and completion of the project, which includes funds sufficient to pay the nonfederal share of project costs, when applicable.

B. Contribute personnel, provide equipment and supplies as needed, and manage the employees so that work is completed as mutually agreed upon to the specifications stated in the Statement of Work Supplement, incorporated hereunder as Exhibit A.

C. Administer agreement funds, including timekeeping payment of salaries and invoices for payment.

D. Provide and maintain work environments and procedures which will safeguard Tribal employees, the public, and Forest Service personnel, property, materials, supplies and equipment exposed to the operations and activities, and avoid interruptions of Government operations and delays of other projects and completion dates.

Participating Agreement ¶¶ III(A)-(D), at 2. See Ohlsen Motion ¶ 10, at 6 (citing Second Fox Decl. ¶ 27, at 7); Sais Motion ¶ 12, at 6 (citing Second Fox Decl. ¶ 27, at 7); Ohlsen Response ¶ 10, at 19. The Participating Agreement continues:

The Pueblo shall maintain effective control over and accountability for all U.S. Forest Service funds, real property, and personal property assets. The Pueblo shall keep effective internal controls to ensure that all United States Federal funds received are separately and properly allocated to the activities described in the

agreement. The Pueblo shall adequately safeguard all such property and shall ensure that it is used solely for authorized purposes.

Participating Agreement ¶ V(J)(3), at 6. Likewise, the Participating Agreement gives Isleta Pueblo responsibility for safeguarding "Tribal employees, the public, and Forest Service personnel, property, materials, supplies and equipment," Participating Agreement ¶¶ III(D), at 2; Participating Agreement ¶ V(F)(3), at 6, and for providing fire safety and bearing liability for fire, see Participating Agreement ¶¶ III (A)-(D), at 2; id. ¶ (V)(F), at 5; Statement of Work Original Original §§ 3-4, 11, at 355, 364-68; Statement of Work Modification 3 §§ 3-4, 11 at 416, 427-30. See also McDaniel v. United States, 53 F. App'x 8, 11-12 (10th Cir. 2002)(unpublished)("In addition, under the terms of the contract, Brazos was responsible for complying with all applicable safety and health laws and regulations.").

The Participating Agreement does not give the Forest Service comparable supervisory authority. Although the Forest Service has inspection authority under the Participating Agreement, see Participating Agreement ¶¶ IV(B), at 2-3, and the ability to sanction Isleta Pueblo for non-compliance with the Participating Agreement and the Statements of Work, see Participating Agreement ¶¶ V(Y), at 10-11, such authorities do not create an employer-employee relationship, see Logue v. United States, 412 U.S. at 529-30. In Logue v. United States, the Supreme Court considered persuasive toward finding an independent contractor relationship evidence that

> [t]he county undertakes to provide custody in accordance with the Bureau of Prisons' 'rules and regulations governing the care and custody of persons committed' under the contract. These rules in turn specify standards of treatment for federal prisoners, including methods of discipline, rules for communicating with attorneys, visitation privileges, mail, medical services, and employment. But the agreement gives the United States no authority to physically supervise the conduct of the jail's employees; it reserves to the United States only 'the right to enter the institution . . . at reasonable hours for the purpose of inspecting the same and determining the conditions under which federal offenders are housed.'

Logue v. United States, 412 U.S. at 529-30 (providing no citations to quotations).  The Tenth

Circuit has likewise stated:

> For example, under the contract, the contracting officer for the [United States] Air
> Force had the authority to stop all or part of the work to correct any conditions that
> posed a risk to the public or to government personnel. . . .  However,
>
>> [t]he fact that the contract may have reserved to the United States
>> the right to inspect the work and facilities of the independent
>> contractor, and the right to stop the work, does not in itself override
>> or alter the general rule of non-liability for the torts of the contractor
>> because no duty is created to employees or third parties.  This
>> includes the reservation to inspect for the adherence to contract
>> safety provisions.

McDaniel v. United States, 53 F. App'x at 11-12.  Cf. Tsosie v. United States, 452 F.3d at 1164

(deeming an independent contractor relationship to exist where a contract directed the entity in

question "to provide professional medical services in both inpatient and outpatient settings,

including emergency room physicians on an 'as needed' basis.  Another Contract provision

required that patient care services were to be appropriate and timely in accordance with the

standards of care established by recognized medical care organizations."); Begay v. United States,

188 F. Supp. 3d at 1083 (noting that a provision for control over the quality of work does not

necessarily convert a relationship into an employer-employee relationship).

    The Ohlsen Plaintiffs' argument that the Participating Agreement's language indicating

that "The U.S. Forest Service Shall . . .  Inspect the work and provide feedback on how goals are

being accomplished," Participating Agreement ¶¶ IV(C), at 3, means that the Forest Service could

comment on the means through which and not simply whether the thinning crew was achieving its

goals, see Ohlsen Independent Contractor Response ¶ 4, at 6, Ohlsen Independent Contractor

Response ¶ 10, at 14, Ohlsen Independent Contractor Response ¶ 12, at 14-15, does not persuade

the Court. The Ohlsen Plaintiffs cite the F. Jiron Depo. testimony that the Forest Service ensured that the thinning crew satisfied the Participating Agreement. See Ohlsen Independent Contractor Response ¶ 10, at 14 (citing F. Jiron Depo. 97-9 at 98:13-18). The United States disagrees with this interpretation of the Participating Agreement, see Independent Contractor Reply Plaintiffs' § A4, at 9-10, and the Court agrees with the United States that the Ohlsen Plaintiffs' interpretation is a stretch. The provision in the Participating Agreement gives the United States such feedback authority in the same section that it grants inspection authority. See Participating Agreement ¶¶ IV(B)-(C), at 3. This combination suggests that the two authorities go hand-in-hand, and give the United States authority to verify that Isleta Pueblo adequately achieves the conditions for which the United States, based on the authority in the Participating Agreement's preceding provision, "[d]esignate[s] work areas and provide[s] cutting guidelines for achieving desired condition." Participating Agreement ¶¶ IV(B), at 3. Moreover, F. Jiron's testimony is ambiguous whether the Forest Service supervised the thinning crew's end-result or the steps the thinning crew used to reach that result. See F. Jiron Depo. 97-9 at 98:13-18.

The Forest Service could also, consistent with an independent contractor relationship, provide specific conditions for the thinning work. The Tenth Circuit has rejected the proposition that a detailed contract necessarily shows an employer-employee relationship. See Curry v. United States, 97 F.3d at 415. In Curry v. United States, the Tenth Circuit reasoned:

> In fact, the detailed nature of Roybal's contract with the USFS is consistent with the finding that Roybal was an independent contractor. In Norton v. Murphy, 661 F.2d 882 (10th Cir. 1981), we reviewed a district court's finding that a person who contracted with the United States Post Office Department to deliver mail on certain routes was not an employee under the FTCA. In affirming this decision, we noted that

the very length and detail of the contract . . . suggests, to us, an independent contractor relationship between the parties. To us it is doubtful that a master servant relationship, where the master tells the servant what to do and when to do it, would require a contract of the type here involved.

*Id.* at 884.

97 F.3d at 415. In <u>Curry v. United States</u>, the Tenth Circuit upheld a district court's judgment deeming Roybal – a road grader -- an independent contractor, where the Forest Service and Roybal's agreement provided

[a] description of exactly what the job entailed was set forth in a detailed contract or "purchase order." Roybal was to grade the 99.2-mile stretch of road and also perform maintenance work such as "pulling ditches," cleaning culverts and ditches, and removing brush. The contract provided that "[a]ll work shall be performed in accordance with these specifications and in conformity with the attached drawings," and that the USFS would conduct periodic inspections to verify compliance.

97 F.3d at 413. Here, the Statements of Work and Silviculture Prescriptions, which contain detailed prescriptions for Isleta Pueblo's work, should similarly not transform the relationship into an employer-employee relationship. <u>See</u> Independent Contractor Motion ¶ 31, at 9 (citing First Fox Decl. ¶ 21, at 4; Statement of Work Modification 3 §§ 1, 3-11, at 410-11, 416-430); Ohlsen Independent Contractor Response ¶ 31, at 17; Ohlsen Independent Contractor Response ¶ 3, at 5 (citing Statement of Work Original § 1(A), at 328); Ohlsen Independent Contractor Response ¶ 1, at 4 (citing Participating Agreement at 1 ("The Project has a silviculture prescription, which the crew will follow.")); Independent Contractor Reply Plaintiffs' § A1, at 7; Ohlsen Independent Contractor Response ¶ 1, at 4 (stating that the United States has produced twenty-seven pages of silviculture prescriptions (citing Dixon Depo. 97-6 at 21:13-16; <u>id.</u> at 36:21-37:3; <u>id.</u> at 43:5-11; Silviculture Prescriptions); Ohlsen Independent Contractor Response ¶ 1, at 4 (citing generally

Silviculture Prescriptions; and citing Dixon Depo. 97-6 at 38:4-9; id. at 38:18-39:6).  The detailed

prescriptions reflect that the Forest Service directed Isleta Pueblo's work from afar.  See Curry v.

United States, 97 F.3d at 415.  Thus, whether the Forest Service created the Silviculture

Prescriptions to control the thinning crew's work is irrelevant, because the detailed contract does

not transform the Forest Service and Isleta Pueblo's relationship into an employer-employee

relationship.  Cf. Independent Contractor Reply Plaintiffs' § A1, at 7 (citing Videotaped

Deposition of Ian Fox at 98:14-25 (taken October 23, 2018), filed February 28, 2019 (Doc. 126-

1)("Ian Fox Depo. 126-1"); id. at 99:1-8; F. Jiron Depo. at 74:10-25; id. at 75:1-24; Third Fox

Decl. ¶¶ 29-35, at 6-7[194]).  Likewise, that the Statements of Work describe flags and numbers

---

[194]The Ohlsen Plaintiffs object to the Third Fox Decl. ¶¶ 29, 31, 33-35, at 6-7, on the grounds that the statements in those paragraphs are inadmissible legal opinions and are not based on personal knowledge.  See Fox Objections at 2-3.  The United States responds that Fox describes statements of fact about the silviculture prescription and its relation to the Participating Agreement and, as the person administering the Participating Agreement, he has personal knowledge for his statements of fact.  See Fox Objections Response at 3-4.  The Ohlsen Plaintiffs reply that Fox contradicts the Participating Agreement's meaning and repeat that he offers legal opinions.  See Fox Objections Reply at 2.  The Ohlsen Plaintiffs further argue that the Participating Agreement states that "[t]he Project has a silviculture prescription, which the crew will follow," see Fox Objections at 2-3 (quoting Participating Agreement at 1), and that Fox's Fox' testimony contradicts Johnson's testimony:

> A prescription is a more specific document than what you'll find in Section 1 and Section 5 of this document.  It was something that we would have handed to the crew when they moved into a unit.  It just provided a few more details than what we have in the participating agreement.  This is just describing the general description of work.

Johnson Depo. 97-1 at 37:22-38:3.  See Fox Objections at 2-3.  The Ohlsen Plaintiffs aver that Fox lacks a foundation in personal knowledge, because he did not observe Johnson giving the thinning crew the Silviculture Prescriptions when the thinning crew began work on a new unit.  See Fox Objections Reply at 3.

Although the admissibility of these Third Fox Decl. paragraphs does not affect the Court's conclusion, as the Court concludes in the text that such detailed prescriptions as the Silviculture

designating areas in which the thinning crew will work and directing the thinning crew's work,[195]

and that the Forest Service performed the tasks of marking the units, does not make the relationship

---

Prescriptions are consistent with <u>Curry v. United States</u>, the Court notes that it disagrees with the Plaintiffs that these concerns make inadmissible these Third Fox Decl. paragraphs. First, the Court concludes that Fox does not interpret the Participating Agreement but describes a term -- silviculture prescription -- in the Participating Agreement, and the Forest Service's use of the term. <u>See</u> Third Fox Decl. ¶¶ 29, 31, 33-35, at 6-7. The Court reads the Third Fox Decl. ¶ 35, at 5 -- about the Participating Agreement and the Statements of Work being the only documents that directed Isleta Pueblo under the Participating Agreement -- to expand on Fox'sFox' statements about the Silviculture Prescriptions' relation to the Participating Agreement. <u>See</u> Third Fox Decl. ¶ 35, at 5. The Court has previously concluded that witnesses may provide their understandings of particular terms in a contract. <u>See</u> Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); <u>United States v. Goodman</u>, 633 F.3d 963, 968 (10th Cir. 2011)(noting that rule 704(a) of the Federal Rules of Evidence do not bar lay witnesses from touching on ultimate issues); <u>Abraham v. WPX Prod. Prods., LLC</u>, 184 F. Supp. 3d 1150, 1205-06 (D.N.M. 2016)(Browning, J.)(permitting an expert to testify to information that helps a factfinder understand the contract's terms). Second, Fox'sFox' position as the Forest Service Natural Resources Staff Officer provides him a foundation to discuss silviculture prescriptions' roles within the Forest Service. That Fox'sFox' testimony conflicts with Johnson's testimony does not mean that Fox' testimony lacks a foundation in personal knowledge, but shows that a dispute exists about the Silviculture Prescriptions' role. Moreover, nothing in Johnson's testimony means that Third Fox Decl. ¶¶ 29, 31, 33, 34, and 35, at 6-7, inaccurately describe silviculture prescriptions. The documents could be internal, but also public, documents that Johnson would have provided the thinning crew to give further directions for the thinning work. <u>See</u> Fox Objections Response at 4.

[195]The Ohlsen Plaintiffs argue that the Statements of Work's discussion of the map and boundaries affirmatively delegates to the Forest Service the tasks of demarcating the boundaries, <u>see</u> Ohlsen Independent Contractor Response ¶ 11, at 14; Independent Contractor Reply ¶ 17, at 15-16 (citing Statement of Work Original §1(D), at 349-50; Johnson Depo. 97-1 at 35:24-36:3; Dixon Depo. 97-6 at 23:18-24:7; <u>id.</u> at 99:16-25; <u>id.</u> at 108:25-109:10; F. Jiron Depo. 97-9 at 69:1-3), but the United States avers that these provisions do not delineate work responsibilities to the Forest Service, but describe work that the Forest Service has done, <u>see</u> Independent Contractor Reply Def.'s UMNF No. 11, at 21-22 (citing Participating Agreement § IV(A)-(D), at 2-3; Statement of Work Modification 3 § 1 (F)-(G), at 411); Independent Contractor Reply Def.'s UMF No. 17, at 23. The Court agrees with the United States' analysis. The Statements of Work describe in the passive voice that, for instance, the treatment units "are delineated on the ground" with flagging and "were established by Forest Service personnel." Statement of Work Original §1(D), at 349; Statement of Work Modification 3 § 1(F), at 411. The Statements of Work do not contain imperative language instructing the Forest Service's actions.

an employer-employee relationship. See Ohlsen Independent Contractor Response ¶ 2, at 4-5 (citing Statement of Work § 1(D)-(E), at 349-50); Statement of Work Modification 3 §§ 1(F)(G), at 411; Independent Contractor Reply Plaintiffs' § A2, at 8; Ohlsen Motion ¶ 13, at 6 (citing Second Fox Decl. ¶ 33, at 8); Sais Motion ¶ 15, at 6 (citing Second Fox Decl. ¶ 33, at 8); Ohlsen Response ¶ 13, at 19; Ohlsen Independent Contractor Response ¶ 2, at 5 (citing Unit Map, filed December 19, 2018 (Doc. 97-8)); Independent Contractor Reply Plaintiffs' § A2, at 8; Ohlsen Independent Contractor Response (F. Jiron Depo. 97-9 at 69:1-13); Independent Contractor Reply Plaintiffs' § A3; Independent Contractor Motion ¶ 18, at 6 (citing First Fox Decl. ¶ 21, at 4; F. Jiron Depo. 76-2 at 108:24-109:17); Ohlsen Independent Contractor Response ¶ 18, at 16; Ohlsen Response ¶ 11, at 4 (citing Lueras Depo. 98-6 at 30:19-31:7; Kohrman Depo. 98-9 at 101:2-104:23; Silviculture Prescriptions); Ohlsen Reply ¶ 10 and 11, at 12.[196]

---

[196]The Court notes that, as it concludes that the Statements of Work could, consistent with an independent contractor relationship, provide detailed instructions for the thinning crew's work, the parties' disagreements regarding the Statements of Work's specific instructions, and the Forest Service and Isleta Pueblo's process for developing the Statements of Work's modifications are irrelevant. See Ohlsen Independent Contractor Response ¶ 1, at 7-8 (citing Dixon Depo. 97-6 at 55:22-58:9; id. at 183:8-17); Independent Contractor Reply Plaintiffs' § B1, at 11-12 (citing Fox Depo. 126-1 at 58:10-25; id. at 59:1-16; id. at 73:8-74:20; Dixon Depo. 97-6 at 57:2-18; id. at 73:8-21); Ohlsen Independent Contractor Response ¶ 2, at 8 (citing generally Statement of Work Modification 2); Independent Contractor Reply (citing Statement of Work Modification 2 at § 1(G), 8 at 381-82, 397)(providing that Isleta Pueblo will designate someone to act for the daily operation of the agreement and submit a plan of operations); Ohlsen Independent Contractor Response ¶ 3-4, at 8 (citing Statement of Work Modification 3 § 5(C), at 419; Dixon Depo. 97-6 at 93:5-18; Johnson Depo. 97-1 at 52:22-53:1); Independent Contractor Reply Plaintiffs § B3-Plaintiffs' § B4, at 12-13 (Fox. Depo. 126-1 at 73:8-74:20); Ohlsen Independent Contractor Response ¶ 2, at 5 (citing Unit Map, filed December 19, 2018 (Doc. 97-8); Johnson Depo. 97-1 at 32:16-18); Independent Contractor Reply Plaintiffs' § A2, at 8 (citing Statement of Work Modification 3 § 1.D, at 1).

The Court also agrees with the United States that, contrary to the Ohlsen Plaintiffs' arguments, the Statement of Work Original's provisions regarding the timing of the thinning crew's work does not amount to setting the thinning crew's daily schedule. See Ohlsen Independent Contractor Response ¶ 9, at 7; Independent Contractor Reply Plaintiffs' § A9, at 11. Although the Statement of Work Original contains a timetable scheduling what work the Forest Service expected the thinning crew to complete during particular months, see Ohlsen Independent Contractor Response ¶ 13, at 15 (citing Johnson Depo 97-1 at 36:6-14; Statement of Work Original § 12, at 18-19[197]); Ohlsen Independent Contractor Response ¶ 9, at 7 (citing Statement of Work Original § 12, at 18-19); Independent Contractor Reply Plaintiffs' § A9, at 11; Ohlsen Independent Contractor Response ¶ 9, at (explaining the Forest Service "scheduled Unit 4 for hand thinning to be done August through November 4" (citing Statement of Work Original § 12, at 369-70)); Independent Contractor Reply Plaintiffs' § A9, at 11; see also Statement of Work Modification 2 §12, at 405,[198] in any independent contractor relationship, a principal has a timeframe in which he,

---

[197]The Court interprets this provision to have applied on June 14, 2016, although Statement of Work Modification 3 does not contain the provision. Kohrman testified that the Statement of Work modifications supplement the Statement of Work Original and change the scope of Isleta Pueblo's work. See Kohrman Depo. 97-4 at 138:10-14. The Court does not understand the Statement of Work Original's timetable to change the scope of work, and no provision in Statement of Work Modification 3 contradicts the timetable. Accordingly, the Court deems that the provision continued to apply after Statement of Work Modification 3 took effect. If the provision does not apply and/or the Forest Service established a different timeframe in which it expected Isleta Pueblo to complete its work, the Court's opinion that this timetable did not equate to setting the thinning crew's daily schedule would not change.

[198]Statement of Work Modification 2 §12, at 405 contains a similar provision. The Court has not located a similar provision in the evidence provided on Statement of Work Modification 1 or Statement of Work Modification 3. The Court assumes, however, that, as it could not locate a provision altering the timetable, the timetable remains in effect. See Kohrman Depo. 97-4 at 138:10-14 (describing that a modification supplements and may not replace a previous Statement of Work).

she, or it desires the contractor to complete the work. A homeowner may hire, for instance, a professional painter and expect the painter to complete the work within several days' time. Such a relationship is not necessarily an employer-employee relationship because the parties established a general timetable for the task.

Last, the parties disagree whether the Participating Agreement identifies Isleta Pueblo managers or supervisors, given that the Participating Agreement names F. Jiron and Abeita as "contacts" but also assigns to Isleta Pueblo responsibility for supervising the thinning crew's work. Ohlsen Independent Contractor Response ¶ 5, at 6 (citing Participating Agreement ¶ V(A), at 3-4); Independent Contractor Reply Plaintiffs' § A5, at 10 (citing Participating Agreement ¶ V(A), (F), at 3, 5). The Court deems this dispute irrelevant. The Court recognizes that the Participating Agreement does not use the words "manager" or "supervisor" in describing Isleta Pueblo individual's roles in the thinning project, but the Court views the balance of the Participating Agreement to designate daily supervisory authority to Isleta Pueblo. Accordingly, the Court concludes that the first Lilly factor counsels an independent contractor relationship.

C.  **THE THINNING CREW'S RELATIONSHIP TO THE FOREST SERVICE ALSO EVIDENCES AN INDEPENDENT CONTRACTOR RELATIONSHIP.**

The second factor in the Lilly test -- "whether the United States controls only the end-result or may also control the manner and method of reaching the result" -- also counsels toward finding an independent contractor relationship about which the Plaintiffs have not established a genuine issue of material fact. Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859). A United States agency can exercise detailed direction over a contractor's end-results before the supervision amounts to an employer-employee relationship; as long as the United States does not

direct the contractor's daily work, an independent contractor relationship exists. See Curry v.

United States, 97 F.3d at 413-15. In Curry v. United States, the Tenth Circuit affirmed a judgment

for the United States in a bench trial involving Roybal's employment operating a road grader[199]

pursuant to a contract with the Forest Service. See Curry v. United States, 97 F.3d at 413. While

on the road grader, Roybal approached a motorcycle, causing the motorcycle to tip over, and the

plaintiff to suffer injuries from the fall and from the road grader. See Curry v. United States, 97

F.3d at 413. Roybal's Forest Service supervisor -- Joe Cordova -- had responsibilities including

> making payments to Roybal, issuing orders to suspend or resume work, and maintaining a daily diary. In the diary, Cordova recorded the work done, the payments made, and any problems encountered. For example, Cordova described in the diary several instances when he told Roybal that a certain portion of the grading work would not be approved until the area was cleaned properly.

97 F.3d at 413. A Forest Service inspector -- Pedro Aragon -- frequently visited Robyal's work

site, and "gave specific orders such as to remove certain debris or to go back and finish cleaning

certain areas, making sure that Roybal complied with the contract's specifications." Curry v.

United States, 97 F.3d at 413. The Tenth Circuit described:

> Although USFS officials such as Cordova and Aragon had some general supervisory authority to make sure that Roybal's performance conformed with the contract specifications, they did not otherwise tell Roybal how or when to do his work. They did not tell Roybal whom to hire or how to operate his equipment. As far as safety and insurance, Roybal understood that he was responsible for public safety, although he did not have liability insurance. Roybal thought of Cordova as his "boss," since Cordova had the power to terminate the contract, but Roybal did not consider himself to be a [Forest Service] employee.

---

[199]"A grader, also commonly referred to as a road grader or a motor grader, is a construction machine with a long blade used to create a flat surface during the grading process." Grader, Wikipedia, https://en.wikipedia.org/wiki/Grader (last visited May 27, 2019).

97 F.3d at 413.  The Tenth Circuit affirmed the district court's conclusion, noting: "The USFS monitored his activities to the extent necessary to ensure that the desired results were achieved, but it otherwise gave Roybal discretion in choosing how to perform the contract."  97 F.3d at 415. The Tenth Circuit emphasized: "The [Forest Service] exercised considerable control over Roybal to the extent that the contract was very detailed and specific, but it did not supervise Roybal's day-to-day operations in a way that made him an employee."  97 F.3d at 415.  At the other end of the independent contractor case spectrum, in Patterson & Wilder Construction Co. v. United States, 226 F.3d 1269 (11th Cir. 2000), the Eleventh Circuit denied summary judgment and deemed a contractor a federal employee where the United States directed each step in the day of the contractor's employees:

> The Government (1) directed the pilots to fly in sequence to a specified location in St. Petersburg, then to and from a specified location in Ft. Lauderdale, then to a specified location in Panama, and only at that point to Colombia; (2) selected the exact location in Colombia where the deal was to occur, provided the pilots with the coordinates of that location, and instructed them to fly to that location; (3) made the arrangements for a particular drug dealer (Armando) to be at that location at a prescribed time; (4) determined the times at which the pilots were to leave from Florida for Panama and then from Panama to Colombia; (5) provided a radio frequency for the pilots to contact Armando, and instructed the pilots to use that frequency, and installed a transponder on the plane so its movements could be tracked and so that it could be identified as part of a U.S. Government operation; (6) instructed the pilots to attend meetings with its agents; (7) instructed the pilots to modify the aircraft's interior while the aircraft was on the ground at the American base in Panama; (8) participated in preparing the flight plan for the Panama-Colombia leg; (9) at least nominally supervised the personal activities of the pilots as they spent the night at crew lodgings in Panama before flying to Colombia; and (10) clearly instructed the pilots as to what they were expected to do when they arrived in Colombia (meet Armando, load the contraband and return to Panama).

> The record may fairly be read to show the Government decided, and instructed the pilots on, virtually every important aspect of the aircraft's intended use.  This was clearly not an operation where the pilots were given an objective and left to achieve that objective however they saw fit -- the Government actively supervised and dictated many if not most of the significant day-to-day activities of

the mission up to the point when events went awry on the ground. Moreover, the Government not only dictated the pilots' activities, but arranged what would occur on the ground in Colombia, thereby controlling both ends of the mission. Presented with this kind of evidence of the Government's involvement in the major as well as minor details of how the mission went down, a reasonable factfinder could well conclude that the Government exercised enough control over the pilots' day-to-day activities to make the pilots employees.

Patterson & Wilder Constr. Co. v. United States, 226 F.3d at 1274-78. See Duplan v. Harper, 188 F.3d at 1201-02 (reversing a district court's conclusion that a doctor was a federal employee where the government required the doctor to meet minimum qualifications, reviewed his performance, and required him to follow the clinic's regulations and dress code); Bird v. United States, 949 F.2d 1079, 1086 (10th Cir. 1991)(classifying as an employee a nurse who was "under [the employee physicians'] actual control to the extent they chose to exercise it"; "was required to work with patients designated by others"; "maintained no separate office"; "could see patients in no other place nor under any other circumstance than as directed by government employees"; and "was under the control and supervision of the government surgeon at the hospital to the same extent that . . . a regular employee of the government, was").

The facts of this case resemble the situation in Curry v. United States. Isleta Pueblo furnished the individuals who oversaw the thinning project's daily operations. Cf. Curry v. United States, 97 F.3d at 413 ("[Roybal] had several employees, and he was fully in charge of hiring and firing them, paying their salaries, and paying the necessary taxes."). F. Jiron attended the thinning project site "at least once a week" and "was on site seventy-five percent (75%) of the time." Independent Contractor Motion ¶ 42, at 10 (citing F. Jiron Depo. 76-2 at 52:12-14; id. at 96:20-25). See Ohlsen Independent Contractor Response ¶ 2, at 9 (citing Johnson Depo. 97-1 at 40:16-20; id. at 72:20-73:1). He either personally instructed the thinning crew or he shared instructions

with Zuni who visited F. Jiron daily, and acted as the thinning crew's daily supervisor.[200]  See Independent Contractor Motion ¶ 45, at 11 (citing F. Jiron Depo. 76-2 at 61:12-23; id. at 94:23-96:25); Ohlsen Independent Contractor Response ¶ 45, at 20 (citing F. Jiron Depo. 97-9 at 61:12-23); Ohlsen Independent Contractor Response ¶ 43, at 20 (citing F. Jiron Depo. 97-9 at 96:4); Independent Contractor Motion ¶ 51, at 12 (J. Jiron Depo. 76-3 at 95:3-19); Ohlsen Independent Contractor Response ¶ 51, at 21.  J. Jiron, E. Jiron, and Jaramillo identify Dixon, F. Jiron, and Zuni as their supervisors.  See Independent Contractor Motion ¶ 49, at 11 (citing J. Jiron Depo. 76-3 at 94:21-95:12; E. Jiron Depo. 76-4 at 83:10-22; Jaramillo Depo. 76-5 at 91:3-19).  Isleta Pueblo also determined the thinning crew's daily work schedule.  See Ohlsen Motion ¶ 28, at 8-9 (citing Second Fox Decl. ¶ 55, at 12); Sais Motion ¶ 32, at 9 (citing Second Fox Decl. ¶ 55, at 12).  See also Independent Contractor Motion ¶ 60, at 13 (citing E. Jiron Depo. 76-4 at 90:16-25; Jaramillo Depo. 76-5 at 92:5-12); Ohlsen Independent Contractor Response ¶ 60, at 21; Independent Contractor Motion ¶ 61, at 13 (citing F. Jiron 76-2 at 46:4-15; J. Jiron 76-3 at 51:11-52:10; E. Jiron Depo. 76-4 at 90:15-25); Ohlsen Independent Contractor Response ¶ 61, at 21.

Johnson and Lueras filled a similar role in relation to the thinning crew that the Forest Service filled in relation to Roybal.[201]  Johnson, like Cordova in Curry v. United States, recorded

---

[200]The Ohlsen Plaintiffs state that neither F. Jiron nor Zuni were daily with the thinning crew, but that the crews had a "lead."  Ohlsen Independent Contractor Response ¶ 9, at 13 (citing Johnson Depo. 60-5 at 40:16-22).  The evidence that the Plaintiffs cite does not, however, support their proposition.  Johnson states that the crew foreman -- F. Jiron -- was at the unit when the thinning crew started a new type of work on a unit and does not mention the frequency with which Zuni visited the site.  See Johnson Depo. 60-5 at 40:16-22.

[201]The parties dispute who was responsible for the end results on the treatment units; the United States argues that, within the thinning crew, Zuni was responsible for the hand thinning units and that the two masticator operators were responsible for the mastication units, see

the thinning crew's progress in a "Participating Agreement Site Visit Report" -- or "inspection report" or "contract daily diary report."[202]  Independent Contractor Motion ¶ 36, at 9-10 (citing Johnson Depo. 60-5 at 56:6-18; F. Jiron Depo. 76-2 at 18:25-24:18; id. at 96:3-11); Ohlsen Independent Contractor Response ¶ 36, at 19 (citing Johnson Depo. 97-1 at 56:6-15; id. at 67:14-21); Ohlsen Independent Contractor Response ¶ 3, at 9-10; Independent Contractor Reply Plaintiffs' § C3, at 14-15.[203]  Johnson visited the thinning site several times, although he did so

---

Independent Contractor Motion ¶ 46, at 11 (citing F. Jiron Depo. 76-2 at 98:4-9), while the Plaintiffs argue that the Forest Service ensured that the thinning crew met the Forest Service's specifications, see Ohlsen Independent Contractor Response ¶ 46, at 20 (citing F. Jiron 97-9 at 98:13-18).  The Court deems this dispute immaterial, because, even if the Forest Service ensured that the thinning crew met the Participating Agreement's and Statements of Work's specifications, such a fact would not transform Isleta Pueblo into a Forest Service employee, as, in Curry v. United States, the Forest Service supervisor and inspector performed such a task, but the Tenth Circuit concluded that Roybal was an independent contractor.  See Curry v. United States, 97 F.3d at 413.

[202]The Ohlsen Plaintiffs and the United States disagree whether every time the thinning crew finished a unit, Johnson inspected the unit and approved the work; according to the United States, the Plaintiffs cite evidence of only one such inspection occurring.  See Ohlsen Independent Contractor Response ¶ 8, at 11 (citing Contract Daily Diary at 1 (dated June 3, 2014), filed December 19, 2018 (Doc. 97-21)("Contract Daily Diary Doc. 97-21"); Johnson Depo. 97-1 at 75:1-7); Independent Contractor Reply Plaintiffs' § C8, at 16 (citing same).  The Court agrees with the United States that the Ohlsen Plaintiffs' evidence shows that Johnson inspected a unit after completion on one occasion only.  See Contract Daily Diary Doc. 97-21 at 1; Johnson Depo. 97-1 at 75:1-7.  Even had Johnson inspected and approved the thinning crew's work every time that it finished a unit, that fact would not change the Court's conclusion about Isleta Pueblo's independent contractor status.  Curry v. United States shows that, in an independent contractor relationship, a Forest Service supervisor can inspect, direct improvements on, and approve a contractor's work several times without creating an employer-employee relationship.  See Curry v. United States, 97 F.3d at 414 ("For example, Cordova described in the diary several instances when he told Roybal that a certain portion of the grading work would not be approved until the area was cleaned properly.").

[203]The Court deems irrelevant the parties' dispute over the wording whether the Project Administrators "documented" the thinning crew's work.  The parties dispute the United States' assertion that the Participating Agreement Site Visit Report, Inspection Report, and Contract Daily Dairy Report constitute documentation of the thinning crew's work.  See Independent Contractor

irregularly,[204] see Independent Contractor Motion ¶ 52, at 12 (citing J. Jiron Depo. 76-3 at 24:3-25:6; id. at 47:3-48:22; id. at 95:22-97:24); Ohlsen Independent Contractor Response ¶ 52, at 21; Independent Contractor Motion ¶ 57, at 12 (citing E. Jiron Depo. 76-4 at 46:14-47:4; id. at 83:24-84:21), and Lueras visited around once a week, see Ohlsen Independent Contractor Response ¶ 13, at 12 (citing Delegation at 1; Lueras Depo. 97-29 at 33:8-23; id. at 52:20-23); Independent Contractor Reply Plaintiffs' § C13, at 18-19; Ohlsen Response ¶ 12, at 4-5; Ohlsen Reply ¶ 12, at 12-13. See also Curry v. United States, 97 F.3d at 413 (stating that Aragon visited the work site "many" times). Likewise, like Aragon in Curry v. United States, Johnson and Lueras identified and notified the thinning crew of specific problems to resolve to satisfy the Forest Service's

---

Motion ¶ 36, at 9-10 (citing Johnson Depo. 60-5 at 56:6-18; id. at 65:16-67:25; F. Jiron Depo. 76-2 at 18:25-22:25); Ohlsen Independent Contractor Response ¶ 36, at 19 (citing Statement of Work Original § 2, at 351; Kohrman Depo. 97-4 at 178:3-9; Johnson Depo. 97-1 at 56:6-7; id. at 56:8-14; id. at 67:14-21). The United States argues that Johnson testified that he recorded the project's progress, see Independent Contractor Reply Def.'s UMF No. 36, at 27-28 (citing Johnson Depo. 60-5 at 66:3-9; id. at 70:25; id. at 71:1-4), but that Johnson did not need to make a written recording on every visit, see Independent Contractor Reply Def.'s UMF No. 36, at 27-28. Curry v. United States demonstrates that contract daily diary reports like those that Johnson recorded are consistent with an independent contractor relationship, and whether Johnson's actions should be classified as "documentation" does not create a genuine dispute of material fact whether Johnson's actions in making written recordings creates an employer-employee or independent contractor relationship. See Curry v. United States, 97 F.3d at 413 (describing Cordova's daily diaries of Roybal's work).

[204]The Ohlsen Plaintiffs and the United States dispute how often Johnson visited the thinning project site, with the Plaintiffs arguing that Johnson visited the site two times a week, see Ohlsen Independent Contractor Response ¶ 11, at 11 (citing J. Jiron Depo. 97-1 at 24:3-25:6; F. Jiron Depo. 97-9 at 49:10-50:10), and the United States arguing that the Ohlsen Plaintiffs' misstate the evidence, see Independent Contractor Reply Plaintiffs' § C10, at 17 (citing E. Jiron Depo. 97-15 at 46:14-20). The Court agrees with the United States that the Ohlsen Plaintiffs' evidence shows that F. Jiron received instructions maybe twice a week from Johnson, but not that Johnson visited biweekly the thinning project site. See F. Jiron Depo. at 49:10-50:10. See also Independent Contractor Motion ¶ 44, at 11; Ohlsen Independent Contractor Response ¶ 44, at 20; Independent Contractor Reply Def.'s UMF NO. 44, at 29.

conditions. See Curry v. United States, 97 F.3d at 413-15; Ohlsen Independent Contractor Response ¶ 12, at 12 (citing F. Jiron Depo. 97-9 at 20:8-24); Ohlsen Independent Contractor Response ¶ 4, at 10 (citing Site Visit Report at 1; and citing Johnson Depo. 97-1 at 70:4-8); Independent Contractor Reply Plaintiffs' § C4, at 15; Ohlsen Independent Contractor Response ¶ 5, at 8 (citing Contractor Daily Diary 97-18 at 1; Johnson Depo. 97-1 at 71:7-16); Independent Contractor Reply Plaintiffs' § C5, at 15; Independent Contractor Motion ¶ 6, at 10 (citing Contract Daily Diary 97-19 at 1; Johnson Depo. 60-5 at 71:19-72:4); Independent Contractor Reply Plaintiffs' § C6, at 15-16; Ohlsen Independent Contractor Response ¶ 7, at 10 (citing Johnson Depo. 97-1 at 73:4-74:23; Contract Daily Diary 97-20 at 1); Independent Contractor Reply Plaintiffs' § C7, at 16; Ohlsen Independent Contractor Response ¶ 13, at 12 (citing Lueras Depo. 97-29 at 36:3-18); Ohlsen Independent Contractor Response ¶ 13, at 12 (citing Delegation at 1; Lueras Depo. 97-29 at 33:8-23; id. at 52:20-23); Independent Contractor Reply Plaintiffs' § C13, at 18-19; Ohlsen Response ¶ 14, at 5 (citing Lueras Depo. 98-6 at 33:2-17; id. at 35:3-20); Ohlsen Reply ¶ 13-16, at 13; Ohlsen Independent Contractor Response ¶ 13, at 12 (citing Lueras Depo. 97-29 at 35:9-36:2); Independent Contractor Reply Plaintiffs' § C13, at 18-19; Ohlsen Response ¶ 15, at 5 (citing Lueras Depo. 98-6 at 39:2-16); Ohlsen Reply ¶¶ 13-16, at 13; Ohlsen Response ¶ 16, at 5 (citing Johnson Depo. 98-3 at 65:6-66:9; id. at 123:11-124:23; id. at 128:20-24); Ohlsen Reply ¶ 13-16, at 13; Ohlsen Independent Contractor Response ¶ 3, at 6 (citing Johnson Depo. 97-1 at 37:17-38:9); Independent Contractor Reply Plaintiffs' § A3, at 9.

That Johnson sometimes communicated with the thinning crew members rather than their leads and that the crew members listened to him does not put the Forest Service in an employer relationship with Isleta Pueblo. See Ohlsen Independent Contractor Response ¶ 12, at 11-12

(citing F. Jiron Depo. 97-9 at 20:8-24; id. at 50:1-10; id. at 23:17-20); Independent Contractor Reply Plaintiffs' § C12, at 18. Johnson largely communicated through F. Jiron and Zuni, see Independent Contractor Motion ¶ 54, at 12 (citing J. Jiron Depo. 76-3 at 47:1-15; id. at 95:1-97:24); Ohlsen Independent Contractor Response ¶ 54, at 21, and turned to the thinning crew members only if no higher authority were available, see Ohlsen Independent Contractor Response ¶ 12, at 11-12 (citing F. Jiron Depo. 97-9 at 20:8-24; id. at 50:1-10; id. at 23:17-20); Independent Contractor Reply Plaintiffs' § C12, at 18. These communications suggest that Johnson did not daily direct the thinning crew members as the Isleta Pueblo supervisors did. Moreover, Roybal viewed Cordova as his boss, but the Tenth Circuit upheld that an independent contractor relationship existed. See Curry v. United States, 97 F.3d at 413.

The parties raise several points of contention about Johnson's and Lueras' relationships with the thinning crew. The parties argue, for instance, whether Johnson monitored the work progress and quality, and had a regular route that included reviewing the thinning site, or engaged in minor interactions to discuss specifications and progress with the thinning crew. See, e.g., Independent Contractor Motion ¶ 38, at 10 (citing Johnson Depo. 60-5 at 54:4-55:19; Johnson Depo. 76-1 at 130:12-25; F. Jiron Depo. 76-2 at 20:11-18; id. at 93:20-94:1; J. Jiron Depo. 76-3 at 24:3-25:6; id. at 27:6-28:10; id. at 47:1-48:22; id. at 96:1-99:11; E. Jiron Depo. 76-4 at 46:3-47:4; Jaramillo Depo. 76-5 at 15:8-22); Independent Contractor Motion ¶ 39, at 10 (Johnson Depo. 60-5 at 39:17-40:22; id. at 52:11-55:19; id. at 67:9-68:19; id. at 71:1-72:13; Johnson Depo. 76-1 at 130:11-131:7; F. Jiron Depo. 76-2 at 22:1-24:18, id. at 28:17-29:7; J. Jiron Depo. 76-3 at 46:2-48:22; E. Jiron Depo. 76-4 at 46:3-47:4, id. at 83:10-84:21); Ohlsen Independent Contractor Response ¶ 38, at 10; id. ¶ 39, at 19-20; id. ¶ 57, at 21 (citing E. Jiron 76-4 at 46:21-47:4),

Independent Contractor Reply Def.'s UMF No. 38-Def.'s UMF No. 39, at 28-29; Independent

Contractor Motion ¶ 57, at 12 (citing E. Jiron Depo. 76-4 at 46:3-47:4, id. at 83:10-84:21). The

parties also dispute whether to emphasize that Johnson spoke to J. Jiron only a "little bit" or that

Johnson inspected J. Jiron's work. See Independent Contractor Motion ¶ 55, at 12 (citing J. Jiron

Depo. 97-3 at 48:1-22); Ohlsen Independent Contractor Response ¶ 55, at 21 (citing J. Jiron Depo.

97-3 at 24:3-25:6; id. at 48:6-22). Likewise, the parties disagree whether Johnson's telling the

thinning crew which trees to hand thin or the size trees to thin, and Lueras' or Johnson's clarifying

when the unit was close to finished, see Ohlsen Independent Contractor Response ¶ 11, at 11

(citing J. Jiron Depo. 97-3 at 98:3-11; id. at 98:12-25), means that the Forest Service supervised

the thinning crew's day-to-day operations, see Independent Contractor Reply Plaintiffs' § C11, at

17-18. According to the Plaintiffs, F. Jiron testified that Johnson supervised the thinning project

for the Forest Service. See Ohlsen Independent Contractor Response ¶ 11, at 11 (citing F. Jiron

Depo. 97-9 at 34:23-25).

The Court does not think that these disputes are issues of material facts in this case.[205] The

terminology used to describe Johnson's actions in reviewing the thinning site does not change the

facts, and the Ohlsen Plaintiffs' evidence does not portray a different story than that the Court tells

---

[205]As an evidentiary issue arises in the context of the parties' disputes, the Court will
address briefly that evidentiary dispute. In its Independent Contractor Reply Def.'s UMF No. 38,
the United States cites the First Fox Decl. ¶¶ 22-23, at 4-5, as evidence that the Project
Administrators had oversight responsibility for the thinning project and did not have regular
schedules for visiting the project. See Independent Contractor Reply Def.'s UMF No. 38 (citing
First Fox Decl. ¶¶ 22-24, at 4-5). The Ohlsen Plaintiffs argue that the First Fox Decl. ¶¶ 22-23, at
4-5, lack foundation in personal knowledge and contain inadmissible lay opinions. See First
Objections ¶ 3, at 2. The United States raises the same arguments in response as it raises in
response to the First Fox Decl. ¶ 22, at 4-5. See supra note 35. For the Court's conclusions on
this issue, see supra notes 35 and 118.

in the Factual Background. "Under this 'independent contractor' exception, the United States cannot be liable for a contractor's acts *unless* it exercises 'federal authority to control and supervise the detailed physical performance and day to day operations of the contractor.'" Cabalce v. VSE Corp., 914 F. Supp. 2d 1145, 1160-61 (D. Haw. 2012)(Seabright, J.)(emphasis in Cabalce v. VSE Corp.)(quoting Autery v. United States, 424 F.3d at 955). The Ohlsen Plaintiffs here do not show such close supervision as, for instance, that in Patterson & Wilder Const. Co. v. United States. The evidence is not such that it shows Johnson managing the day-to-day thinning operations -- when they begins, when they end, how the thinning crew masticates. The evidence shows a situation very like that in Curry v. United States, wherein supervisors came to the thinning site and directed the thinning crew how to achieve the project's goals.[206]

---

[206]The parties have several disagreements about the exact directions the Forest Service gave the thinning crew. The Ohlsen Plaintiffs and the United States disagree whether, on one occasion, Johnson directed a crew lead not to masticate an area that was too rocky or had too steep a slope to masticate. See Ohlsen Independent Contractor Response ¶ 9, at 11 (citing Contract Daily Diary (dated November 13), filed December 19, 2018 (Doc. 97-22); Johnson Depo. 97-1 at 78:4-24; id. at 80:19-92:4; E. Jiron Depo. 76-4 at 77:3-78:14); Independent Contractor Reply Plaintiffs' § C9, at 16-17 (citing Johnson Depo. 97-1 at 81:1-82:4). The Court agrees with the United States that Johnson testified that he left whether to masticate to the thinning crew. See Johnson Depo. 97-1 at 81:1-82:4. The parties also dispute whether, at one point, Lueras told F. Jiron that the slash was too deep, although Johnson approved of the slash height, see Ohlsen Independent Contractor Response ¶ 13, at 12 (citing F. Jiron Depo. 97-9 at 26:20-27:18), because, according to the United States, Lueras testified that he never spoke directly to the thinning crew, see Independent Contractor Reply Plaintiffs' § C13, at 18-19 (citing Lueras Depo. 97-29 at 35:19-23). The Ohlsen Plaintiffs and the United States also dispute whether the evidence shows that Johnson defined the masticator's scope of work. See Ohlsen Independent Contractor Response ¶ 10, at 11 (citing E. Jiron Depo. 97-15 at 46:14-47:4; id. at 79:8-14); Independent Contractor Reply Plaintiffs' § C10, at 17 (citing E. Jiron Depo. 97-15 at 46:14-20). The parties argue whether "a lot of conversations" occurred between the Forest Service and Isleta Pueblo, because the Plaintiffs rely on Dixon's testimony that "a lot of conversations" occurred, see Ohlsen Independent Contractor Response ¶ 14, at 12 (citing Dixon Depo. 97-6 at 160:10-161:5; id. at 161:16-17), but the United States avers that Dixon could not state how regularly such conversations occurred, see Independent Contractor Reply Plaintiffs § C15, at 19 (citing Dixon Depo. 97-6 at 161:3-5). The

Ohlsen Plaintiffs and the United States also disagree whether Johnson could, or typically did call or email, Isleta Pueblo personnel with directions for the thinning work. See Ohlsen Independent Contractor Response ¶ 3, at 9-10 (citing Dixon Depo. 97-6 at 28:17-31:3); Independent Contractor Reply Plaintiffs' § C3 (citing Dixon Depo. 97-6 at 30:5-31:3).

The Court concludes that these disputes do not create issues of material fact. The instructions that Johnson and Lueras gave Isleta Pueblo resemble the instructions given in Curry v. United States, and constitute specific directions for achieving the end-result rather than specific, day-to-day instructions. Such conversation could occur frequently without altering the relationship, and none of the parties' disputes regarding the exact instructions given change the Court's conclusion.

The Ohlsen Plaintiffs also argue that the USFS Project Administrators had the responsibility of ensuring that the thinning crew had the firefighting tools for their job. See Ohlsen Independent Contractor Response ¶ 11, at 14 (citing Kohrman Depo. 97-4 at 205:22-24). The Court does not see that this assertion raises an issue of material fact. Kohrman's testimony aligns with the Forest Service authority to inspect the thinning crew's work for compliance with the Participating Agreement, Statement of Work Original, and Statement of Work Modification 3. The statement, particularly in light of the other evidence, does not establish control over the thinning crew's daily activities.

In the briefings on the Ohlsen Motion, the Plaintiffs and the United States also dispute Martinez' role in overseeing the thinning project. The Ohlsen Plaintiffs aver that the Forest Service visited the thinning project cite weekly or more frequently, citing the Martinez Depo. 98-4 at 40:8-41:22. See Ohlsen Response ¶ 12, at 4-5. The United States contends that, while Martinez testified that he visited the area weekly to check on site, see Ohlsen Reply ¶ 12, at 12 (citing Martinez Depo. 98-4 at 40:8-41:22; Second Martinez Decl. ¶¶ 1, 4, 5, at 1-2, he "was not responsible for the" Participating Agreement, Ohlsen Reply ¶ 12, at 12 (citing Second Martinez Decl. ¶ 4, at 1; Martinez Depo. 98-4 at 22:3-23:25; Deposition Martinez at 21:21-23 (taken November 27, 2018), filed February 28, 2019 (Doc. 127-5)("Martinez Depo. 127-5")). The United States explains that Martinez administered the "fire and the fuels program, which includes fire suppression and prescribed burns," Ohlsen Reply ¶ 12, at 12 (citing Martinez Depo. 127-5 at 16:10-17:13), and monitoring conditions for wildfires, see Ohlsen Reply (Second Martinez Decl. ¶ 5, at 2; Martinez Depo. 127-5 at 12:11-18; id. at 14:2-19; id. at 15:2-15; id. at 16:10-17:13; id. at 151:4-16; id. at 153:6-19), but did not have responsibility for reduction of fuels, see Ohlsen Reply ¶ 12, at 12 (citing Martinez Depo. 127-5 at 17:21-18:1).

The Court agrees with the United States that the evidence that the Plaintiffs cite does not demonstrate a genuine dispute of material fact about the Forest Service's relationship with the thinning crew. Martinez testifies to monitoring the area's conditions, see Martinez Depo. 98-4 at 40:8-41:22, and that he did not oversee the mastication, see Martinez Depo. 98-4 at 22:3-23:25, and no evidence shows his interactions with the thinning crew. The Court concludes that this information does not suggest that Martinez, and, through him, the Forest Service exercised control over the thinning crew's daily operations such as to create a genuine dispute of material fact whether the second Lilly factor counsels an independent contractor relationship.

The Ohlsen Plaintiffs and the United States also argue regarding the testimony of Elaine Kohrman, the Forest Supervisor of Cibola National Forest and National Grasslands,[207] on Forest Service employees' roles working with Isleta Pueblo and regarding the definition of Project Administrator. The Delegation identifies Johnson and Hudson as the Project Administrators. See Ohlsen Independent Contractor Response ¶ 7, at 7 (citing Delegation at 1); Independent Contractor Reply Plaintiffs' § A7, at 10. According to the Plaintiffs, Kohrman testified that the Delegation defines Forest Service employees' responsibilities "for supervising the activities of the project workers." Ohlsen Independent Contractor Response ¶ 15, at 13 (citing Delegation; Kohrman Depo. 97-4 at 209:1-18). The United States responds that Kohrman explained that "the Pueblo was responsible for supervising their employees, and that the responsibilities were 'outlined in the delegation of authority' in the agreement." Independent Contractor Reply Plaintiffs' § C15, at 19 (quoting Kohrman Depo. 97-4 at 209:10). Regarding the Project Administrator's role, the Plaintiffs cite the Statements of Work's description of a Project Administrator as the "[i]ndividual responsible for on-site administrator for agreement implementation; designation is based on responsibilities assigned by the Project Contact." Ohlsen Independent Contractor Response ¶ 7, at 7 (citing Statement of Work Original § 2(A), at 351).[208] They also cite Kohrman's testimony

---

[207]The Court draws Kohrman's full, official title from the Cibola Nation Forest Supervisor of Cibola National Forest and National Grasslands website, see Whitehair named as District Ranger on Mt. Taylor Ranger District on the Cibola National Forest and National Grasslands, Cibola National Forest and National Grasslands, https://www.fs.usda.gov/detail/cibola/news-events/?cid=STELPRD3844143 (last visited June 6, 2019), but the Court deems the title consistent with the titles that the parties provide. The Ohlsen Plaintiffs identify Kohrman as "U.S. Forest Supervisor," see Ohlsen Independent Contractor Response ¶ 7, at 7, and the United States identifies Kohrman as "USFS Forest Supervisor," see Ohlsen Reply ¶ 10 and 11, at 12.

[208]The Court has not located this definition in the Statement of Work Modification 1,

that the Project Administrators' role "was 'to work on the ground with the Pueblo and the crew and manage the operational on-the-ground activities.'" Ohlsen Independent Contractor Response ¶ 7, at 7 (citing Kohrman Depo. 97-4 at 178:3-9). The United States avers that the Ohlsen Plaintiffs' citation to the Statement of Work Original and Kohrman's testimony do not show that the Forest Service supervised the thinning crew. See Independent Contractor Reply Plaintiffs' § A7, at 10-11.

The Court agrees with the United States that this evidence is not sufficient to show an issue of material fact as to the Forest Service and Isleta Pueblo's relationship. As discussed in the Analysis' preceding section, the Participating Agreement, which the Statements of Work supplement, see Statement of Work Original at 1; Statement of Work Modification 3 at 1, designates daily supervisory authority to Isleta Pueblo. Kohrman's one-line statement about the Project Administrators' job does not outweigh the facts describing Johnson's, Hudson's, and Lueras' interactions with the thinning crew. The facts show that Johnson, Hudson, and Lueras worked "on the ground" with the thinning crew as Kohrman asserts, Ohlsen Independent Contractor Response ¶ 7 , at 7 (citing Kohrman Depo. 97-4 at 178:3-9), but did not perform duties rising to day-to-day supervision.[209]

---

Statement of Work Modification 2, and Statement of Work Modification 3, but it also has not located a new definition. The Court concludes, therefore, that the definition continues in effect. See Kohrman Depo. 97-4 at 138:10-14 (describing that a modification supplements and may not replace a previous Statement of Work).

[209]The parties engage in several disputes how to classify the Forest Service's relationship with Isleta Pueblo. The parties dispute, for instance, whether the Project Administrators had "oversight" responsibility over the thinning crew's work and "monitored" the work. Independent Contractor Motion ¶ 33, at 9 (citing First Fox Decl. ¶ 22, at 4). Regarding this dispute, the Plaintiffs object to the United States' reliance on the First Fox Decl. ¶¶ 22-23, at 4-5, because,

Accordingly, the Court concludes that the second <u>Lilly</u> factor counsels deeming Isleta Pueblo an independent contractor. "[T]here must be *substantial* supervision over the day-to-day operations of the contractor in order to find that the individual was acting as a government employee," <u>Cabalce v. VSE Corp.</u>, 914 F. Supp. 2d at 1160-61 (emphasis in <u>Cabalce v. VSE Corp.</u>)(quoting <u>Autery v. United States</u>, 424 F.3d at 957), and the Plaintiffs have not produced evidence establishing such substantial supervision. Although Johnson, Lueras, and Hudson gave detailed directions for meeting the Participating Agreement's and Statements of Work's specifications, a genuine issue of material fact does not exist whether they supervised the thinning crew's daily activity.[210]

**D.** **THE <u>LILLY</u> FACTORS REGARDING WHO OWNED THE THINNING CREW'S EQUIPMENT AND WHO PAID THE THINNING CREW WORKERS' SOCIAL SECURITY TAXES WEIGH SLIGHTLY TOWARD AN INDPENDENT CONTRACTOR RELATIONSHIP.**

The Court addresses the remaining <u>Lilly</u> factors -- "(3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others" -- in two groups and out of order, because factors three and five raise similar issues. <u>Curry v. United States</u>, 97

---

according to them, in the paragraph, Fox offers an inadmissible legal opinion and lacks a foundation in personal knowledge. Ohlsen Independent Contractor Response ¶ 33, at 17-18. For the Court's conclusions on these paragraphs, <u>see</u> <u>supra</u> notes 35 and 118.

[210]The Court concludes that <u>Martarano v. United States</u>, is inapposite, because the contract under which the state loaned the employee to the United States expressly assigned the United States the responsibility of directly supervising the employee, and the United States exercised this supervision in fact, unlike the situation at issue here. <u>See</u> 231 F. Supp. at 808.

F.3d at 414 (citing <u>Lilly</u>, 876 F.2d at 859). The Court addresses factors three and five here. It concludes that these factors do not counsel an employer-employee relationship.

The parties dispute whether the Forest Service or Isleta Pueblo bore the costs for equipment and social security taxes. Isleta Pueblo "owned and maintained the masticator." Independent Contractor Motion ¶ 26, at 8 (citing First Fox Decl. ¶ 12, at 3; Participating Agreement ¶ III(B), V(S), at 2, 9; Statement of Work Modification 3 §§ 3-4, at 416; J. Jiron Depo. 76-3 at 27:6-28:10; <u>id.</u> at 99:6-11). Isleta Pueblo first paid the Project's costs, including employee wages and social security, and the costs for equipment, but it sent the Forest Service invoices and received reimbursement for its costs. <u>See</u> Independent Contractor Motion ¶ 22-23, at 7 (citing Participating Agreement ¶¶ III (A)-(D), (V)(F) at 2, 5; Statement of Work Modification 3 §§ 3-4, 11 at 416, 427-30; J. Jiron Depo. 76-3 at 100:2-4; E. Jiron Depo. 76-4 at 83:10-19); Ohlsen Independent Contractor Response ¶¶ 22-23, at 16 (citing Participating Agreement ¶¶ IV(A), at 5; Dixon Depo. 97-6 at 116:6-11; <u>id.</u> at 128:9-25; and citing generally Request for Reimbursement (dated April 7, 2015), filed December 19, 2018 (Doc. 97-23)("Request for Reimbursement 97-23"); Request for Reimbursement (dated January 20, 2015), filed December 19, 2018(Doc. 97-24)("Request for Reimbursement 97-24")). Isleta Pueblo also supplied and purchased all equipment meeting the Participating Agreement's definition of "equipment" -- material "having a fair market value of $5,000.00 or more per unit and a useful life of over one year," Independent Contractor Motion at 7 n.5 (citing Participating Agreement ¶ V(S), at 9), Independent Contractor Motion ¶¶ 24-25, at 7-8 (citing First Fox Decl. ¶ 13-14, at 3; Participating Agreement ¶¶ III (A)-(D), at 2; <u>id.</u> ¶ (V)(F), at 5; (V)(S), at 9; Statement of Work Modification 3 §§ 3-4, 11 at 426, 427-30; Johnson Depo. 76-1 at 112:21-113:19; F. Jiron Depo. 76-2 at 99:16-23; J. Jiron Depo. 76-3 at 99:1-11), but it used

Forest Service funds from invoice payments to purchase equipment in the lay sense of the word, including "chain saws, tools, parts for the masticator, rental trucks, and other equipment," Ohlsen Independent Contractor Response ¶¶ 24-25, at 16-17 (citing F. Jiron Depo. 97-9 at 100:3-12; id. at 119:9-17; Dixon Depo. 97-6 at 118:2-121:18; Request for Advance or Reimbursement 97-3 at 1-7).

The Forest Service and Isleta Pueblo's reimbursement arrangement implies a closer connection than an independent contractor relationship where the contractor runs a separate business and bills the United States an agreed-to amount for services. Cf. Woodruff v. Covington, 389 F.3d at 1127 (indicating, in concluding that a contractor was an independent contractor, that "he billed the Army separately"); Curry v. United States, 97 F.3d at 413 ("Roybal did not receive a salary under this contract; rather, he periodically billed the USFS for the work he had completed, usually every two weeks. He had several employees, and he was fully in charge of hiring and firing them, paying their salaries, and paying the necessary taxes."); Norton v. Murphy, 661 F.2d at 884-85 ("Murphy pays self-employment Social Security tax, and there is no employee withholding tax on the monthly contract payments made by the United States to Murphy."). The Forest Service contributed 77.15 percent to financing the forestry project which included the thinning crew's work, as compared to Isleta Pueblo's 22.85 percent. See Agreement Financial Plan at 1. The Forest Service, for instance, provided $421,961.81 in cash to Isleta Pueblo for salaries and labor, while Isleta Pueblo contributed $78,000.00 to the total value for salaries and labor. See Agreement Financial Plan at 1. Likewise, the Forest Service provided Isleta Pueblo $169,999.20 for equipment, compared to Isleta Pueblo's $35,000.00 contribution to the total

equipment costs, and the Forest Service provided all the funding for supplies and material --$115,200.00. See Agreement Financial Plan at 1.

Isleta Pueblo managed, however, the project's funds. The Forest Service did not calculate the thinning crew workers' social security in its accounting and did not purchase for Isleta Pueblo the equipment for the thinning project. See Independent Contractor Motion ¶ 22-23, at 7 (citing Participating Agreement ¶¶ III (A)-(D), (V)(F), at 2, 5; Statement of Work Modification 3 §§ 3-4, 11 at 416, 427-30; J. Jiron Depo. 76-3 at 100:2-4; E. Jiron Depo. 76-4 at 83:10-19); Ohlsen Independent Contractor Response ¶¶ 22-23, at 16 (citing Participating Agreement ¶¶ IV(A), at 5; Dixon Depo. 97-6 at 116:6-11; id. at 128:9-25; and citing generally Request for Reimbursement 97-23; Request for Reimbursement 97-24); Ohlsen Independent Contractor Response ¶¶ 24-25, at 16-17 (citing F. Jiron Depo. 97-9 at 100:3-12; id. at 119:9-17; Dixon Depo. 97-6 at 118:2-121:18; Request for Reimbursement 97-23 at 1-7). The Participating Agreement assigns to Isleta Pueblo the responsibilities for maintaining accounting records, see Participating Agreement ¶ V(J)(2), at 6, for "control over and accountability for" the funds, Participating Agreement ¶ V(J)(3), and for documentation to support the accounting records, see Participating Agreement ¶ V(J)(4).

The Court concludes that this arrangement does not counsel an employer-employee relationship. The Forest Service may have provided funds for the thinning project, but it did not exercise an employer's daily control over the funds. Isleta Pueblo acted in the employer's accounting and purchasing role. See Walding v. United States, 955 F. Supp. 2d at 809 (concluding that a contractors' purchasing and supplying of equipment outweighed, for purposes of the independent contractor analysis, the United States' funding of equipment). The Forest Service did not even pay Isleta Pueblo regularly for its time, but reimbursed Isleta Pueblo quarterly. See

Request for Reimbursement 97-23 at 1-7; Request for Reimbursement 97-24 at 1-8)).  Cf. Restatement (Third) Of Agency § 7.07, comment f (2006)(listing as a factor in the control test "whether the agent is paid by the job or by the time worked").  Accordingly, taken together with the other Lilly factors, these facts regarding social security taxes and equipment do not show a genuine issue of material fact whether the Forest Service employed Isleta Pueblo as a federal employee.

E.   **THAT ISLETA PUEBLO PURCHASED LIABILITY INSURANCE, THAT FEDERAL REGULATIONS DID NOT PROHIBIT FEDERAL EMPLOYEES FROM PERFORMING THE THINNING CREW'S WORK, AND THAT ISLETA PUEBLO COULD AND DID SUBCONTRACT WORK COUNSEL AN INDEPENDENT CONTRACTOR RELATIONSHIP.**

The remaining Lilly factors -- "(4) who provides liability insurance; . . . (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others," Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859) -- also counsel an independent contractor relationship.  First, the Forest Service did not provide Isleta Pueblo liability insurance.  See Independent Contractor Motion ¶¶ 20-21, at 7 (citing First Fox Decl., ¶¶ 16, at 3); Ohlsen Independent Contractor Response ¶¶ 20-21, at 16.  The United States produces no admissible evidence that Isleta Pueblo purchased liability insurance, see supra note 116, but Isleta Pueblo need not have purchased liability insurance for this factor to counsel an independent contractor relationship, see Curry v. United States, 97 F.3d at 413 ("Roybal understood that he was responsible for public safety, although he did not have liability insurance."); Norton v. Murphy, 661 F.2d at 884 (describing that the contractor required Murphy to purchase liability insurance).  An employer purchases liability insurance with the expectation of bearing responsibility for the employee's actions; that the Forest Service did not

purchase insurance suggests that the Forest Service did not imagine it would carry the risk of liability for the thinning crew's work. Whether Isleta Pueblo waived its sovereign immunity, see Ohlsen Independent Contractor Response at 31, is either irrelevant to the inquiry whether the Forest Service and Isleta Pueblo imagined an employer-employee relationship such that the Forest Service would bear liability for the thinning crews' actions or points in the direction opposite the Ohlsen Plaitniffs' contentions. The United States' and the contractor's liabilities are separate inquiries. That Isleta Pueblo did not waive its sovereign immunity might suggest, however, that Isleta Pueblo chose to insulate itself from its potential liability. Even if the Lilly factor about liability insurance is ambiguous, the ambiguity does not outweigh the other factors' weight toward an independent contractor relationship. Second, the parties do not present evidence of any federal regulations prohibiting federal employees from performing similar contracts, see Independent Contractor Motion at 22, and the Court, in its independent research, has not found any federal regulations that prohibit federal employees from performing the work. Third, under the Participating Agreement, Isleta Pueblo had authority to subcontract and "hired a subcontractor to hand-cut trees, remove them from the field, and stack them for fuel wood." Independent Contractor Motion ¶ 27, at 8 (citing Participating Agreement ¶ V(U), at 9; F. Jiron Depo. 76-2 at 107:10-25); Ohlsen Independent Contractor Response ¶ 27, at 17.

Accordingly, the Court concludes that the Forest Service and Isleta Pueblo did not mutually agree to Forest Service supervision such that Isleta Pueblo was a federal employee, and not an independent contractor. The Court grants, therefore, the Independent Contractor Motion, and dismisses with prejudice those portions of the Ohlsen Complaint, the C De Baca Complaint, Cianchetti Complaint, the Sais Plaintiff Complaint, the State Farm Complaint, and the Homesite

Indemnity Complaint alleging Isleta Pueblo's and the thinning crew workers' -- Isleta Pueblo employees' -- negligence in conducting the thinning project. The Court specifically dismisses those claims that rest solely on Isleta Pueblo's and the thinning crew's actions, including the Ohlsen Plaintiffs' allegations that Isleta Pueblo negligently conducted the thinning operations such that it: (i) "failed to create and accept a mandatory ('shall' in the PA) 'safety plan'"; (ii) "did not have proper training and equipment to suppress the fire given waist deep slash (slash that exceeds the limit in the PA of 18'')"; and (iii) "failed to and were not in the position to suppress the fire at the time of ignition, and the USFS is complicit in that failure because of its prior knowledge of the waist deep slash." Ohlsen Plaintiffs' Claim List at 1. The Court also specifically dismisses the State Farm Plaintiffs' claim based on the Forest Service's "[n]egligently operating mastication machinery on rocky terrain at a time of elevated fire risk" and their claim based on the Forest Service's "other negligence" to the extent the claim depends on Isleta Pueblo's and the thinning crew workers' actions. State Farm Complaint ¶ 30 (e)-(f), at 8. Likewise, the Court dismisses Homesite Indemnity's claims to the extent that Homesite Indemnity alleges the Forest Service's liability based on the thinning crew's

(a)    carelessly and negligently operating a masticator;

(b)    operating a masticator in a manner that resulted in a fire;

(c)    operating a masticator when Defendants knew or should have known that there were rocks present in the area and that striking a rock can cause a fire;

(d)    operating a masticator near highly-combustible materials;

(e)    acting in a manner that caused a fire;

(f)    failing to prevent a fire from spreading;

(g)     failing to keep the necessary fire-prevention equipment and personnel at the subject work site;

(h)     operating a masticator in a negligent manner;

(i)     failing to pay attention to the surrounding area and conditions when operating a masticator;

(j)     using a masticator when it was unsafe to do so;

(k)     failing to take evasive measures to avoid striking a rock while operating a masticator;

(l)     failing to hire, train, select, and supervise their employees, workers and contractors with care; and/or

(m)     violating, and/or failing to comply with, applicable rules, codes, laws, regulations, and industry standards.

Homesite Complaint ¶ 25(a)-(m), at 5.

## IV.     THE DISCRETIONARY FUNCTION EXCEPTION BARS THE OHLSEN PLAINTIFFS', C DE BACA AND CIANCHETTI'S, AND THE SAIS PLAINTIFFS' CLAIMS.

The Court concludes that the discretionary function exception bars the Ohlsen Plaintiffs', C De Baca's , Cianchetti's, and the Sais Plaintiffs' claims.  The Court discusses the claims in turn below.  The Court divides its discussion by Plaintiff -- grouping together C De Baca and Cianchetti -- and by claim.  The Court undertakes a two-step analysis in considering the discretionary function exception.  First, for the discretionary function exception to apply, the Forest Service's acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'"  United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536).  Second, the conduct must be "'based on considerations of public policy.'"  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537).

## A. THE DISCRETIONARY FUNCTION EXCEPTION BARS THE OHLSEN PLAINTIFFS' CLAIMS.

The Court concludes that the discretionary function exception bars all the Ohlsen Plaintiffs' claims. First, the Court concludes that the discretionary function exception protects the Forest Service's decision to masticate Unit 4. See Ohlsen Plaintiffs' Claim List at 1. The Ninth Circuit has concluded that decisions to masticate are discretionary functions. See Safeco Ins. v. United States, 1999 WL 1038272, at *1 ("All claims involving whether, how, and when to masticate slash . . . are based on discretionary functions 'involving the necessary element of choice and grounded in the social, economic, [and] political goals of the [relevant] statute and regulations.'" (quoting United States v. Gaubert, 499 U.S. at 323)). The Eighth Circuit has likewise treated silviculture decisions as within the United States' discretion. See Layton v. United States, 984 F.2d at 1502 (describing the Forest Service's forest treatment decisions as discretionary).

The Court agrees with this assessment; here, the decision to masticate was discretionary in nature. No mandatory requirement bound the Forest Service's actions. The Ohlsen Plaintiffs cite no evidence of such a requirement, and the Court, in its independent research, has not found such a requirement. The Multiple Use Sustained Yield Act of 1960 gives the Forest Service discretion in forest management and directs the Forest Service to manage National Forests: "to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States" and "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." Ohlsen Motion at 15 (quoting first 16 U.S.C. § 475; then quoting 16 U.S.C. § 528; and citing 16 U.S.C. §§ 529-31). The Strategic Plan and Landscape Plan also leave the Forest Service discretion while setting forth policy considerations for forest management. See Strategic Plan at

iv-v, 1, 6-7, 15-16, 18-21; Landscape Plan at 1-4.  The Ohlsen Plaintiffs' argument that the Forest

Service had a mandatory duty to perform a prescribed burn in Unit 4 does not convince the Court.

See Ohlsen Response ¶ 20, at 5-6; Ohlsen Reply ¶ 20, at 14-15.  The Decision Notice provides that

the Forest Service "will include fuels reduction and restoration treatments on approximately 5,700

acres of National Forest System lands by thinning trees, creating temporary openings for

regeneration, and disposing of woody debris through mechanical methods and prescribed

burning."  Decision Notice at 1.  It specifies:

> Activity fuels such as bole wood, slash, hand piles,[211] and masticating grindings will be treated as needed to meet fuels reduction objectives through prescribed burning and/or pile burning when conditions allow for safe and effective burning.  All prescribed burning will comply with New Mexico State air quality regulations and will be approved through appropriate permitting processes.

Decision Notice at 3.  Although the Decision Notice describes with the future tense a plan, it does

not state an absolute or a requirement.  The Decision Notice contemplates prescribed burning "as

needed," and "when conditions allow for safe and effective burning."  Decision Notice at 3.  The

Decision Notice leaves room for the Forest Service to have concluded in its discretion that it could

not, on or before June 14, 2016, safely conduct a prescribed burn, or to have planned a prescribed

burn after June 14, 2016.  See Ohlsen Reply ¶ 20, at 14-15 (citing Deposition Martinez at 32:2-

33:13 (taken November 27, 2018), filed February 28, 2019 (Doc. 127-5)("Martinez Depo. 127-

5")).  The Court also agrees with the United States that the Kohrman Depo. 98-9 to which the

Plaintiffs cite does not show a mandatory duty that the Forest Service engage in a prescribed burn.

---

[211]"Typically these piles are a loose stack of wood built by placing one piece of wood onto the pile at a time.  No care is taken to elevate the pile from the ground, but typically the pile rests on a few supporting branches that elevate the pile."  Deborah S. Page-Dumroese, et al., "Methods to Reduce Forest Reside Volume after Timber Harvesting and Produce Black Carbon," Scientifica (March 9, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5362704/.

See Ohlsen Reply ¶ 20, at 15. Kohrman states only that the Forest Service performed prescribed burns on the slash from previous projects. See Kohrman Depo. 98-9 at 27:11-17.

The Court concludes that the Forest Service decided to masticate Unit 4 because of policy considerations. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. at 324. Moreover, both the Ohlsen Plaintiffs and the United States identify factors that the Forest Service weighed to make the decision. The Ohlsen Plaintiffs identify: (i) the risk of fire, see Ohlsen Response ¶ 32, at 7 (citing Johnson Depo. 98-3 at 45:2-46:18); (ii) the costs of a prescribed burn, see Ohlsen Response ¶ 33, at 7 (citing Johnson Depo. 98-3 at 46:15-48:18; id. at 49:10-50:18); and (iii) the timing of the Forest Service's other projects, see Ohlsen Response ¶ 33, at 7 (citing Johnson Depo. 98-3 at 49:10-50:18). The United States lists as other factors:

> the objectives of the Isleta Restoration Project; forest health in Unit 4, and as it fit within the rest of the Isleta Restoration Project; plans for other Forest restoration projects; restoring the Forest to more natural conditions; improving wildlife habitat; weighing the risk of wildfire under the various options; public access to Unit 4, and available resources and funding for treating Unit 4 and other competing projects.

Ohlsen Motion ¶ 23, at 9. Cf. Safeco Ins. v. United States, 1999 WL 1038272, at *1 ("'[P]ractical considerations' are part of the discretionary-function policy mix." (citing Gager v. United States, 149 F.3d 918, 921-22 (9th Cir. 1998); Richardson v. United States, 943 F.2d 1107, 1111 (9th Cir. 1991)). The Ohlsen Plaintiffs and the United States do not dispute that the Forest Service accounted for several policy considerations in deciding how to treat Forest Service lands.

> Decisions regarding when and how to treat specific areas of USFS lands were guided by statutes governing management of those lands, the overall mission

of the USFS, and importantly here, the Forest Plan, the Strategic Plan, and Region 3 Strategic Plan. The USFS also considered important policy considerations such as anticipated and available funding, competing projects, risk of wildfire, overall health of the forest, and relative health of different areas of the forest, population density, public interests, and other committed resources, while also taking into account the priorities of USFS's partners.

Ohlsen Motion ¶ 17, at 7 (citing Second Fox Decl. ¶ 36, at 9); Sais Motion ¶ 19, at 7 (citing Second Fox Decl. ¶ 36, at 9). "The planned treatment on Unit 4 served the objectives of the Isleta Restoration Project, including improving forest health, providing work for USFS partners, and serving the public's interest in obtaining firewood from the Forest." Ohlsen Motion ¶ 19, at 7 (citing Second Fox Decl. ¶¶ 43-44, at 10); Sais Motion ¶ 23, at 8 (citing Second Fox Decl. ¶¶ 43-44, at 10). See Ohlsen Response ¶ 19, at 20.

Given the Court's conclusion, the Ohlsen Plaintiffs and the United States' disputes about the Forest Service's specific reasoning for and mistakes in not performing a prescribed burn are immaterial. See, e.g., Ohlsen Response ¶ 22, at 6 (citing Dixon Depo. 98-2 at 7:12-20; id. at 64:12-17; id. at 65:18-66:14); Ohlsen Reply ¶ 22, at 16 (citing Dixon Depo. 98-2 at 66:4-5); Ohlsen Response ¶ 32, at 7 (Johnson Depo. 98-3 at 45:2-46:18); Ohlsen Reply ¶ 32, at 19 (citing Johnson Depo. 98-3 at 45:2-46:18); Ohlsen Response ¶ 21, at 6 (citing Martinez Depo. 98-4 at 24:10-25:16, id. at 26:12-17; id. at 27:1-4; id. at 27:12-28:9); Ohlsen Reply ¶ 21, at 15-16 (citing Martinez Depo. 98-4 at 24:10-25:16; E. Jiron Depo. 98-14 at 30:20-31:17; Videotaped Deposition of Mark Dixon at 52:12-18 (taken November 29, 2018), filed February 28, 2019 (Doc. 127-6)("Dixon Depo. 127-6"); Videotaped Deposition of Francisco Lueras at 69:15-17 (taken December 12, 2018), filed February 28, 2019 (Doc. 127-9)("Lueras Depo. 127-9"); id. at 37:23-38:5; Martinez Depo. 98-4 at 26:18-27:21; Second Martinez Decl. ¶¶ 6-7, at 2); Ohlsen Response ¶ 33, at 7 (citing Participating Agreement ¶ IV(D), at 3; Johnson Depo. 98-3 at 46:19-48:18; id. at 49:10-59:18; Videotaped

Deposition of Ian Fox at 31:13-24 (taken October 23, 2018), filed December 19, 2018 (Doc. 98-11)("Fox Depo. 98-11")); Ohlsen Reply ¶ 33, at 19 (citing Johnson Depo. 98-3 at 28:5-9; Videotaped Deposition of Aaron Johnson at 49:21-25 (taken September 11, 2018), filed February 28, 2019 (Doc. 127-8)); Ohlsen Reply ¶ 39, at 21 (citing Johnson Depo. 98-3 at 16:20-17:14; id. at 91:1-24; id. at 92:19-93:6); Ohlsen Response ¶ 39, at 8 (citing Johnson Depo. 98-3 at 33:2-23; id. at 89:10-91:6; id. at 92:19-93:6); Ohlsen Motion ¶ 23, at 9 (citing Second Martinez Decl. ¶ 48, at 11); Ohlsen Reply ¶ 23, at 20 (citing Johnson Depo. 98-3 at 45:2-48:18; Dixon Depo. at 25:17-20; id. at 64:18-65:14; id. at 94:3-7); Ohlsen Response ¶ 19, at 5 (citing Johnson Depo. 98-3 at 41:21-42:11); Ohlsen Reply ¶ 19, at 5 (citing Johnson Depo. 98-3 at 42:1-11).[212] The United States

---

[212]The Ohlsen Plaintiffs ask that the Court disregard the Third Fox Decl. ¶ 9, at 2-3, for lack of foundation personal knowledge and use their objections to the Third Fox Decl. ¶ 9, at 2-3, to argue that the Forest Service breached its duty to determine if the thinning crew safely masticated Unit 4. See Motion to Strike Reply at 4. Regarding the Third Fox Decl. ¶ 9, at 2-3, the Ohlsen Plaintiffs complain that Fox relies on information from Martinez so does not rely on his personal knowledge. See Motion to Strike Reply at 4. The Court agrees with the Ohlsen Plaintiffs that the third sentence in the Third Fox Decl. ¶ 9, at 2-3, repeats what Fox heard from Martinez: "[A]ccording to Anthony Martinez . . . because of the heavy fuel load on Unit 4, USFS could not safely do a prescribed burn until the slash had been masticated." Third Fox Decl. ¶ 9, at 2-3. Fox may have personal knowledge that Martinez' reasoning is why the Forest Service did not perform the prescribed burn, but, as Fox relies on Martinez' statement, the Court cannot reasonably infer that Fox has personal knowledge of the truth of Martinez' statement. The Third Fox Decl. ¶ 9, at 2-3, also raises, therefore a hearsay problem. Hearsay "means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Martinez made the statement outside the Court, and, as, in the Third Fox Decl. ¶ 9, at 2-3, Fox explains why the Forest Service did not perform a prescribed burn in Unit 4, and introduces Martinez' statement for the truth of the matter it asserts -- why the Forest Service could not perform a prescribed burn, the United States introduces the evidence for its truth. See Fed. R. Evid. 801(c). Accordingly, the Court disregards the third sentence in the Third Fox Decl. ¶ 9, at 2-3. The Court deems the other sentences in the Third Fox Decl. ¶ 9, at 2-3, admissible, because the Court reasonably infers that Fox describes the purpose of the Decision Notice's statement that mastication grinding will be treated through a prescribed burn and why the Forest Service did not conduct a prescribed burn in Unit 4 based on role as Resource Staff Officer and in administering the Participating Agreement.

acted within its discretion in deciding to masticate Unit 4, and "[w]hen the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'" Redman v. United States, 934 F.2d at 1157 (quoting 28 U.S.C. § 2680(a)). A court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the government's duties under the common law. Domme v. United States, 61 F.3d at 789. The Ohlsen Plaintiffs' arguments about the Forest Service's "negligent disregard of the policy requiring the prescribed burn in Unit 4" and decision to masticate Unit 4 in disregard of the fire risks misses the mark for the discretionary function analysis. Ohlsen Response at 32. See Ohlsen Response at 31-33, 36; Motion to Strike Reply at 4-6 (describing the United States' duty to assess the fire risk and whether Isleta Pueblo could safely masticate Unit 4). Accordingly, the Court dismisses this claim for lack of subject-matter jurisdiction.

Second, the discretionary function exception bars the Ohlsen Plaintiffs' claim based on the Forest Service's failure "to provide two 300-gallon water trucks with knowledge of the mastication being conducted in extreme conditions." Ohlsen Plaintiffs' Claim List at 1. The Ohlsen Plaintiffs cite no evidence of a mandatory requirement directing the fire engine's location, and the Court's

---

See Third Fox Decl. ¶ 9, at 2-3. The Court concludes that these statements, for which Fox does not clearly rely on Martinez, are admissible. The Court also concludes that the Ohlsen Plaintiffs other arguments responding to the Third Fox Decl. ¶ 9, at 2-3, are irrelevant, because a court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the government's duties under the common law. Domme v. United States, 61 F.3d at 789.

The Ohlsen Plaintiffs also respond to Fox' statements about Unit 4's density with arguments about the impropriety of masticating the unit. See Motion to Strike Reply at 6-7. In making this argument, the Ohlsen Plaintiffs attempt to argue negligence before the discretionary function exception. The Court deems, according, the arguments irrelevant.

independent research revealed none. Moreover, the Cohesive Strategy emphasizes that fire management decisions and programs should balance multiple policy concerns:

- Reducing risk to firefighters and the public is the first priority in every fire management activity.

- Sound risk management is the foundation for all management activities.

- Actively manage the land to make it more resilient to disturbance, in accordance with management objectives.

    . . . .

- Rigorous wildfire prevention programs are supported across all jurisdictions.

    . . . .

- Fire management decisions are based on the best available science, knowledge and experience, and used to evaluate risk versus gain.

- Federal agencies, local, state, tribal governments support one another with wildfire response, including engagement in collaborative planning and the decision-making processes that take into account all lands and recognize the interdependence and statutory responsibilities among jurisdictions.

    . . . .

- Fire management programs and activities are economically viable and commensurate with values to be protected, land and resource management objectives, and social and environmental quality considerations.

Ohlsen Motion at 19 (emphasis omitted)(quoting Cohesive Strategy at 6). The Ohlsen Plaintiffs' citation to the Martinez Depo. 98-4 does not show a mandatory requirement that the fire engines should have accompanied the masticator. See Ohlsen Response ¶ 41, at 9 (citing Martinez Depo. 98-4 at 47:19-49:19). Martinez testifies only that the fire engines patrolled areas with potential for wildfires and with a public presence. See Martinez Depo. 98-4 at 47:19-49:19. His description of the fire engines' activities does not reflect a mandate that the fire engines patrol any particular areas. The second factor in the Berkovitz by Berkovitz v. United States test for the discretionary

function exception is also satisfied. The Court presumes that the Forest Service acted on policy choices, see United States v. Gaubert, 499 U.S. at 324, and the Ohlsen Plaintiffs and the United States agree that the Forest Service must weigh policy considerations when deciding how to manage fire equipment. See Ohlsen Motion ¶ 30, at 9 (citing Second Fox Decl. ¶¶ 63-66, at 14-15); Sais Motion ¶ 37, at 10 (citing Second Fox Decl. ¶¶ 63-66, at 14-15); Ohlsen Response ¶ 29, at 22. "Decisions regarding required tools and equipment to mitigate the risk of causing wildfire involves policy considerations such as how best to use USFS monetary resources, the benefits of additional tools and equipment, and the risk that the work will cause a wildfire." Ohlsen Motion ¶ 30, at 9 (citing Second Fox Decl. ¶¶ 63-66, at 14-15); Sais Motion ¶ 37, at 10 (citing Second Fox Decl. ¶¶ 63-66, at 14-15). See Ohlsen Response ¶ 29, at 22.

The Court concludes, therefore, that the United States acted within its discretion in deciding where to position the fire engines, and "[w]hen the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'" Redman v. United States, 934 F.2d at 1157 (quoting 28 U.S.C. § 2680(a)). The Ohlsen Plaintiffs arguments about the Forest Service's "blatant disregard for the public's wellbeing" conflate the negligence and discretionary function analyses. Ohlsen Response at 35. Accordingly, the Ohlsen Plaintiffs' arguments fail, and the Court dismisses the Ohlsen Plaintiffs' claim regarding the fire engines for lack of subject-matter jurisdiction.

Third, the discretionary function exception bars the Ohlsen Plaintiffs' claim based on the Forest Service's failure "to implement site specific fire restrictions given the extreme fire danger and fuel load conditions." Ohlsen Plaintiffs' Claim List at 1. The decision to proceed with treating Unit 4 involved judgment or choice. The Ohlsen Plaintiffs identify no specific or mandatory

requirement that the Forest Service violated in not prescribing site specific fire restrictions, and the Court, with its independent research, has not discovered any such requirement. That the Forest Service in Statement of Work Modification 4 adopted site-specific fire risk assessments does not support that any mandatory duty existed to implement site-specific fire restrictions. See Ohlsen Response ¶ 74, at 15 (citing Lueras Depo. 98-6 at 28:17-30:9); Ohlsen Response ¶ 5, at 8 (citing Kohrman Depo. 97-4 at 138:21-139:6; id. at 140:3-7; id. at 140:22-141:8; Dixon Depo. 97-6 at 83:6-10; F. Jiron Depo. 97-9 at 42:2-43:20; Project Fire Precautions Assessment, filed December 19, 2018 (Doc. 97-14)); Independent Contractor Reply Plaintiffs' § B5, at 13. Risk assessments differ from restrictions, and, moreover, the Ohlsen Plaintiffs have produced no evidence that the Forest Service had any policy about site-specific assessments before the Dog Head Fire, and the Court has not located such information. Further, contrary to the Ohlsen Plaintiffs' suggestion, 16 U.S.C. § 551 is not a mandatory requirement establishing the Forest Service's "duty to 'protect against destruction by fire.'" March Notice of Supp. Authority at 1. The statutes states: "The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests." 16 U.S.C. § 551. The statute does not direct what provisions the Agriculture Department should enact or how the Agriculture Department should determine which provisions to enact, but leaves these matters to the Agriculture Department's discretion.

The second Berkovitz by Berkovitz v. United States factor is also satisfied here. The Cohesive Strategy reflects the Agriculture Department's understanding that fire prevention and management decisions rest in policy concerns. See Cohesive Strategy at 6. Moreover, the Ohlsen Plaintiffs and the United States agree that decisions about forest treatment and fire restrictions

involve balancing several considerations:

> Decisions regarding when and how to treat specific areas of USFS lands were guided by statutes governing management of those lands, the overall mission of the USFS, and importantly here, the Forest Plan, the Strategic Plan, and Region 3 Strategic Plan. The USFS also considered important policy considerations such as anticipated and available funding, competing projects, risk of wildfire, overall health of the forest, and relative health of different areas of the forest, population density, public interests, and other committed resources, while also taking into account the priorities of USFS's partners.

Ohlsen Motion ¶ 17, at 7 (citing Second Fox Decl. ¶ 36, at 9); Sais Motion ¶ 19, at 7 (citing Second Fox Decl. ¶ 36, at 9). Regarding balancing forest treatment and fire restrictions,

> USFS weighs the risk of further restricting forest thinning activity on USFS lands versus the risk of a catastrophic wildfire if the work is not performed in a timely manner. The USFS also has several restoration projects happening in tandem and must take into consideration the timing of each of these projects. The USFS must also take into consideration available funding for projects and when the projects must take place to take advantage of the funding.

Ohlsen Motion ¶ 29, at 10 (citing Second Fox Decl. at 53-58, at 12-13); Sais Motion ¶ 33, at 9-10 (citing Second Fox Decl. ¶¶ 53-58, at 12-13). The Ohlsen Plaintiffs focus on the Forest Service's failure to fulfill its duty to react to and warn of fire risks. See Ohlsen Response at 36; Motion to Strike Reply at 4 ("It was the USFS' duty to determine when the workers could safely burn or masticate in dangerous conditions."); id. at 5-6 (describing that the Forest Service failed to identify the extreme fire risk in Unit 4 and therefore did not enact the appropriate fire restrictions). "The exception to the FTCA applies[, however,] regardless of 'whether or not the discretion involved be abused,' Redman v. United States, 934 F.2d at 1157 (quoting 28 U.S.C. § 2680(a)), so the Ohlsen Plaintiffs' arguments do not persuade the Court.

The United States avers that the lack of a site-specific analysis of Unit 4's fire risk did not cause the Plaintiffs' injuries, because the Forest Service would still not have imposed fire

restrictions had it performed a site-specific analysis.  See Ohlsen Reply at 46 (citing Second Fox Decl. ¶¶ 59-61, at 13-14).  Although, because the Court determines that the decision to enter site-specific fire restrictions was discretionary, disputes about causation are irrelevant, the Court notes that no genuine dispute of fact as to causation exists.   "To circumvent the discretionary function exception, the mandatory duty alleged must be one whose breach bears a causal relationship to the Plaintiffs' injuries, thereby giving rise to their cause of action against the government."  Clark v. United States, 695 F. App'x 378, 387-88 (10th Cir. 2017)(unpublished)(citing Franklin Savings Corp. v. United States, 180 F.3d 1124, 1132-33 (10th Cir. 1999)).  According to the United States, the Forest Service enacted no fire restrictions on June 14, 2016, and "there was some urgency to addressing the slash" in Unit 4.  Second Fox Decl. ¶ 61, at 13.  As the risk of the masticator sparking a fire was small, the Forest Service would have, therefore, continued the mastication even had it performed a site-specific analysis.  See Second Fox Decl. ¶ 62, at 14.  The Ohlsen Plaintiffs have produced no evidence contradicting the United States' assertions.   The Court deems, therefore, that no genuine issue of fact exists that the lack of a site-specific analysis did not cause the Plaintiffs' injuries.  The Ohlsen Plaintiffs' allegation focuses, however, on the Forest Service's failure to impose site-specific fire restrictions rather than a site-specific analysis.  See Ohlsen Plaintiffs' Claim List at 1.  Neither party has produced evidence regarding what restrictions the Forest Service would have imposed and those hypothetical restrictions' relation to the Plaintiffs' injuries.   The Court cannot, therefore, determine whether the lack of site-specific restrictions caused the Plaintiffs' injury, but, as neither party argues or produces evidence on this question, neither party has shown that a genuine issue of fact whether the lack of site-specific fire restrictions

caused the Plaintiffs' injuries. Accordingly, the Court dismisses this claim about site-specific fire restrictions for lack of subject-matter jurisdiction.

Fourth, the Court concludes that the discretionary function exception likewise bars the Ohlsen Plaintiffs' allegation that the Forest Service "[violated the] mandatory provision in the PA (standard USFS form) that provided that slash shall not exceed 18'' in depth." Ohlsen Plaintiffs' Claim List at 1. The Statements of Work's prescriptions about slash depth did not apply to the Forest Service, but applied to Isleta Pueblo; the Participating Agreement provides that Isleta Pueblo will "manage the employees so that work is completed as mutually agreed upon to the specifications stated in the Statement of Work Supplement." Participating Agreement ¶¶ III(B), at 2. The Forest Service's decisions to contract with Isleta Pueblo, and to delegate responsibility to thin the project site and to adhere to the maximum slash depth are within the Forest Service's discretion. The Court has recognized that the decision to hire an independent contractor is a discretionary function. See Coffey v. United States, 906 F. Supp. 2d at 1158 (deciding that the BIA decision to enter a contract for detention beds is a discretionary decision). See also Carroll v. United States, 661 F.3d at 103-04 (describing the judgment to hire independent contractors as a discretionary function). Likewise, decisions to delegate duties and how to oversee the performance of those duties are often discretionary. See, e.g., Carroll v. United States, 661 F.3d at 100-05 (describing the decision to delegate responsibilities as permissible); Garcia v. U.S. Air Force, 533 F.3d at 1178 (deeming that no mandatory requirement existed that the Air Force monitor a contractor's work when the Air Force inspectors' guidelines did not specify any specific standards for or times for inspection); Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1167-67 (10th Cir. 2004)(concluding that the Forest Service could decide in its discretion

the extent to monitor a ski resort contractor's daily operations); <u>Andrews v. United States</u>, 121 F.3d 1430, 1440 (11th Cir. 1997)("The discretionary function exception encompasses government decisions about how and how much to supervise the safety procedures of independent contractors."); <u>Domme v. United States</u>, 61 F.3d at 791 (concluding that the United States Department of Energy had discretion to decide when and how it exercised appraisals of a contractor's work); <u>Layton v. United States</u>, 984 F.2d at 1502-03 (describing decisions to delegate safety responsibility to contractors and to oversee the contractors' compliance with contract requirements as discretionary); <u>Fritz v. United States</u>, 42 F.3d 1406, 1994 WL 678495, at *1 ("We agree with the district court that the failure of the United States to monitor adequately . . . compliance with its insurance certifications falls directly within the discretionary function exception to the Federal Tort Claims Act."); <u>Tilga v. United States</u>, No. CIV 14-0256 JAP/SMV, 2015 WL 12661930, at *9-10 (D.N.M. June 12, 2015)(Parker, J.)("[T]he United States acted within its discretion in delegating responsibility for contract compliance and for the day-to-day supervision and management of the Albuquerque halfway house to Dismas.").

Here, the Court and the Ohlsen Plaintiffs have identified no mandatory requirements governing the Forest Service's actions. Regarding the Forest Service's role in overseeing Isleta Pueblo, the Participating Agreement states that "The U.S. Forest Service Shall . . . Designate work areas and provide[s] cutting guidelines for achieving desired condition. . . . Inspect the work and provide feedback on how goals are being accomplished." Participating Agreement ¶¶ IV(B)-(C), at 3. The Participating Agreement does not further specify the Forest Service's responsibilities in overseeing Isleta Pueblo, although it grants the Forest Service the option to suspend the Participating Agreement or otherwise sanction Isleta Pueblo for its non-compliance. <u>See</u>

Participating Agreement ¶ V(Y), at 10-11. In Estate of Harshman v. Jackson Hole Mountain Resort Corp., the Tenth Circuit upheld a district court's decision that similar provisions did not impose a mandatory requirement on the Forest Service. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1166; Estate of Harshman v. Jackson Hole Mountain Resort Corp., 200 F. Supp. 2d 1329, 1336 (D. Wyo. 2002)(Brimmer, J.)(concluding that an agreement reserving to the Forest Service the ability to inspect a contractor's operations, to oversee compliance of the contract, and to temporarily suspend the contractor's operations did not create a mandatory requirement governing the Forest Service's supervision).[213]

Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy. United States v. Gaubert, 499 U.S. at 324. The Court presumes that the Forest Service exercised its discretion in deciding to hire and how to supervise Isleta Pueblo. Additionally, the Ohlsen Plaintiffs and the United States agree that the Forest Service exercised its judgment in weighing "multiple public

---

[213]The Ohlsen Plaintiffs' citations to Maryls Bear Medicine v. United States ex rel. Secretary of the Department of the Interior, Faber v. United States, and McGarry v. United States do not persuade the Court. In Maryls Bear Medicine v. United States ex rel. Secretary of the Department of the Interior, Faber v. United States, and McGarry v. United States, the Ninth Circuit identified mandatory policies that bound the United States. See Maryls Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior, 241 F.3d at 1215; Faber v. United States, 56 F.3d at 1126; and McGarry v. United States, 549 F.2d at 591. Although, in Faber v. United States, the requirements that the Ninth Circuit identified resemble the Participating Agreement, ¶¶ IV(B)-(C), at 3, and ¶ V(Y), at 10-11, in Estate of Harshman v. Jackson Hole Mountain Resort Corp., the Tenth Circuit addressed a situation with contractual provisions much like those provisions in the Participating Agreement and concluded that similar provisions do not establish mandatory requirements for the Forest Service. See Faber v. United States, 56 F.3d at 1126; Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1166. The Court likewise deems Berkovitz by Berkovitz v. United States, unpersuasive, because in that case, a regulation bound the agency to ensure compliance with regulatory standards. See 486 U.S. at 544.

policy considerations" when the Forest Service entered the Participating Agreement delegating responsibilities to Isleta Pueblo. Ohlsen Motion ¶ 6, at 4 (citing Second Fox Decl. ¶¶ 15-26, at 3-7); Sais Motion ¶ 8, at 4 (citing Second Fox Decl. ¶¶ 15-26, at 3-7). When the Forest Service decided to accept Isleta Pueblo's proposal, for instance, the Forest Service considered

> whether the Pueblo Proposal, and actions taken in carrying out the Pueblo Proposal, served the public policies underlying the statutes that govern the management of USFS lands; the agency's mission, which is to sustain the health, diversity, and productivity of the Nation's forests and grasslands using the sustainable multiple-use management concept to meet the diverse needs of the people; public policies and priorities as set forth in the Cibola National Forest Land and Resource Management Plan ("Forest Plan"), the USDA Strategic Plan: FY 2010-2015 ("Strategic Plan"), the Forest Service Southwestern Region Landscape Conservation and Restoration Strategic Action Plan dated January 31, 2011 ("Region 3 Strategic Plan"), and the National Cohesive Wildland Fire Management Strategy ("Cohesive Strategy").

Ohlsen Motion ¶ 7, at 5 (citing Second Fox Decl. ¶ 15, at 3-4); Sais Motion ¶ 9, at 4-5 (citing Second Fox Decl. ¶ 15, at 3-4). In assessing Isleta Pueblo's proposal, the Forest Service considered

> whether the Isleta Restoration Project would reduce threats of catastrophic wildland fire, improve forest health, improve watershed health, improve wildlife habitat, provide job training and development programs, and provide mutual interests other than monetary considerations. USFS also considered the policy preference for tribally proposed projects on USFS lands, protection of Indian trust resources from fire and disease, health of the proposed project area as compared to the rest of the Forest, Pueblo's experience with similar restoration projects, additional proposed/ongoing projects, relative priority of the projects, and available funding.

Ohlsen Motion ¶ 8, at 6 (citing Second Fox Decl. ¶¶ 18-25, at 4-6); Sais Motion ¶ 10, at 5 (citing Second Fox Decl. ¶¶ 18-25, at 4-6).

The Ohlsen Plaintiffs argue that the Forest Service acted negligently in allowing the slash to accumulate. See Ohlsen Response at 30-31; Motion to Strike Reply at 6 ("Allowing the slash to accumulate to over twice the depth specified as the maximum in the Participating Agreement

constituted an extreme fire danger and meant the forest should have been closed to all masticating operations.").  As the Court discusses <u>supra</u>, the discretionary function analysis does not involve questions of the United States' negligence.  Accordingly, the Ohlsen Plaintiffs' argument fails.

Disputes about the maximum slash depth applicable to Unit 4's thinning, the slash depth in Unit 4 on June 14, 2016, and the relation of slash depth to fire risk are irrelevant to the Court's discretionary function analysis, as the Court concludes that allowing the slash to accumulate was within the Forest Service's discretion.  The Court addresses, nevertheless, the United States' argument that the Court should dismiss this claim, because the Ohlsen Plaintiffs cannot show that excess slash caused the Dog Head Fire damages.  <u>See</u> <u>Clark v. United States</u>, 695 F. App'x at 387-88 (citing <u>Franklin Savings Corp. v. United States</u>, 180 F.3d at 1132-33).  The Court concludes that a genuine dispute of fact exists as to this issue, although this dispute is irrelevant to the Court's conclusion.  The Court cannot determine with certainty which Statement of Work modification applied to Unit 4's thinning.  Statement of Work Modification 3 provides no maximum slash depth for Unit 4, as it discusses masticating Unit 4.  <u>See</u> Statement of Work Modification 3 § 5(C), at 419.  The Court cannot verify when the thinning crew began work on Unit 4, although the thinning crew finished thinning Unit 4 on August 12, 2015.  <u>See</u> Contract Daily Diary 98-13 at 1.  Statement of Work Modification 2 took effect in early June 2015, before the thinning crew finished thinning Unit 4.  <u>See</u> Statement of Work Modification 2 at 1.  If the thinning crew began work on Unit 4 before Statement of Work Modification 2 took effect, Modification 1 governs that work, and Modification 1 left in place the Statement of Work Original's eighteen-inch maximum slash depth.  <u>See</u> Modification 1 at 1-6; Statement of Work Original § 5, at 356, filed February 28, 2019 (Doc. 125-1)("Statement of Work Original 125-1").  Otherwise, Statement of Work Modification

2 governs. Statement of Work Modification 2 is ambiguous as to the slash depth applicable to Unit 4, because it specifies a maximum slash depth of 18 inches for ninety-four acres of Treatment Type 1 units -- which the Court assumes are the 94 acres of Treatment Type 1 units in goshawk dispersal post fledgling lands mentioned on page 378 -- on page 378 and on page 387, see Statement of Work Modification 2 § 1(A), 5(A), at 378, 387, but also states, on page 387, under the quality standards for "Treatment Type 1 Units, Selection of Cut Trees," that "[s]lash disposal will consist of scatter and lop all slash (3'' and smaller) to 24'' height or less," Statement of Work Modification 2 § 5(A), at 387.[214] The Court requires extrinsic evidence to determine whether the twenty-four-inch requirement represents a maximum slash depth requirement, and, if it does, which maximum slash depth the Forest Service and Isleta Pueblo intended in Statement of Work Modification 2. The Court also needs additional evidence to determine whether Statement of Work

_____

[214]The Ohlsen Plaintiffs complain about the United States' reliance on the Third Fox Decl. ¶ 28, at 6. See Motion to Strike ¶¶ 8-9, at 2-3. They argue that Fox does not have personal knowledge about the Participating Agreement and the Statements of Work. See Motion to Strike ¶¶ 8-9, at 2-3. The United States responds that Fox' experience with the Forest Service and role in administering the Participating Agreement, including drafting Forest Service contracts, provide sufficient foundation for his statement. See Motion to Strike Response at 5-6. The Ohlsen Plaintiffs' reply by attacking Fox' personal knowledge, because, in the Videotaped Deposition of Ian Fox at 144:24-145:23 (taken October 23, 2018), filed March 5, 2019 (Doc. 135-1)("Fox Depo. 135-1"), he admits that he drew the Participating Agreement from a form contract. See Motion to Strike ¶ 8, at 2-3 (citing Fox Depo. 135-1 at 91:13-93:7). The Court, for the reasons described supra note 75, concludes that the Third Fox Decl. ¶ 28, at 6, is not based on personal knowledge. The Ohlsen Plaintiffs also aver that Fox omits relevant facts about the maximum slash depth from the Third Fox Decl. ¶ 28, at 6, see Motion to Strike ¶ 11, at 3; Motion to Strike Reply at 7, such as that the slash depth exceeded the maximum slash depth on June 14, 2016, see Motion to Strike Reply at 7, but the Court deems these objections to speak to the weight to give the Third Fox Decl. ¶ 28, at 6 rather Third Fox Decl. ¶ 28, at 6's admissibility. As the Court concludes that the paragraph lacks a foundation in personal knowledge, however, the Court will disregard the paragraph.

Modification 2 applies to Unit 4, because the Court cannot verify whether Unit 4 is excluded from the goshawk dispersal post fledgling lands, as the Ohlsen Plaintiffs alleged at the hearing.  See March 8 P.M. Tr. at 70:7-17 (Tosdal).  Regardless the provided-for maximum slash depth, the Ohlsen Plaintiffs and the United States also dispute whether the slash in Unit 4 exceeded any maximum slash depth.  See Ohlsen Response ¶ 30, at 7 (describing the slash as over 36 inches deep (citing E. Jiron Depo. 98-14 at 30:20-31:17[215]); Ohlsen Reply ¶ 30, at 18 (describing that E. Jiron did not clarify what percentage of the slash exceeded the maximum slash depth, and that other witnesses stated the slash was not as deep as E. Jiron testified and that the slash depth complied with the Statements of Work requirements (citing E. Jiron Depo. 98-14 at 30:20-31:17; Dixon Depo. 127-6 at 52:12-18; Lueras Depo. 127-9 at 69:15-17; id. at 37:23-38:5; Third Fox Decl. ¶¶ 18-21, at 4-5[216]); Motion to Strike ¶ 12, at 3 (citing Videotaped Deposition of Ian Fox at 144:24-145:23 (taken October 23, 2018), filed March 5, 2019 (Doc. 135-1)("Fox Depo. 135-1")).

---

[215]The United States asks that the Court exclude from evidence the picture that the Ohlsen Plaintiffs cite in Ohlsen Response ¶ 30, at 7.  See Ohlsen Reply ¶ 30, at 18; Picture, filed December 19, 2018 (Doc. 98-16).  The United States argues that the Picture is not authenticated and not identified.  See Picture at 1.  The Court agrees with the United States that the unidentified image of slash is inadmissible and does not consider the Picture as evidence supporting the Ohlsen Plaintiffs' statement.

[216]The United States cites the Third Fox Decl. ¶¶ 16-24, 28, at 4-6, to support its statement that Statement of Work Modification 2 changed the maximum slash depth to twenty-four-inches with a requirement that the thinning crew meet this maximum ninety-five percent of the time.  See Ohlsen Reply ¶ 30, at 18.  The Ohlsen Plaintiffs ask that the Court disregard the Third Fox Decl. ¶¶ 16, 18, and 28, at 4, 6.  See Motion to Strike Reply at 5-7.  The Ohlsen Plaintiffs argue that the Third Fox Decl. ¶¶ 16 and 18, at 4, ignore the Forest Service's duty to assess fire risk, but they do not present arguments about the statements' admissibility or cite any evidence creating a mandatory requirement for the Forest Service to engage in fire risk assessment.  See Motion to Strike Reply at 5-6.  The Court concludes, accordingly, that it need not disregard the Third Fox Decl. ¶¶ 16, 18, and 28, at 4, 6, for the reasons in the Motion to Strike Reply at 5-7, but that a dispute of fact exists as to these paragraphs.

A dispute also exists whether the slash depth caused the Ohlsen Plaintiffs' harms, although the Court deems the dispute irrelevant to its conclusion. The Ohlsen Plaintiffs argue that the maximum slash depth provides for safer prescribed burns. See Ohlsen Response ¶ 19, at 5 (citing Johnson Depo. at 41:21-42:11). The Ohlsen Plaintiffs submit evidence from Michael Wetzel, a Certified Forester, of the scientific model for calculating ERC and of the connections between fuel load and slash depth. See Motion to Strike ¶¶ 16-17, at 4 (citing Exhibit 2A at 1, filed March 5, 2019 (Doc. 135-3); Declaration of Michael Wetzel ¶¶ 1-5, at 1-2 (dated March 5, 2019), filed March 5, 2019 (Doc. 135-2)("Wetzel Decl."); Motion to Strike Reply at 3 (citing Forester's Report of the Dog Head Fire at 5 (dated April 12, 2019), filed April 23, 2019 (Doc. 171-3)("Wetzel Report")).[217] The United States avers that slash depth does not relate to fire intensity and that the

---

The Ohlsen Plaintiffs also object to the Third Fox Decl. ¶¶ 16-17, at 4, as inadmissible legal opinions. The United States describes that Fox makes statements of fact "from the contract" or "based on the text of . . . the Participating Agreement." Fox Objections Response ¶¶ 2-3, at 2-3. For the same reasons stated supra note 35, the Court deems the Third Fox Decl. ¶¶ 16-17, at 4, inadmissible.

The Ohlsen Plaintiffs further object to the Third Fox Decl. for lack of personal knowledge of the Participating Agreement and Statements of Work. See Third Fox Decl. Objections ¶ 9, at 3. The Court, for the reasons stated supra note 35 in relation to the First Fox Decl., deems Third Fox Decl. ¶ 16, 17, 22-24, 28, at 4-6, inadmissible for lack of a foundation in personal knowledge, because the paragraphs summarize -- if not repeat -- the Participating Agreement and Statements of Work. See supra note 29. The Court concludes that the Third Fox Decl. ¶¶ 18-21, 28 at 4-6, which state the Forest Service's recognition of the costs of reducing all slash below a maximum 18 inches deep, identify pages missing from the Statement of Work Original exhibit attached to the Ohlsen Response, authenticate the Statement of Work Original excerpt attached to the Third Fox Decl., and identify Unit 4 as a Treatment Type 1 Unit, without citation to a Statements of Work, are admissible. See Third Fox. Decl. ¶¶ 18-21, at 4-5. The Court concludes that Fox has the personal knowledge to authenticate the documents and identify missing pages, and, after working as the Natural Resources Staff Officer, see Third Fox Decl. ¶ 1, at 1, Motion to Strike Response at 5-6, to opine on the costs of reducing slash and the treatment type of Unit 4.

[217]The Ohlsen Plaintiffs cite the Forester's Report of the Dog Head Fire at 5 (dated April 12, 2019), filed April 23, 2019 (Doc. 171-3)("Wetzel Report"), to support the text's statement.

slash depth did not prevent the thinning crew from suppressing the fire.  See Ohlsen Reply at 40.

In its argument section, the United States relies on Martinez' testimony that the amount of fuel on

the ground -- measured by the fuel load and not the slash depth -- feeds a fire's intensity.  See

Ohlsen Reply at 40 (citing Martinez Depo. 98-4 at 26:18-27:21; Second Martinez Decl. ¶¶ 6-7, at

2).  In its reply to the Ohlsen Plaintiffs' proposed undisputed facts, the United States also cites

Fox' testimony in the Third Fox Decl. ¶ 25, at 5, that the Statements of Work impose a maximum

slash depth that aims to balance aesthetics and the cost for reducing the slash depth, and that the

Forest Service pulled the number from timber contracts.  See Ohlsen Reply ¶ 19, at 14 (citing

Third Fox Decl. ¶ 25, at 5).  The United States also references Fox' assertion that he has never

heard that slash depth affects the risk of fire.  See Ohlsen Reply ¶ 19, at 14 (citing Third Fox Decl.

---

Additionally, the Ohlsen Plaintiffs cite the Report of Kevin K. Eckert, Consulting Arborist ¶ 3, at 6-7 (dated January 15, 2019), filed April 23, 2019 (Doc. 171-5)("Eckert Report"), for evidence that 18 inches "is a recognized maximum depth for slash to minimize risk of wildfire."  Motion to Strike Reply at 3.  The Court has previously concluded that expert reports are hearsay.  See, e.g., Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013)(Browning, J.)(excluding an expert report, because it "is a written document that [the expert] prepared outside of the court and contains statements offered "for the truth of what the statements assert"); Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LFG, 2007 WL 2219449, at *3 n.4 (D.N.M. May 14, 2007)(Browning, J.)(excluding the expert report "because rule 703 of the Federal Rules of Evidence allows an expert to rely on inadmissible facts in reaching an opinion or inference, but does not allow the proponent of the expert testimony to use the expert as a conduit for a party to get in otherwise inadmissible evidence"), aff'd in part, rev'd in part, dismissed in part, 535 F.3d 1198 (10th Cir. 2008); United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3834072, at *4 (D.N.M. Aug. 7, 2010)(Browning, J.)(concluding that an expert report was inadmissible, and noting that, although inadmissible, "[the expert] could rely upon that report, because the materials that form the basis of an expert opinion need not, themselves, be admissible . . . .").  For the Court to rely on the Wetzel Report and the Eckert Report, Wetzel and Kevin Eckert would have needed to submit affidavits with the reports and swear, under penalty of perjury, that the statements in the reports are true and accurate, and made in reliance on information that experts in the field usually follow, pursuant to rule 703 of the Federal Rules of Civil Procedure.  See ABQ Uptown, LLC v. Davide Enterprises, LLC, No. CIV 13-0416 JB/KK, 2015 WL 8364799, at *15 n.31 (D.N.M. Oct. 19, 2015)(Browning, J.).

¶ 26, at 5). The Court declines the Ohlsen Plaintiffs' invitation to strike these portions of the Third Fox Decl. ¶¶ 25-26, at 5. <u>See</u> Motion to Strike at 1-6. The United States argues regarding the Third Fox Decl. ¶ 25, at 5, that Fox has personal knowledge about the Statements of Work from his seventeen years as the Forest Service Natural Resource Officer, and, regarding the Third Fox Decl. ¶ 26, at 5, that Fox makes the statement based on that same experience and does not opine on the risks of fire. <u>See</u> Motion to Strike Response at 5-6. The Court agrees with the United States and concludes that the Ohlsen Plaintiffs attack Fox' credibility rather than the statements' admissibility, <u>see</u> Motion to Strike at 2-3; Motion to Strike Reply at 6, and aver, for instance, that Fox admits that he is not a "'fire guy,'" Motion to Strike ¶ 4, at 3 (quoting Fox Depo. 135-1 at 31:5), and lacks the expertise to engage in fire risk operations, <u>see</u> Motion to Strike ¶ 5, at 3 (citing Fox Depo. 135-1 at 146:2-11). The Ohlsen Plaintiffs add that Fox does not have personal knowledge about the Participating Agreement and Statements of Work, <u>see</u> Motion to Strike ¶¶ 8-9, at 2-3, and that other evidence contradicts Fox' statements, <u>see</u> Motion to Strike Reply at 6. The arguments about Fox' accuracy are arguments about credibility rather than admissibility, and, as Fox is the Natural Resources Staff Officer who administered those documents, the Court concludes that he has personal knowledge to explain his understanding why the Statements of Work contain the specified maximum slash depth, <u>see</u> Third Fox Decl. ¶ 1, at 1. The Court does not consider Fox' statements on these matters expert opinions as the Court does not read the Third Fox Decl. ¶¶ 25-26, at 5, to try to offer expert opinions; Fox describes what the maximum slash depth's inclusion in the Statements of Work means to him and that he has no information about slash depth increasing the risk of fire. <u>See</u> Third Fox Decl. ¶¶ 25-26, at 5. The Ohlsen Plaintiffs' arguments about Fox' credibility create, however, a question of fact regarding the slash depth's relation to

the fire risk. Moreover, the Third Fox Decl. ¶¶ 25-26, at 6, does not preclude a reasonable factfinder from concluding that the slash depth is related to fire risk. As both the concepts of fuel load and slash depth relate to the amount of material on the ground and the concepts correlate to each other, as Exhibit 2A reflects, see Exhibit 2A at 1, the Court concludes that an issue of fact exists whether the slash depth is related to the risk of wildfire. As the choice to delegate the responsibility of complying with the maximum slash depth was within the Forest Service's discretion, however, and the independent contractor exception protects the United States from liability for Isleta Pueblo's actions, this issue is irrelevant, and the Court dismisses for lack of subject-matter jurisdiction the claim about the Forest Service violating the maximum slash depth.

Fifth, the Court concludes that the discretionary function exception bars the Ohlsen Plaintiffs' claim based on the Forest Service's failure to impose fire restrictions that "are automatically implemented when the ERC reaches 90." Ohlsen Plaintiffs' Claim List at 1. The Court concludes that the Plaintiffs have not shown a genuine dispute of material fact whether the Forest Service has a mandatory obligation to impose fire restrictions when the ERC reaches 90.[218]

---

[218]The Court concludes that a question of fact exists whether the ERC on June 14, 2016, was ninety percent or above. The Ohlsen Plaintiffs aver that, at the Martinez Depo., Martinez testified that the ERC on June 14, 2016, was at or above ninety percent, see Ohlsen Response ¶ 44, at 90 (citing ERC Chart at 1, filed December 19, 2018 (Doc. 98-20)("ERC Chart Doc. 98-20")), but, that Martinez changed his testimony to state that the ERC was below eighty percent, see Ohlsen Response ¶ 44, at 9 (citing ERC Chart, filed December 19, 2081 (Doc. 98-21)("ERC Chart Doc. 98-21")(same chart as ERC Chart Doc. 98-20, except for Martinez' circle, which is located in a different place); Martinez Depo. 98-4 at 55:1-57:7). The Ohlsen Plaintiffs contend that the United States later confirmed that the ERC on June 14, 2016, was above ninety percent. See Ohlsen Response ¶ 45, at 9-10 (citing ERC Chart at 1, filed December 19, 2081 (Doc. 98-22)("ERC Chart Ex. 21A")). The United States replies that, at the deposition, Martinez circled a point above ninety percent on the ERC Chart, and then realized his mistake, stated that he looked at the wrong line when he circled the point, and repeatedly testified that the ERC was below eighty percent. See Ohlsen Reply ¶ 44, at 23 (citing Martinez Depo. 98-4 at 186:8-12; Martinez Depo.

The Ohlsen Plaintiffs argue that Martinez, when pressed, "admitted restrictions are not discretionary." Ohlsen Response ¶ 53, at 11-12 (citing Martinez Depo. 98-4 at 64:6-65:13). The United States argues that Kohrman decides when to enter fire restrictions and that the Forest Service considers several public policy factors in reaching the decision. See Ohlsen Reply ¶ 44, at 23 (citing Martinez Depo. 98-4 at 61:25-62:1; id. at 58:2-25; Videotaped Deposition of Elaine Kohrman at 62:15-23 (dated September 10, 2018), filed February 28, 2019 (Doc. 127-10)("Kohrman Depo. 127-10"); id. at 63:2-22; id. at 200:5-20; id. at 201:11-16; Second Martinez Decl. ¶¶ 16-19, at 4-5; Martinez Depo. 127-5 at 151:4-16; id. at 153:6-19). The Martinez Depo. 98-4 excerpt on which the Ohlsen Plaintiffs rely reflects Martinez stating, in response to the question, "what should you do . . . when [the ERC] hits 90 percent?," Martinez Depo. 98-4 at 65:6-7, "I don't like the word 'should.' What I do . . . is definitely go into restrictions," Martinez Depo.

---

127-5 at 146:15-19; id. at 183:21-184:3)). According to the United States, Martinez also reported the ERC to be below eighty percent on June 14, 2016. See Ohlsen Reply ¶ 44, at 23 (Wildland Fire Risk and Complexity Assessment at 3, 6, filed December 19, 2018 (Doc. 98-19)). The Ohlsen Plaintiffs and the United States also dispute how to interpret ERC Chart Ex. 21A, which shows a sharp increase in the ERC around June 14, 2016. See Ohlsen Response ¶ 45, at 9-10 (citing ERC Chart at 1, filed December 19, 2081 (Doc. 98-22)("ERC Chart Ex. 21B")); Ohlsen Reply ¶ 45, at 24 (citing ERC Chart Ex. 21B at 1). The Court agrees with the United States that the Martinez Depo. most likely reflects that Martinez made a mistake. See Martinez Depo. 98-4 at 55:1-57:7. The Court has, moreover, questions about the ERC chart, because the chart appears to have been produced originally with the vertical axis divided into twenty-percent-point intervals, and a ninety percent line appears to have been added. See ERC Chart Doc. 98-20 at 1; ERC Chart Doc. 98-21 at 1. The ninety percent line appears, however, to be lower than the halfway point between eighty percent and one hundred percent where the line would be expected to be. See ERC Chart Doc. 98-20 at 1; ERC Chart Doc. 98-21 at 1. As the Court should not make credibility determinations on a motion for summary judgment, Liberty Lobby, 477 U.S. at 255, however, the Court deems these differences to create a genuine dispute of material fact. Moreover, the Court agrees with the United States that ERC Chart Ex. 21A presents an ambiguous chart that a reasonable factfinder could interpret to show an ERC in a range from eighty percent to above ninety percent around June 14, 2016. See Ohlsen Response ¶ 45, at 9-10. As the Court concludes, however, that the Forest Service acted in its discretion in not entering fire restrictions, this dispute is irrelevant.

98-4 at 65:11-13.  The Martinez Depo. 98-4 continues: "Q: You . . . definitely go into restrictions?  A: Yeah," Martinez Depo. 98-4 at 65:11-13.  Martinez makes no comment about laws, regulations, or Forest Service policies mandating fire restrictions.  On the other hand, Martinez, Kohrman, and Forest Service guidelines treat entering fire restrictions as a matter of judgment.  See Martinez Depo. 98-4 at 61:25-62:1; id. at 58:2-25; Kohrman Depo. 127-10 at 62:15-23; id. at 63:2-22; id. at 200:5-20; id. at 201:11-16; Second Martinez Decl. ¶¶ 16-19, at 4-5; Martinez Depo. 127-5 at 151:4-16; id. at 153:6-19; Forest Service Fire Management Guidelines at 1-3, filed February 28, 2019 (Doc. 172-2)("Fire Management Guidelines"); Southwest Coordinating Group Interagency Fire Restriction and Closure Procedures at 1-2, filed February 28, 2019 (Doc. 127-3)("Fire Restriction and Closure Procedures"); Cibola National Forest and Grasslands Fire Danger Operating Plan at 1-3, filed February 28, 2019 (Doc. 127-4)("Fire Danger Operating Plan").  The Fire Management Guidelines give no mandatory requirements on fire management; they instead direct the Forest Service to consider several principles to consider in developing fire management.  See Fire Management Guidelines at 3.  The Fire Restriction and Closure Procedures, filed February 28, 2019 (Doc. 127-3), likewise provide no mandatory requirement, but rather state:

> Fire restrictions should be considered when high to extreme fire danger is predicted to persist.  Other considerations are the level of human caused fire occurrences being experienced, firefighting resources available, potential high-risk occasions (4th of July, etc.), and large fire activity occurring on a unit or within the Region.  Fire restrictions should not be considered the primary prevention program and all other alternatives should be taken prior to considering fire restrictions.

Fire Restriction and Closure Procedures at 2.  The Fire Danger Operating Plan similarly directs the Forest Service to use its discretion when determining fire restrictions: "Fire danger will be determined by district, and forest level fire personnel.  These fire program personnel will use the

National Fire Danger Rating System[219] to make informed decisions about fire danger." Fire Danger Operating Plan at 2. In light of this evidence, Martinez' single Martinez Depo. 98-4 comment does not show a genuine dispute of material fact whether the Forest Service lacked the ability to make a judgment or choice in entering fire restrictions. See Ohlsen Reply ¶ 44, at 23 (citing Martinez Depo. 98-4 at 61:25-62:1; id. at 58:2-25; Kohrman Depo. 127-10 at 62:15-23; id. at 63:2-22; id. at 200:5-20; id. at 201:11-16; Second Martinez Decl. ¶¶ 16-19, at 4-5; Martinez Depo. 127-5 at 151:4-16; id. at 153:6-19).

The Ohlsen Plaintiffs and the United States agree that the Forest Service's decisions about fire restrictions weigh policy considerations:

> Aligning forest-thinning work on the units with general fire restrictions involves weighing policy considerations. USFS weighs the risk of further restricting forest thinning activity on USFS lands versus the risk of a catastrophic wildfire if the work is not performed in a timely manner. The USFS also has several restoration projects happening in tandem and must take into consideration the timing of each of these projects. The USFS must also take into consideration available funding for projects and when the projects must take place to take advantage of the funding.

Ohlsen Motion ¶ 29, at 10 (citing Second Fox Decl. at 53-58, at 12-13); Sais Motion ¶ 33, at 9-10 (citing Second Fox Decl. at 53-58, at 12-13). Practical considerations also amount to policy choices. See Safeco Ins. v. United States, 1999 WL 1038272, at *1 ("'[P]ractical considerations' are part of the discretionary-function policy mix." (citing Gager v. United States, 149 F.3d at 921-22; Richardson v. United States, 943 F.2d at 111). The Forest Service considers temperature, wind

---

[219]"National Fire Danger Rating System (NFDRS) is used in the United States to provide a measure of the relative seriousness of burning conditions and threat of fire." National Fire Danger Rating System, Wikipedia, https://en.wikipedia.org/wiki/National_Fire_Danger_Rating_System (last visited June 6, 2019). It uses a complex set of equations and considers "current and antecedent weather, fuel types, and live and dead fuel moisture." National Fire Danger Rating System, supra.

speed, relative humidity, ERC, see Martinez Depo. 127-5 at 151:4-16, the effects of closing the forest on the public, staffing descriptions, relationships with adjacent landowners, see Second Martinez Decl. ¶¶ 16-19, at 4-5, available resources, and events, such as the Fourth of July, that affect the fire risk, see Fire Restriction and Closure Procedures at 1. The Ohlsen Plaintiffs emphasize the Forest Service's negligence in failing to enter fire restrictions, see Ohlsen Response at 35-36; Independent Contractor Motion and Ohlsen Motion at 4-6, but this contention improperly conflates the discretionary function analysis and the negligence analysis, see Redman v. United States, 934 F.2d at 1157 (citing 28 U.S.C. § 2680(a)). The Ohlsen Plaintiffs' arguments do not persuade, therefore, the Court. Accordingly, the Court concludes that the discretionary function exception bars the Ohlsen Plaintiffs' claim based on the Forest Service not enacting fire restrictions.

Sixth, the discretionary function exception bars the Ohlsen Plaintiffs' claim based on the allegation that "USFS and POI [(Isleta Pueblo)] failed to create and accept a mandatory ('shall' in the PA) 'safety plan.'" Ohlsen Plaintiffs' Claim List at 1. The Ohlsen Plaintiffs have identified no mandatory requirements that apply to the Forest Service's role in Isleta Pueblo developing a safety plan, and the Court has identified none. The Statements of Work specify that the requirement to develop a safety plan applies to Isleta Pueblo. See Statement of Work Modification 3 ¶ 2, at 11 ("The Partner shall prepare and submit a safety plan to provide for worker and public safety."). As discussed supra in relation to the claim based on the maximum slash depth, the Forest Service's decisions to contract with Isleta Pueblo and to delegate it responsibilities are discretionary functions. The Ohlsen Plaintiffs' statements that "the USFS violated the Participating Agreement by negligently allowing the Pueblo to disregard safety requirements" and

that, "[n]otwithstanding the independent contractor issue and the duties of the POI, the USFS is responsible for its negligent acts and omissions" ignore that the Court must not consider the Forest Service's negligence in analyzing the discretionary function exception. Ohlsen Response at 33-34. Accordingly, as the United States acted in its discretion and the independent contractor function bars the United States' liability for Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.[220]

Seventh, the discretionary function exception bars the Ohlsen Plaintiffs' claim based on the allegation that "USFS and POI members did not have proper training and equipment to suppress the fire given waist deep slash (slash that exceeds the limit in the PA of 18'')." Ohlsen Plaintiffs' Claim List at 1. The Participating Agreement delegates to Isleta Pueblo the responsibilities of training the thinning crew and ensuring safety while working on the thinning project. See Participating Agreement ¶ III(D), V(F), at 3, 5. The Statements of Work, as discussed supra, govern Isleta Pueblo, and delegate to Isleta Pueblo the responsibility of ensuring fire safety and providing adequate equipment for fire prevention. See Statement of Work Modification 3 §§ 3-4, 11 at 416, 427-30. The Ohlsen Plaintiffs have identified no mandatory requirements for the Forest Service's decisions about training and equipment, or for the Forest Service's supervision over Isleta Pueblo's choices about training and equipment. As discussed supra in the discussion of the maximum slash depth, the United States' decisions to contract with Isleta Pueblo and to delegate it responsibilities, including safety responsibilities, are discretionary functions. See, e.g.,

---

[220]The Court deems the Ohlsen Plaintiffs' citation to Terbush v. United States inapt, because the Court concludes that the responsibility for enacting a safety plan and, as discussed in the text infra, having proper fire suppression equipment lay with Isleta Pueblo, and the Forest Service acted within its discretion in delegating to Isleta Pueblo these responsibilities. See Ohlsen Response at 35 (citing Terbush v. United States, 516 F.3d at 1133-34).

Carroll v. United States, 661 F.3d at 103-04; Coffey v. United States, 906 F. Supp. 2d at 1158; Andrews v. United States, 121 F.3d at 1440; Andrews v. United States, 121 F.3d at 1440; Layton v. United States, 984 F.2d at 1502-03. Neither the Ohlsen Plaintiffs nor the United States produce evidence about the considerations governing the Forest Service's training decisions for its employees, and the Court has located none. The Court presumes that the Forest Service grounded its decision on policy. See Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1222 ("Though not all discretionary acts fit this criteria, we presume that a government agent's discretionary actions are grounded in policy, and it is up to the challenger to allege facts showing that the actions were actually not policy-oriented." (citing United States v. Gaubert, 499 U.S. at 324-25)). The Court and Courts of Appeals have previously concluded that decisions about training are discretionary functions, as the Forest Service must weigh the costs, time, and benefits of training. See Kelly v. United States, 241 F.3d 755, 763 (9th Cir. 2001)(describing that training decisions are generally discretionary and collecting cases); Redmon By & Through Redmon v. United States, 934 F.2d at 1156 (determining that the Federal Aviation Administration's decision not to require a practical flight test for pilots was a discretionary decision); Garcia v. United States, 709 F. Supp. 2d at 1151-52 (describing a police department's choices about training police officers as discretionary, because the department had to weigh, for instance, training's costs and the likelihood that training would produce benefits). The Ohlsen Plaintiffs and the United States agree that "[d]ecisions regarding required tools and equipment to mitigate the risk of causing wildfire involves policy considerations such as how best to use USFS monetary resources, the benefits of additional tools and equipment, and the risk that the work will cause a wildfire." Ohlsen Motion ¶ 30, at 9 (citing Second Fox Decl. ¶¶ 63-66, at 14-15); Sais Motion ¶ 37, at 10 (citing Second Fox

Decl. ¶¶ 63-66, at 14-15).  As with the Ohlsen Plaintiffs' claim about Isleta Pueblo's safety plan, the Ohlsen Plaintiffs' statements that "the USFS violated the Participating Agreement by negligently allowing the Pueblo to disregard safety requirements," and that, "[n]otwithstanding the independent contractor issue and the duties of the POI, the USFS is responsible for its negligent acts and omissions," miss the discretionary function analysis' mark.  Ohlsen Response at 33-34. Accordingly, as the United States acted in its discretion and the independent contractor function bars the United States' liability for Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.

Eighth and last, the discretionary function exception bars the Ohlsen Plaintiffs' claim that "USFS and POI members failed to and were not in the position to suppress the fire at the time of ignition, and the USFS is complicit in that failure because of its prior knowledge of the waist deep slash."  Plaintiff's Claims at 1.  The Participating Agreement delegates to Isleta Pueblo the responsibility for taking safety precautions, and the Statements of Work delegate to Isleta Pueblo the responsibility for responding to and containing fires in the area on which the thinning crew worked.  See Participating Agreement ¶ V(F), at 3, 5; Statement of Work Modification 3 § 11(A), at 427.  As discussed supra in the discussion of the maximum slash depth, the United States' decisions to contract with Isleta Pueblo and to delegate to Isleta Pueblo duties including safety responsibilities, such as fire suppression, are discretionary functions.  See, e.g., Autery v. United States, 424 F.3d at 958-59 (concluding that the independent contractor exception bars claims against the United States when a contract delegates fire prevention to a contractor).  The Ohlsen Plaintiffs cite no evidence of a mandatory requirement governing the Forest Service's fire suppression decisions, and the Court could locate none.  The Tenth Circuit has concluded that

decisions about fire suppression "are susceptible to a policy analysis grounded in social, economic, or political concerns." Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1222. See id. at 1222-23 ("[T]he balancing of the needs to protect private property, ensure firefighter safety, reduce fuel levels, and encourage natural ecological development . . . are precisely the kind of social, economic, and political concerns the discretionary function exception was designed to shield."). Moreover, the Court presumes that the Forest Service grounded its decision on policy, see Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1222 ("Though not all discretionary acts fit this criteria, we presume that a government agent's discretionary actions are grounded in policy, and it is up to the challenger to allege facts showing that the actions were actually not policy-oriented." (citing United States v. Gaubert, 499 U.S. at 324-25)), and the Ohlsen Plaintiffs have offered no specific arguments here that the Forest Service's decision did not rest on policy considerations. The Ohlsen Plaintiffs appear to rest their contentions on the arguments that "the USFS violated the Participating Agreement by negligently allowing the Pueblo to disregard safety requirements" and that, "[n]otwithstanding the independent contractor issue and the duties of the POI, the USFS is responsible for its negligent acts and omissions." Ohlsen Response at 33-34. As discussed supra, these arguments improperly conflate, however, the discretionary function exception analysis and the negligence analysis. Accordingly, as the discretionary function exception bars claims against the Forest Service based on its fire suppression choices and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.[221]

---

[221]The Court deems Rounds v. United States Forest Service inapplicable to the Court's discretionary function analysis, see March Notice of Supplemental Authority at 1, because the case does not address the FTCA, see Rounds v. U.S. Forest Serv., 301 F. Supp. 2d at 1292.

**B. THE DISCRETIONARY FUNCTION EXCEPTION BARS C DE BACA'S AND CIANCHETTI'S CLAIMS.**

The Court concludes that the discretionary function exception bars C De Baca's and Cianchetti's claims of the Forest Service's "purported failure to ensure that the equipment used in the forest thinning project was in good order and the proper equipment for the terrain; failure to provide proper fire extinguishment tools; and failure to manage the undergrowth of the forest area where the fire occurred." C De Baca Motion at 1. C De Baca, Cianchetti, and the United States do not specifically argue whether the discretionary function exception bars C De Baca's and Cianchetti's claims of the Forest Service's "purported failure to ensure that the equipment used in the forest thinning project was in good order and the proper equipment for the terrain; failure to provide proper fire extinguishment tools; and failure to manage the undergrowth of the forest area where the fire occurred." C De Baca Motion at 1. C De Baca and Cianchetti incorporate all other Plaintiffs' responses to the United States' motions to dismiss, and, specifically incorporate the Ohlsen Independent Contractor Response, Ohlsen Response, and Sais Response, into their C De Baca Response. See C De Baca Response at 4. See also Ohlsen Response at 1 n.1 (stating that the Ohlsen response speaks for all Plaintiffs). To the extent the contents of the Ohlsen Plaintiffs' discretionary function exception arguments are relevant to C De Baca and Cianchetti's claims, the Court considers, accordingly, those arguments in response to the C De Baca Motion.

First, the discretionary function exception bars C De Baca's and Cianchetti's claims of the Forest Service's "purported failure to ensure that the equipment used in the forest thinning project was in good order and the proper equipment for the terrain." C De Baca Motion at 1. The Participating Agreement delegates to Isleta Pueblo the responsibility of providing equipment for the thinning crew's work and of maintaining a work environment that safeguards the thinning

crew's, the public's, and the Forest Service's interests.  See Participating Agreement ¶ III(B)-(D), at 3.  Such provisions encompass the responsibility for ensuring that the thinning crew had proper equipment for its work in Unit 4.  C De Baca and Cianchetti have identified no mandatory requirements requiring the Forest Service to oversee Isleta Pueblo's equipment choices, and the Court has identified none.  As discussed supra, the Forest Service acted within its discretion in contracting with Isleta Pueblo and delegating responsibilities.  As the discretionary function exception bars claims against the Forest Service based on the thinning crew's equipment, and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.

Second, the discretionary function exception applies to C De Baca's and Cianchetti's claim for the Forest Service's "failure to provide proper fire extinguishment tools."  C De Baca Motion at 9.  As discussed supra in relation to the Ohlsen Plaintiffs' claim that "USFS and POI members did not have proper training and equipment to suppress the fire given waist deep slash (slash that exceeds the limit in the PA of 18''),"  Ohlsen Plaintiffs' Claim List at 1, the Forest Service delegated responsibility for providing fire extinguishment tools to Isleta Pueblo, and had no mandatory requirement binding its decisions about overseeing Isleta Pueblo's tools or about its fire extinguishment tools.  As discussed supra, the Forest Service acted within its discretion in making decisions regarding the fire extinguishment tools.  As the discretionary function exception bars claims against the Forest Service based on the thinning crew's fire extinguishment tools, and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.

Third, the discretionary function exception applies to C De Baca's and Cianchetti's claim for the Forest Service's "failure to manage the undergrowth of the forest area where the fire occurred." C De Baca Motion at 1. As C De Baca, Cianchetti and the United States do not discuss this claim, the Court cannot ascertain exactly what C De Baca and Cianchetti believe the Forest Service failed to manage. As discussed supra, however, the Forest Service's silviculture decisions and decisions about the slash lay within the Forest Service's discretion. Accordingly, as the discretionary function exception bars claims against the Forest Service, and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions in managing the forest, the Court dismisses this claim for lack of subject-matter jurisdiction.

## C. THE DISCRETIONARY FUNCTION EXCEPTION BARS THE SAIS PLAINTIFFS' CLAIMS.

The Court will also dismiss the Sais Plaintiffs' claims for lack of subject-matter jurisdiction. These claims include all the same claims as C De Baca and Cianchetti bring, and also that the Forest Service "was negligent in leaving slash and boles produced by forest thinning operations on the ground where the fire started; conducting forest thinning operations under unreasonable conditions; failing to employ competent individuals to perform the work; and failing to train, instruct, direct, or supervise the Pueblo crews." Sais Motion at 11. The United States incorporates its discretionary function arguments from the Ohlsen Motion and does not otherwise argue in the Sais Motion that the discretionary function exception bars these claims, see Sais Motion at 15, and the Sais Plaintiffs likewise incorporate the Ohlsen Response without making their own arguments, see Sais Response at 1-2. See also Ohlsen Response at 1 n.1 (stating that the Ohlsen response speaks for all Plaintiffs). As the Sais Plaintiffs' claims do not align exactly with the Ohlsen Plaintiffs' claims, the Court discusses each Sais Plaintiff claim in turn. First, for the

reasons discussed supra in the Analysis' Section II(B), the Court dismisses all the claims that overlap with C De Baca's and Cianchetti's claims.

Second, the Court concludes that the discretionary function exception bars the Sais Plaintiffs' claims against the Forest Service for "leaving slash and boles produced by forest thinning operations on the ground where the fire started." Sais Motion at 11. As discussed supra in the Analysis' Section II(A), the Forest Service's decisions about the slash lay within the Forest Service's discretion. Accordingly, as the discretionary function exception bars claims against the Forest Service, and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions in, the Court dismiss this claim for lack of subject-matter jurisdiction.

Third, the Court concludes that the discretionary function exception bars the Sais Plaintiffs' claims against the Forest Service for "conducting forest thinning operations under unreasonable conditions." Sais Motion at 11. As discussed supra, the Forest Service's decisions to masticate and not to enter fire restrictions are within the Forest Service's discretion. Accordingly, as the discretionary function exception bars claims against the Forest Service and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.

Fourth, the Court concludes that the discretionary function exception bars the Sais Plaintiffs' claims against the Forest Service for "failing to employ competent individuals to perform the work." Sais Motion at 11. The Participating Agreement delegates to Isleta Pueblo the responsibility for obtaining personnel to perform the thinning work, see Participating Agreement ¶ III(B), at 2, and, as discussed supra, the Forest Service's decisions to hire an

independent contractor and which contractor to hire were within its discretion. Accordingly, as the discretionary function exception bars claims against the Forest Service, and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.

Fifth, the Court concludes that the discretionary function exception bars the Sais Plaintiffs' claims against the Forest Service for "failing to train, instruct, direct, or supervise the Pueblo crews." Sais Motion at 11. The Participating Agreement delegates to Isleta Pueblo the responsibility for training, instructing, directing, and supervising the thinning crew. See Participating Agreement ¶ III(B), V(F), at 2, 5. As discussed supra, the Forest Service's decisions to hire an independent contractor and to delegate responsibilities to the contractor lay within the Forest Service's discretion. Accordingly, as the discretionary function exception bars claims against the Forest Service, and the independent contractor exception protects the United States from liability based on Isleta Pueblo's actions, the Court dismisses this claim for lack of subject-matter jurisdiction.

### D. THE DISCRETIONARY FUNCTION EXCEPTION BARS HOMESITE INDEMNITY'S AND THE STATE FARM PLAINTIFFS' CLAIMS.

The Court also concludes that it lacks subject-matter jurisdiction over the State Farm Plaintiffs' and Homesite Indemnity's claims. The parties agreed at the March 8, 2019, hearing that the arguments from the Ohlsen Motion, C De Baca Motion, and the Sais Motion, and the relevant responses and replies would apply to the State Farm Plaintiffs and Homesite Indemnity. See Ohlsen Response at 1 n.1 (stating that the Ohlsen response speaks for all Plaintiffs); March 8 P.M. Tr. at 117:1-15 (Ortega, Court); March 8 P.M. Tr. at 118:2-8 (Tosdal). The Court applies,

accordingly, its conclusions from the preceding sections on the discretionary function exception to the State Farm Plaintiffs and Homesite Indemnity.

The Court begins with the State Farm Plaintiffs' claims. As discussed <u>supra</u>, the Forest Service's silviculture decisions and fire restriction decisions are within the Forest Service's discretion. Accordingly, the discretionary function exception divests the Court of subject-matter jurisdiction over the State Farm Plaintiffs' claims of the Forest Service's

> c. Negligently allowing for accumulated slash and boles to harden, dry and transform into an abundant dead vegetative fuel load for fire;
>
> d. Negligently conducting forest thinning and mechanical mastication during the New Mexico wildfire season;
>
> e. Negligently operating mastication machinery on rocky terrain at a time of elevated fire risk;

State Farm Complaint ¶¶ 30 (a)-(c), at 8. Additionally, as discussed <u>supra</u>, the Forest Service has discretion in hiring contractors and delegating responsibilities, and the Participating Agreement delegates to Isleta Pueblo the responsibilities for fire safety, for supervising and directing the thinning crew, <u>see</u> Participating Agreement ¶ V(F), at 5, for completing the thinning work, and for safeguarding Isleta Pueblo's, the public's, and the Forest Service's interests that the thinning implicates, <u>see</u> Participating Agreement ¶¶ II(B), (D), at 2, so the discretionary function exception bars claims based on the masticator operation by the thinning crew. <u>See</u> State Farm Complaint ¶ 30 (c), at 8. Likewise, as discussed <u>supra</u>, the Forest Service's decisions regarding hiring an independent contractor, training its and the contractor's employees, and supervising the contractor are discretionary, so the discretionary function exception bars the State Farm Plaintiffs' claims of the Forest Service

a.      Negligently failing to properly train, instruct, direct, and/or supervise their forestry crew with regard to fire hazards, fire prevention, and fire suppression as well as to proper heavy machinery operating procedures; and

b.      Negligently employing a contractor that failed to properly train, instruct, direct, and/or supervise their forestry crew with regard to fire hazards, fire prevention, and fire suppression as well as to proper heavy machinery operating procedures;

State Farm Complaint ¶¶ 30 (a)-(b), at 8.

The Court turns to Homesite Indemnity's claims. As discussed <u>supra</u>, the Forest Service has discretion in hiring contractors and delegating responsibilities, and the Participating Agreement and Statements of Work delegate to Isleta Pueblo responsibility for conducting the thinning operations. Accordingly, the discretionary function exception divests the Court of jurisdiction over Homesite Indemnity's claims of the Forest Service

(a)      carelessly and negligently operating a masticator;

(b)      operating a masticator in a manner that resulted in a fire;

(c)      operating a masticator when Defendants knew or should have known that there were rocks present in the area and that striking a rock can cause a fire;

(d)      operating a masticator near highly-combustible materials;

(e)      acting in a manner that caused a fire;

(f)      failing to prevent a fire from spreading;

(g)      failing to keep the necessary fire-prevention equipment and personnel at the subject work site;

(h)      operating a masticator in a negligent manner;

(i)      failing to pay attention to the surrounding area and conditions when operating a masticator;

(j)      using a masticator when it was unsafe to do so;

- 284 -

(k)     failing to take evasive measures to avoid striking a rock while operating a masticator;

(l)     failing to hire, train, select, and supervise their employees, workers and contractors with care; and/or

(m)     violating, and/or failing to comply with, applicable rules, codes, laws, regulations, and industry standards,

Homesite Complaint ¶ 25(a)-(m), at 5, to the extent any of those claims rest on the Forest Service's supervision over Isleta Pueblo. Additionally, as discussed supra, the Forest Service's decisions about mastication, forest management, fire suppression, training, and hiring independent contractors are discretionary, so the discretionary function exception bars Homesite Indemnity's claims to the extent the claims are based on the decisions that led to the mastication, to the Forest Service reaction to the Dog Head Fire, and to the Forest Service's actions in hiring, training, and selecting Isleta Pueblo and the thinning crew. See Homesite Complaint ¶ 25, at 5. The Court concludes, accordingly, that it lacks subject-matter jurisdiction over the State Farm Plaintiffs' and Homesite Indemnity's claims because of the discretionary function exception.

## IV.     THE OHLSEN PLAINTIFFS, C DE BACA, CIANCHETTI, AND THE SAIS PLAINTIFFS DID NOT PROPERLY EXHAUST ALL THEIR CLAIMS.

The Court concludes that the Ohlsen Plaintiffs properly exhausted their claim based on Isleta Pueblo's fire suppression activities and their claim based on the Forest Service's failure to have a fire engine accompany the masticator. The Ohlsen Plaintiffs did not, however, exhaust their claim that the Forest Service failed to suppress the Dog Head Fire or their claims, other than the claim about Isleta Pueblo's fire suppression activities, based on the United States' liability for Isleta Pueblo's actions. The Court concludes that C De Baca, Cianchetti, and the Sais Plaintiffs exhausted only their claim that the Forest Service and Isleta Pueblo failed to ensure that the

equipment for thinning Unit 4 was in good working order and the proper equipment for the terrain. The Court divides its discussion of the claims by Plaintiff, grouping C De Baca and Cianchetti together, and addresses each claim separately.

## A. THE ADMINISTRATIVE EXHAUSTION REQUIREMENT BARS SOME OF THE OHLSEN PLAINTIFFS' CLAIMS.

The Court concludes that the Ohlsen Plaintiffs properly exhausted their claim based on Isleta Pueblo's fire suppression activities and their claim based on the Forest Service's failure to have a fire engine accompany the masticator. The Ohlsen Plaintiffs did not, however, exhaust their claim that the Forest Service failed to suppress the Dog Head Fire or their claims, other than the claim about Isleta Pueblo's fire suppression activities, based on the United States' liability for Isleta Pueblo's actions. The United States complains in the Ohlsen Motion that the Ohlsen Plaintiffs did not exhaust their claim based on the Forest Service's and the thinning crew's fire suppression activities. See Ohlsen Motion at 12-13. In the Ohlsen Reply, the United States adds that the Ohlsen Plaintiffs failed to exhaust their claims of the United States' liability based on the thinning crew's actions and of the Forest Service's negligence for not having a fire engine accompany the masticator. See Ohlsen Reply at 32-33. The Court takes each argument in turn and divides the claim about fire suppression activity into two claims: (i) Isleta Pueblo fire suppression activity; and (ii) the Forest Service's fire suppression activity.

First, the Court concludes that the Ohlsen Plaintiffs properly exhausted their claim based on Isleta Pueblo's fire suppression activities. "[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'" Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d at 884 (quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853). The allegations

that the thinning crew "did not attempt to suppress the fire in its very small incipient state" alert the United States that the Ohlsen Plaintiffs are bringing claims about the thinning crew's actions after the fire ignited. Ohlsen Notice of Claim ¶¶ 11, at 4. This language speaks immediately to the Ohlsen Plaintiffs' claim that Isleta Pueblo was not in a position to and did not suppress the Dog Head Fire. See Ohlsen Plaintiffs' Claim List at 1. The Court concludes, accordingly, that the exhaustion requirements do not bar this claim.

Second, the Court concludes that the Ohlsen Plaintiffs have not exhausted their claim that the Forest Service failed to suppress the Dog Head Fire. See Ohlsen Plaintiffs' Claim List at 1. In their Ohlsen Response, the Ohlsen Plaintiffs indicate that they allege that "[t]he Project and agency named in this claim did not reasonably employ a competent and careful contractor to perform the work and did not train, direct, or supervise the contractor and crew with regard to fire danger evaluation, proper operational procedures, fire prevention, and fire suppression procedures and techniques," and that "[t]he fire suppression equipment required by the Project and agency named in this claim to be on hand during the mastication operation was insufficient to suppress the fire in its incipient state." Ohlsen Notice of Claim ¶¶ 11-12, at 4. These negligent supervision and training allegations do not alert the United States of the Ohlsen Plaintiffs' claim that the Forest Service "failed to and were not in the position to suppress the fire at the time of ignition, and the USFS is complicit in that failure because of its prior knowledge of the waist deep slash." Ohlsen Plaintiffs' Claim List at 1. Nothing indicates that the Ohlsen Plaintiffs seek to hold the United States liable for the Forest Service's direct actions responding to the Dog Head Fire. Throughout the Ohlsen Notice of Claim, the Ohlsen Plaintiffs differentiate the "Project" or "agency named in this claim" from "the contractor" and "crew." Ohlsen Notice of Claim ¶¶ 4-14, at 3-4. The Ohlsen

Plaintiffs' allegations about the thinning crew's failure to suppress the fire do not, therefore, give the United States' notice of the Ohlsen Plaintiffs' claim about the Forest Service's fire suppression actions. The Court will dismiss, accordingly, this claim for lack of jurisdiction.

Third, the Court concludes that, other than the claim about Isleta Pueblo's fire suppression activities, the Ohlsen Plaintiffs did not exhaust their administrative remedies for their claims of the United States' liability for Isleta Pueblo's actions. The Ohlsen Plaintiffs make clear in the Ohlsen Notice of Claim their intent to bring claims against any actor involved in directing the project which included the thinning activities on Unit 4; they write:

> (4)     The mastication operations were being conducted by a crew of a contractor which had been contracted to perform fuel reduction work by one or more agencies or partners involved in or by a partnership known as the "Isleta Collaborative Landscape Restoration Project," of which the USFS, NCRS, BIA, and other groups and agencies are participants and partners. . . . The agency which is the subject of this claim directed and/or approved the conduct which caused the fire and each agency was the agent of the other partners and participants in the Project and/or of the Project itself acting within the scope of its agency.

Ohlsen Notice of Claim at 3. As discussed supra, throughout the Ohlsen Notice of Claim, however, the Ohlsen Plaintiffs differentiate the "Project" or "agency named in this claim" from "the contractor" and "crew." Ohlsen Notice of Claim ¶¶ 4-14, at 3-4. The Ohlsen Plaintiffs consistently use words like directed, approved, supervised, or trained to describe the Forest Service's relationship with the contractor and thinning crew. See Ohlsen Notice of Claim ¶¶ 4-14, at 3-4. Although "the FTCA's notice requirements should not be interpreted inflexibly," Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853, nothing in this language alerts the United States to the Ohlsen Plaintiffs' claim of the United States' liability for the thinning crew's actions. Cf. Kikumura v. Osagie, 461 F.3d 1269, 1302 (10th Cir. 2006)(finding, in a situation the reverse of the allegations here, where an inmate filed a notice of claim alleging an employee's

direct liability, the claim "fail[ed] to mention the possibility that his injuries were caused by the inadequate training and supervision" so did not exhaust the plaintiff's administrative remedies).

Fourth, the Court concludes that the Ohlsen Plaintiffs properly exhausted their administrative remedies for the claims of the Forest Service's negligence in not having a fire engine accompanying the masticator. The Ohlsen Plaintiffs allege in the Ohlsen Notice of Claim that "[t]he fire suppression equipment required by the Project and agency named in this claim to be on hand during the mastication operation was insufficient to suppress the fire in its incipient state." Ohlsen Notice of Claim ¶ 12, at 4. Nothing in this statement restricts the Ohlsen Plaintiffs' claim to the fire equipment that the Forest Service required that the thinning crew have "on hand." Ohlsen Notice of Claim ¶ 12, at 4. Sufficient fire suppression equipment might include a fire engine. The Court views, accordingly, this claim as properly exhausted.

The Ohlsen Plaintiffs' arguments about their knowledge at the time they filed the Ohlsen Notice of Claim do not persuade the Court to reach a different conclusion. See March 8 A.M. Tr. at 92:7-15 (Dow); id. at 93:12-17 (Dow); id. at 92:16-93:9 (Dow). The Court agrees with the United States that the Tenth Circuit has directed district courts to disregard a plaintiff's knowledge at the notice of claim's filing. See Lopez v. United States, 823 F.3d 970, 977 (10th Cir. 2016)(explaining that a district court should not have considered in deeming the exhaustion requirement satisfied that, when filing the notice of claim, the plaintiff's counsel did not have the information to allege a claim based on a doctor's competence). The Tenth Circuit emphasizes that the exhaustion inquiry should focus on whether the plaintiff notified the United States of the claim. See Lopez v. United States, 823 F.3d at 977. Accordingly, the Court concludes that it lacks jurisdiction over the Ohlsen Plaintiffs' claim that the Forest Service "failed to and [was] not in the

position to suppress the fire at the time of ignition, and . . . is complicit in [Isleta Pueblo's failure to suppress the fire] because of its prior knowledge of the waist deep slash," Ohlsen Plaintiffs' Claim List at 1, and the Ohlsen Plaintiffs' claims of the United States' liability for the thinning crew's actions, because the Ohlsen Plaintiffs failed to exhaust their administrative remedies for those claims. The Court has jurisdiction over the other claims about Isleta Pueblo's fire suppression activities and about the Forest Service's failure to have a fire engine at Unit 4 during mastication.

### B. C DE BACA AND CIANCHETTI ONLY PROPERLY EXHAUSTED THEIR CLAIM ABOUT THE THINNING CREW'S EQUIPMENT.

The Court concludes that C De Baca and Cianchetti properly exhausted two of the three claims that the United States challenges for failure to exhaust. The Court addresses each claim separately. First, the Court concludes that C De Baca and Cianchetti exhausted their claim that

> Defendant [(the Forest Service, and its employees and agents)] failed to ensure that the equipment, its employees, and agents used was in good working order, and/or was the proper equipment for the terrain. The equipment used in the hot, dry forested area of National Forest System lands created sparking, causing a fire.

C De Baca Motion at 1. The C De Baca Notice of Claim and the Cianchetti Notice of Claim notify the United States to investigate all aspects of the thinning crew's masticator operations on June 14, 2016; in the C De Baca Notice of Claim and the Cianchetti Notice of Claim, C De Baca and Cianchetti allege: "As a result of negligent operation of equipment, and/or negligence in commencing fire suppression activity, the Dogs Head Fire commenced and spread." C De Baca Notice of Claim at 4; Cianchetti Notice of Claim at 4. This C De Baca Notice of Claim and Cianchetti Notice of Claim statement encompasses all concerns whether, on June 14, 2016, the thinning crew was operating a masticator that it should not have operated in Unit 4, such as a

masticator that masticator was sparking -- either from its technical problems or from the challenging terrain -- such that the thinning crew should have stopped operation.

The cases that the United States cites are inapposite. In <u>Benally v. United States</u>, the Tenth Circuit concluded that a plaintiff did not properly exhaust a claim where the plaintiff brought a claim based on events -- post-operative care -- that constituted a series of occurrences apart from the discrete event -- the initial operation -- alleged in the notice of claim. <u>See</u> 735 F. App'x at 488. Likewise, in <u>Gallegos v. Wood</u>, No. CIV 13-1055 JB/KBM, 2017 WL 3701866 (D.N.M. Aug. 25, 2017)(Browning, J.), the notice of claim referenced a single episode during an individual's hospitalization and did not reference events post-hospitalization. <u>See</u> 2017 WL 3701866, at *40. The Court concluded that this notice of claim did not properly exhaust a claim based onpost-hospitalization events. <u>See</u> 2017 WL 3701866, at *40. Here, on the other hand, C De Baca and Cianchetti allege actions in the C De Baca Complaint and Cianchetti Complaint that are not separate, discrete events from the C De Baca Notice of Claim' and the Cianchetti Notice of Claim' allegation. <u>Cf.</u> <u>Gallegos v. Wood</u>, 2015 WL 6393561, at *21 (describing cases like <u>Benally v. United States</u> and <u>Gallegos v. Wood</u> as involving attempts "to unify a series of separate incidents"). On June 14, 2016, the masticator operator should have checked that and watched that the masticator functioned properly.

In <u>Barnes v. United States</u>, 707 F. App'x 512, 516 (10th Cir. 2017)(unpublished), the plaintiff raised claims

> under the FTCA for negligent supervision and training, false arrest, wrongful imprisonment, abuse of process, malicious prosecution, and intentional infliction of emotional distress. She allege[d] that [Brandon] McFadden[, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives] falsely testified at her trial and instructed another person to do the same, resulting in her illegal arrest, prosecution, and imprisonment.

Barnes v. United States, 707 F. App'x at 516. In her notice of claim, she mentioned only McFadden, so the Tenth Circuit concluded that she did not exhaust her administrative remedies for her other claims. Barnes v. United States, 707 F. App'x at 516. Here, on the other hand, the allegation of negligent operation of equipment puts the United States on notice to investigate all aspects of the masticator's operation on June 14, 2016, including whether the operation should not have occurred or should have ceased because of masticator's condition or the rocky ground. The Court determines, therefore, that C De Baca and Cianchetti exhausted this claim.

C De Baca and Cianchetti did not, however, exhaust their claims based on the Forest Service's "failure to provide proper fire extinguishment tools; and failure to manage the undergrowth of the forest area where the fire occurred." C De Baca Motion at 1. Although having the proper fire extinguishment tools relates to fire suppression, "negligence in commencing fire suppression activity" alerts the United States to investigate how the Forest Service responded to the fire's ignition, and not to inquire what equipment the Forest Service provided the thinning crew. C De Baca Motion at 1. Likewise, nothing in the C De Baca Notice of Claim and the Cianchetti Notice of Claim mention Unit 4's undergrowth or the Forest Service's silviculture decisions. The United States had no notice to investigate such concerns. The Court concludes, accordingly, that C De Baca and Cianchetti did not properly exhaust these claims.

### C.    THE SAIS PLAINTIFFS ONLY PROPERLY EXHAUSTED THEIR CLAIM ABOUT THE THINNING CREW'S EQUIPMENT.

The Court concludes that the Sais Plaintiffs similarly only properly exhausted their claim about the thinning crew's equipment. As the Sais Plaintiffs bring the same claims that C De Baca and Cianchetti bring, and the Sais Plaintiffs' Notice of Claim likewise is the same as the C De

Baca Notice of Claim and the Cianchetti Notice of Claim, compare C De Baca Motion at 1, C De Baca Notice of Claim at 4, and Cianchetti Notice of Claim at 4, with Sais Motion at 11-12, and Sais Plaintiffs' Notice of Claim at 1, the Court reaches the same decisions regarding those claims as it discusses supra for C De Baca's and Cianchetti's claims.  Regarding the Sais Plaintiffs' remaining claims that the Forest Service "was negligent in leaving slash and boles produced by forest thinning operations on the ground where the fire started; conducting forest thinning operations under unreasonable conditions; failing to employ competent individuals to perform the work; and failing to train, instruct, direct, or supervise the Pueblo crews," Sais Motion at 11-12, the Court concludes that the Sais Plaintiffs failed to exhaust their administrative remedies.  The Sais Plaintiffs' Notice of Claim alerts the United States to investigate the operation of the masticator and the initial response to the Dog Head Fire: "As a result of negligent operation of equipment, and/or negligence in commencing fire suppression activity, the Dogs Head Fire commenced and spread."  Sais Plaintiffs Notice of Claim at 1.  Nothing in this claim relates to the Forest Service's silviculture decisions or to the Forest Service's hiring of, supervision of, or training of Isleta Pueblo and the thinning crew.  See Kikumura v. Osagie, 461 F.3d at 1302 (concluding that, where an inmate filed a notice of claim alleging an employee's direct liability, the claim "fail[ed] to mention the possibility that his injuries were caused by the inadequate training and supervision" and did not exhaust administrative remedies).  Accordingly, the Court concludes that the Sais Plaintiffs only exhausted their claim that the Forest Service did not ensure that the masticator was in good condition and the appropriate equipment for Unit 4.  The Court dismisses the other claims for lack of subject-matter jurisdiction.  Hence, The Court grants the Independent Contractor Motion, the Ohlsen Motion, the C De Baca Motion, the Sais Motion, the

Motion to Strike, and the Supplemental Briefing Motion, and sustains in part and overrules in part the Ohlsen Plaintiffs' objections in the First Objections, the Fox Objections, the Motion to Strike, and the Motion to Strike Reply.

**IT IS ORDERED** that: (i) the United States of America's Motion to Dismiss Claims for Lack of Subject Matter Jurisdiction or In the Alternative for Partial Summary Judgment, and Memorandums in Support, filed November 2, 2018 (Doc. 60), is granted; (ii) all claims in the Ohlsen Plaintiffs' Second Amended Complaint, filed August 15, 2018 (Doc. 38)("Ohlsen Complaint"), Plaintiff's Amended Complaint for Negligence Arising Under the Federal Tort Claims Act, filed November 27, 2017 (Doc. 5)("C De Baca Complaint"), Cianchetti v. United States of America, No. CIV 17-1186 JB\KK, Plaintiff's Complaint for Negligence Arising Under the Federal Tort Claims Act, filed December 1, 2017 (Doc. 1)("Cianchetti Complaint"); Sais v. United States, No. CIV 18-0496 JB\JHR, Plaintiff's Amended Complaint for Negligence Arising under the Federal Tort Claims Act, filed November 6, 2018 (Doc. 16)("Sais Complaint"); Homesite Indemnity Co. v. United States, No. CIV 17-1233 JB\KK, Complaint ¶ 25, at 5, filed December 15, 2017 (Doc. 1)("Homesite Complaint"), and State Farm Fire and Casualty Co. v. United States, No. CIV 18-0367 JB\KK, Nature of Action, filed April 19, 2018 (Doc. 1)("State Farm Complaint")), based on the Pueblo of Isleta's and the thinning crew's actions are dismissed without prejudice; (iii) the United States of America's Motion to Dismiss *Ohlsen* Plaintiffs' Second Amended Complaint Due to Lack of Subject Matter Jurisdiction, filed November 2, 2018 (Doc. 62)("Ohlsen Motion"), is granted in part and denied in part; (iv) the Defendant United States

of America's requests in the Ohlsen Motion that the Court dismiss the Ohlsen Plaintiffs'[222] res ipsa loquitur and non-delegable duty claims are granted; (v) the United States' request in the Ohlsen Motion that the Court dismiss the Ohlsen Complaint's claims alleging the United States Forest Service actions because the discretionary function exception divests the Court of subject-matter jurisdiction is granted; (v) the United States' request in the Ohlsen Motion that the Court dismiss, for the Ohlsen Plaintiffs' failure to exhaust, the Ohlsen Complaint's claim based on the Forest Service's fire suppression activities is granted; (viii) the United States' requests in the Reply in Support of the United States of America's Motion to Dismiss *Ohlsen* Plaintiffs' Second Amended Complaint Due to Lack of Subject Matter Jurisdiction (Doc. 62)("Ohlsen Reply"), that the Court dismiss the Ohlsen Complaint's claims based on the United States' liability for Isleta Pueblo's actions, other than the claim about Isleta Pueblo's fire suppression activities, is granted; (ix) the

---

[222]The Ohlsen Plaintiffs are:

Gerald Ohlsen individually and as trustee of The Ohlsen Family Trust u/d/1/1/91, The Ohlsen Family Trust II u/d/1/1/93, The Ohlsen Family Trust III u/d/11/1/94, and the Los Pinos II Limited Partnership, Janet Youngberg, James Farrington, Thomas and Caryn De Rochie, William and Donna McClellan IV, Nancy Higgins, Vernon and Binda Cobb, Christine Wood, Vested Interest, LLC., Donald Giles and Bonnie Long, Thomas and Diane Bragg, Ernest and Frieda Vigil, Brad Wosick, Johnny and Deanne Luna, Marlene Barber, Michael McDaniel and Paula Wiltgen, Martin Valencia, Anthony and Janice Farrington individually and as trustees of The Anthony S and Janice L Farrington Revocable Living Trust, The Michael Farrington Trust, and The Lisa Farrington Trust, Ken and Debbie Kugler, David and Diana Lee individually and as trustee of the Lee Revocable Trust, Joseph and Alica Lee, Ed and Katherine Mortensen, David Coulter, Matt and Marie Urban, Olympia Salas individually and as trustee of The Olympia E Salas Revocable Trust, Michael and Michelle Chavez, Ronald Douglass, Brett Myrick, Rena Shepherd, Manuel Urban, Michael and Herrera Medwin, and Mary Ann Solis.

Ohlsen Plaintiffs' Second Amended Complaint ¶ 5, at 2-3, filed August 15, 2018 (Doc. 38).

United States' request in the Ohlsen Reply that the Court dismiss the Ohlsen Complaint's claim based on the Forest Service's negligence in not having a fire engine accompanying the masticator is denied; (x) the Ohlsen Complaint is dismissed without prejudice, because, with the independent contractor exception, the dismissal of the Ohlsen Plaintiffs' res ipsa loquitur and non-delegable duty claims, the discretionary function exception, and the Ohlsen Plaintiffs' failure to exhaust administrative remedies, the Court lacks subject-matter jurisdiction over any claims in the Ohlsen Complaint; (xi) the United States of America's Motion to Dismiss Plaintiff Catherine C De Baca's Amended Complaint and Gary Cianchetti's Complaint Due to Lack of Subject Matter Jurisdiction, filed November 5, 2018 (Doc. 64)("C De Baca Motion"), is granted in part and denied in part; (xii) the United States' request in the C De Baca Motion that the Court dismiss the C De Baca Complaint's and the Cianchetti Complaint's claims based on the Forest Service's actions because the discretionary function exception divests the Court of subject-matter jurisdiction is granted; (xiii) the United States' request in the C De Baca Motion that the Court dismiss, based on Plaintiffs Catherine C De Baca's and Gary Cianchetti's failures to exhaust administrative remedies, the C De Baca Complaint's and the Cianchetti Complaint's claim that the Forest Service failed to ensure that its equipment was in good working order and was the appropriate equipment for the terrain is denied; (xiv) the United States' requests in the C De Baca Motion that the Court dismiss, for C De Baca and Cianchetti's failures to exhaust administrative remedies, the C De Baca Complaint's and the Cianchetti Complaint's claims that the Forest Service did not provide proper fire extinguishment tools and failed to manage the undergrowth in Treatment Unit 4 are granted; (xv) the C De Baca Complaint and the Cianchetti Complaint are dismissed without prejudice, because, with the independent contractor exception, the discretionary function exception, and C

De Baca's and Cianchetti's failures to exhaust their administrative remedies, the Court lacks subject-matter jurisdiction over any claims in the C De Baca Complaint and the Cianchetti Complaint; (xvi) the United States of America's Motion to Dismiss Plaintiffs Sais, Apodaca and Sorroche's Amended Complaint Due to Lack of Subject Matter Jurisdiction, filed November 15, 2018 (Doc. 80)("Sais Motion"), is granted in part and denied in part; (xvii) the United States' request in the Sais Motion that the Court dismiss the Sais Complaint's claims based on the Forest Service's actions because the discretionary function exception divests the Court of subject-matter jurisdiction is granted; (xviii) the United States' request in the Sais Motion that the Court dismiss, based on Plaintiffs David Sais, Lucille Sais, Tomás Apodaca, Christine Apodaca, and Jeff Sorroche (the "Sais Plaintiffs") failures to exhaust administrative remedies, the Sais Complaint's claims in that the Forest Service failed to ensure that its equipment was in good working order and was the appropriate equipment for the terrain is denied; (xix) the United States' requests in the Sais Motion that the Court dismiss, based on the Sais Plaintiffs' failures to exhaust administrative remedies, the Sais Complaint's claims that the Forest Service did not provide the proper fire extinguishment tools, failed to manage the undergrowth in the area where the Dog Head Fire ignited, and "was negligent in leaving slash and boles produced by forest thinning operations on the ground where the fire started; conducting forest thinning operations under unreasonable conditions; failing to employ competent individuals to perform the work; and failing to train, instruct, direct, or supervise the Pueblo crews," Sais Motion at 11-12, are granted; (xx) the Sais Complaint is dismissed without prejudice, because, with the independent contractor exception, the discretionary function exception, and the Sais Plaintiffs' failures to exhaust their administrative remedies, the Court lacks subject-matter jurisdiction over any claims in the Sais Complaint;

(xxi) the United States' request in the Ohlsen Motion as adopted against Plaintiffs State Farm Fire & Casualty Company, Safeco Insurance Company of America and Allstate Insurance Company (the "State Farm Plaintiffs") and Plaintiff Homesite Indemnity Company that the Court dismiss the State Farm Complaint's and the Homesite Complaint's claims based on the Forest Service's actions because the discretionary function exception divests the Court of subject-matter jurisdiction over those claims is granted; (xxii) the United States' requests in the Ohlsen Motion as adopted against the State Farm Plaintiffs that the Court dismiss State Farm Complaint's res ipsa loquitur and non-delegable duty claims is granted; (xxiii) the Homesite Complaint and the State Farm Complaint are dismissed without prejudice, because, with the independent contractor exception, the discretionary function exception, and the dismissal of the State Farm Complaint's res ipsa loquitur and non-delegable duty claims, the Court lacks subject-matter jurisdiction over any claims in the Homesite Complaint and the State Farm Complaint; (xxiv) the Ohlsen Plaintiffs' requests in the *Ohlsen* Plaintiffs' Objections to Evidence Submitted by the United States in Support of Its Motion to Dismiss or for Summary Judgment, filed December 20, 2018 (Doc. 102)("First Objections"), the *Ohlsen* Plaintiffs' Objections to Third Declaration of Ian Fox, filed March 5, 2019 (Doc. 134)("Fox Objections"), the *Ohlsen* Plaintiffs' Motion to Strike Portions of Third Declaration of Ian Fox [Doc. 125] or, Alternatively, Motion for Leave to file Surreply, filed March 5, 2019 (Doc. 135)("Motion to Strike"), and the *Ohlsen* Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion to Strike Portions of Third Declaration of Ian Fox [Doc. 125] or, Alternatively, Motion for Leave to File Surreply, filed April 23, 2019 (Doc. 171)("Motion to Strike Reply"), are sustained in part and overruled in part; (xxv) the Court makes individualized rulings on the Ohlsen Plaintiffs' evidentiary objections in the First Objections, the Fox Objections, the

Motion to Strike, and the Motion to Strike Reply throughout this Memorandum Opinion and Order's Factual Background and Analysis sections; (xxvi) the Ohlsen Plaintiffs' request in the Motion to Strike to file surreply addressing the Third Declaration of Ian Fox (dated February 27, 2019), filed February 28, 2019 (Doc. 125)("Third Fox Decl."), is granted; (xxvii) the United States may file a surreply in response to the Ohlsen Plaintiffs surreply on the Third Fox Decl.; (xxviii) the Defendants' Motion for Leave to File Supplemental Brief, filed May 8, 2019 (Doc. 179), is granted; (xxix) the Defendants' Motion for Leave to File Supplemental Brief, filed May 8, 2019 (Doc. 179)("Supplemental Briefing Motion"), is granted; and (xxx) the Plaintiffs may file supplemental briefing in response to the United States' briefing filed pursuant to the grant of the Supplemental Briefing Motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

A. Blair Dunn
Dori Ellen Richards
Western Agriculture Resource and Business Advocates, LLP
Albuquerque, New Mexico

 *Attorneys for Plaintiffs Catherine C De Baca, Gary Cianchetti, David Lloyd Sais, Lucille*
 *Sais, Thomas Apodaca, Christine Apodaca*

Thomas L. Tosdal
Tosdal Law Firm
Solana Beach, California

--and--

Mark Dow
Mary Louise Boelcke
Bauman Dow & Stambaugh, P.C.
Albuquerque, New Mexico

*Attorneys for Plaintiffs Gerald Ohlsen, Janet Youngberg, James Farrington, Thomas Derochie, Caryn DeRochie, William McClellan, Donna McClellan, Nancy Higgins, Vernon Cobb, Binda Cobb, Christine Wood, Mark Thompson, Donald Giles, Bonnie Long, Thomas Bragg, Diane Bragg, Ernest Vigil, Frieda Vigil, Brad Wosick, Johnny Luna, Deanne Luna, Marlene Barber, Michael McDaniel, Paula Wilten, Martin Valencia, Vested Interest, LLC, Janice Farrington, Ken Kugler, Debbie Kugler, David Lee, Diana Lee, Joseph Lee, Alicia Lee, Ed Mortensen, Katherine Mortensen, David Coulter, Matt Urban, Marie Urban, and Olympia Salas*

Mark Grotefeld
Kevin Scott Mosley
Anooj Manu Thakrar
Cristina Gonzalez
Grotefeld Hoffmann
Austin, Texas

 *Attorneys for Plaintiffs State Farm Fire and Casualty Co., Safeco Insurance Company of America, and Allstate Insurance Company*

Vladislav Kushnir
VB Kushnir, LLC
Trevose, Pennsylvania

 *Attorney for Plaintiff Homesite Indemnity Company*

John C. Anderson
 United States Attorney
Roberto D. Ortega
Ruth Fuess Keegan
Christopher F. Jeu
Cassandra C. Currie
 Assistant United States Attorneys
United States Attorneys Office
Albuquerque, New Mexico

 *Attorneys for Defendants United States of America, United States Department of Agriculture, United States Forest Service, Natural Resources Conservation Service, Bureau of Indian Affairs, and FNU Does*